1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  WAYNE SNODGRASS, State Bar #148137
   SHERRI SOKELAND KAISER, State Bar #197986
3  Deputy City Attorneys
   1 Dr. Carlton B. Goodlett Place
4  City Hall, Room 234
   San Francisco, California 94102-4682
5  Telephone:    (415) 554-4691
   Facsimile:    (415) 554-4747
6  E-Mail:       sherri.kaiser@sfgov.org

7  Attorneys for Defendants
   CITY AND COUNTY OF SAN FRANCISCO,
8  MAYOR EDWIN LEE and ACTING POLICE CHIEF
   JEFF GODOWN
9

10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13

14  ESPANOLA JACKSON, PAUL COLVIN,          Case No. C09-2143 RS
    THOMAS BOYER, LARRY BARSETTI,
15  DAVID GOLDEN, NOEMI MARGARET            NOTICE OF MOTION AND MOTION TO
    ROBINSON, NATIONAL RIFLE               DISMISS AMENDED COMPLAINT FOR
16  ASSOCIATION OF AMERICA, INC. SAN        LACK OF JURISDICTION; SUPPORTING
    FRANCISCO VETERAN POLICE               MEMORANDUM OF POINTS AND
17  OFFICERS ASOCIATION,                    AUTHORITIES
                                            Fed. R. Civ. P. 12(b)(1)
18                  Plaintiffs,
                                            Hearing Date:    April 7, 2011
19         vs.                              Time:            1:30 p.m.
                                            Place:           Courtroom 3, 17th Floor
20  CITY AND COUNTY OF SAN
    FRANCISCO, MAYOR EDWIN LEE, in his
21  official capacity; ACTING POLICE CHIEF
    JEFF GODOWN, in his official capacity, and
22  Does 1-10,

23                  Defendants.

24

25

26

27

28

MOTION TO DISMISS AM. COMPLAINT
USDC No. C09-2143 RS                                    n:\govlit\li2011\091333\00680106.doc

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

NOTICE AND MOTION ................................................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED ................................................................ 1

INTRODUCTION ............................................................................................................ 2

BACKGROUND .............................................................................................................. 3

      A.     Police Code Section 4512:  The Safe Storage Law ..................................... 3

      B.     Section 613.10(g):  Prohibiting Sale Of Particularly Dangerous
            Ammunition ................................................................................................. 4

      C.     Section 1290:  The Discharge Ban ............................................................. 5

ARGUMENT ................................................................................................................... 7

I.     TO AVOID DISMISSAL, PLAINTIFFS MUST MAKE PLAUSIBLE
        FACTUAL ALLEGATIONS THAT ESTABLISH SUBJECT MATTER
        JURISDICTION IN THIS COURT. ............................................................ 7

II.    THE ALLEGATIONS IN THE AMENDED COMPLAINT FAIL TO
        DEMONSTRATE THAT ANY OF THE PLAINTIFFS HAS STANDING TO
        CHALLENGE ANY OF THE ORDINANCES. ......................................... 8

      A.     Plaintiffs' Allegations Fail To Demonstrate The "Irreducible
            Constitutional Minimum" Of An Injury-In-Fact. ...................................... 8

      B.     The Plaintiffs Lack Standing To Challenge Section 613.10(g) For The
            Further Reason That They Are Barred From Asserting The Rights Of
            Third Parties Who Face No Obstacle To Defending Their Own Rights
            Should They So Choose. ............................................................................. 13

III.   THE ALLEGATIONS IN THE AMENDED COMPLAINT ALSO FAIL TO
        ESTABLISH THAT PLAINTIFFS' CLAIMS ARE RIPE. ........................ 14

CONCLUSION ............................................................................................................... 16

APPENDIX A ................................................................................................................. 17

### TABLE OF AUTHORITIES

**Federal Cases**

*Alaska Airlines, Inc. v. City of Long Beach*
  951 F.2d 977 (9th Cir. 1991) ...................................................................14

*Ashcroft v. Iqbal*
  129 S.Ct. 1937 (2009)...............................................................................7

*Ashwander v. Tennessee Valley Authority*
  297 U.S. 288 (1936)..................................................................................13

*Bell Atlantic Corp. v. Twombly*
  550 U.S. 544 (2007)...................................................................................7

*Carey v. Population Services International*
  431 U.S. 678 (1977)..............................................................................9, 10

*District of Columbia v. Heller,*
  128 S.Ct. 2783 (2008)................................................................................2

*Laird v. Tatum*
  408 U.S. 1 (1972).....................................................................................11

*LSO, Ltd. v. Stroh*
  205 F.3d 1146 (9th Cir. 2000) ................................................................12

*Lujan v. Defenders of Wildlife*
  504 U.S. 555 (1992)...................................................................................8

*McDonald v. Chicago*
  130 S.Ct. 3020 (2010)................................................................................2

*Planned Parenthood of Idaho v. Wasden*
  376 F.3d 908 (9th Cir. 2004) ....................................................................9

*Poe v. Ullman*
  367 U.S. 497 (1961).................................................................7, 10, 13, 15

*Portman v. County of Santa Clara*
  995 F.2d 898 (9th Cir. 1993) ..................................................................14

*Powers v. Ohio*
  499 U.S. 400 (1991)..................................................................................14

*Renne v. Geary*
  501 U.S. 312 (1991)...................................................................................7

*Rincon Band of Mission Indians v. County of San Diego*
  495 F.2d 1 (9th Cir. 1974) ......................................................................10

*Sabri v. United States*
    541 U.S. 600 (2004) ..............................................................................16

*San Diego Gun Rights Comm. v. Reno*
    98 F.3d 1121 (9th Cir. 1996) ...................................7, 9, 11, 12, 14, 16

*Singleton v. Wulff*
    428 U.S. 106 (1976) ..............................................................................13

*State of Georgia v. Stanton*
    6 Wall. 50 (1868) ..................................................................................15

*Steffel v. Thompson*
    415 U.S. 452 (1974) .....................................................................9, 10, 11

*Stoianoff v. State of Montana*
    695 F.2d 1214 (9th Cir. 1983) ...........................................................9, 11

*Thomas v. Anchorage Equal Rights Comm'n*
    220 F.3d 1134 (9th Cir. 2000) ..............................................................15

*United States v. Raines*
    362 U.S. 17 (1960) ................................................................................16

*Washington State Grange v. Washington State Republican Party*
    552 U.S. 442 (2008) ..............................................................................16

*Wauchope v. U.S. Dept. of State*
    985 F.2d 1407 (9th Cir. 1993) ..............................................................14

*Wolfson v. Brammer*
    616 F.3d 1045 (9th Cir. 2010) .........................................................13, 15

*Yazoo & Mississippi Valley R. Co. v. Jackson Vinegar Co.*
    226 U.S. 217 (1912) ..............................................................................16

**Constitutional Provisions**
U.S. Constitution, Article III ..........................................................2, 8, 9

**Rules**
Federal Rules of Civil Procedure
    Rule 12(b)(1) ......................................................................................1, 7

**State Statutes & Codes**
Cal. Civ. Code § 50 .....................................................................................6

Cal. Penal Code § 197 .................................................................................6

**San Francisco Statutes, Codes & Ordinances**
San Francisco Police Code
    § 613.10(g) ...............................................................................4, 5, 13, 14

§ 613.10(g)(1) ...................................................................................................................... 5

§ 613.10(g)(3) ...................................................................................................................... 5

§ 1290 ............................................................................................................................... 5, 6

§ 4512 .................................................................................................................................. 3

§ 4512(a) ............................................................................................................................. 4

## NOTICE AND MOTION

TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:   Defendants hereby move to dismiss the amended complaint in this matter in its entirety under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction.  The hearing on the motion will take place at 1:30 p.m. on Thursday, April 7, 2011, or as soon thereafter as may be heard, before the Honorable Richard Seeborg in Courtroom 3 on the 17th Floor of the United States District Court, San Francisco Division, 450 Golden Gate Ave., San Francisco, California.  The motion shall be based on this notice of motion and motion, the supporting memorandum of points and authorities and request for judicial notice, the arguments of counsel at the hearing, and any such further matters as the Court deems appropriate.

## STATEMENT OF ISSUES TO BE DECIDED

1) Have plaintiffs established standing to make a pre-enforcement challenge to local laws under the Second Amendment when they do not allege that they have are being prosecuted or face a genuine threat of imminent prosecution under those laws, and do not allege any incidents of prior enforcement of these laws against anyone, much less homeowners who used their weapons in self-defense in their home?

2) Have plaintiffs established standing to challenge a permit condition that prohibits licensed, San Francisco firearms dealers from selling certain types of particularly dangerous ammunition when they do not allege that they themselves are licensed San Francisco gun dealers, that any such gun dealer sells prohibited ammunition or has had its permit revoked on the basis of prohibited ammunition sales, that any such gun dealer even wishes to sell such ammunition, or that a gun dealer affected by the challenged permit condition faces an obstacle to enforcing its own rights?

3) Do plaintiffs' allegations indicate that their federal constitutional claims are ripe for adjudication when their allegations establish at most the existence of the challenged laws and a general statement of the government's intent to enforce or failure to disavow them; plaintiffs' allegations fail to demonstrate that any state authority has rendered an opinion construing the challenged municipal laws to reach the conduct in which plaintiffs would like to engage; and plaintiffs themselves face no penalties or other hardship should a licensed gun dealer violate the ammunition sales prohibition?

### INTRODUCTION

Defining the limits of the government's ability to regulate guns and ammunition consonant with the Second Amendment poses difficult constitutional questions that should be answered carefully, little by little, and not until they become unavoidable. Only in this way can federal courts avoid intruding on the powers of the coordinate branches of government and the States, powers they must guard as zealously as their own. And only in this way can courts draw on the fullest possible measure of prior courts' wisdom and experience to guide and inform their own judgments. Thus, the ripeness and standing constraints imposed on federal jurisdiction by Article III of the United States Constitution help safeguard federal courts from issuing erroneous and premature decisions. Where courts confront constitutional questions, these jurisdictional limitations take on heightened importance, because avoidable mistakes injure not only the parties before the court and all of the parties to follow, but the fabric of democratic self-government itself. This is why courts always avoid constitutional questions if they can, whether because of a constitution limit on their jurisdiction or simply as a matter of prudence.

These considerations require the Court to dismiss plaintiffs' amended complaint as an inadequately crystallized, primarily ideological dispute over which it lacks jurisdiction. Fewer than three years ago, for the first time in the Nation's history, the Supreme Court announced that each individual has a Second Amendment right to bear arms: specifically, the right to keep and use handguns in the home for self-defense. *District of Columbia v. Heller*, 128 S.Ct. 2783 (2008). And still less than a year ago, it further determined that the Second Amendment applies to states and localities as well as the federal government. *McDonald v. Chicago,* 130 S.Ct. 3020, 3050 (2010) (plurality opinion). In the giddy aftermath of these decisions, the National Rifle Association and others with similar interests appear have embarked on a campaign to identify gun-control laws around the country that they could challenge under *Heller* to cleanse them from the books. Or at least that's the most likely explanation for this complaint.

Because as it turns out, the three local gun-related ordinances that the plaintiffs challenge here have never been enforced, or even inspired any threat of enforcement, against any of the plaintiffs. One of the laws doesn't even apply to private citizens like the plaintiffs and can never be enforced

against them.  They have no personal stake in the matter, no crystallized injury-in-fact that confers

them with standing to present their concerns to the Court.  And the constitutional questions they pose

can wait to be answered another day, because any claim that plaintiffs may eventually suffer injury are

entirely speculative, and such injuries may never occur.

These standing and ripeness requirements separate those plaintiffs with a real story to tell and

the pressing need to tell it from the ideologues, who can offer only abstract talking points and policy

preferences.  Plaintiffs' failure to allege that they have suffered any concrete and actual or imminent

injury from the ordinances they challenge reveals them as cause-based crusaders.  While our form of

government thrives on that sort of civic engagement in the public square, the Constitution closes the

door to generalized and premature assertions of rights in federal court.  This Court should dismiss their

complaint for lack of subject matter jurisdiction.

## BACKGROUND

On August 24, 2009, the National Rifle Association (NRA), along with six San Francisco

residents and the San Francisco Veteran Police Officers Association (SFVPOA) (collectively,

plaintiffs), filed an amended complaint against the City and County of San Francisco, its Mayor, and

its Chief of Police (collectively, defendants or the City).[1]  Plaintiffs' suit is a pre-enforcement

challenge to three local gun-related ordinances, each of which they allege to be in violation of the

Second Amendment, and one of which they also believe to be unconstitutionally vague.

### A.      Police Code Section 4512:  The Safe Storage Law

The first challenged ordinance, San Francisco Police Code section 4512,[2] is designed to

prevent accidental shootings in the home.  While it allows San Francisco residents to carry unsecured

handguns freely in their homes at any time, the safe storage law requires the gun owner to apply a

trigger lock or store the handgun in a locked container when it is not under such direct, personal

---

[1] The individuals holding those offices have changed since this suit was filed and may change again before it is resolved.  Given that the Mayor and the Chief of Police are sued in their official capacities only, the City stipulates that the proper defendant at any given time is the Mayor or Chief of Police then in office.

[2] All further statutory references are to the San Francisco Police Code unless otherwise indicated. The full text of each San Francisco ordinance referenced in this Memorandum has been reproduced in Appendix A for the convenience of the Court.

control. Failure to do so may be charged as a misdemeanor. *See* App. A, § 4512(a). Plaintiffs assert that the safe storage law violates the Second Amendment because a handgun that must be locked when it is stored will necessarily be unavailable in a self-defense emergency for the time it takes to unlock it. Am. Compl. ¶ 50. They assert that the Second Amendment does not tolerate any obstacle between them and their loaded handguns, no matter how quick and simple to remove, and no matter whether it protects against unintended uses of that firearm by children or others.

But there are no allegations in the amended complaint to indicate that any of the plaintiffs has ever been prosecuted or faced a threat of prosecution under the safe storage law. Plaintiff David Golden alleges that "a city official came unannounced to [his] San Francisco residence and demanded to see his firearms – firearms he legally possessed – to determine whether they were properly stored in a locked box" (Am. Compl. ¶ 53), but he provides no further detail nor any allegation that this episode resulted in his prosecution or a genuine threat of prosecution under the safe storage law.

Instead, plaintiffs collectively allege that they "presently intend to keep their handguns within the home in a manner ready for immediate use to protect themselves and their families from attack by violent intruders, as is their right under the Second Amendment," and that they "forthwith would keep their handguns operable within the home . . . if this court declared the ordinances challenged herein void and unenforceable." Am. Compl. ¶¶ 22-23. They also assert that an unnamed City official at some point publicly declared to someone in some context that City intended to enforce the law: "Just because you legally possess a gun in the sanctity of your locked home doesn't mean that we're not going to walk into that home and check to see if you're being responsible and safe in the way you conduct your affairs." *Id*. at ¶ 52. They complete their jurisdictional allegations by asserting that the City has not, to their knowledge at least, disavowed that intent or instructed its police officers not to enforce the law. *Id*. at ¶ 55.

**B.   Section 613.10(g):  Prohibiting Sale Of Particularly Dangerous Ammunition**

Next, plaintiffs challenge Section 613.10(g), which prohibits a licensed San Francisco gun shop from selling, leasing or otherwise transferring to another person ammunition that has been enhanced to increase the damage it inflicts on the human body, such as fragmenting bullets, expanding bullets, bullets that project shot or disperse barbs into the body, or other bullets that serve no sporting

purpose.  *See* § 613.10(g)(1)-(3).  Plaintiffs claim that the Second Amendment prohibits the City from restricting the sale of this unusually dangerous ammunition because it is "the very type of ammunition most suitable for self-defense."  Am. Compl. ¶ 58.  According to the plaintiffs, hollow-point and similar ammunition "has greater stopping power and is less likely to pass through the intended target or ricochet off hard surfaces and injure innocent bystanders."  *Id.*  They assert that the Second Amendment prohibits the City from restricting the sale of ammunition that enhances the safety of a shooter firing in self-defense, even though such ammunition would be equally available to aggressors, and even though the safety of the shooter comes at the expense of more grievous injury to the victim.

Once again, there is no allegation that the City has enforced Section 613.10(g) against any of the plaintiffs, nor that they currently face a genuine threat of enforcement.  Indeed, the ordinance is a permit condition that only applies to licensed San Francisco firearms dealers, and plaintiffs do not allege that they hold such permits or intend to apply for them.  And while plaintiffs do make a conclusory allegation that they "are prohibited from purchasing" the covered types of ammunition (Am. Compl. ¶ 7), they do not allege facts demonstrating that any of them tried but was unable to purchase such ammunition, nor that any of them has been prevented from possessing or using it in self-defense.  They also do not claim that any of them has suffered injury to their person, family or property from a pass-through or ricocheting bullet, whether or not discharged in self-defense.

Plaintiffs raise a second challenge to Section 613.10(g), alleging that it is unconstitutionally vague and overbroad in violation of their Fifth Amendment right to due process, particularly in regard to its ban on selling ammunition that "serves no sporting purpose."  Am. Compl. ¶¶ 69-73.  Although plaintiffs claim that Section 613.10(g) is defective both "on its face and as applied" (*id.*, ¶ 69), as with all of their other claims, they nowhere allege facts showing that it has ever been applied, to them or to anyone else.

C.      **Section 1290:  The Discharge Ban**

Finally, plaintiffs also challenge a somewhat unusual section of the Police Code that, in one breath, prohibits firing both firearms and fireworks.  *See* App. A, § 1290 ("No person or persons, firm, company, corporation or association shall fire or discharge any firearms or fireworks of any kind or description" within City limits.)  This section and its precursors hail back more than a century, to at

least 1892, when the provision was Section 22 of General Order 1,587 of the Board of Supervisors. *See* Request for Judicial Notice, Ex. A at 35-36.  Old Section 22 delimited a central area in the City bounded by various City streets within which one could not discharge any "firearms, firecrackers, bombs or fireworks." *Id.* at 36.  This prohibited shooting-bombing-exploding area also extended to within "300 yards from any public highway, or upon any ground set apart as a cemetery or public square, or park, or within three hundred yards of any dwelling-house." *Id.*  Even so, every person explicitly retained the right to "shoot[] destructive animals within or upon his own inclosure." *Id.* at 36.  As the City has changed over time and non-residential areas have dwindled to the vanishing point (leaving, one hopes, only pets, raccoons and rodents to maraud in people's yards), these historical limitations on the scope and extent of Section 22 have fallen away.  Modern Section 1290 appears as an unelaborated ban on all firearms discharges within the City.

Despite the fact that there clearly are implied exceptions to the discharge ban, at least to keep the police from arresting each other at the S.F.P.D. firing range, Plaintiffs charge that Section 1290 violates the Second Amendment because it lacks an explicit exception for discharging handguns inside the home for lawful self-defense purposes.  Am. Compl. ¶ 64.  Given the well-established statutory right under state law to use reasonable force to protect one's person, property, and the person of another (Cal. Civ. Code § 50), and state law's express declaration that killing a home invader in self-defense is a justifiable homicide (Cal. Penal Code § 197), the notion that Section 1290 is ever enforced against anyone for discharging a handgun in the home in self-defense seems implausible on its face.

As one would expect, and as with the other challenged ordinances, plaintiffs nowhere allege that the City has prosecuted or stands ready to prosecute any one of them for violating Section 1290, nor even that any State authority has construed Section 1290 to reach discharges in the home for self-defense.  And while they do claim that "San Francisco police have advised homeowners, who have otherwise lawfully discharged firearms in self-defense to thwart late-night criminal attacks in their homes, that they would be arrested for discharging their firearms unless they stated the discharges were 'accidental' . . . and that there was no exception for discharges within one's home while defending oneself from criminal attack," (*id.* ¶ 65), they do not allege that the City has ever arrested or

prosecuted anyone under Section 1290 for discharging a firearm in self-defense under any circumstances, much less a homeowner fending off a home invader in the middle of the night.

Taken singly or together, the allegations in the amended complaint fail to establish that the plaintiffs have standing to bring any of their claims, or that the claims are ripe for judicial consideration. Because the plaintiffs bear the burden of affirmatively establishing both before this Court can hear their claims, the City now brings this motion to dismiss the amended complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## ARGUMENT

### I.   TO AVOID DISMISSAL, PLAINTIFFS MUST MAKE PLAUSIBLE FACTUAL ALLEGATIONS THAT ESTABLISH SUBJECT MATTER JURISDICTION IN THIS COURT.

Federal Rule of Civil Procedure 12(b)(1) provides that a complaint must be dismissed if the plaintiffs' allegations fail to establish subject matter jurisdiction. "The federal courts are presumed to lack jurisdiction, unless the contrary appears affirmatively from the record." *San Diego Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) ("*Gun Rights Committee*") (internal quotation marks omitted). The burden of establishing standing rests solely on the plaintiffs. *Renne v. Geary*, 501 U.S. 312, 316 (1991).

For purposes of a motion to dismiss, this Court must accept as true all factual allegations that have a plausibility of truth, but not mere "conclusory statements" or implausible allegations. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In fact, federal courts have long recognized their inherent power—and, in constitutional cases, duty—to independently assess not only the legal sufficiency, but also the likely truth of jurisdictional allegations. *See Poe v. Ullman*, 367 U.S. 497, 501 (1961). Just as legally insufficient allegations fail to establish federal jurisdiction, implausible allegations are "too fragile a foundation for indulging in constitutional adjudication." *Id.*

Therefore, to survive a motion to dismiss under Rule 12(b)(1), a complaint raising constitutional questions, like this one, must contain plausible factual allegations that together establish federal subject-matter jurisdiction. For each of the many independent reasons that follow, the amended complaint in this case comes nowhere close.

---

MOTION TO DISMISS AM. COMPLAINT                    7                    n:\govlit\li2011\091333\00680106.doc
USDC No. C09-2143 RS

## II. THE ALLEGATIONS IN THE AMENDED COMPLAINT FAIL TO DEMONSTRATE THAT ANY OF THE PLAINTIFFS HAS STANDING TO CHALLENGE ANY OF THE ORDINANCES.

Under Article III of the U.S. Constitution, the judicial branch is empowered to adjudicate only "Cases" or "Controversies."  U.S. Const. Art. III, § 1.  This limitation defines and safeguards the separation of powers between the judiciary and coordinate branches of government by preventing such intrusions as advisory opinions or preemptive injunctions, and it necessarily circumscribes the kinds of disputes the federal courts can hear and resolve.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Although portions of the standing doctrine reflect prudential considerations rather than constitutional requirements, "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Id.*  Accordingly, a plaintiff who seeks to invoke the jurisdiction of a federal court must demonstrate standing.

In this case, the standing analysis reveals that the plaintiffs are entirely unsuited to press their asserted claims, and the Court must dismiss the amended complaint.

### A. Plaintiffs' Allegations Fail To Demonstrate The "Irreducible Constitutional Minimum" Of An Injury-In-Fact.

One "irreducible constitutional minimum of standing" is injury-in-fact, which requires every plaintiff to show "an invasion of a legally protected interest which is (a) concrete and particularized … and (b) 'actual or imminent, not "conjectural" or "hypothetical." ' "  *Id.* (citations omitted).  A "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way."  *Id.* at 561 n.1.  If the plaintiff has not yet suffered an actual injury from the complained-of law or conduct, then "imminent" injury may also be sufficient to show injury-in-fact.  But imminence exists only where a plaintiff can show that the injury is "*certainly* impending" or has a "high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all."  *Id.* at 564 n.2 (emphasis in original) (internal quotation marks and citation omitted).

In the context of constitutional challenges to the City's ordinances, these standing concerns require the plaintiff to show that he or she is actually being prosecuted or, at a minimum, has received

a personalized threat of imminent prosecution under the challenged law.[3] "The mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy with the meaning of Article III." *Stoianoff v. State of Montana*, 695 F.2d 1214, 1223 (9th Cir. 1983). Nor does standing flow from a simple "ideological" interest in seeing the statute invalidated. *Planned Parenthood of Idaho v. Wasden*, 376 F.3d 908, 918 (9th Cir. 2004).

But at the other end of the spectrum, neither is it necessary "that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights," so long as he or she faces a genuine, individualized threat of imminent prosecution. *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Steffel challenged the constitutionality of a criminal trespass statute that the police had twice invoked to stop him from passing out handbills against the Vietnam War in front of a local shopping mall. Unwilling to be arrested, Steffel complied both times the police warned him to stop handbilling or face arrest and prosecution. In contrast, his companion on the second occasion continued handbilling—and was promptly arrested and arraigned on a criminal trespass charge. Moreover, during the course of the litigation, the defendant officials stipulated that Steffel would likewise be arrested for criminal trespass if were ever to ignore the order to cease handbilling. *Id.* at 455-56. On these facts, the Court found a sufficiently concrete and imminent threat of prosecution under the challenged law to support standing. *Id.* at 459.

In *Carey v. Population Services International*, 431 U.S. 678, 682 (1977), plaintiff Population Planning Associates, Inc. (PPA), a mail-order contraceptives distributor in North Carolina, brought a challenge to the constitutionality of a New York criminal statute prohibiting the display, distribution, and advertising of contraceptives under certain circumstances. PPA did business in New York and routinely violated the New York restrictions. Various officials became aware of these violations, and PPA received two letters documenting violations and requesting future compliance. The second letter also threatened PPA, warning that its continued failure to comply would result in the matter being

---

[3] This rule has been relaxed for First Amendment and abortion-related cases due to their unique considerations. See, *e.g.*, *Doe v. Bolton*, 410 U.S. 179 (1973) (abortion); *Planned Parenthood of Idaho v. Wasden*, 376 F.3d 908, 917 (9th Cir. 2004) (same); *Washington Mercantile Assoc. v. Williams*, 733 F.2d 687, 688-89 (9th Cir. 1984) (First Amendment). Under controlling Ninth Circuit precedent, it is stringently applied to other types of constitutional claims. *See San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121, 1129-30 (9th Cir. 1996).

referred to the Attorney General for legal action.  In addition, PPA received a report from inspectors at

the State Board of Pharmacy that documented that PPA had violated the law and been warned to stop.

*See id.* at 682-83.  In reliance on *Steffel*, the Court found these threats of enforcement sufficiently

imminent to support standing, even though no legal action had yet been initiated against PPA.  *Id*. at

684 n.3.

In *Poe*, in contrast, the Supreme Court denied standing to plaintiffs seeking a similar

declaration that a Connecticut statute prohibiting the use of contraceptives was invalid.  367 U.S. at

501.  Unlike PPA and its history of actual tangles with officials, the plaintiffs in *Poe* alleged only that

the State's Attorney had declared that he intended to prosecute any violations of Connecticut law,

including the use of and advice concerning contraceptives.  *Id*. at 500-01.  The Court suggested that

such an allegation is insufficient to show standing, because it lacks the required immediacy.  *Id*. at

501.  In addition, the Court noted that the challenged statute, which had been on the books since 1879,

appeared to have gone unenforced but for a single prosecution twenty years earlier, even though it was

common knowledge that contraceptives were widely sold at Connecticut drug stores.  *Id*. at 501-02.  In

the Court's view, the fact that the statute had so rarely been used made it highly improbable that the

plaintiffs faced an imminent threat of prosecution.  *Id*. at 502.

And in *Rincon Band of Mission Indians v. County of San Diego*, 495 F.2d 1, 4 (9th Cir. 1974),

plaintiffs were again denied standing for lack of an imminent threat of enforcement.  The Band sought

a declaratory judgment and injunction against the San Diego County gambling ordinance so that it

could establish a card room on its reservation.  To show injury-in-fact, the Band alleged that (1) even

before its decision to open a card room, several tribe members had been arrested for impromptu

gambling at their annual fiestas; (2) Sheriff's Department representatives had informed individual tribe

members that gambling on the reservation was illegal, and that the San Diego gambling ordinance

would be enforced against the Band; and (3) after the Band requested a written statement of the

county's view of its jurisdiction to enforce the gambling ordinance on reservation land, the Sheriff

responded that all gambling laws would be enforced on the reservation to the same extent as in the rest

of the county.  *Id*. at 3-4.   On these facts, and in reliance on *Poe v. Ullman*, the court concluded that

the threat alleged by the Band "is clearly of a general nature."  *Id*. at 4.  Even though the threats were

directed to plaintiff, and even though they addressed the very law under dispute, at bottom they boiled down to nothing more the assertion that the authorities would enforce the law.  That proposition is insufficient to confer standing as a matter of law.  *Id.*

These decisions and the distinctions they draw together provide the foundation for a case with facts so similar to the case at bar that it directly controls this lawsuit.  In *Gun Rights Committee*, 98 F.3d 1121, three individual and two associational plaintiffs brought a facial constitutional challenge to a federal law banning semiautomatic assault weapons and large capacity ammunition feeding devices for a period of ten years.  *Id.* at 1124.  Like the plaintiffs here, none of the individual plaintiffs had been arrested or prosecuted under the challenged law, though they wished to engage in conduct it prohibited and intended to do so.  *Id.*

As the cases just discussed required, the Ninth Circuit held that the *Gun Rights Committee* plaintiffs lacked standing.  Rejecting their argument that they were injured simply by "the chilling of their desire and ability" to engage in the prohibited conduct (*id.* at 1129), the Court explained that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  *See id.*, quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) and further citing to *Steffel*, 415 U.S. at 476 (Stewart, J. concurring).  The only remaining allegations of harm left to the *Gun Rights Committee* plaintiffs boiled down to complaints about the "mere existence of a statute, which may or may not ever be applied to [them]."  *Gun Rights Committee*, 98 F.3d at 1121.  That, admonished the court, cannot alone support standing.  *Id.* (citing *Stoianoff*, 695 F.2d at 1223); *see also id.* ("[T]he mere possibility of criminal sanctions applying does not of itself create a case or controversy" (internal quotation marks omitted)).  Further, the *Gun Rights Committee* plaintiffs, like the plaintiffs in this case, also failed to establish that they had received a specific threat of an imminent intent to prosecute them.[4]  *Id.* at 1127-28.  And they did not even show

---

[4] In the case at bar, Plaintiff David Golden makes a conclusory allegation that he "has been harassed by city agencies regarding the manner of storage of firearms in his home," (Am. Compl. ¶ 18), but there is no indication that this "harassment" took the form of a specific threat by law enforcement officials to prosecute Mr. Golden for a violation of the safe storage law.  He further alleges that, "[o]n May 6, 2009, a city official came unannounced to [his] San Francisco residence and demanded to see his firearms – firearms he legally possessed – to determine whether they were properly stored in a locked box."  *Id.* ¶ 53.  This account likewise fails to establish a constitutionally sufficient injury.  Whether the unnamed city official is a member of law enforcement and the reason why the official wanted to make sure any guns were secured remain unexplained.  Indeed, Golden

1  a history of past enforcement, which might have bolstered their argument that they faced a strong

2  governmental response if they violated the law.  *Id.*

3      *Gun Rights Committee,* and its holding that the plaintiffs lacked standing to challenge a gun

4  law that they believed to be unconstitutional and intended someday to violate, directly controls this

5  case.  Indeed, the plaintiffs here make an even weaker showing of any sort of enforcement-related

6  injury, because they allege that they intend to obey the laws unless and until this Court invalidates

7  them.  Thus, it is hardly surprising that none of them alleges having received a specific warning from a

8  prosecuting authority that they were personally in danger of prosecution on the basis of their actions.

9  Nor do plaintiffs allege any history of past enforcement of the challenged laws against others who are

10 similarly situated, which might lend some credibility to a plaintiff's fear of prosecution in a case in

11 which the plaintiff's conduct might trigger efforts to enforce the law (*see LSO, Ltd. v. Stroh*, 205 F.3d

12 1146, 1155 (9th Cir. 2000))—though this clearly is not such a case.  Rather, they allege only their

13 information and belief that the City has not affirmatively disavowed an intent to enforce the

14 challenged laws.  While this might be a consideration in a First Amendment case, in which the simple

15 chilling effect of possible enforcement "tilts [the inquiry] dramatically toward a finding of standing,"

16 (*id.*), once again this is not such a case.

17      In sum, because the plaintiffs in this case do not allege facts that demonstrate—or even hint—

18 that they have suffered an actual injury-in-fact, face a genuine threat of imminent prosecution, or ever

19 intend to violate the challenged laws, they are in an even worse position to establish standing than the

20 plaintiffs in *Gun Rights Committee*, who utterly failed to do so.  Of that case, the Ninth Circuit acidly

21 remarked:  "[I]t would be difficult to imagine a circumstance under which plaintiffs could have made a

22 more feeble showing of injury-in-fact."  98 F.3d at 1133.  Of course, they have not yet had the

23 opportunity to review the amended complaint in this case.

24

25

---

26 does not even allege that the safe storage law was at issue, and it is quite possible that the official
   simply wanted to assure him- or herself that Golden did not have a loaded weapon in easy reach
27 during the visit.  But one thing is crystal clear: the critical allegations for purposes of standing—that
   Golden violated the safe storage law and was arrested, prosecuted, or threatened with prosecution in
28 the wake of this incident—are all missing.

**B.** **The Plaintiffs Lack Standing To Challenge Section 613.10(g) For The Further Reason That They Are Barred From Asserting The Rights Of Third Parties Who Face No Obstacle To Defending Their Own Rights Should They So Choose.**

Prudential concerns as well as constitutional requirements must guide the courts in evaluating standing when a plaintiff makes a constitutional challenge without showing at least a threat of imminent prosecution under the statute. *See Poe*, 367 U.S. at 502. The Supreme Court has "developed, for its own governance in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing on a large part of all the constitutional questions pressed upon it for decision." *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 341, 346 (1936). The doctrine of prudential standing requires the court "to consider . . . whether the alleged injury is more than a mere generalized grievance, whether the plaintiff is asserting her own rights or the rights of third parties, and whether the claim falls within the zone of interests to be protected or regulated by the constitutional guarantee in question." *Wolfson v. Brammer*, 616 F.3d 1045, 1056 (9th Cir. 2010) (internal quotation marks omitted). Here, in addition to improperly asserting merely generalized grievances in relation to all of their claims, *see* Section II.A, *supra*, plaintiffs lack prudential standing because they improperly assert the rights of third parties in their challenge to Section 613.10(g).

Although the Constitution does not strictly bar third-party standing, it is strongly disfavored on a prudential basis because, like the other circumstances and practices over which federal courts do not accept jurisdiction, it threatens to bring issues to the Court that do not necessarily require decision. *See Singleton v. Wulff*, 428 U.S. 106, 113-14 (1976) ("[T]he courts should not adjudicate [a third party's constitutional] rights unnecessarily, and it may be that the holders of those rights . . . do not wish to assert them.")

Thus, without a showing that persons whose rights are directly affected by a challenged law face "some genuine obstacle" to asserting their own rights, third party standing is foreclosed. *Id*. at 115-16. So, for example, a physician may assert the rights of women seeking abortions, because they face significant obstacles in unavoidable mootness and public exposure of their most private decisions if they seek to assert their rights themselves. *Id*. at 117. Likewise, a criminal defendant may assert the equal protection rights of potential jurors dismissed on the basis of race, because the dismissed jurors themselves will not have sufficient information or incentive to do so on their own. *Powers v. Ohio*,

499 U.S. 400, 414-15 (1991).  And the foreign-born children of American mothers were allowed to assert their mothers' equal protection rights to have their children awarded U.S. passports on the same terms as foreign-born children of American fathers, because the challenged law applied only to children born before 1932, and by the time the claim was brought the mothers had died.  *Wauchope v. U.S. Dept. of State*, 985 F.2d 1407, 1411 (9th Cir. 1993).

In this case, plaintiffs seek to assert the rights of San Francisco gun dealers to sell particular types of ammunition that plaintiffs believe are entitled to Second Amendment protection, and those gun dealers' due process rights to clarity in defining ammunition with "no sporting purpose."  But they do not explain why no gun dealers themselves are among the plaintiffs in case, nor do they identify any "genuine obstacle" local gun dealers might face to asserting their own rights directly.  And certainly none is evident.

Accordingly, plaintiffs lack third-party standing to challenge Section 613.10(g), and this is an independent reason why their constitutional challenges to the unusually dangerous ammunition regulation must be dismissed.  To echo another of the Ninth Circuit's observations in *Gun Rights Committee*, "[t]o grant plaintiffs standing to challenge the constitutionality of the [gun law] in the circumstances of this case would … throw all prudential caution to the wind."  98 F.3d at 1133.  Indeed.

## III.   THE ALLEGATIONS IN THE AMENDED COMPLAINT ALSO FAIL TO ESTABLISH THAT PLAINTIFFS' CLAIMS ARE RIPE.

The ripeness doctrine has developed "to separate matters that are premature for review because the injury is speculative and may never occur from those cases that are appropriate for federal court action."  *Portman v. County of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993).  "[W]here it is impossible to know whether a party will ever be found to have violated a statute, or how, if such a violation is found, those charged with enforcing the statute will respond, any challenge to the statute is premature."  *Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 986 (9th Cir. 1991).  Accordingly, where, as in this case, the plaintiffs have not established a sufficiently imminent injury, the standing and ripeness inquiries largely overlap, and both independently bar access to the federal

1    courthouse. *Wolfson*, 616 F.3d at 1058; *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134,

2    1138-39 (9th Cir. 2000) (en banc).

3        In addition, there is a separate, prudential component of the ripeness doctrine that plaintiffs

4    must satisfy to establish federal jurisdiction.  Prudential ripeness focuses on two elements: the fitness

5    of the issues for judicial decision and the hardship to the parties of withholding consideration.  *See*

6    *Wolfson*, 616 F.3d at 1060.  As with constitutional standing, prudential standing, and constitutional

7    ripeness, plaintiffs' allegations fail to establish that their claims satisfy the prudential ripeness

8    doctrine.

9        In particular, the allegations demonstrate that this case is extraordinarily unfit for judicial

10   consideration, because rendering an opinion would require the Court to make difficult constitutional

11   decisions of first impression in a vacuum, with precious little precedent and no facts at all to guide it.

12   The need to avoid the unnecessary consideration of constitutional challenges is particularly acute

13   where, as here, a federal court is asked to strike down a legislative enactment.  The power to nullify an

14   act of a coordinate branch of government, and sometimes the act of a separate if also subordinate

15   government, must be wielded cautiously.  That is why a federal court " 'can have no right to

16   pronounce an abstract opinion upon the constitutionality of a State law.  Such law must be brought

17   into actual or threatened operation upon rights properly falling under judicial cognizance, or a remedy

18   is not to be had here.' "  *Poe*, 367 U.S. at 504 (quoting *State of Georgia v. Stanton*, 6 Wall. 50, 75

19   (1868)).  For this prudential reason, courts should wait to adjudicate such constitutional questions until

20   the decision becomes one of "strict[] necessity," that is, "only at the instance of one who is himself

21   immediately harmed, or immediately threatened with harm, by the challenged action."  *Id.* at 504

22   (internal quotation marks omitted); *id.* at 506 (chiding that a party cannot "invoke the power of [the]

23   Court to obtain constitutional rulings in advance of necessity.").  *Id*. at 506.

24        Moreover, federal courts are routinely cautioned to use their prudential power to avoid

25   adjudicating facial constitutional challenges, particularly where the plaintiff fails to elaborate how the

26   statute has caused any concrete injury that could focus the court's analysis.  According to the Supreme

27   Court,

28

> [F]acial challenges are best when infrequent.  See, *e.g.*, *United States v. Raines*,
> 362 U.S. 17, 22 (1960) (laws should not be invalidated by 'reference to
> hypothetical cases'); *Yazoo & Mississippi Valley R. Co. v. Jackson Vinegar Co.*,
> 226 U.S. 217, 219-220 (1912) (same).  Although passing on the validity of a
> law wholesale may be efficient in the abstract, any gain is often offset by losing
> the lessons taught by the particular, to which common law method normally
> looks.  Facial adjudication carries too much promise of 'premature
> interpretatio[n] of statutes' on the basis of factually barebones records. *Raines*,
> *supra*, at 22.

*Sabri v. United States,* 541 U.S. 600, 609-610 (2004); *see also Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) ("Exercising judicial restraint in a facial challenge frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy." (internal quotation marks omitted).)

That is certainly the case here.  Without any sort of factual record to guide the Court, it is impossible to know how the challenged ordinances operate outside the realm of hypothetical vagaries. As the *Gun Rights Committee* Court concluded its opinion, "to hold that [plaintiffs'] claims are ripe for adjudication in the absence of any factual context would essentially transform district courts into the general repository of citizen complaints against every legislative action."  98 F.3d at 1133.  This is yet another reason why the Court must dismiss the amended complaint.

## CONCLUSION

For all of the reasons set forth above, the City respectfully requests that the Court dismiss the amended complaint in its entirety for lack of subject matter jurisdiction.

Dated: February 10, 2011

DENNIS J. HERRERA
City Attorney
WAYNE SNODGRASS
SHERRI SOKELAND KAISER
Deputy City Attorneys


By:  s/Sherri Kaiser
SHERRI SOKELAND KAISER

Attorneys for Defendants City and County of San
Francisco, Mayor Edwin Lee and Acting Police Chief
Jeff Godown

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**APPENDIX A**

(Challenged provisions of the San Francisco Police Code.)

\* \* \*

**ARTICLE 9:  MISCELLANEOUS CONDUCT REGULATIONS**
**SEC. 613.10. - LICENSE—CONDITIONS.**

In addition to all other requirements and conditions stated in this Article, each license shall be subject to all of the following conditions, the breach of any of which shall be sufficient cause for revocation of the license by the Chief of Police:

(a)   The business shall be carried on only in the building located at the street address shown on the license, except as otherwise authorized under Section 12071(b)(1) of the California Penal Code.

(b)   The licensee shall comply with Sections 12073, 12074, 12076, 12077 and 12082 of the California Penal Code, to the extent that the provisions remain in effect.

(c)   The licensee shall not deliver any pistol or revolver to a purchaser earlier than 10 days after the application for the purchase, lease or transfer, unless otherwise provided by State or federal law.

(d)   The licensee shall not deliver any firearm to a purchaser, lessee or other transferee unless the firearm is unloaded and securely wrapped or unloaded in a locked container.

(e)   The licensee shall not deliver any firearm, firearm ammunition, or firearm ammunition component to a purchaser, lessee or other transferee unless the purchaser, lessee or other transferee presents clear evidence of his or her identity and age to the seller. As used in this Section, "clear evidence of his or her identity and age" includes, but is not limited to, a motor vehicle operator's license, a State identification card, an armed forces identification card, an employment identification card which contains the bearer's signature and photograph, or any similar documentation which provides the seller reasonable assurance of the identity and age of the purchaser.

(f)   The licensee shall not display in any part of the premises where it can be readily seen from outside the premises, any firearm, firearm ammunition or imitation thereof, or placard advertising the sale or other transfer thereof, other than a sign identifying the name of the business.

(g)   The licensee shall not sell, lease or otherwise transfer to any person any ammunition that:

(1)   Serves no sporting purpose;

(2)   Is designed to expand upon impact and utilize the jacket, shot or materials embedded within the jacket or shot to project or disperse barbs or other objects that are intended to increase the damage to a human body or other target (including, but not limited to, Winchester Black Talon, Speer Gold Dot, Federal Hydra-Shok, Hornady XTP, Eldorado Starfire, Hollow Point Ammunition and Remington Golden Sabre ammunition; or

(3)   Is designed to fragment upon impact (including, but not limited to, Black Rhino bullets and Glaser Safety Slugs).

This subsection does not apply to conventional hollow-point ammunition with a solid lead core when the purchase is made for official law enforcement purposes and the purchaser is authorized to make such a purchase by the director of a public law enforcement agency such as the Chief of the San Francisco Police Department or the Sheriff of the City and County of San Francisco.

(h)   The licensee shall post within the licensee's premises a notice stating the following: "THE CALIFORNIA PENAL CODE PROHIBITS THE SALE OF FIREARMS OR FIREARMS AMMUNITION TO PERSONS UNDER THE AGE OF 18, AND FURTHER GENERALLY PROHIBITS THE SALE OF A PISTOL, REVOLVER, OR FIREARM CAPABLE OF BEING CONCEALED UPON THE PERSON TO ANY PERSON UNDER THE AGE OF 21."

The posted notice shall be in a conspicuous location, shall be in 36 point type block letters in black ink on a white background, and shall be located so that the notice

1  can easily and clearly be seen by all prospective purchasers of firearms and firearm ammunition.

2  **(i)**     The licensee shall not sell, lease or otherwise transfer any ultracompact firearm except as authorized by Section 613.10-2 or any 50 caliber firearm or 50 caliber cartridge except as authorized by Section 613.10-1.

3

4  **(j)**     Any license issued pursuant to this Article shall be subject to such additional conditions as the Chief of Police finds are reasonably related to the purpose of this Article.

5  **(k)**     The licensee shall comply with the requirements of Section 613.10-3 and shall, in addition, post the appropriate notice or notices, as specified below, in a conspicuous location at the entrance of the licensee's premises (or at the entrance to the separate room or, enclosure pursuant to Section 613.10-3(c)). Such notice shall be in 36 point type block letters in black ink on a white background.

6

7  **(1)**     Licensees that sell, lease or otherwise transfer firearms, other than firearms capable of being concealed on the person, shall post a notice at the entrance to the premises (or at the entrance to the separate room or enclosure pursuant to Section 613.10-3(c)) stating the following:

8

9

10  "THE SAN FRANCISCO POLICE CODE REQUIRES THAT FIREARMS DEALERS PROHIBIT ENTRY BY PERSONS UNDER AGE 18, AND FURTHER PROHIBITS ENTRY BY (1) PERSONS CONVICTED OF A VIOLENT OFFENSE WHO ARE PROHIBITED FROM POSSESSING FIREARMS PURSUANT TO CALIFORNIA PENAL CODE SECTIONS 12021 OR 12021.1; AND (2) PERSONS WHO ARE CURRENTLY PROHIBITED FROM POSSESSING FIREARMS BECAUSE THEY HAVE BEEN ADJUDICATED AS MENTALLY DISORDERED, NOT GUILTY BY REASON OF INSANITY OR INCOMPETENT TO STAND TRIAL."

11

12

13

14

15  **(2)**     Licensees that sell, lease or otherwise transfer firearms capable of being concealed on the person shall post a notice at the entrance to the premises (or at the entrance to the separate room or enclosure containing such firearms pursuant to Section 613.10-3(c)) stating the following:

16

17  "THE SAN FRANCISCO POLICE CODE REQUIRES THAT FIREARMS DEALERS PROHIBIT ENTRY BY PERSONS UNDER AGE 21, AND FURTHER PROHIBITS ENTRY BY (1) PERSONS CONVICTED OF A VIOLENT OFFENSE WHO ARE PROHIBITED FROM POSSESSING FIREARMS PURSUANT TO CALIFORNIA PENAL CODE SECTIONS 12021 OR 12021.1; AND (2) PERSONS WHO ARE CURRENTLY PROHIBITED FROM POSSESSING FIREARMS BECAUSE THEY HAVE BEEN ADJUDICATED AS MENTALLY DISORDERED, NOT GUILTY BY REASON OF INSANITY OR INCOMPETENT TO STAND TRIAL."

18

19

20

21

22  **(3)**     Licensees that sell, lease or otherwise transfer firearms capable of being concealed on the person, but who keep such firearms in a separate room or enclosure in accordance with Section 613.10-3(c) shall post the notice required by paragraph (1) at the entrance to the premises or separate room or enclosure containing firearms that are not capable of being concealed on the person, and shall post the notice required by paragraph (2) at the entrance to the separate room or enclosure containing firearms capable of being concealed on the person.

23

24

25

26  **(l)**     The licensee shall notify the Chief of Police of the name, age and address of, and submit a certificate of eligibility under Penal Code Section 12071 from the State Department of Justice for, any person not listed on the licensee's application under Section 613.2(a)(1) who will be given access to, or control of, workplace firearms, firearm ammunition, or firearm ammunition components. The licensee shall submit the

27

28

1    required information and certificate within 10 days of such person being employed or
     otherwise being given access to, or control over workplace firearms, firearm
2    ammunition, or firearm ammunition components.

   **(m)**    Within the first five business days of April and October of each year, licensees shall
3    cause a physical inventory to be taken that includes a listing of each firearm held by the
     licensee by make, model, and serial number, together with a listing of each firearm the
4    licensee has sold since the last inventory period. In addition, the inventory shall include
     a listing of each firearm lost or stolen that is required to be reported pursuant to Penal
5    Code Section 12071(b)(13). Licensees shall maintain a copy of the inventory on the
     premises for which the license was issued. Immediately upon completion of the
6    inventory, licensees shall forward a copy of the inventory to the address specified by
     the Chief of Police, by such means as specified by the Chief of Police. With each copy
7    of the inventory, licensees shall include an affidavit signed by the licensee (or, if the
     licensee is not a natural person, by an officer, general manager, or other principal of the
8    licensee) stating under penalty of perjury that within the first five business days of that
     April or October, as the case may be, the signer personally confirmed the presence of
9    the firearms reported on the inventory.

10   *(Added by Ord. 91-94, App. 2/25/94; amended by Ord. 290-95, App. 9/1/95; Ord. 225-96, App. 6/11/96; Ord. 283-96,
     App. 7/3/96; Ord. 62-00, File No. 000197, App. 4/14/2000; Ord. 242-00, File No. 000950, App. 10/27/2000; Ord. 260-04,
11   File No. 031932, App. 11/4/2004; Ord. 192-07, File No. 070684, App. 8/1/2007)*

12   S.F., Cal., Police Code art. 9, § 613.10 (2010), *available at*
     http://library.municode.com/HTML/14140/level1/ART9MICORE.html#ART9MICORE_S613.10LIO
13   N.

14                                              *  *  *

**ARTICLE 17: MISCELLANEOUS LICENSE REGULATIONS**
**SEC. 1290. - DISCHARGE OF FIREARMS PROHIBITED—FIREWORKS.**

No person or persons, firm, company, corporation or association shall fire or discharge any firearms or fireworks of any kind or description within the limits of the City and County of San Francisco.

Provided, however, that public displays of fireworks may be given with the joint written consent of the Fire Marshal and the Chief of Police.

*(Added by Ord. 1.075, App. 10/11/38)*

S.F., Cal., Police Code art. 17, § 1290 (2010), *available at* http://library.municode.com/HTML/14140/level1/ART17MILIRE.html#ART17MILIRE_S1290DIFIPRIR.

\* \* \*

**ARTICLE 45:  FIREARMS AND WEAPONS VIOLENCE PREVENTION ORDINANCE**

**SEC. 4512. - HANDGUNS LOCATED IN A RESIDENCE TO BE KEPT IN A LOCKED CONTAINER OR DISABLED WITH A TRIGGER LOCK.**

(a)  **Prohibition.** No person shall keep a handgun within a residence owned or controlled by that person unless the handgun is stored in a locked container or disabled with a trigger lock that has been approved by the California Department of Justice.

(b)  **Definitions.**

    (1)  "Residence." As used in this Section, "residence" is any structure intended or used for human habitation including but not limited to houses, condominiums, rooms, in law units, motels, hotels, SRO's, time-shares, recreational and other vehicles where human habitation occurs.

    (2)  "Locked container." As used in this Section, "locked container" means a secure container which is fully enclosed and locked by a padlock, key lock, combination lock or similar locking device.

    (3)  "Handgun." As used in this Section, "handgun" means any pistol, revolver, or other firearm that is capable of being concealed upon the person, designed to be used as a weapon, capable of expelling a projectile by the force of any explosion or other form of combustion, and has a barrel less than 16 inches in length.

    (4)  "Trigger lock." As used in this Section, a "trigger lock" means a trigger lock that is listed in the California Department of Justice's list of approved firearms safety devices and that is identified as appropriate for that handgun by reference to either the manufacturer and model of the handgun or to the physical characteristics of the handgun that match those listed on the roster for use with the device under Penal Code Section 12088(d).

(c)  **Exceptions.** This Section shall not apply in the following circumstances:

    (1)  The handgun is carried on the person of an individual over the age of 18.

    (2)  The handgun is under the control of a person who is a peace officer under Penal Code Section 830.

(d)  **Lost or Stolen Handguns.** In order to encourage reports to law enforcement agencies of lost or stolen handguns pursuant to San Francisco Police Code Section 616, a person who files a report with a law enforcement agency notifying the agency that a handgun has been lost or stolen shall not be subject to prosecution for violation of Section 4512 (a) above.

(e)  **Penalty.** Every violation of this Section shall constitute a misdemeanor and upon conviction shall be punished by a fine not to exceed $1,000.00 or by imprisonment in the county jail not to exceed six months, or by both.

(f)  **Severability.** If any provision, clause or word of this chapter or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect any other provision, clause, word or application of this Section which can be given effect without the invalid provision, clause or word, and to this end the provisions of this Section are declared to be severable.

*(Added by Ord. 193-07, File No. 070683, App. 8/1/2007)*

S.F., Cal., Police Code art. 45, §§ 4500-4512 (2010), *available at* http://library.municode.com/HTML/14140/level1/ART45FIWEVIPROR.html.