C. D. Michel - S.B.N. 144258
Glenn S. McRoberts - S.B.N. 144852
Clinton B. Monfort - S.B.N. 255609
MICHEL & ASSOCIATES, PC
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: 562-216-4444
Facsimile: 562-216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ESPANOLA JACKSON, PAUL COLVIN, THOMAS BOYER, LARRY BARSETTI, DAVID GOLDEN, NOEMI MARGARET ROBINSON, NATIONAL RIFLE ASSOCIATION OF AMERICA, INC. SAN FRANCISCO VETERAN POLICE OFFICERS ASSOCIATION,<br><br>Plaintiffs<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, MAYOR GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY; POLICE CHIEF GEORGE GASCÓN, in his official capacity, and Does 1-10,<br><br>Defendants. | CASE NO. CO9-2143 PJH<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>**[FRCP Rule 12(b)(1)]**<br><br>Hearing Date: April 14, 2011<br>Time:      9:00 a.m.<br>Place:      Courtroom 5 |

# TABLE OF CONTENTS

PAGE(S)

STATEMENT OF ISSUES TO BE DECIDED . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Section 4512: "Safe" Storage Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Section 1290: Discharge Ban . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Section 613.10(g): Ban on Ammunition Serving "No Sporting Purpose" . . . . . . . . . . . . . 6

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.   TO SURVIVE A MOTION TO DISMISS, PLAINTIFFS NEED ONLY
     PRESENT PLAUSIBLE ALLEGATIONS SUFFICIENT TO ESTABLISH
     THIS COURT HAS SUBJECT MATTER JURISDICTION . . . . . . . . . . . . . . . . . . 8

II.  PLAINTIFFS HAVE PLED SUFFICIENT FACTS TO ESTABLISH
     STANDING TO BRING THIS ACTION, INDICATING AN INJURY
     -IN-FACT TRACEABLE TO DEFENDANTS' ACTIONS . . . . . . . . . . . . . . . . . . 9

     A.   Plaintiffs Have Established an Intention to Engage in a Course
          of Conduct Protected by the Constitution, Yet Proscribed by the
          Challenged Ordinances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     B.   Plaintiffs Reasonably Fear the Challenged Ordinances Are Being
          and Will Continue to Be Enforced . . . . . . . . . . . . . . . . . . . . . . . . . 13

          1.   Plaintiffs Need Not Face an "Individualized Threat of Imminent
               Prosecution" Before They May Bring a Pre-Enforcement
               Challenge; The Requisite "Credible Threat of Enforcement"
               Is Established by a Showing that Defendants Intend to Enforce
               the Ordinances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**TABLE OF CONTENTS (CONT.)**

**PAGE(S)**

      2.     The "Mere Existence" of the Ordinances Is Sufficient to Confer Standing in Cases, Like This, Wherein *Constitutionally Protected Conduct Is "Chilled"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

   C.    Plaintiffs Have Standing to Challenge Section 613.10(g) As They Assert Their Own Rights, Not the Rights of Third Party Ammunition Retailers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

III.   PLAINTIFFS' CLAIMS ARE RIPE BECAUSE PLAINTIFFS HAVE SUFFERED AN INJURY-IN-FACT, NOTHING WILL BRING MORE CLARITY TO THE ISSUES, AND PLAINTIFFS WILL CONTINUE TO SUFFER GREAT HARDSHIP ABSENT REVIEW OF THEIR CLAIMS . . . . . . 23

   A.    Having Established Sufficient Injury to Confer Article III Standing, Plaintiffs Meet the Requirement of Constitutional Ripeness . . . . . . . . . . . . 23

   B.    Plaintiffs Meet the Further Requirement of Prudential Ripeness Because No Further Factual Development Will Make the Issues More Clear and Their Constitutional Rights Are Undermined Every Second the Court Delays Review of Their Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

       1.     Plaintiffs' Challenge Is Fit for Judicial Review Because No Further Factual Context Is Required to Clarify the Issues . . . . . . . . . . . . . . . 24

       2.     Plaintiffs Presently Suffer Great Hardship by the Infringement of Their Constitutional Rights and They Will Continue to so Suffer Unless and Until This Court Grants Review of Their Claims . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1

## <u>TABLE OF AUTHORITIES</u>

2                                                                                    **PAGE(S)**

3

## <u>FEDERAL CASES</u>

4

5   *Abbott Labs. v. Gardner,*
        387 U.S. 136, 148-49 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23
6
    Andrews v. State, 50 Tenn.
7       165, 178, 8 A. Rep. 8, 13 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
8   *Ashcroft v. Iqbal,*
        __ U.S. __, 129 S. Ct. 1937, 1949 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9
9
    *Ariz. Right to Life Pol. Action Comm. v. Bayless,*
10      320 F.3d 1002 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11, 12, 23
11  *Babbitt v. United Farm Workers Nat'l Union,*
        442 U.S. 289, 298 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7
12
13   *Bland v. Fessler,*
        88 F.3d 729, 737 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2, 12, 14, 18
14  *Cal. Pro-Life Council v. Getman,*
        328 F.3d 1088, 1093 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9, 17, 23
15
    *Clinton v. Acequia, Inc.,*
16      94 F.3d 568, 572 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24
17  *Culinary Workers Union, Local 226 v. Del Papa,*
        200 F.3d 614, 618 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
18
    *District of Columbia v. Heller,*
19      554 U.S. 570, 571 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3
20  *Doe v. Bolton,*
        422 U.S. 179, 188 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16, 21
21
    *Epperson v. Arkansas,*
22      393 U.S. 97 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7, 15, 17
23  *McDonald v. Chicago,*
        __ U.S. __, 130 Sup. Ct. 3020 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6, 20
24
    *Hickman v. Block,*
25      81 F.3d 98, 101 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
26  *Holder v. Humanitarian Law Project,*
        __ U.S. __, 130 S. Ct. 2705, 2717 (2010) . . . . . . . . . . . . . . . . . . . . . . .   10, 11, 12, 16, 17
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>TABLE OF AUTHORITIES (CONT.)</u>**

**PAGE(S)**

**<u>FEDERAL CASES (CONT.)</u>**

*Jones v. Comty. Redevel. Agency of City of L.A.,*
    733 F.2d 646, 650 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kokkonen v. Guardian of Life Ins. Co. of Am.,*
    511 U.S. 375, 377 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555, 561 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 15

*Majors v. Abell,*
    317 F.3d 719, 721 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118, 129 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16

*Mobil Oil Co. v. Atty Gen. of Commw. of Va.,*
    940 F.2d 73, 74 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Nat'l Park Hospitality Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Navegar, Inc. v. United States,*
    103 F.3d 994, 1000 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Nordyke v. King,*
    563 F.3d 439, 444 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Poe v. Ullman,*
    367 U.S. 497, 508 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Richardson v. Ramirez,*
    48 U.S. 24, 36 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Rincon Band of Mission Indians v. County of San Diego,*
    495 F.2d 1, 4 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Samuels v. Mackell,*
    401 U.S. 66, 73 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*San Diego Gun Rights Committee v. Reno,*
    98 F.3d 1121 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Simmonds v. INS,*
    326 F.3d 351, 357 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

1

## TABLE OF AUTHORITIES (CONT.)

2

**PAGE(S)**

3

## FEDERAL CASES (CONT.)

4

5   *Socialist Party v. Gilligan*,
        406 U.S. 583 (972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24
6
    *Steffel v. Thompson,*
7        415 U.S. 452, 462 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7, 15, 16

8   *Stoianoff v. Montana*,
        695 F.2d 1214, 1223 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17
9
    *Stormans, Inc. v. Selecky*,
10       586 F.3d 1109, 1125 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

11  *Takhar v. Kessler*,
        76 F.3d 995, 1000 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
12
    *Thomas v. Anchorage Equal Rights Comm'n*,
13       220 F.3d 1134 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17, 23

14  *United States* v. *Chester*,
        628 F.3d 673, 682 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20
15
    *United States* v. *Huet*,
16       No. 08-0215, 2010 WL 4853847, * 10-11 (W.D. Pa. Nov. 22, 2010) . . . . . . . . . . . . . .   20

17  *United States* v. *Marzzarella,*
        614 F.3d 85, 89 n.4, 96-97 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . .   20
18
    *U.S. Civil Service Comm'n v. Nat'l Ass'n of Letter Carriers*,
19       413 U.S. 548 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

20  *Virginia v. Am. Booksellers Ass'n, Inc.*,
        484 U.S. 383 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13, 18
21
    *Younger v. Harris,*
22       401 U.S. 37, 40-41 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

23

## STATUTES & RULES

24

San Francisco Police Code sections 4512 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   *passim*
25
San Francisco Police Code sections 1290 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   *passim*
26
San Francisco Police Code sections 613.10(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   *passim*

27

28

**STATEMENT OF ISSUES TO BE DECIDED**

1.   Do Plaintiffs have standing to challenge unconstitutional city laws that cause Plaintiffs direct and ongoing harm, where: (1) the city has declared its intention to enforce those laws and/or has never declared it was *not* going to enforce those laws; (2) Plaintiffs comply with the laws and, in so doing, forego fundamental, constitutionally protected rights; and (3) because of this coerced compliance, Plaintiffs have not yet been criminally prosecuted under the laws? Or, must they first violate the law and subject themselves to prosecution to have standing?

2.   Do Plaintiffs have standing to challenge a law that deprives them of access to the types of ammunition most suitable for self-defense, where the Supreme Court has held that individuals have the right to possess functional firearms for self-defense, and where ammunition is a necessary component of a functional firearm, or must Plaintiffs first open their own firearms business within the city, begin selling such ammunition in violation of the law, and subject themselves to forfeiture of their business licenses before they may raise a challenge to vindicate their personal rights to purchase ammunition most suitable for self-defense?

3.   Where Defendants' unconstitutional laws currently cause specific harm to Plaintiffs by coercing them to forego the exercise of individual, fundamental rights, including the right to keep a firearm ready for self-defense emergencies, to purchase ammunition tailored for self-defense, and to use a firearm in self-defense, are Plaintiffs' grievances ripe for adjudication, or must they suffer these harms until they violate the law, then seek redress of their grievances in a state criminal court to have their rights restored?

**INTRODUCTION**

Motions to dismiss for lack of subject matter jurisdiction on fact-dependant bases generally waste the court's time because they are premature, being brought before the parties have had an opportunity to flesh out the factual grounds for plaintiffs' claims. Because, at this stage, courts favor amendment of the pleadings over dismissal, any defect regarding standing or ripeness is often easily corrected. For these reasons, such motions are disfavored.

That said, Plaintiffs' current dispute with Defendants is real and ripe for adjudication. Plaintiffs presently own guns and want to keep them in their homes in operable condition, ready to

defend themselves and their families. Defendants' ordinances prevent them from doing so without violating the law, thereby infringing upon Plaintiffs' Second Amendment right to keep and bear arms for self-defense and other lawful purposes. Defendants have moved to dismiss this action, claiming their laws cause Plaintiffs no harm and, because no Plaintiff has actually been criminally charged, prosecuted, or convicted for violating the challenged laws, the case is not ripe.

In short, Defendants argue that until Plaintiffs break the law, and unless Defendants choose to prosecute them for doing so, Plaintiffs have no standing to seek a declaration regarding whether the laws in question violate their constitutional rights. Hence, Plaintiffs must either forego their right to possess a handgun in the home that is ready to be used for immediate defense against a violent attack, or violate the law and become "criminals" themselves.

 Defendants' claims are untenable and conflict with the body of authority on declaratory relief. Plaintiffs' "predicament–submit to a statute or face the likely perils of violating it–is precisely why the declaratory judgment cause of action exists." *Mobil Oil Co. v. Atty Gen. of Commw. of Va.*, 940 F.2d 73, 74 (4th Cir. 1991), *cited with approval*, *Bland v. Fessler*, 88 F.3d 729, 737 (9th Cir. 1996). Moreover, Defendants' contention that Plaintiffs are unharmed unless actually prosecuted conflicts with general legal principles and the law in this circuit. *Bland*, 88 F.3d at 737. Plaintiffs have raised serious legal issues concerning the fundamental right of law-abiding citizens to keep and bear arms within the sanctity of their homes to defend themselves and their loved ones. The Court should address these concerns now, as it is authorized to do under the Declaratory Relief Act, 28 U.S.C. §§ 2201-2201, rather than force Plaintiffs to break the law and face criminal prosecution before their rights can be ascertained.

Finally, Plaintiffs are regrettably compelled to note that Defendants' jurisdictional challenge appears to have more to do with gamesmanship than with merit. Despite pushing to consolidate this case with *Pizzo v. Newsom* (which includes, among many others, "copy and paste" challenges to sections 4512, 1290 and 613.10(g)), Defendants forewent a motion to dismiss in that case. *See* Defendants' Answer, *Pizzo v. Newsom*, No. 09-4493 (N.D. Cal. filed Sept. 23, 2009) (Pls.' Req. Jud. Notice, Exh. A); Case Docket Sheet, *Pizzo*, *supra*, No. 09-4493 (Pls.' Req. Jud. Notice, Exh. B). Defendants' willingness to pass on an opportunity to dismiss those claims in

1    *Pizzo*, while fervently arguing they should be dismissed here, suggests Defendants' concern is not

2    with this case's justiciability, but with ensuring it is bogged down with yet another preliminary

3    motion, while *Pizzo* moves toward resolution on the merits.

4        Defendants' motion should be denied in full, and the parties should have their dispute

5    heard and their rights and obligations under the law adjudicated on the merits. To the extent the

6    Court is not so inclined, Plaintiffs should be granted leave to amend.

7        **SUMMARY OF FACTS**

8        Plaintiffs brought this suit to challenge the validity of San Francisco Police Code sections

9    4512, 1290, and 613.10(g)[1] enacted by Defendant City and County of San Francisco and enforced

10   by its Mayor and Chief of Police ("Defendants"). Each of these sections violates Plaintiffs' right

11   to keep and bear arms under the Second Amendment to the Constitution and, specifically, their

12   right to defense of self and others by exercising that right within their homes.

13       **Section 4512: "Safe" Storage Law**

14       In August 2007, Defendants passed section 4512, requiring handguns kept within the

15   home to be stored in a locked container or disabled with a trigger lock, unless that firearm "is

16   carried on the person of an individual over the age of 18" or "under the control of a person who is

17   a peace officer" as defined by state law. Violation is a misdemeanor punishable by a fine not to

18   exceed $1,000 and/or by imprisonment not to exceed six months. S.F. Cal., Police Code art. 45, §

19   4512(e). In effect, section 4512 requires, under threat of criminal prosecution, that Plaintiffs

20   render and keep their handguns inoperable and practically useless for self-defense emergencies.

21       The Supreme Court, in *District of Columbia v. Heller*, 554 U.S. 570, 571 (2008), struck

22   down a similar trigger lock ordinance, finding the requirement "makes it impossible for citizens to

23   use them for the core lawful purpose of self-defense and is hence unconstitutional." The

24   requirements of section 4512 similarly make it virtually impossible for Plaintiffs to use their

25   handguns for the constitutionally protected purpose of self-defense–particularly in life-threatening

26

27

28      [1] All further statutory references are to the San Francisco Police Code unless otherwise indicated.

situations when the need to exercise that right is most acute.[2]  Regardless, Defendants have "failed to repeal and continue to enforce" section 4512 (Am. Compl. ¶ 35) and "ha[ve] never advised the public or [their] law enforcement personnel that [they] did not intend to enforce" or "that [they have] stopped enforcing [it] at any time following its enactment" (Am. Compl. ¶ 55).

In fact, quite the opposite is true–Defendants' have expressly indicated their  intention to enforce the law. For instance, upon passage of section 4512, former District Attorney Kamala Harris infamously declared "[j]ust because you legally possess a gun in the sanctity of your locked home doesn't mean that we're not going to walk into that home and check to see if you're being responsible and safe in the way that you conduct your affairs." (Am. Compl. ¶ 52.) In short, Defendants have clearly stated their intent to enforce the law and coerce behavior restricting constitutional rights, going so far as to publicly threaten the preemptive enforcement of the law by invading the sanctity of one's home just to "check" on whether handguns are stored in compliance with the ordinance. Additionally, on May 6, 2009, a city official came unannounced to Plaintiff Golden's residence, demanding to see that his firearms were properly stored in a locked container for the purpose of ensuring he was safely storing his handguns. (Am. Compl. ¶ 53.)

As a matter of fact (assumed true for purposes of this motion), Plaintiffs each presently own at least one handgun that they intend to keep operable within their homes, accessible for immediate self-defense and not disabled by a trigger lock nor stored in a locked container. (Am.

---

[2]  While the burden Defendants impose on Plaintiffs' right to keep and bear arms is not at issue in this motion, we note that the *Heller* Court understood it to be a serious concern, so much so that Chief Justice Roberts and Justice Scalia had the following exchange with counsel for the District of Columbia, regarding the ease with which one might render a locked weapon operable in the dead of night to defend against an intruder:

JUSTICE SCALIA:   You turn on, you turn on the lamp next to your bed so you can–you can turn the knob at 3-22-95, and so somebody--

MR. DELLINGER:   Well--

CHIEF JUSTICE ROBERTS: Is it like that?  Is it a numerical code?

MR. DELLINGER:    Yes, you can have one with a numerical code.

CHIEF JUSTICE ROBERTS: So then you turn on the lamp, you pick up your reading glasses--

Transcript of Oral Argument at 83-84, *Heller*, 554 U.S. 570 (2008) (No. 07-290). Clearly, the Court was having a bit of fun of Mr. Dellinger's suggestion that the District's trigger-lock ordinance would impose a minimal or insignificant burden to one's right to Arms in an emergency.

1   Compl. ¶¶ 22-23, 37.) Plaintiffs presently keep their handguns in inoperable condition in

2   compliance with the law. (Am. Compl. ¶¶ 23, 25.) But for the enactment and credible threat of

3   enforcement of section 4512, they would each "keep their handguns operable within the home,

4   i.e., not disabled by a trigger lock or locked in a container . . . ." (Am. Compl. ¶ 23.) Plaintiffs

5   thus seek a declaration of their rights under the Second Amendment with respect to section 4512

6   and, should the Court enjoin the enforcement of the law, would immediately resume keeping their

7   handguns in operable condition, ready for use in a self-defense emergency.

8                          **Section 1290: Discharge Ban**

9            In addition, section 1290's blanket prohibition against the "discharge [of] any firearms"

10  within the City and County of San Francisco–with no exception for self-defense discharges within

11  the home–violates Plaintiffs' right to keep and bear arms in defense of self and others as

12  guaranteed by the Second Amendment. The rights recognized in *Heller* necessarily include a right

13  to discharge firearms in self-defense, not simply to keep and bear them. Simply put, section 1290

14  deters, punishes, and directly conflicts with the exercise of that constitutional right.

15           Notably, Police Code section 4502 prohibits discharging firearms in *public* places, and

16  section 4506(a) *expressly* provides an exception for public discharges made in self-defense.

17  Section 1290 provides *no such exception*. Further, as alleged in Plaintiffs' Amended Complaint,

18  Defendants have threatened enforcement of section 1290 in self-defense situations. Specifically,

19  "San Francisco police have advised homeowners, who have otherwise lawfully discharged

20  firearms in self-defense to thwart late-night criminal attacks in their homes, that they would be

21  arrested for discharging their firearms [under section 1290] unless they stated the discharges were

22  'accidental.' The police further advised these homeowners that it was the city's policy to arrest

23  anyone who discharged a firearm within the city, and that there was no exception for discharges

24  within one's home while defending oneself from criminal attack." (Am. Compl. ¶ 65.) Based on

25  the foregoing, no self-defense exception can be implied.[3]

26

27          [3] Moreover, this suit was filed initially on May 15, 2009. Defendants have had ample
    opportunity to amend section 1290 to cure the obvious defect (and narrow the issues in this suit),
28  but has chosen not to do so. Evidently, in addition to Plaintiffs' suit, it will take an order from this

                          Plaintiffs' Opposition to Defendants' Motion to Dismiss

                                              5

1    In sum, as a matter of fact (based on the statute's existence and on Plaintiffs' allegations),

2    section 1290 remains the law in San Francisco and has been enforced, as a matter of policy,

3    against residents discharging firearms in self-defense within the sanctity of their own homes.

4    Defendants have provided no evidence that its policy of enforcing section 1290 has changed. (Am.

5    Compl. ¶¶ 61-62.) And Plaintiffs have alleged their intent to discharge their firearms in violation

6    of section 1290 to defend hearth and home should the need arise. (Am. Compl. ¶¶ 38-39.)

7    Plaintiffs thus seek a judicial declaration of their rights under the Second Amendment as it relates

8    to section 1290 and injunctive relief prohibiting enforcement of the same.

9    **Section 613.10(g): Ban on Ammunition Serving "No Sporting Purpose"**

10    Plaintiffs also challenge section 613.10(g), Defendants' ban on the sale, lease, or transfer

11    of ammunition that "serves no sporting purpose" or is designed to expand or fragment upon

12    impact. Section 613.10(g) effectively bans all self-defense ammunition that does not also serve a

13    "sporting purpose." But self-defense is not a "sport." Thus, section 613.10(g) effectively prohibits

14    city residents, including Plaintiffs, from purchasing ammunition specifically designed for self-

15    defense. This is often the same ammunition used by law enforcement. It is ammunition designed,

16    for safety reasons, to prevent ricochet and eliminate over-penetration of unarmored assailants.

17    (Am. Compl. ¶ 58.) Such ammunition is the exact opposite of the "cop-killer bullets" Defendants

18    claim it seeks to ban, yet it remains subject to prohibition under section 613.10(g).

19    Banning the sale of ammunition designed for self-defense violates Plaintiffs' right to keep

20    and bear arms and defeats its "core lawful purpose of self-defense." Moreover, Section

21    613.10(g)'s ban on the sale of all ammunition that "serves no sporting purpose" is vague and

22    overbroad, as it fails to adequately inform ammunition retailers and law enforcement as to which

23    ammunition is regulated by the law. (Am. Compl. ¶¶ 70-72.) In turn, retailers, unsure of which

24    ammunition is subject to the ordinance, steer far wider of the zone of unlawful conduct and refrain

25    from selling far more types of ammunition that may or may not be subject to the ban. This further

26

27

28    court to force Defendants to bring section 1290 into compliance with *Heller* and *McDonald v.*
*Chicago*, __ U.S. __, 130 Sup. Ct. 3020 (2010).

Plaintiffs' Opposition to Defendants' Motion to Dismiss

6

1   impacts Plaintiffs' access to ammunition necessary for the exercise of their fundamental rights.

2   Plaintiffs' thus seek declaratory and injunctive relief.

3   **SUMMARY OF ARGUMENT**

4   The assertion that Plaintiffs lack standing and that their claims are not yet ripe for review

5   because Plaintiffs have not suffered an injury-in-fact traceable to Defendants' conduct is without

6   merit. By Defendants' enactment and ongoing enforcement of sections 4512, 1290, and 613.10(g),

7   Plaintiffs presently endure the direct and ongoing harm of the denial of their individual,

8   fundamental right to keep and bear arms, which necessarily includes the right to keep their

9   firearms in a condition ready for use in self-defense emergencies.

10   Defendants' core argument, that Plaintiffs suffer no harm unless and until they violate the

11   law, and Defendants directly threaten to prosecute them, runs counter to case law governing pre-

12   enforcement challenges to laws that violate fundamental rights and has harmful practical

13   consequences. Nonetheless, Plaintiffs will address each of Defendants' contentions in turn.

14   Because Plaintiffs have been placed "between the Scylla of intentionally flouting state law

15   and the Charybdis of forgoing what [they believe] to be constitutionally protected activity in order

16   to avoid becoming enmeshed in a criminal proceeding," they have suffered a sufficient injury to

17   seek declaratory relief without "first expos[ing] [themselves] to actual arrest or prosecution."

18   *Steffel v. Thompson,* 415 U.S. 452, 462 (1974). By virtue of the mere enactment of the ordinances,

19   which prohibit the exercise of fundamental rights, and Defendants' expressly declared intent to

20   enforce these laws and failure to disavow such intent, Plaintiffs suffer direct harm and face a

21   credible threat of enforcement, such that Plaintiffs have standing to challenged these ordinances

22   and their claims are ripe for review. *See Babbitt v. United Farm Workers Nat'l Union,* 442 U.S.

23   289, 298 (1979); *Epperson v. Arkansas*, 393 U.S. 97 (1968)**.**

24   Regarding Plaintiffs' challenges to section 613.10(g), they have standing to bring this

25   action on their own behalf to vindicate their personal rights to purchase the ammunition most

26   suitable for self-defense. They do not, as Defendants suggest, seek to assert the rights of third

27   party ammunition retailers to sell the ammunition regulated by the challenged ordinance.

28   Finally, no further factual development will make the underlying issues any more clear, so

Plaintiffs' Opposition to Defendants' Motion to Dismiss

1   this Court should refuse to exercise its discretion to dismiss this case on prudential ripeness

2   grounds and address Plaintiffs' harms *now*, rather than wait until some unknown future date.

3       For the reasons set out above–and more thoroughly examined below–Defendants' motion

4   should be denied, and litigation on the merits of Plaintiffs' claims should be permitted to proceed.

5       In the event the Court is not satisfied with the sufficiency of Plaintiffs' allegations,

6   Plaintiffs respectfully request leave to amend the complaint under the liberal policy in federal

7   courts favoring amendment of the pleadings over dismissal before plaintiff has an opportunity to

8   be heard. *Jones v. Comty. Redevel. Agency of City of L.A.*, 733 F.2d 646, 650 (9th Cir. 1984).

9                                    **ARGUMENT**

10  **I.    TO SURVIVE A MOTION TO DISMISS, PLAINTIFFS NEED ONLY PRESENT
        PLAUSIBLE ALLEGATIONS SUFFICIENT TO ESTABLISH THIS COURT
11      HAS SUBJECT MATTER JURISDICTION**

12      The plaintiff has the initial burden of establishing standing. *See, e.g.*, *Kokkonen v.*

13  *Guardian of Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The particular weight of that burden

14  is contingent upon the procedural posture of the case. *See Lujan v. Defenders of Wildlife*, 504 U.S.

15  555, 561 (1992). "For purposes of ruling on a motion to dismiss for want of standing, both the

16  trial and reviewing courts must accept as true all material allegations of the complaint, and must

17  construe the complaint in favor of the complaining party." *Takhar v. Kessler*, 76 F.3d 995, 1000

18  (9th Cir. 1996) (internal citations and quotation marks omitted). And, as the Supreme Court

19  observed in *Lujan*, "at the pleading stage, general factual allegations of injury resulting from the

20  defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations

21  embrace those specific facts that are necessary to support the claim." 504 U.S. at 561.

22      Defendants raise doubts about the plausibility of Plaintiffs' factual allegations by attacking

23  *only the specifics* behind Plaintiffs' general statements regarding issues central to the standing

24  question. (*See* Defs.' Mem. Supp. Mot. to Dismiss ("Defs.' Mot.") 7, 11-12 n.4.) But Plaintiffs

25  have sufficiently pled in general terms, which is all that is required, *Lujan,* 504 U.S. at 561, that

26  they and others similarly situated have been subject to threats of enforcement by Defendants under

27  the provisions challenged in this action (Am. Compl. ¶¶ 52-53, 65) and that Defendants have

28  never disavowed their intention to enforce those sections ( Am. Compl. ¶¶ 54-55, 61-62, 66-67).

Plaintiffs' Opposition to Defendants' Motion to Dismiss

1   To require that Plaintiffs show more to survive a motion to dismiss would be improper. While it is

2   true that the court need not accept mere "labels and conclusions" or a "formulaic recitation of the

3   elements of a cause of action" *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009), such is

4   not the case here. The Amended Complaint does more than make conclusory statements that the

5   challenged ordinances violate the Second Amendment. It alleges facts that, if accepted as true,

6   establish a credible threat the ordinances will be enforced, causing Plaintiffs to surrender their

7   rights to engage in constitutionally protected conduct.

8   **II.    PLAINTIFFS HAVE PLED SUFFICIENT FACTS TO ESTABLISH STANDING
        TO BRING THIS ACTION, INDICATING AN INJURY-IN-FACT TRACEABLE
9       TO DEFENDANTS' ACTIONS**

10          Article III of the U.S. Constitution limits the jurisdiction of federal courts to "actual cases

11  or controversies," requiring there be an "actual dispute[] between adverse parties." *Richardson v.*

12  *Ramirez*, 48 U.S. 24, 36 (1974). This requirement encompasses the "core component of standing."

13  *Lujan*, 504 U.S. at 560. To establish Article III standing, Plaintiffs must show they "have suffered

14  a constitutionally cognizable injury-in-fact," *Cal. Pro-Life Council v. Getman*, 328 F.3d 1088,

15  1093 (9th Cir. 2003), generally requiring the "invasion of a legally protected interest which is (a)

16  concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*,

17  504 U.S. at 560. Defendants argue this requires Plaintiffs show they are "*actually* being

18  prosecuted, or at a minimum, [have] received a personalized threat of *imminent* prosecution under

19  the challenged law." (Defs.' Mot. 8 (emphasis added).) Such a showing is far more than is

20  required of Plaintiffs.

21          It is not a controversial legal principle that the government creates an "actual case or

22  controversy" whenever its laws cause reasonable people to forego behavior protected by the

23  Constitution. As the Supreme Court recently affirmed:

24          [W]here threatened action by government is concerned, we do not require a
            plaintiff to expose himself to liability before bringing suit to challenge the basis for
25          the threat–for example, the constitutionality of a law threatened to be enforced. The
            plaintiff's own action (or inaction) in failing to violate the law eliminates the
26          imminent threat of prosecution, but nonetheless does not eliminate Article III
            jurisdiction.

27  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) (emphasis omitted). In other

28  words, a plaintiff need not first expose himself to actual arrest or prosecution to challenge a

Plaintiffs' Opposition to Defendants' Motion to Dismiss

9

1  statute that arguably infringes on the exercise of his constitutional rights. *Babbitt,* 442 U.S. at 298.

2  Indeed, if actual prosecution were required to establish standing, the Declaratory Judgment Act,

3  under which this action is brought and which provides the mechanism for seeking pre-

4  enforcement review, would *itself* be unconstitutional.

5  Accordingly, in cases where a plaintiff seeks to challenge a law under which he has not yet

6  faced prosecution, the courts have found that Article III standing lies so long as a plaintiff: (1)

7  "alleges an intention to engage in a course of conduct arguably affected with a constitutional

8  interest, but proscribed by a statute" and (2) can demonstrate a "credible threat of enforcement" of

9  that law. *Id.* at 298. Plaintiffs have plainly alleged facts sufficient to satisfy both prongs of the

10  standing analysis for pre-enforcement challenges.

11  **A.    Plaintiffs Have Established an Intention to Engage in a Course of Conduct
         Protected by the Constitution, Yet Proscribed by the Challenged Ordinances**

12  Under the first prong of *Babbitt*, Plaintiffs must "allege[] an intention to engage in a

13  course of conduct arguably affected with a constitutional interest, but proscribed by statute." *Id.* It

14  is not necessary that Plaintiffs allege an intention to *break the law*, it is sufficient that they

15  establish a concrete plan to engage in the proscribed conduct and that they would immediately

16  implement that plan, but for the arguably unconstitutional limitation. *See Holder v. Humanitarian*

17  *Law Project*, __ U.S. __, 130 S. Ct. 2705, 2717 (2010).

18  Nevertheless, Defendants erroneously equate this case with *San Diego Gun Rights*

19  *Committee v. Reno*, 98 F.3d 1121 (1996), a firearms case decided before the Second Amendment

20  was recognized as protecting a fundamental, individual right, in which the court found plaintiffs

21  lacked standing. There, the plaintiffs expressed only a "desire or wish" to manufacture or possess

22  "assault weapons" in some unspecified manner at some unspecified future time. *Id.* at 1127. Here,

23  "Plaintiffs presently intend to exercise their rights to defend themselves, their homes and families

24  by keeping firearms in the home, including handguns, available for immediate use by assembling

25  them, removing trigger locks, removing them from locked storage containers, and loading them

26  with appropriate ammunition and, if necessary discharging them is defense of self or others."

27  (Am. Compl. ¶ 37.) Plaintiffs also allege that, but for the enforcement of these ordinances, they

28  would presently "keep their handguns in their residences without being stored in a locked

Plaintiffs' Opposition to Defendants' Motion to Dismiss

10

1   container or disabled with a trigger lock; would forthwith purchase ammunition designed for self-

2   defense use without regard to whether it serves any sporting purpose; and would discharge their

3   firearms if threatened with imminent deadly force." (Am. Compl. ¶ 40.)

4         In sum, Plaintiffs currently own guns, which are presently kept inoperable as required by

5   law, and Plaintiffs seek–immediately–to render their guns operable for defense of themselves,

6   their families, and their homes. (Am. Compl. ¶¶ 37-39.) Unlike *Reno*, Plaintiffs here have

7   described a "concrete plan" to engage in constitutionally protected conduct–a plan they would

8   implement presently but for the challenged ordinances. And this, under *Holder* and *Arizona Right*

9   *to Life Political Action Committee v. Bayless*, 320 F.3d 1002 (9th Cir. 2003) is all that is required

10   to meet the first prong of the pre-enforcement standing analysis.

11         In *Holder*, plaintiffs challenged a federal law prohibiting the knowing provision of

12   "material support or resources" to designated terrorist organizations. 130 S. Ct. at 2712-13. There,

13   plaintiffs were found to have standing where they had provided support to two such organizations

14   before the enactment of the statute and alleged only "that they would provide similar support if the

15   statute's allegedly unconstitutional bar were lifted." *Id.* at 2717. They never established an intent

16   to break the law, only to engage in the proscribed conduct *immediately*, but for the ongoing

17   enforcement of the challenged statute.

18         Similarly, in *Arizona Right to Life*, the Ninth Circuit found plaintiff had standing to raise a

19   pre-enforcement challenge, though they alleged only that they "wanted" to engage in the regulated

20   conduct, but obeyed the law to avoid civil penalties. 320 F.3d at 1006. Because plaintiff  neither

21   broke the law, nor alleged an intention to do so, it was never "personally in danger of prosecution

22   on the basis of [its] actions." (*See* Defs.' Mot. 12.) Regardless, the court found pre-enforcement

23   standing existed because plaintiff reasonably "modif[ied] its behavior out of fear of being the

24   object of an enforcement action." *Ariz. Right to Life* at 1007.

25         Here, Plaintiffs have alleged that, but for the enactment and enforcement of the challenged

26   ordinances, they would exercise their rights to defend themselves immediately, keeping handguns

27   unencumbered by trigger locks or locked containers, purchasing and loading the most appropriate

28   ammunition, regardless of whether it serves a "sporting purpose," and discharging them when

1    necessary for self-defense. (Am. Compl. ¶ 23-25, 37-39.) Like the plaintiffs in *Holder*, Plaintiffs

2    would immediately engage in the described course of conduct "if the [ordinance's] allegedly

3    unconstitutional bar were lifted." *See Holder*, 130 S. Ct. 2717. And, like the plaintiffs in *Arizona*

4    *Right to Life*, Plaintiffs have not alleged an intention to break the law, but to obey it until such

5    time as this Court declares their rights under the Constitution. This course of action demonstrates

6    a  "commendable respect for the rule of law" and should not be the basis for the Court to shut its

7    doors to Plaintiffs' concerns. *See Bland*, 88 F.3d at 737.

8          To follow Defendants' suggestion that Plaintiffs must first allege an intention to *break the*

9    *law* (Defs.' Mot. 12), would put Plaintiffs in an unenviable position, requiring them to openly

10   flout the law and come to the attention of the authorities before seeking a declaration of the

11   parties' rights and responsibilities under the Second Amendment.[4] Sound public policy dictates

12   against encouraging individuals–who wish to both obey the law *and* exercise their fundamental

13   rights–to themselves become criminals before their rights can be declared by a court.[5]

14         Accordingly, because Plaintiffs have alleged they would presently render their firearms

15   operable for use in a self-defense emergency if the Court prevented the enforcement of the

16   challenged ordinances, Plaintiffs have presented a sufficiently concrete plan to engage in

17   constitutionally protected conduct proscribed by law. As such, Plaintiffs have satisfied the first

---

18

19   [4] Taken to its logical conclusion, the position lobbied by Defendants would leave Plaintiffs and
20   similarly situated law-abiding citizens subject to a grievous wrong without a remedy, as they
     would never be in the position to challenge these ordinances. For if Plaintiffs obey the law and are
21   robbed, raped, or murdered while unlocking and loading their handguns, they will obtain no relief
     for the harm caused by the ordinances, which they followed to their detriment. Defendants'
22   untenable position would leave only *law-breaking* gun owners, who have actually violated the law,
     with standing to determine legislative constitutional rights violations. Accordingly, Second
23   Amendment challenges would be muddied (as Defendants would no doubt prefer it), such that they
     would only be brought by criminals who have already violated the law as opposed to law-abiding
24   individuals whom the Second Amendment was intended to protect. And all the while Plaintiffs
     will continue to be denied their rights without any avenue for recourse.
25

26   [5] "Public policy should encourage a person aggrieved by laws he considers unconstitutional to
27   seek a declaratory judgment against the arm of the state entrusted with the state's enforcement
     power, *all the while complying with the challenged law*, rather than to deliberately break the law
28   and take his chances in the ensuing suit or prosecution." *Mobil Oil Corp.,* 940 F.2d at 75, *cited
     with approval*, *Ariz. Right to Life*, 320 F.3d at 1007; *Bland*, 88 F.3d at 737.

1   prong of the standing analysis for pre-enforcement challenges as set forth in *Babbit*.

2   **B.      Plaintiffs Reasonably Fear the Challenged Ordinances Are Being and Will Continue to Be Enforced**

3         Plaintiffs allege that Defendants have expressly indicated an intention to enforce the

4   challenged ordinances. For instance, former District Attorney Kamala Harris publicly declared

5   "[j]ust because you legally possess a gun in the sanctity of your locked home doesn't mean that

6   we're not going to walk into that home and check to see if you're being responsible and safe in the

7   way that you conduct your affairs." (Am. Compl. ¶ 52.) And on May 6, 2009, a city official came

8   unannounced to Plaintiff Golden's residence, demanding to see that his firearms were properly

9   stored in a locked container. (Am. Compl. ¶ 53.) "San Francisco police have [repeatedly] advised

10  homeowners, who have otherwise lawfully discharged firearms in self-defense to thwart late-night

11  criminal attacks in their homes, that they would be arrested for discharging their firearms [under

12  section 1290] unless they stated the discharges were 'accidental.' The police further advised these

13  homeowners that it was the city's policy to arrest anyone who discharged a firearm within the city,

14  and that there was no exception for discharges within one's home while defending oneself from

15  criminal attack." (Am. Compl. ¶ 65.)[6]

16        In light of these instances, as well as Defendants' failure to publicize that the ordinances

17  are not being enforced, Plaintiffs legitimately fear prosecution should they exercise their

18  fundamental rights in violation of the law. They have thus alleged facts sufficient to establish

19  standing to raise a pre-enforcement challenge, having presented "an actual and well-founded fear

20  that the law will be enforced against them." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383

21  (1988). As explained above, the fact that Plaintiffs have curbed their behavior in order to evade

22  actual prosecution does not destroy Article III standing, and it does not destroy their reasonable

23  fear that, should they resume the proscribed conduct, the law will be enforced against them. It is

24  sufficient that the threat of prosecution is "credible"–as it would be with any statute threatened to

25

26        [6] Although section 613.10(g) does not impose liability on individual purchasers, Plaintiffs

27  nonetheless have standing to sue in their own right as Defendants' enforcement denies them access to constitutionally protected components of a functional firearm as set forth fully in section II. C.,

28  *infra*.

1  be enforced–rather than "imaginary or speculative"–as would be the case if the statute were

2  obsolete or never enforced. *See Babbitt*, 442 U.S. at 298.

3       In accordance with the Supreme Court's opinions in *Babbitt* and its progeny, the Ninth

4  Circuit has concluded that a plaintiff who challenges a law before it is enforced can establish the

5  requisite "credible threat of enforcement" by demonstrating that the defendant "intends either to

6  enforce a statute or to encourage local law enforcement agencies to do so." *Culinary Workers*

7  *Union, Local 226 v. Del Papa*, 200 F.3d 614, 618 (9th Cir. 1999). Judicial authorization for pre-

8  enforcement standing is especially apparent in instances where the "alleged danger of the

9  [challenged law] is, in large measure, one of self-censorship," wherein the challenger abstains

10  from the exercise of constitutionally protected conduct for fear the law will be enforced against

11  him. *Id.* Such a harm is one "that can be realized even without actual prosecution." *Am.*

12  *Booksellers*, 484 U.S. at 393. The Ninth Circuit has repeatedly affirmed that the "pre-enforcement

13  nature" of a suit does not foreclose standing where a plaintiff alleges a *well-founded fear the law*

14  *will be enforced*. *Bland*, 88 F.3d at 737 (emphasis added). Plaintiffs fears are indeed well

15  founded–for not only have Defendants promised to enforce the laws should they happen to

16  encounter a violation, the *City's chief prosecutor publicly* threatened to enter *the sanctity of*

17  *residents' locked homes* to *guarantee* compliance with Defendants' gun policies.

18       Plaintiffs here have established a "credible threat of enforcement," having alleged that

19  Defendants have explicitly stated their intention to enforce the challenged ordinances. But even

20  absent Defendants' noted policy of enforcement, under the circumstances, the ordinances' "mere

21  existence" provides sufficient threat of enforcement to defeat Defendants' motion.

22       **1.  Plaintiffs Need Not Face an "Individualized Threat of Imminent**
             **Prosecution" Before They May Bring a Pre-Enforcement Challenge;**
23           **The Requisite "Credible Threat of Enforcement" Is Established by a**
             **Showing that Defendants Intend to Enforce the Ordinances**

24       The "credible threat" standard does not, as Defendants suggest, require that Plaintiffs show

25  they are subject to an "individualized threat of imminent prosecution." (Defs.' Mot. 9.) In fact, the

26  requirement advocated by Defendants is not supported by the great body of case law regarding

27

28

1  pre-enforcement constitutional challenges.[7] Defendants' imminent prosecution requirement

2  instead echoes the injury-in-fact element of standing, requiring an "invasion of a legally protected

3  interest that is . . . 'actual or imminent.' " *Lujan*, 504 U.S. at 560-61. Perhaps Defendants are

4  advocating that if a plaintiff challenging a statute does not face "actual" prosecution, he must at

5  least face an "imminent" one, but this erroneously conflates Plaintiffs' "injury" and the

6  government's "prosecution." In so doing, Defendants ignore the great harm inflicted by the

7  existence and enforcement of a statute that prevents individuals from *engaging in constitutionally*

8  *protected conduct*. Standing exists because plaintiff's abstention, when reasonably coerced by the

9  government, is *itself* an actual injury, regardless of whether prosecution is imminent. *See Poe v.*

10 *Ullman*, 367 U.S. 497, 508 (1961).

11        Not only does Defendants' imminent prosecution requirement conflict with Supreme

12 Court guidance on this issue, but it has harmful practical consequences. Obviously, a prosecution

13 is unlikely to be imminent if individuals refrain from violating the law under a credible threat of

14 the law's enforcement, as Plaintiffs have done. Yet, as Defendants would have it, individuals

15 would have pre-enforcement standing only if they come close enough to violating the law to

16 become singled out or uniquely targeted by law enforcement. But if they do violate the law, the

17 door to declaratory relief in federal court is slammed shut as soon as the government initiates

18 prosecution. *See Younger v. Harris*, 401 U.S. 37, 40-41 (1971); *see also Samuels v. Mackell*, 401

19 U.S. 66, 73 (1971) (extending *Younger* to actions for declaratory relief). But the Declaratory

20

---

21        [7] Defendants rely on *Steffel*, 415 U.S. at 459, for the rule that a pre-enforcement challenge may
   be heard only "so long as [plaintiff] faces a genuine, individualized threat of imminent
22 prosecution." (Defs.' Mot. 9.) *Steffel* should not be read to require such a stringent test. Even
   though plaintiffs in that case had faced an individualized threat, the Court no where states that
23 such is *required* before pre-enforcement standing can be had. To the contrary, the *Steffel* Court
   relies on *Epperson v. Arkansas*, 393 U.S. 97, a case in which plaintiff faced *no* individualized
24 threat of prosecution, imminent or otherwise. *Steffel*, 415 U.S. at 459.

25        Defendants also cite *Rincon Band of Mission Indians v. County of San Diego*, 495 F.2d 1, 4
   (9th Cir. 1974) to argue that threats of prosecution of a "general nature" are insufficient to confer
26 standing. This case, however, is distinguishable because no fundamental right was implicated by
   the challenged ordinance. *Id.* at 3-4. *Rincon* itself indicates this would have made a difference. *Id.*
27 at 6 (distinguishing *Rincon* from a case in which plaintiff had standing where he alleged
   "interference with fundamental rights").

28

1    Judgment Act was designed precisely to provide " 'an alternative to pursuit of the arguably illegal

2    activity.' " *MedImmune*, 549 U.S. at 129 (quoting *Steffel*, 415 U.S. at 480 (Rehnquist, J.

3    concurring)). To follow Defendants' rule would essentially nullify the purpose of the Act.

4         Instead, courts have found standing in instances in which prosecution was neither

5    imminent nor individually threatened. *Holder*, a recent Supreme Court case discussed *supra*, is a

6    good example. Recall that, there, plaintiffs sought pre-enforcement review of a federal statute

7    making it a crime to "knowingly provid[e] material support or resources" to foreign terrorist

8    organizations. *Holder*, 130 S. Ct. at 2712, 2717. Though the government never actually threatened

9    plaintiffs with prosecution (even during twelve years of litigation), the Court nonetheless found

10   the requisite "credible threat of enforcement" because it never disavowed its ability or intent to

11   enforce the statute against plaintiffs. *Id.* at 2717.

12        Similarly, Plaintiffs allege they would immediately engage in constitutionally protected

13   conduct but for the enactment and continued enforcement of sections 4512, 1290, and 613.10(g).

14   (Am. Compl. ¶¶ 23-25, 37-39.) They have a valid, well-founded fear of prosecution the moment

15   they do engage in that conduct. The challenged ordinances are, after all,  neither "moribund," *Doe*

16   *v. Bolton*, 422 U.S. 179, 188 (1973), nor a "historical curiosity," *Navegar, Inc. v. United States*,

17   103 F.3d 994, 1000 (D.C. Cir. 1997). Plaintiffs genuinely fear enforcement based on "credible

18   threats" by high-profile city officials and law enforcement officers, expressly indicating their

19   intention to enforce these laws. (Am. Compl. ¶¶ 52-53, 56.) And Defendants have not disavowed

20   their ability to enforce the ordinances (Am. Compl. ¶¶ 54-55, 61-62, 66-67), a fact which courts

21   have long considered to be a factor in favor of finding standing, *Babbit,* 442 U.S. at 302.

22        To establish a "credible threat," Plaintiffs need not show a history of completed or

23   imminently threatened prosecutions. Plaintiffs have satisfied their burden by pleading, in general

24   terms, that a "credible threat of enforcement" exists because Defendants have demonstrated an

25   intention to enforce the challenged ordinances. Recall that Defendants have publicly threatened to

26   enter the locked homes of firearms owners to ensure compliance with the "safe" storage law,

27   conducted a surprise home visit of Plaintiff Golden to ensure his firearms were stored in a locked

28   container, and informed homeowners–who had otherwise lawfully discharged their firearms in

Plaintiffs' Opposition to Defendants' Motion to Dismiss

1    self-defense–of Defendants' intention to enforce section 1290 against them unless they claimed

2    the discharge was accidental. In light of all these facts, just like the plaintiffs in *Holder*, Plaintiffs

3    have established a "credible threat" the challenged ordinances will be enforced.

4        **2.    The "Mere Existence" of the Ordinances Is Sufficient to Confer
         Standing in Cases, Like This, Wherein *Constitutionally Protected***
5        ***Conduct Is "Chilled"***

6        Even if criminal prosecution were unlikely, the mere existence of the ordinance *is itself* a

7    basis for standing to challenge them, because they are laws capable of "chilling" constitutionally

8    protected conduct.[8] In *Epperson v. Arkansas*, for example, a teacher had standing to challenge the

9    Arkansas "anti-evolution" statute even though she never faced any threat of prosecution under the

10   law, which had been on the books for *nearly forty years without any history of enforcement*, and

11   where the statute was "more of a curiosity than a vital fact of life." 393 U.S. at 98-102.

12       Similarly, in *California Pro-Life Council, Inc. v. Getman*, the Ninth Circuit cited with

13   approval a Seventh Circuit case holding the following:

14       A plaintiff who mounts a pre-enforcement challenge to a statute that he claims
         violates his freedom of speech[[9]] need not show that the authorities have
15       threatened to prosecute him; *the threat is latent in the existence of the statute*.
         Not if it clearly fails to cover his conduct, of course. But if it arguably covers it,
16       and so may deter constitutionally protected expression because most people are
         frightened of violating criminal statutes especially when the gains are slight, . . .
17       there is standing.

18   328 F.3d, 1088, 1095 (9th Cir. 2003) (citing *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2001))

19   (emphasis added). Ultimately, the Ninth Circuit limited its earlier ruling in *Thomas v. Anchorage*

20   *Equal Rights Commission*, 220 F.3d 1134 (1999), and reaffirmed the "validity of pre-

21   enforcement challenges to statutes infringing upon constitutional rights." *Cal. Pro-Life Council,*

22   

---

23       [8] Defendants rely on *Stoianoff v. Montana*, 695 F.2d 1214, 1223 (9th Cir. 1983) for the rule that
24   " 'The mere existence of a statute, which may or may not ever be applied to plaintiffs, is not
     sufficient to create a case or controversy with [sic] the meaning of Article III.' "(Defs.' Mot. 9
25   (quoting *Stoianoff*, 695 F.2d at 1223).) This case is distinguishable, however, because no
     fundamental right was implicated by the challenged statute, and the exercise of constitutionally
26   protected conduct was not abandoned.

27       [9] For a discussion on applying First Amendment analysis of pre-enforcement standing to a
28   Second Amendment challenge, see page 20, *infra*.

1   *Inc.*, 328 F.3d at 1094. The court recognized that particularly, *but not exclusively*, in the First

2   Amendment context, "the Supreme Court has dispensed with rigid standing requirements," and

3   found standing to challenge a law whose very existence "chilled" constitutionally protected

4   conduct, inflicting the harm of self-censorship. *Id.* at 1094-95.

5       In fact, a long line of cases uphold pre-enforcement review of First Amendment

6   challenges to criminal statutes by plaintiffs with bases for standing no different than those

7   asserted by Plaintiffs here. For example, in *American Booksellers*, plaintiffs brought a suit

8   challenging the constitutionality of a newly enacted Virginia statute criminalizing the display for

9   commercial purposes of certain sexually explicit visual and/or written material. 484 U.S. at 387-

10   88. The Commonwealth of Virginia claimed plaintiffs lacked standing because they had not yet

11   been threatened with prosecution under the statute, which had not yet taken effect. *Id.* at 392. The

12   Supreme Court, "not troubled by the pre-enforcement nature of th[e] suit," concluded that

13   "plaintiffs ha[d] alleged an actual and well-founded fear that the law [would] be enforced against

14   them" because the "state ha[d] not suggested that the . . . law [would] not be enforced" and

15   because the there was no reason to assume that it would not be. *Id.* at 393.

16       There is no distinction between *American Booksellers* and the case at bar, except that

17   Plaintiffs have clearly alleged that law enforcement officers and high-profile city officials have

18   explicitly expressed their intentions to enforce the challenged ordinances (Am. Compl. ¶¶ 52-53,

19   65), providing even more support that Plaintiffs have a well-founded fear the ordinances will be

20   enforced against them. And especially as to section 4512, having been enacted only four years

21   ago,[10] it would be wholly unreasonable to believe the San Francisco Board of Supervisors so

22   recently enacted laws it had no intention to see enforced.

23       Defendants attempt to limit the application of the relaxed standards of pre-enforcement

24   standing–particularly the idea that a statute's "chilling effect" alone  may confer standing–to the

25

26      [10] *See Bland v. Fessler*, 88 F.3d 729, 737 (standing to bring a pre-enforcement challenge even

27 though the law had never been enforced against *anyone* because the court found no reason to
assume it would not be enforced– the Attorney General had not stated he would not enforce the

28 statute and it had only been on the books for six years, so it had "not fallen into desuetude").

1   First Amendment context. (Defs.' Mot. 9 n.3, 12.) Claiming that Plaintiffs must show that they

2   are "actually being prosecuted" or have "received a personalized threat of imminent prosecution

3   under the challenged law," Defendants relegate to a mere footnote the important fact that the

4   Supreme Court has relaxed this standard in cases implicating First Amendment and privacy

5   rights and casts aside the notion that Second Amendment challenges deserve similar deference.

6   (Defs' Mot. 9 n.3.) Citing *Reno*, Defendants instead suggest that, "[u]nder controlling Ninth

7   Circuit precedent, [the stricter standard] is stringently applied to *other types of constitutional*

8   *claims*" not rooted in the First Amendment. (Defs.' Mot. 9 n.3. (emphasis added).)  Defendants

9   then assert that *Reno* "is so similar to the case at bar that it directly controls this lawsuit,"–a gross

10   overstatement of its bearing on this case.

11          First, Defendants fail to mention that *Reno* is *not* a Second Amendment opinion; *Reno*

12   specifically rejected plaintiff's Second Amendment claim *on the merits*, *not* for lack of

13   jurisdiction to bring that claim. *Id.* at 1124-25 (citing *Hickman v. Block*, 81 F.3d 98, 101 (9th Cir.

14   1996), *abrogation recognized*, *Nordyke v. King*, 563 F.3d 439, 444 (9th Cir. 2009)). The court

15   similarly rejected the plaintiffs' Ninth Amendment challenge, finding ultimately that the Ninth

16   Amendment (which does not exist as an independent source of rights) does not confer an

17   individual, fundamental right to keep and bear arms–again rejecting plaintiffs' claims on the

18   merits rather than standing. *Id.* at 1125. Thus, the court limited its analysis to the plaintiff's

19   standing to raise a *Commerce Clause challenge*. *Id*. at 1125-26, 1125 n.2. And the Commerce

20   Clause empowers Congress to enact legislation affecting certain types of commerce; it neither

21   proclaims nor recognizes the *rights of individual citizens*.[11] In stark contrast, the Second

22   Amendment protects individual, fundamental rights *of the People*. *See Heller*, 554 U.S. at 595. It

23   should thus come as no surprise that a court might exercise its discretion under the Declaratory

24   Relief Act to entertain a Second Amendment challenge to a local ordinance that infringes upon

25   an individual's fundamental right to armed self-defense, while declining to adjudicate a challenge

26

27   ─────────────────────

28   [11] "The Congress shall have power . . . To regulate commerce with foreign nations, and among
the several states, and with the Indian tribes."  U.S. Const. art. I § 8.

1   to a federal statute because it allegedly infringes upon the freedom to engage in commerce

2   concerning semiautomatic "assault weapons."

3      Moreover, *Reno* was handed down in a pre-*Heller*/*McDonald* world–a world in which

4   fundamental rights protected by the Second Amendment were not yet recognized. It is thus

5   hardly surprising the *Reno* court so easily dismissed the Second Amendment challenge and

6   refused to apply the relaxed rules of pre-enforcement standing previously reserved for First

7   Amendment and privacy cases. But the United States Supreme Court's rulings in *Heller* and

8   *McDonald* confirm that Second Amendment rights are indeed fundamental to our system of

9   ordered liberty and should be afforded protections similar to those of the First Amendment. The

10   Supreme Court has emphatically rejected attempts to deprive the Second Amendment of the

11   dignity afforded other fundamental rights and explained the Second Amendment is no different

12   from the First, *id.* at 634-35, implying that First Amendment doctrine should inform Second

13   Amendment analyses. In fact, several post-*Heller* decisions have applied First Amendment

14   analysis in the Second Amendment context.[12] This court should now do the same in considering

15   Plaintiffs' standing to bring this challenge to vindicate Plaintiffs' fundamental rights.

16      Applying the principles often used in First Amendment pre-enforcement challenges to

17   this context, the Court should relax the "rigid standing requirements" and recognize Plaintiffs'

18   standing because the "mere existence" of the challenged ordinances has and continues to "chill"

19   conduct protected by the Second Amendment.

20      **C.    Plaintiffs Have Standing to Challenge Section 613.10(g) As They Assert Their Own Rights, Not the Rights of Third Party Ammunition Retailers**

21   Plaintiffs raise two constitutional challenges to section 613.10(g); namely, that it

22   impermissibly infringes upon Plaintiffs' Second Amendment right to keep and bear arms, and

23   that the terms of the ordinance are unconstitutionally vague. Because Plaintiffs assert their own

24

25      [12] *United States* v. *Marzzarella,* 614 F.3d 85, 89 n.4, 96-97 (3d Cir. 2010); *United States* v.

26   *Chester*, 628 F.3d 673, 682 (4th Cir. 2010) ("[g]iven *Heller's* focus on 'core' Second Amendment conduct and the Court's frequent references to First Amendment doctrine we agree with those who

27   advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment"); *United States* v. *Huet*, No. 08-0215, 2010 WL 4853847, * 10-11 (W.D. Pa.

28   Nov. 22, 2010).

1   rights, rather than the rights of third party ammunition retailers, and because they themselves

2   have suffered an injury-in-fact by the enactment and enforcement of section 613.10(g), Plaintiffs

3   have standing to raise both claims.

4          In *Doe v. Bolton*, 410 U.S. 179 (1973), a woman had standing to challenge an abortion

5   statute, claiming the law was unconstitutionally vague because it "deterred hospitals and doctors

6   from performing abortions. She sued 'on her own behalf and on behalf of all others similarly

7   situated.' " *Id.* at 186. In that case, she claimed that her *own right* to procure an abortion was

8   infringed by the existence of a law that restricted the circumstances under which a physician

9   could perform the procedure. She was personally under *no threat* of prosecution under the

10  arguably vague statute because it operated not against women seeking abortions, but against the

11  healthcare providers who sought to perform them. However, because her access to the

12  constitutionally protected procedure was limited by the challenged law's enforcement against

13  physicians, she indeed suffered an injury-in-fact sufficient to confer standing. *Id.*

14         The standing issue plays out similarly in this case. Here, Plaintiffs raise Second

15  Amendment and vagueness challenges to section 613.10(g), San Francisco's ordinance

16  prohibiting the transfer or sale of ammunition that "serves no sporting purpose" or is designed to

17  expand or fragment upon impact. As Defendants correctly note, section 613.10(g) "applies to

18  licensed San Francisco firearms dealers, and plaintiffs do not allege that they hold such permits

19  or intend to apply for them." (Defs.' Mot. 5.) From there, however, Defendants miss the point.

20  The harm Plaintiffs suffer is not the prosecution of retailers under section 613.10(g), but the

21  infringement of their own fundamental rights. As such, Plaintiffs are suing on their *own behalf*,

22  and not, as Defendants suggest, to vindicate the rights of gun dealers and ammunition retailers.

23         Plaintiffs' Second Amendment claim rests on the argument that prohibiting the sale of

24  this ammunition ultimately prohibits "law-abiding residents from using the type of ammunition

25  best suited for self-defense" and violates "Plaintiffs' right to self-defense, which is at the core of

26  the Second Amendment right to keep and bear arms." (Am. Compl. ¶ 60.) In other words, while

27  Plaintiffs are under no threat of prosecution under section 613.10(g), the threat of its enforcement

28  against gun dealers significantly limits Plaintiffs' access to the ammunition best suited for self-

1  defense in violation of the Second Amendment. The existence and enforcement of the ordinance

2  effectively limit not only the ability of ammunition retailers to sell the ammunition, *but the right*

3  *of Plaintiffs to access it. See Andrews v. State*, 50 Tenn. 165, 178, 8 A. Rep. 8, 13 (1871). And

4  *that* is the harm Plaintiffs seek to vindicate.

5  Examination of the issue in the context of firearms is also revealing. Consider, for

6  example, a law banning the sale of handguns by retailers. Although residents would be denied the

7  ability to access handguns for self-defense, as Defendants would have it, Plaintiffs would be

8  barred from challenging the government's denial of their Second Amendment rights because they

9  aren't "retailers." And though Defendants might argue that the ability to access certain types of

10  ammunition is not encompassed by the Second Amendment, that is an issue for the court to

11  consider on the *merits*, not on a motion to dismiss for lack of standing.

12  Plaintiffs' vagueness challenge similarly hinges on the issue of access. Plaintiffs allege

13  that "the provisions, in particular the undefined phrase, 'serves no sporting purpose,' inevitably

14  leads citizens–both sellers and buyers of ammunition–to steer far wider of the 'unlawful zone' of

15  conduct than if the boundaries of the forbidden areas were clearly marked." (Am. Compl. ¶ 71.)

16  The result is that retailers, unsure of what constitutes ammunition that "serves no sporting

17  purpose," halt transfers of far more types of ammunition out of fear that they may be regulated by

18  the law. As the vagueness of the statute challenged in *Doe* arguably discouraged physicians from

19  performing abortions, section 613.10(g) similarly discourages ammunition retailers from selling

20  ammunition necessary for the full and meaningful exercise of Plaintiffs' Second Amendment

21  rights. Plaintiffs are thus harmed not only by denial of access to ammunition that is *actually*

22  *banned by section 613.10(g)* (whatever that may be), but by their inability to acquire ammunition

23  that doesn't *actually fall within the scope of the ordinance*–but which they nonetheless are unable

24  to purchase because 613.10(g)'s vagueness causes retailers to forego the sale of ammunition

25  *beyond the intended scope of the law*.

26  Much like Plaintiffs' Second Amendment claims, whatever Defendants' stance regarding

27  Plaintiffs' vagueness claim might be, that is an issue appropriate for resolution on the

28  merits. Because Plaintiffs have pled in general terms that they will be harmed by being denied

Plaintiffs' Opposition to Defendants' Motion to Dismiss

1  access to ammunition in excess of what is actually prohibited, thus denying them access to

2  constitutionally protected components of a functional firearm, dismissal of Plaintiffs' claims at

3  this stage of the litigation is unwarranted.

4  **III.   PLAINTIFFS' CLAIMS ARE RIPE BECAUSE PLAINTIFFS HAVE SUFFERED AN INJURY-IN-FACT, NOTHING WILL BRING MORE CLARITY TO THE ISSUES, AND PLAINTIFFS WILL CONTINUE TO SUFFER GREAT HARDSHIP ABSENT REVIEW OF THEIR CLAIMS**

5

6        The ripeness doctrine is "drawn both from Article III limitation on judicial power and

7  from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v.*

8  *Dep't of Interior*, 538 U.S. 803 (2003). While Article III ripeness, like Article III standing, is

9  jurisdictional and mandatory, "[p]rudential considerations of ripeness are discretionary . . . ."

10 *Thomas* 220 F.3d at 1142. Under both ripeness tests, this case is ready for judicial review.

11       **A.   Having Established Sufficient Injury to Confer Article III Standing, Plaintiffs Meet the Requirement of Constitutional Ripeness**

12       "Sorting out where standing ends and ripeness begins is not an easy task." *Thomas*, 220

13 F.3d at 1138. The Ninth Circuit has noted that "the ripeness inquiry contains both a constitutional

14 and a prudential component . . . and that the constitutional component of ripeness is synonymous

15 with the injury-in-fact prong of the standing inquiry." *Cal. Pro-Life Council*, 328 F.3d at 1094

16 n.2 (citations omitted). Because Plaintiffs have established sufficient injury to confer standing,

17 their claims are necessarily ripe for review. *See Ariz. Right to Life*, 320 F.3d at 1007 n.6 (noting

18 that a finding that plaintiff has suffered a harm "dispenses with any ripeness concerns").

19       **B.   Plaintiffs Meet the Further Requirement of Prudential Ripeness Because No Further Factual Development Will Make the Issues More Clear and Their Constitutional Rights Are Undermined Every Second the Court Delays Review of Their Claims**

20

21       Often "when a court declares that a case is not prudentially ripe, it means that the case

22 will be better decided later *and that the parties will not have constitutional rights undermined by*

23 *the delay*." *Simmonds v. INS*, 326 F.3d 351, 357 (2d Cir. 2003) (emphasis added). Prudential

24 ripeness thus turns on two considerations: (1) whether an issue is presently fit for judicial

25 decision and (2) whether and to what extent the parties will endure hardship if a decision is

26 withheld. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). Because no additional fact

27 would make this case better fit for review–even absent prosecution, Plaintiffs' injury is

28 immediate and very real–and because Plaintiffs' Second Amendment rights are continuously

1    undermined by the existence of the challenged ordinances, Plaintiffs' claims are ripe for review.

2         **1.     Plaintiffs' Challenge Is Fit for Judicial Review Because No Further Factual Context Is Required to Clarify the Issues**

3    The first prong of the ripeness doctrine tests whether the issues are "fit" for judicial

4    consideration. To be so fit, the issues should be sufficiently focused to permit judicial resolution

5    without further factual development. *See Clinton v. Acequia, Inc.*, 94 F.3d 568, 572 (9th Cir.

6    1992). In contrast, ripeness is less likely when the factual record does not permit a necessary

7    assessment of the effect of the challenged law on the plaintiff's conduct, *see Socialist Party v.*

8    *Gilligan*, 406 U.S. 583 (972), or where the outcome "hangs on future contingencies that may or

9    may not occur," *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1125 (9th Cir. 2009). Contrary to

10   Defendants' assertions, this is not such a case.

11        Here, no further factual record is necessary to clarify the impact of the challenged

12   ordinances on Plaintiffs' conduct, as the injury invited upon Plaintiffs by Defendants'

13   enforcement of those laws is already apparent and very real. The harm lies in the fact that

14   Plaintiffs have surrendered their constitutional rights out of reasonable fear of criminal liability

15   and commendable respect for the law. That harm exists even absent an actual or imminent

16   prosecution. And for purposes of defeating a motion to dismiss, Plaintiffs have sufficiently

17   alleged facts that, if accepted as true, establish this injury. As such, prosecution of Plaintiffs

18   under the ordinances would not add anything to the record necessary for the Court to pass upon

19   the constitutionality of the challenged ordinances.

20        **2.     Plaintiffs Presently Suffer Great Hardship by the Infringement of Their Constitutional Rights and They Will Continue to so Suffer**
21        **Unless and Until This Court Grants Review of Their Claims**

22        In general, the greater the potential hardship from denying review, the greater the chance

23   the case is ripe. Significant hardship is often found in cases in which the plaintiff faces a decision

24   whether to comply with a statute or regulation and surrender their fundamental rights or not to

25   comply and face criminal or civil penalties. In such cases, the plaintiff need not wait to be

26   prosecuted and challenge the law as a defense. *See Steffel*, 415 U.S. 452; *U.S. Civil Service*

27   *Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548 (1973). As with standing, the question in

28   these pre-enforcement review cases generally turns on the degree of certainty that the affected

party intends to engage in the proscribed conduct and the likelihood of prosecution if it does. The certainty of enforcement is informed by whether prosecuting authorities have warned of enforcement or have disclaimed an intent to enforce the challenged laws. And, as noted above, this analysis shifts in favor of petitioners when fundamental rights are denied by arguably unconstitutional laws that coerce law-abiding citizens to forego such rights or violate the law.

The harm inflicted on Plaintiffs in this case, which has been detailed extensively above, is clear; as is Plaintiffs' intention to engage in constitutionally protected conduct, but for the enforcement of the challenged ordinances. (Am. Compl. ¶¶ 23-25, 37-39.) And enforcement of these laws is highly probable as both law enforcement officers and public officials have indicated their intention to enforce them, and they have not disavowed any intention to continue so doing. (Am. Compl. ¶¶ 52-55, 61-62, 65-67.)

Because Plaintiffs' constitutional rights are infringed every minute the challenged ordinances are allowed to stand, forcing Plaintiffs to forego protected conduct or risk criminal prosecution, the harm imposed from denying review is severe, tilting the balance of the prudential ripeness analysis strongly in Plaintiffs' favor. Viewed together with the fact that little factual development is required before the Court can properly consider this case, Plaintiffs' claims are now ripe for review. Accordingly, the Court should exercise its jurisdiction over this case and refuse to exercise its discretion to dismiss on ripeness grounds at this stage.

## CONCLUSION

Based on the reasons set forth above, and in light of the fact that motions to dismiss for lack of jurisdiction on fact-dependant bases are generally disfavored, Plaintiffs have alleged facts sufficient to establish both standing and ripeness. Plaintiffs thus respectfully request that Defendants' motion to dismiss be denied in full. Alternatively, should this Court grant the motion, Plaintiffs request leave to amend.

Date: March 23, 2011                    **MICHEL & ASSOCIATES, PC**

                                        _____/S/_____
                                        C. D. Michel
                                        Attorney for Plaintiffs

Plaintiffs' Opposition to Defendants' Motion to Dismiss

25

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ESPANOLA JACKSON,  PAUL COLVIN, THOMAS BOYER, LARRY BARSETTI, DAVID GOLDEN, NOEMI MARGARET ROBINSON, NATIONAL  RIFLE ASSOCIATION OF AMERICA, INC. SAN FRANCISCO VETERAN POLICE OFFICERS ASSOCIATION, | ) **CASE NO.: CV-09-2143-RS** ) ) ) **CERTIFICATE OF SERVICE** ) ) ) ) |
| Plaintiffs | ) ) |
| vs. | ) ) ) |
| CITY AND COUNTY OF SAN FRANCISCO, MAYOR GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY; POLICE CHIEF GEORGE GASCÓN, in his official capacity, and Does 1-10, | ) ) ) ) ) |
| Defendants. | ) ) |

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 E. Ocean Blvd., Suite 200, Long Beach, California, 90802.

I am not a party to the above-entitled action. I have caused service of:

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Wayne Snodgrass, Deputy City Attorney
Sherri Sokeland Kaiser, Deputy City Attorney
sherri.kaiser@sfgov.org
City and County of San Francisco
Office of the City Attorney
City Hall 1 Drive Carlton B.
San Francisco, CA 94102

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 23, 2011.

_____

_____/S/_____
C. D. Michel
Attorney for Plaintiffs'