# EXHIBIT "A"
# CASE NO.: CV-09-2143-RS

# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-3525

RHONDA EZELL, et al.,

*Plaintiffs-Appellants,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 cv 5135—**Virginia M. Kendall**, *Judge.*

ARGUED APRIL 4, 2011—DECIDED JULY 6, 2011*

Before KANNE, ROVNER, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* For nearly three decades, the
City of Chicago had several ordinances in place
"effectively banning handgun possession by almost all
private citizens." *McDonald v. City of Chicago,* 130 S. Ct. 3020,
3026 (2010). In 2008 the Supreme Court struck
down a similar District of Columbia law on an original-

---

* This opinion is released in typescript; a printed version will
follow.

meaning interpretation of the Second Amendment.[1]
*District of Columbia v. Heller*, 554 U.S. 570, 635-36 (2008).
*Heller* held that the Amendment secures an individual
right to keep and bear arms, the core component of which is
the right to possess operable firearms—
handguns included—for self-defense, most notably in
the home. *Id.* at 592-95, 599, 628-29.

Soon after the Court's decision in *Heller*, Chicago's
handgun ban was challenged. *McDonald*, 130 S. Ct. at
3027. The foundational question in that litigation was
whether the Second Amendment applies to the States
and subsidiary local governments. *Id.* at 3026. The
Supreme Court gave an affirmative answer: The
Second Amendment applies to the States through the
Due Process Clause of the Fourteenth Amendment. *Id.*
at 3050. In the wake of *McDonald*, the Chicago City
Council lifted the City's laws banning handgun posses-
sion and adopted the Responsible Gun Owners
Ordinance in their place.

The plaintiffs here challenge the City Council's treat-
ment of firing ranges. The Ordinance mandates one
hour of range training as a prerequisite to lawful gun
ownership, *see* Chi. Mun. Code § 8-20-120, yet at the
same time prohibits all firing ranges in the city, *see id.*
§ 8-20-080. The plaintiffs contend that the Second Amend-

---

[1] The Second Amendment provides: "A well regulated Militia,
being necessary to the security of a free State, the right of the
people to keep and bear Arms, shall not be infringed." U.S.
Const. amend. II.

ment protects the right to maintain proficiency in firearm use—including the right to practice marksmanship at a range—and the City's total ban on firing ranges is unconstitutional. They add that the Ordinance severely burdens the core Second Amendment right to possess firearms for self-defense because it conditions possession on range training but simultaneously forbids range training everywhere in the city. Finally, they mount a First Amendment challenge to the Ordinance on the theory that range training is protected expression. The plaintiffs asked for a preliminary injunction, but the district court denied this request.

We reverse. The court's decision turned on several legal errors. To be fair, the standards for evaluating Second Amendment claims are just emerging, and this type of litigation is quite new. Still, the judge's decision reflects misunderstandings about the nature of the plaintiffs' harm, the structure of this kind of constitutional claim, and the proper decision method for evaluating alleged infringements of Second Amendment rights. On the present record, the plaintiffs are entitled to a preliminary injunction against the firing-range ban. The harm to their Second Amendment rights cannot be remedied by damages, their challenge has a strong likelihood of success on the merits, and the City's claimed harm to the public interest is based entirely on speculation.

# I.  Background

## A.  Chicago's Responsible Gun Owners Ordinance

The day after the Supreme Court decided *McDonald*, the Chicago City Council's Committee on Police and Fire held a hearing to explore possible legislative responses to the decision. A Chicago alderman asked the City's legal counsel what could be done about firearms possession and other gun-related activity in the city, including shooting ranges. The City's Corporation Counsel replied that the Council could "limit what we allow to operate in our city however is reasonable as decided by the City Council."

The Committee quickly convened hearings and took testimony about the problem of gun violence in Chicago. Witnesses included academic experts on the issue of gun violence in general; community organizers and gun-control advocates; and law-enforcement officers, including Jody Weis, then the Superintendent of the Chicago Police Department. Based on these hearings, the Committee made recommendations to the City Council about how it should regulate firearm possession and other firearm-related activity.

The Council immediately took up the Committee's recommendations and, just four days after *McDonald* was decided, repealed the City's laws banning handgun possession and unanimously adopted the Responsible Gun Owners Ordinance. *See Nat'l Rifle Ass'n of Am., Inc. v. City of Chicago, Ill.*, Nos. 10-3957, 10-3965 & 11-1016, 2011 WL 2150785, at *1 (7th Cir. June 2, 2011). The new Ordinance—a sweeping array of firearm restrictions—took effect

on July 12, 2010. To give a sense of its scope: The Ordinance prohibits handgun possession outside the home, CHI. MUN. CODE § 8-20-020, and the possession of long guns outside the home or the owner's fixed place of business, *id.* § 8-20-030. It forbids the sale or other transfer of firearms except through inheritance or between peace officers. *Id.* § 8-20-100. A person may have "no more than one firearm in his home assembled and operable." *Id.* § 8-20-040. The Ordinance bans certain kinds of firearms, including assault weapons and "unsafe handgun[s]," as well as certain firearm accessories and types of ammunition. *Id.* §§ 8-20-060, 8-20-085, 8-20-170.

The Ordinance also contains an elaborate permitting regime. It prohibits the possession of any firearm without a Chicago Firearm Permit. CHI. MUN. CODE § 8-20-110(a). (Certain public-safety and private-security professionals are exempt.) In addition, all firearms must have a registration certificate, and to register a firearm, the owner must have a valid Permit.[2] *Id.* at § 8-20-140(a), (b). To apply

---

[2] Once issued, a Chicago Firearm Permit is valid for three years. CHI. MUN. CODE § 8-20-130(a). Any registration certificate expires with the Permit. The Permit fee is $100; the registration certificate fee is $15. *Id.* §§ 8-20-130(b), 8-20-150(a). An application for a registration certificate must be submitted "no later than 5 business days after a person takes possession within the city of a firearm from any source," *id.* § 8-20-140(d), and registration certificates are subject to an annual reporting requirement, *id.* § 8-20-145(c). Failure to file an annual report regarding each registered firearm "may result" in revocation of the owner's

(continued...)

for a Permit, a person must have an Illinois Firearm
Owner's Identification Card. *Id.* § 8-20-110(b)(2). Only those
21 years of age or older may apply for a Permit, except that
a person between the ages of 18 and 20 may apply with the
written consent of a parent or legal guardian if the parent or
guardian is not prohibited from having a Permit or a
Firearm Owner's Identification Card. *Id.* § 8-20-110(b)(1).
Persons convicted of certain crimes may not obtain a Permit.
*Id.* § 8-20-110(b)(3) (disqualifying persons convicted of any
violent crime, a second or subsequent drunk-driving
offense, or an offense relating to the unlawful use of a
firearm). Other lawsuits challenging these and other
provisions of the Ordinance are currently pending in the
District Court for the Northern District of Illinois. *See, e.g.,*
*Second Amendment Arms v. City of Chicago*, No. 10 C 4257
(N.D. Ill. filed July 9, 2010); *Benson v. City of Chicago*, No. 10
C 4184 (N.D. Ill. filed July 6, 2010).

As relevant here, permits are conditioned upon com-
pletion of a certified firearm-safety course. Applicants must
submit an affidavit signed by a state-certified
firearm instructor attesting that the applicant has completed
a certified firearm-safety and training course that provides
at least four hours of classroom instruction and one hour of
range training.[3]  CHI. MUN. CODE § 8-20-

---

[2] (...continued)
registration certificate, his Permit, or both. *Id.* § 8-20-145.

[3] The Ordinance provided a 90-day "grandfathering" period
after its effective date during which previously acquired firearms

(continued...)

120(a)(7). At the same time, however, the Ordinance prohibits all "[s]hooting galleries, firearm ranges, or any other place where firearms are discharged." *Id.* § 8-20-280. The Ordinance also prohibits the "discharge [of] any firearm within the city," making no exception for controlled shooting at a firing range—because, of course, firing ranges are banned throughout the city.[4] *Id.* § 8-24-010.

Violations are punishable by a fine of $1,000 to $5,000 and incarceration for a term of "not less than 20 days nor more than 90 days," and "[e]ach day that such violation exists shall constitute a separate and distinct offense." CHI. MUN. CODE § 8-20-300(a), (b). The penalties go up for subsequent convictions. *Id.* § 8-20-300(b) (For "[a]ny subsequent conviction," the penalty is a fine of $5,000 to $10,000 and incarceration for a term of "not less than 30 days, nor more than six months.").

The firing-range ban does not apply to governmental agencies. *Id.* § 8-20-280. The federal government operates four indoor firing ranges in Chicago, and the Chicago Police Department operates five. Apparently, the City also exempts private security companies; there are

---

[3] (...continued)
could be registered. CHI. MUN. CODE § 8-20-140(d)(2). To take advantage of this provision, a firearm owner had to complete all of the prerequisites for a Permit, including a firearm-safety course with one hour of range training.

[4] There are exceptions for discharging a firearm in self-defense or in defense of another, and also for game-bird hunting in certain limited areas of the city. *Id.* § 8-24-010.

two indoor firing ranges operated by private security
companies in Chicago.[5]

## B. The Litigation

The plaintiffs are three Chicago residents, Rhonda
Ezell, William Hespen, and Joseph Brown; and three
organizations, Action Target, Inc.; the Second Amend-
ment Foundation, Inc.; and the Illinois State Rifle Associa-
tion. Action Target designs, builds, and furnishes
firing ranges throughout the United States and would like to
do so in Chicago. The Second Amendment Foundation and
the Illinois Rifle Association are nonprofit associations
whose members are firearms enthusiasts; among other
activities, these organizations advocate for Second Amend-
ment rights and have made arrangements to try to bring a
mobile firing range to Chicago.

The plaintiffs sought a temporary restraining order
("TRO"), a preliminary injunction, and a permanent injunc-
tion against the City's ban on firing ranges, and correspond-
ing declaratory relief invalidating the ban. The district court
twice denied a TRO, finding that the plaintiffs were

---

[5] We say "apparently" because it is not clear whether the
exception allowing private security companies to operate
firing ranges is codified. The Ordinance contains an exemp-
tion for private security contractors at section 8-20-020(b), but this
exemption appears to apply only to the provision of the Ordi-
nance making it "unlawful for any person to carry or possess a
handgun, except when in the person's home," *id.* § 8-20-020(a),
not to section 8-20-280, the provision banning firing ranges.

not irreparably harmed. The parties conducted expedited discovery, and the court held a two-day hearing on the preliminary-injunction motion. The plaintiffs presented the testimony of representatives of Action Target, the Second Amendment Foundation, and the Illinois Rifle Association. Declarations from the three individual plaintiffs were already in the record, so they did not testify.

The City called two witnesses: Sergeant Daniel Bartoli, a former rangemaster for the Chicago Police Department, and Patricia Scudiero, Chicago's Zoning Commissioner. Bartoli testified that firing ranges can carry a risk of injury from unintentional discharge and raised concerns about criminals seeking to steal firearms from range users. He also explained the possible problem of contamination from lead residue left on range users' hands after shooting. He identified various measures that a firing range should take to reduce these risks. To prevent theft, he said a range should have a secure parking lot and only one entrance into its facilities. To avoid injury from unintentional discharge, a range should provide a separate location for the loading and unloading of firearms and should erect a permanent, opaque fence to deter bystanders from congregating around the facility. He also said a range should have running water onsite so users can wash lead residue from their hands after shooting.

Scudiero testified that Chicago's zoning code prohibits all property uses not expressly permitted and contains

no provision for gun ranges.[6] If firing ranges were
added as a permitted use, she said they should be classified
as an "intensive use" under the Code. An "intensive use,"
she explained, is a use "that could pose a threat to
the health, safety and welfare" of city residents and there-
fore may be located only in a manufacturing district; even
then, intensive uses are allowed only by special-use permit,
not presumptively. On cross-examination Scudiero admitted
she has never been to a firing range. She acknowledged as
well that the governmental firing ranges within the city are
not limited to manufacturing districts; they are located near
churches, schools, university buildings, residential housing,
a county courthouse, retail stores, and parks. She has not
received any complaints from the public about these ranges.

The City introduced evidence that there are 14 firing
ranges open to the public and located within 50 miles
of its borders. Of these, seven are located within
25 miles of the city, and five are located within 5 miles of the
city.

Because the legal issues in the case had been fully briefed,

---

[6] *See* CHI. MUN. CODE §§ 17-2-0204 (Residential Districts
section stating: "Uses that are not listed in the [corresponding
use] table are . . . prohibited."), 17-3-0204 (Business & Com-
mercial Districts section stating the same), 17-4-0204 (Down-
town Districts section stating the same), 17-5-0204 (Manufactur-
ing Districts section stating the same), 17-6-0403-C
(Special Purpose Districts section stating the same). Apparently,
the City does not interpret the "Sports and Recreation" special-
use category allowed in manufacturing districts, *see id.*
§ 17-5-0207, to include firing ranges.

the plaintiffs asked the court to consider the preliminary-injunction hearing as a trial on the merits. *See* FED. R. CIV. P. 65(a)(2) (permitting the court to "advance the trial on the merits and consolidate it with the [preliminary-injunction] hearing"). The court declined to do so and took the matter under advisement.

## C.  The Decision Below

Soon after the hearing, the district court issued a decision denying preliminary injunctive relief because the plaintiffs were neither irreparably harmed nor likely to succeed on the merits. The court's decision is a bit hard to follow; standing and merits inquiries are mixed in with the court's evaluation of irreparable harm. As we will explain, the court made several critical legal errors. To see how the decision got off-track requires that we identify its key holdings.

The judge began by "declin[ing] to adopt the intermediate scrutiny standard" of review, but held in the alternative that "even if" intermediate scrutiny applied, the "[p]laintiffs still fail to meet their burden of demonstrating irreparable harm." The judge said the organizational plaintiffs "do not have the necessary standing to demonstrate their irreparable harm" because "*Heller* and *McDonald* addressed an individual's right to possess a firearm" but "did not address an organization's right." Again, the court purported to enter an alternative holding: "Even if" the organizations had standing to assert a claim under *Heller* and *McDonald,* they "failed to present sufficient evidence . . . that their constituency has been unable to comply with the statute." The court held that none of the plaintiffs were suffering irreparable

harm because the injury in question was limited to the minor cost and inconvenience of having to travel outside the city to obtain the range training necessary to qualify for a Permit and money damages would be sufficient to compensate the plaintiffs for this travel-related injury if they ultimately prevailed.

On the plaintiffs' likelihood of success on the merits, the judge was skeptical that the firing-range ban violated anyone's Second Amendment rights: "Suggesting that firing a weapon at a firing range is tantamount to possessing a weapon within one's residence for self-defense would be establishing law that has not yet been expanded to that breadth." If the Second Amendment was implicated at all, the judge characterized the claim as a minor dispute about an inconvenient permit requirement: "[T]he [c]ity's boundaries are merely artificial borders allegedly preventing an individual from obtaining a [firearm] permit . . . ." The court concluded that the City's evidence about "stray bullets," potential theft, and lead contamination was sufficient to show that "the safety of its citizens is at risk when compared to the minimal inconvenience of traveling outside of the [c]ity for a one-hour course."

Finally, the judge concluded that the balance of harms favored the City because the "potential harmful effects of firing ranges" outweighed any inconvenience the plaintiffs might experience from having to travel to ranges outside of Chicago. The court summarily rejected the plaintiffs' First Amendment claim, finding it underdeveloped. Alternatively, the court held that the range ban did not appear to implicate any expressive message.

No. 10-3525                                                    13

The plaintiffs appealed. *See* 28 U.S.C. § 1292(a)(1) (authorizing immediate appeal of a decision granting or denying injunctive relief).

## II. Analysis

To win a preliminary injunction, a party must show that it has (1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 619 (7th Cir. 2004); *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992). If the moving party meets these threshold requirements, the district court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied. *Christian Legal Soc'y*, 453 F.3d at 859. We review the court's legal conclusions de novo, its findings of fact for clear error, and its balancing of the injunction factors for an abuse of discretion. *Id.*

The district court got off on the wrong foot by accepting the City's argument that its ban on firing ranges causes only minimal harm to the plaintiffs—nothing more than the minor expense and inconvenience of traveling to one of 14 firing ranges located within 50 miles of the city limits—and this harm can be adequately compensated by money damages. This characterization of the plaintiffs' injury fundamentally misunderstands the form of this claim

and rests on the mistaken premise that range training does not implicate the Second Amendment *at all*, or at most only minimally. The City's confused approach to this case led the district court to make legal errors on several fronts: (1) the organizational plaintiffs' standing; (2) the nature of the plaintiffs' harm; (3) the scope of the Second Amendment right as recognized in *Heller* and applied to the States in *McDonald*; and (4) the structure and standards for judicial review of laws alleged to infringe Second Amendment rights.

## A. Standing

We start with the organizational plaintiffs' standing. Article III restricts the judicial power to actual "Cases" and " Controversies," a limitation understood to confine the federal judiciary to "the traditional role of Anglo-American courts, which is is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of the law." *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1148 (2009); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992); U.S. CONST. art. III, § 1. The doctrine of standing enforces this limitation. *Summers*, 129 S. Ct. at 1149; *Lujan*, 504 U.S. at 559-60. "Standing exists when the plaintiff suffers an actual or impending injury, no matter how small; the injury is caused by the defendant's acts; and a judicial decision in the plaintiff's favor would redress the injury." *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010) (citing *Summers*, 129 S. Ct. 1142, and *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)).

No. 10-3525                                              15

We note first that the district court did not address the individual plaintiffs' standing, probably because it is not in serious doubt. Ezell, Hespen, and Brown are Chicago residents who own firearms and want to maintain proficiency in their use via target practice at a firing range. Ezell is the victim of three attempted burglaries and applied for a Chicago Firearm Permit to keep a handgun in her home for protection. Hespen is a retired Chicago police detective who maintains a collection of handguns, shotguns, and rifles. Brown is a U.S. Army veteran who was honorably discharged after service in World War II; he is currently chairman of the Marksmanship Committee of the Illinois unit of the American Legion and teaches a junior firearms course at an American Legion post outside the city. Ezell and Hespen left the city to complete the range training necessary to apply for a Permit to legalize their firearm possession in the city. Brown owns a firearm that he keeps outside the city's limits because he does not have a Permit.

The plaintiffs—all of them—frame their Second Amendment claim in two ways. First, they contend that the Amendment protects the right of law-abiding people to maintain proficiency in firearm use via marksmanship practice and the City's absolute ban on firing ranges violates this right. Second, they contend that the range ban impermissibly burdens the core Second Amendment right to possess firearms in the home for self-defense because it prohibits, everywhere in the city, the means of satisfying a condition the City imposes for lawful firearm possession. They seek a declaration that the range ban is invalid and an injunction blocking its enforcement.

Ezell and Hespen took affirmative steps to comply with the Ordinance's permitting process by completing the range-training requirement outside the city. Brown did not, so he must keep his firearm outside the city to avoid violating the Ordinance. For all three the City's ban on firing ranges inflicts continuous harm to their claimed right to engage in range training and interferes with their right to possess firearms for self-defense. These injuries easily support Article III standing.

Moreover, this is a pre-enforcement challenge to the Ordinance. The plaintiffs contend that the City's ban on firing ranges is wholly incompatible with the Second Amendment. It is well-established that "pre-enforcement challenges . . . are within Article III." *Brandt v. Vill. of Winnetka, Ill.*, 612 F.3d 647, 649 (7th Cir. 2010). The plaintiffs need not violate the Ordinance and risk prosecution in order to challenge it. *Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010) ("A person need not risk arrest before bringing a pre-enforcement challenge . . . ."). The very "existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as 'injury' for the purpose of standing." *Bauer*, 620 F.3d at 708. The City did not question the individual plaintiffs' standing; their injury is clear.

Regarding the organizational plaintiffs, however, the City's argument led the district court astray. The City emphasized that the Second Amendment protects an individual right, not an organizational one, and this point led the court to conclude that "the organizations do not have the necessary standing to demonstrate their

irreparable harm."[7] This was error. Action Target, as a supplier of firing-range facilities, is harmed by the firing-range ban and is also permitted to "act[] as [an] advocate[] of the rights of third parties who seek access to" its services. *See Craig v. Boren*, 429 U.S. 190, 195 (1976) (allowing beer vendor to challenge alcohol regulation based on its patrons' equal-protection rights); *see also Pierce v. Soc'y of Sisters*, 268 U.S. 510, 536 (1925) (allowing private schools to assert parents' rights to direct the education of their children and citing "other cases where injunctions have issued to protect business enterprises against interference with the freedom of patrons or customers"); *Mainstreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 746-47 (7th Cir. 2007). The Second Amendment Foundation and the Illinois Rifle Association have many members who reside in Chicago and easily meet the requirements for associational standing: (1) their members would otherwise have standing to sue in their own right; (2) the interests the associations seek to protect are germane to their organizational purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual associa-

---

[7] The district court's emphasis on the organizational plaintiffs' standing is puzzling. As we have noted, it's clear the individual plaintiffs have standing. Where at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977); *Bond v. Utreras*, 585 F.3d 1061, 1070 (7th Cir. 2009); *Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 530-31 (7th Cir. 1988).

No. 10-3525

tion members in the lawsuit. *See United Food & Commercial Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 553 (1996); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Disability Rights Wis. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 801-02 (7th Cir. 2008).

The district court held in the alternative that the organizational plaintiffs "failed to present sufficient evidence to support their position that their constituency has been unable to comply with the statute." More specifically, the court held that the plaintiffs failed to produce "evidence of any one resident [of Chicago] who has been unable to travel to . . . a range [or] has been unable to obtain [the] range training" required for a Permit. It's not clear whether these observations were directed at standing or the merits of the motion for a preliminary injunction; this discussion appears in the court's evaluation of irreparable harm. Either way, the point is irrelevant. Nothing depends on this kind of evidence. The availability of range training outside the city neither defeats the organizational plaintiffs' standing nor has anything to do with merits of the claim. The question is not whether or how easily Chicago residents can comply with the range-training requirement by traveling outside the city; the plaintiffs are not seeking an injunction against the range-training requirement. The pertinent question is whether the Second Amendment prevents the City Council from banning firing ranges everywhere in the city; that ranges are present in neighboring jurisdictions has no bearing on this question.

## B.  Irreparable Harm and Adequacy of Remedy at Law

The City's misplaced focus on the availability of firing ranges outside the city also infected the district court's evaluation of irreparable harm. The judge's primary reason for rejecting the plaintiffs' request for a preliminary injunction was that they had "failed to establish the irreparable harm they have suffered by requiring them to travel outside of the [c]ity's borders to obtain their firing[-]range permits." The judge thus framed the relevant harm as strictly limited to incidental travel burdens associated with satisfying the Ordinance's range-training requirement. The judge noted that for at least some—perhaps many—Chicago residents, complying with the range-training requirement did not appear to pose much of a hardship at all. She observed that it might actually be easier for some Chicagoans to travel to a firing range in the suburbs than to one located, say, at the opposite end of the city if ranges were permitted to locate within city limits. The judge thought it significant that none of the individual plaintiffs had "testif[ied] that s/he was unable to travel outside of the [c]ity's borders to obtain the one-hour range training and all three have shown that they are capable of doing so and have done so in the past." The court held that although the Ordinance may force the plaintiffs to travel longer distances to use a firing range, this was a "quantifiable expense that can be easily calculated as damages."

This reasoning assumes that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction. That's a profoundly

mistaken assumption. In the First Amendment context, the Supreme Court long ago made it clear that "'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'" *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 76-77 (1981) (quoting *Schneider v. State of New Jersey*, 308 U.S. 147, 163 (1939)). The same principle applies here. It's hard to imagine anyone suggesting that Chicago may prohibit the exercise of a free-speech or religious-liberty right within its borders on the rationale that those rights may be freely enjoyed in the suburbs. That sort of argument should be no less unimaginable in the Second Amendment context.

Focusing on individual travel harms was mistaken for another equally fundamental reason. The plaintiffs have challenged the firing-range ban on its face, not merely as applied in their particular circumstances. In a facial constitutional challenge, individual application facts do not matter. Once standing is established, the plaintiff's personal situation becomes irrelevant. It is enough that "[w]e have only the [statute] itself" and the "statement of basis and purpose that accompanied its promulgation." *Reno v. Flores*, 507 U.S. 292, 300-01 (1993); *see also* Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 STAN. L. REV. 1209, 1238 (2010) ("[F]acial challenges are to constitutional law what res ipsa loquitur is to facts—in a facial challenge, *lex ipsa loquitur*: the law speaks for itself."); David L. Franklin, *Facial Challenges, Legislative Purpose, and the Commerce Clause*, 92 IOWA L. REV. 41, 58 (2006) ("A valid-rule facial challenge asserts that a statute is invalid on its face as written and authoritatively construed, when measured

against the applicable substantive constitutional doctrine, without reference to the facts or circumstances of particular applications."); Mark E. Isserles, *Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement*, 48 AM. U. L. REV. 359, 387 (1998) ("[A] valid rule facial challenge directs judicial scrutiny to the terms of the statute itself, and demonstrates that those terms, measured against the relevant constitutional doctrine, and independent of the constitutionality of particular applications, contains a constitutional infirmity that invalidates the statute in its entirety.").

Though she did not specifically mention it, the judge might have had the *Salerno* principle in mind when she limited her focus to individual travel harms. Under *Salerno* a law is not facially unconstitutional unless it "is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Stated differently, "[a] person to whom a statute properly applies can't obtain relief based on arguments that a differently situated person might present."[8] *United States v. Skoien*, 614 F.3d 638, 645

---

[8] We noted in *Skoien* that "the *Salerno* principle has been controversial" and does not apply to all facial challenges: "[T]he Justices have allowed 'overbreadth' arguments when dealing with laws that restrict speech and reach substantially more conduct than the justifications advanced for the statute support . . . ." *United States v. Skoien*, 614 F.3d 638, 645 (7th Cir. 2010) (en banc) (citing *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010)). Overbreadth claims are a distinct type of facial challenge. *Stevens*, 130 S. Ct. at 1587

(continued...)

(7th Cir. 2010) (en banc) (citing *Salerno*, 481 U.S. at 745).

Here, the judge zeroed in on the occasional expense and inconvenience of having to travel to a firing range in the suburbs, but that's not the relevant constitutional harm. The plaintiffs contend that the Second Amendment protects the right to maintain proficiency in firearm use—including the right to train at a range—and the City's complete ban on range training violates this right. They also claim that the range ban impermissibly burdens the core Second Amendment right to possess firearms at home for protection because the Ordinance conditions lawful possession on range training but makes it impossible to satisfy this condition anywhere in the city. If they're right, then the range ban was unconstitutional when enacted and violates their Second Amendment rights every day it remains on the books. These are not application-specific harms calling for individual remedies.

In a facial challenge like this one, the claimed constitutional violation inheres in the terms of the statute, not its application. *See* Rosenkranz, *The Subjects of the Constitution*, 62 STAN. L. REV. at 1229-38. The remedy is necessarily directed at the statute itself and *must* be injunc-

---

8  (...continued)
("In the First Amendment context, . . . this Court recognizes 'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a *substantial number* of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" (emphasis added) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008))).

tive and declaratory; a successful facial attack means
the statute is wholly invalid and cannot be applied *to
anyone*. Chicago's law, if unconstitutional, is unconstitu-
tional *without regard* to its application—or *in all* its ap-
plications, as *Salerno* requires. That is, the City Council
violated the Second Amendment when it made this law;
its very existence stands as a fixed harm to every Chica-
goan's Second Amendment right to maintain proficiency
in firearm use by training at a range. This kind of constitu-
tional harm is not measured by whether a particular per-
son's gasoline or mass-transit bill is higher because he must
travel to a firing range in the suburbs rather than one in the
city, as the district court seemed to think. Whatever else the
*Salerno* principle might mean for this case, it neither requires
nor supports the district court's approach to irreparable
harm.[9]

---

[9]  For different views of the *Salerno* doctrine and the structure
of the facial and as-applied forms of judicial review, see generally
Nicholas Quinn Rosenkranz, *The Subjects of the Constitution,* 62
STAN. L. REV. 1209, 1242-50 (2010); David L. Franklin, *Facial
Challenges, Legislative Purpose, and the Commerce Clause,* 92 IOWA L.
REV. 41, 58 (2006); Matthew D. Adler, *Rights, Rules, and the
Structure of Constitutional Adjudication: A Response to Professor
Fallon,* 113 HARV. L. REV. 1371 (2000); Richard H. Fallon, Jr., *As-
Applied and Facial Challenges and Third-Party Standing,* 113 HARV.
L. REV. 1321 (2000); Mark E. Isserles, *Overcoming Overbreadth:
Facial Challenges and the Valid Rule Requirement,* 48 AM. U. L. REV.
359 (1998); Michael C. Dorf, *Facial Challenges to State and Federal
Statutes,* 46 STAN. L. REV. 235 (1994); Henry P. Monaghan,
(continued...)

Beyond this crucial point about the form of the claim, for some kinds of constitutional violations, irreparable harm is presumed. *See* 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). This is particularly true in First Amendment claims. *See, e.g., Christian Legal Soc'y*, 453 F.3d at 867 ("[V]iolations of First Amendment rights are presumed to constitute irreparable injuries . . . ." (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976))). The loss of a First Amendment right is frequently presumed to cause irreparable harm based on "the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *Miles Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 548 (6th Cir. 2010) (internal alteration and quotation marks omitted); *see also KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). The Second Amendment protects similarly intangible and unquantifiable interests. *Heller* held that the Amendment's central component is the right to possess firearms for protection. 554 U.S. at 592-95. Infringements of this right cannot be compensated by damages.[10]

---

[9]  (...continued)

*Harmless Error and the Valid Rule Requirement,* 1989 SUP. CT. REV. 195.

[10]  The City cites our opinion in *Campbell v. Miller*, 373 F.3d

(continued...)

---

[10] (...continued)
834, 835 (7th Cir. 2004), which cautioned against the assumption "that money never is an adequate remedy for a constitutional wrong." But *Campbell* concerned a Fourth Amendment unreasonable-search claim—a claim properly characterized as "a constitutional tort" and "often . . . analogized to (other) personal-injury litigation." *Id.* In *Campbell* the plaintiff contended that jail officers violated the Fourth Amendment by subjecting him to an unreasonable search; the proper, fully adequate remedy for that kind of constitutional violation is damages. The constitutional claim here is quite different. The plaintiffs do not contend that a city official violated the Second Amendment by enforcing the range ban against them; they contend that the City Council violated the Second Amendment by enacting the firing-range ban in the first place. If they prevail, the *only* appropriate remedy is a declaration that the firing-range ban is invalid and an injunction forbidding its enforcement.

The City also cites the First Circuit's decision in *Public Service Co. of New Hampshire v. Town of West Newbury*, 835 F.2d 380, 382 (1st Cir. 1987). In *Public Service Co.*, local regulators ordered a nuclear power plant to remove utility poles from its property because they were too high. The plant owner sued, alleging a denial of due process. The First Circuit noted that the "alleged denial of procedural due process, without more, does not automatically trigger" a finding of irreparable harm. *Id.* The court then affirmed the denial of preliminary injunctive relief because "the prospects of any irreparable damage were speculative" and the owner had little likelihood of success on the merits. *Id.* at 383. *Public Service Co.*, like *Campbell*, does not help the City. An improper order requiring the removal of utility poles can easily be remedied by damages—not so with the constitutional viola-
(continued...)

In short, for reasons related to the form of the claim and the substance of the Second Amendment right, the plaintiffs' harm is properly regarded as irreparable and having no adequate remedy at law.

## C.  Likelihood of Success on the Merits

Having rejected the plaintiffs' claim of irreparable harm, the district court only summarily addressed whether they were likely to succeed on the merits. Early on in her decision, the judge said she would not apply intermediate scrutiny to evaluate the constitutionality of the range ban—and by implication, rejected *any* form of heightened review. When she later returned to the merits, the judge suggested that banning range training might not implicate anyone's Second Amendment rights *at all*. She observed that although Chicago requires range training as a prerequisite to firearm possession, "the City does not have the ability to create a Constitutional right to that training." Instead, the judge thought the key question was "whether the individual's right to possess firearms within his residence expands to the right to train with that same firearm in a firing range located within the [c]ity's borders." This statement of the question ends the court's discussion of the merits.

There are several problems with this analysis. First, it is incomplete. The judge identified but did not evaluate

---

[10] (...continued)
tions alleged here.

the Second Amendment merits question. More importantly, the court framed the inquiry the wrong way. Finally, it was a mistake to reject heightened scrutiny. The judge was evidently concerned about the novelty of Second Amendment litigation and proceeded from a default position in favor of the City. The concern is understandable, but the default position cannot be reconciled with *Heller*.

### 1. *Heller*, *McDonald*, and a framework for Second Amendment litigation

It's true that Second Amendment litigation is new, and Chicago's ordinance is unlike any firearms law that has received appellate review since *Heller*. But that doesn't mean we are without a framework for how to proceed. The Supreme Court's approach to deciding *Heller* points in a general direction. Although the critical question in *Heller*—whether the Amendment secures an individual or collective right—was interpretive rather than doctrinal, the Court's decision method is instructive.

With little precedent to synthesize, *Heller* focused almost exclusively on the original public meaning of the Second Amendment, consulting the text and relevant historical materials to determine how the Amendment was understood at the time of ratification. This inquiry led the Court to conclude that the Second Amendment secures a pre-existing natural right to keep and bear arms; that the right is personal and not limited to militia service; and that the "central component of the right" is the right of armed self-defense, most notably in the home. *Heller*, 554 U.S. at 595, 599-600; *see also McDonald*, 130 S. Ct.

at 3036-37, 3044. On this understanding the Court invalidated the District of Columbia's ban on handgun possession, as well as its requirement that all firearms in the home be kept inoperable. *Heller*, 554 U.S. at 629-35. The Court said these laws were unconstitutional "[u]nder any . . . standard[] of scrutiny" because "the inherent right of self-defense has been central to the Second Amendment right" and the District's restrictions "extend[] . . . to the home, where the need for defense of self, family, and property is most acute." *Id.* at 628-29. That was enough to decide the case. The Court resolved the Second Amendment challenge in *Heller* without specifying any doctrinal "test" for resolving future claims.

For our purposes, however, we know that *Heller*'s reference to "any standard of scrutiny" means any *heightened* standard of scrutiny; the Court specifically excluded rational-basis review. *Id.* at 628-29 & n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."); *see also Skoien*, 614 F.3d at 641 ("If a rational basis were enough [to justify a firearms law], the Second Amendment would not do anything . . . because a rational basis is essential for legislation in general."). Beyond that, the Court was not explicit about how Second Amendment challenges should be adjudicated now that the historic debate about the Amendment's status as an individual-rights guarantee has been settled. *Heller*, 554 U.S. at 635 ("[S]ince this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the

entire field . . . ."). Instead, the Court concluded that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.*

And in a much-noted passage, the Court carved out some exceptions:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27. The Court added that this list of "presumptively lawful regulatory measures" was illustrative, not exhaustive. *Id.* at 627 n.26; *see also McDonald*, 130 S. Ct. at 3047 (repeating *Heller*'s "assurances" about exceptions).

These now-familiar passages from *Heller* hold several key insights about judicial review of laws alleged to infringe Second Amendment rights. First, the threshold inquiry in some Second Amendment cases will be a "scope" question: Is the restricted activity protected by the Second Amendment in the first place? *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1449. The answer requires a textual and historical inquiry into original meaning. *Heller*, 554 U.S. at 634-35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or

not future legislatures or (yes) even future judges think that scope too broad."); *McDonald*, 130 S. Ct. at 3047 ("[T]he scope of the Second Amendment right" is determined by textual and historical inquiry, not interest-balancing.).

*McDonald* confirms that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified. *See McDonald*, 130 S. Ct. at 3038-42. Setting aside the ongoing debate about which part of the Fourteenth Amendment does the work of incorporation, and how, *see id.* at 3030-31 (plurality opinion of Alito, J.); *id.* at 3058-80 (Thomas, J., concurring); *id.* at 3089-99 (Stevens, J., dissenting); *id.* at 3120-21 (Breyer, J., dissenting), this wider historical lens is required if we are to follow the Court's lead in resolving questions about the scope of the Second Amendment by consulting its original public meaning as both a starting point and an important constraint on the analysis. *See Heller*, 554 U.S. at 610-19; *McDonald,* 130 S. Ct. at 3038-42.[11]

---

[11] On this aspect of originalist interpretive method as applied to the Second Amendment, see generally Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 215-30, 257-67 (1998); Brannon P. Denning & Glenn H. Reynolds, *Five Takes on* McDonald v. Chicago, 26 J.L & Pol. 273, 285-87 (2011); Josh Blackmun & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities*, The Constitution in 2020, *and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L.

(continued...)

The Supreme Court's free-speech jurisprudence contains a
parallel for this kind of threshold "scope" inquiry. The
Court has long recognized that certain "well-defined and
narrowly limited classes of speech"—e.g., obscenity,
defamation, fraud, incitement—are categorically "outside
the reach" of the First Amendment. *United States v. Stevens*,
130 S. Ct. 1577, 1584-85 (2010); *see also Brown v. Entm't
Merchants Ass'n*, No. 08-1448, 2011 WL 2518809, at *3-4 (June
27, 2011). When the Court has "identified categories of
speech as fully outside the protection of the First Amend-
ment, it has not been on the basis of a simple cost-benefit
analysis." *Stevens*, 130 S. Ct. at 1586. Instead, some catego-
ries of speech are unprotected as a matter of history and
legal tradition. *Id.* So too with the Second Amendment.

---

[11] (...continued)
& PUB. POL'Y 1, 51-57 (2010); Clayton E. Cramer, Nicholas J.
Johnson & George A. Mocsary, *"This Right Is Not Allowed by
Governments That Are Afraid of the People": The Public Meaning
of the Second Amendment When the Fourteenth Amendment Was
Ratified*, 17 GEO. MASON L. REV. 823, 824-25 (2010); Steven G.
Calabresi & Sarah E. Agudo, *Individual Rights Under State
Constitutions When the Fourteenth Amendment Was Ratified in
1868: What Rights Are Deeply Rooted in American History and
Tradition?*, 87 TEX. L. REV. 7, 11-17, 50-54 (2008); Randy E. Barnett,
*Was the Right to Keep and Bear Arms Conditioned on Service in an
Organized Militia?*, 83 TEX. L. REV. 237, 266-70 (2004); David B.
Kopel, *The Second Amendment in the Nineteenth Century*, 1998 BYU
L. REV. 1359; Stephen P. Halbrook, *Personal Security, Personal
Liberty, and "The Constitutional Right to Bear Arms": Visions of the
Framers of the Fourteenth Amendment*, 5 SETON HALL CONST. L.J. 341
(1995).

*Heller* suggests that some federal gun laws will survive Second Amendment challenge because they regulate activity falling outside the terms of the right as publicly understood when the Bill of Rights was ratified; *McDonald* confirms that if the claim concerns a state or local law, the "scope" question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified. *Heller*, 554 U.S. at 625-28; *McDonald*, 130 S. Ct. at 3038-47. Accordingly, if the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment—1791 or 1868—then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.

If the government cannot establish this—if the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected—then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights. *Heller*'s reference to "any . . . standard[] of scrutiny" suggests as much. 554 U.S. at 628-29. *McDonald* emphasized that the Second Amendment "limits[,] but by no means eliminates," governmental discretion to regulate activity falling within the scope of the right. 130 S. Ct. at 3046 (emphasis and parentheses omitted). Deciding whether the government has transgressed the limits imposed by the Second Amendment—that is, whether it has "infringed" the right to keep and bear arms—requires the court to evaluate the regulatory means the government has chosen and the public-benefits end it seeks to

No. 10-3525                                          33

achieve. Borrowing from the Court's First Amendment doctrine, the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right. *See generally*, Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. REV. at 1454-72 (explaining the scope, burden, and danger-reduction justifications for firearm regulations post- *Heller*); Nelson Lund, *The Second Amendment,* Heller, *and Originalist Jurisprudence*, 56 UCLA L. REV. 1343, 1372-75 (2009); Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. REV. 1551, 1571-73 (2009); Lawrence B. Solum, District of Columbia v. Heller *and Originalism,* 103 NW. U. L. REV. 923, 979-80 (2009); Glenn H. Reynolds & Brannon P. Denning, Heller*'s Future in the Lower Courts*, 102 NW. U. L. REV. 2035, 2042-44 (2008).

Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional. *Heller,* 554 U.S. at 628-35 ("We know of no other enumerated constitutional right whose core protection has been subjected to a free-standing 'interest-balancing' approach."); *McDonald*, 130 S. Ct. at 3047-48. For all other cases, however, we are left to choose an appropriate standard of review from among the heightened standards of scrutiny the Court applies to governmental actions alleged to infringe enumerated constitutional rights; the answer to the Second Amendment "infringement" question depends on the government's ability to satisfy whatever standard of means-end scrutiny is held to apply.

The approach outlined here does not undermine
*Skoien*, 614 F.3d at 639-43, or *United States v. Williams*,
616 F.3d 685, 691-93 (7th Cir. 2010), both of which
touched on the historical "scope" question before applying
a form of intermediate scrutiny. And this general framework
has been followed by the Third, Fourth, and Tenth Circuits
in other Second Amendment cases.[12] *See United States v.
Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) ("As we read
*Heller*, it suggests a two-pronged approach to Second
Amendment challenges. First, we ask whether the chal-
lenged law imposes a burden on conduct falling within the

-------

[12] The Ninth Circuit recently adopted a somewhat different
framework for Second Amendment claims. In *Nordyke v. King*,
a divided panel announced a gatekeeping "substantial bur-
den" test before the court will apply heightened scrutiny. No. 07-
15763, 2011 WL 1632063, at *4-6 (9th Cir. May 2, 2011)
(O'Scannlain, J.). Under this approach only laws that substan-
tially burden Second Amendment rights will get some form
of heightened judicial review. *Id.* The *Nordyke* majority specifi-
cally deferred judgment on "what type of heightened
scrutiny applies to laws that substantially burden Second
Amendment rights." *Id.* at *6 n.9. Judge Gould, concurring
in *Nordyke*, would apply heightened scrutiny "only [to] arms
regulations falling within the core purposes of the Second
Amendment, that is, regulations aimed at restricting defense
of the home, resistance of tyrannous government, and protec-
tion of country." *Id.* at *15. All other firearms laws, he said,
should be reviewed for reasonableness, *id.*, although by this
he meant the sort of reasonableness review that applies in
the First Amendment context, not the deferential rational-
basis review that applies to all laws, *id.* at *16.

scope of the Second Amendment's guarantee. . . . If it does
not, our inquiry is complete. If it does, we evaluate the law
under some form of means-end scrutiny."); *United States v.
Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (A "two-part
approach to Second Amendment claims seems appropriate
under *Heller*, as explained by . . . the now-vacated *Skoien*
panel opinion . . . ."); *United States v. Reese*, 627 F.3d 792,
800-01 (10th Cir. 2010) (same). Each of these cases involved
a Second Amendment challenge asserted as a defense to a
federal prosecution under 18 U.S.C. § 922, but we think
the same principles apply here. *McDonald* reiterated that the
Court has long since "abandoned 'the notion that the
Fourteenth Amendment applies to the States only a
w a t e r e d - d o w n,   s u b j e c t i v e   v e r s i o n   o f   t h e
individual guarantees of the Bill of Rights.' " 130 S. Ct. at
3035 (quoting *Malloy v. Hogan*, 378 U.S. 1, 10-11 (1964)).

### 2.  Applying the framework to Chicago's firing-range ban

The plaintiffs challenge only the City's ban on firing
ranges, so our first question is whether range training
is categorically unprotected by the Second Amendment.
*Heller* and *McDonald* suggest to the contrary. The Court
emphasized in both cases that the "central component" of
the Second Amendment is the right to keep and bear
arms for defense of self, family, and home. *Heller*, 554 U.S.
at 599; *McDonald*, 130 S. Ct. at 3048. The right to possess
firearms for protection implies a corresponding right
to acquire and maintain proficiency in their use; the
core right wouldn't mean much without the training

and practice that make it effective. Several passages in *Heller* support this understanding. Examining post-Civil War legal commentaries to confirm the founding-era "individual right" understanding of the Second Amendment, the Court quoted at length from the "massively popular 1868 Treatise on Constitutional Limitations" by judge and professor Thomas Cooley: "[T]o bear arms implies something more than the mere keeping; it implies the learning to handle and use them . . . ; it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order." 554 U.S. at 616, 617-18 (internal quotation marks omitted); *see also id.* at 619 ("'No doubt, a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right.'" (quoting BENJAMIN VAUGHAN ABBOTT, JUDGE AND JURY: A POPULAR EXPLANATION OF THE LEADING TOPICS IN THE LAW OF THE LAND 333 (1880))).

Indeed, the City considers live firing-range training so critical to responsible firearm ownership that it mandates this training as a condition of lawful firearm possession. At the same time, however, the City insists in this litigation that range training is categorically outside the scope of the Second Amendment and may be completely prohibited. There is an obvious contradiction here, but we will set it aside for the moment and consider the City's support for its categorical position. The City points to a number of founding-era, antebellum, and Reconstruction state and local laws that limited the discharge of firearms in urban environments. As we have noted, the most relevant histori-cal period for questions about the scope of the Second

Amendment as applied to the States is the period leading up to and surrounding the ratification of the Fourteenth Amendment. That point aside, most of the statutes cited by the City are not specific to controlled target practice and, in any event, contained significant carveouts and exemptions.

For example, the City cites a 1790 Ohio statute that prohibited the discharge of a firearm before sunrise, after sunset, or within one-quarter of a mile from the nearest building. Act of Aug. 4, 1790, Ch. XIII, § 4, in 1 The Statutes of Ohio and of the Northwestern Territory 104 (Chase ed. 1833). This statute is not directly related to controlled target practice. A similar 1746 statute limiting the discharge of firearms in Boston provided an exception for target practice: City residents could "fir[e] at a Mark or Target for the Exercise of their Skill and Judgment . . . at the lower End of the Common" if they obtained permission from the "Field Officers of the Regiment in Boston"; they could also "fir[e] at a Mark from the Several Batteries in" Boston with permission from the "Captain General." Act of May 28, 1746, Ch. X, in Acts and Laws of the Massachusetts Bay 208 (Kneeland ed. 1746).

The City cites other eighteenth- and nineteenth-century statutes regulating the discharge of firearms in cities, but most of these allowed citizens to obtain a permit or license to engage in firearms practice from the governor or city council.[13] That was the case under the

---

[13] *See* Act of Aug. 26, 1721, § IV, in A Digest of the Acts of

(continued...)

Philadelphia Act of August 26, 1721, § 4, one of the very statutes the Supreme Court considered in *Heller* and deemed "a licensing regime." 554 U.S. at 633. In short, these laws were merely *regulatory* measures, distinguishable from the City's absolute *prohibition* on firing ranges. *See id.* at 632, 574 (founding-era statute that "restricted the firing of guns within the city limits to at least some degree" did not support the District of Columbia's "general[] prohibit[ion] on the possession of handguns"). These "time, place, and manner" regulations do not support the City's position that

---

[13] (...continued)

Assembly Relating to the City of Philadelphia 183 (Duane ed. 1856) (hereinafter Philadelphia Digest) (providing for "governor's special license"); Act of Feb. 9, 1750-51, ch. 388, in 1 Laws of the Commonwealth of Pennsylvania 312 (Carey ed. 1803) (providing for "Governor's special license"); Ordinance of June 7, 1813, § V, in Philadelphia Digest 188 (providing for permission from the board of commissioners); Ordinance of Sept. 8, 1851, § IX, in Philadelphia Digest 419 (providing for permission from the president of the board of commissioners); Ordinance of 1854, ch. 5, § 20, in Revised Ordinances of the City of Manchester, N.H. 59 (Gage ed. 1859) (providing for "permission of the Mayor and Aldermen in writing"); Act of Feb. 14, 1855, § 78, in Private Laws of the State of Illinois 144 (Bailhache ed. 1861) (providing for "permission from the mayor or common council"); Bylaw, Title XI, ch. IV, in Charter and By-Laws of the City of New Haven, Conn. 90 (Benham ed. 1865) (providing for "permission . . . of the Mayor, or some one or more of the Aldermen"); Ordinance of June 12, 1869, § 17, in Laws and Ordinances Governing the City of St. Joseph, Mo. 110 (Grubb ed. 1869) (providing for "permission from the city council or written permission from the mayor").

target practice is categorically unprotected.

To be sure, a few of the eighteenth- and nineteenth-century statutes cited by the City might accurately be described as general prohibitions on discharging firearms within cities. Three of these, however, had clear fire-suppression purposes and do not support the proposition that target practice at a safely sited and properly equipped firing range enjoys no Second Amendment protection whatsoever.[14] Only two—a Baltimore statute from 1826 and an Ohio statute from 1831—flatly prohibited the discharge of firearms based on concerns unrelated to fire suppression, in contrast to the other regulatory laws we have mentioned.[15] *Cf. Heller*, 554 U.S. at 632 ("[W]e would

---

[14] *See* Act of Apr. 22, 1786, in The New York Daily Advertiser, Dec. 30, 1788 (prohibiting discharge of firearms "for the more effectual prevention of FIRES in the city of New York"); Ordinance of July 1, 1817, art. 12, in Ordinances of the City of New Orleans 62, 68 (prohibiting the discharge of firearms for the "Prevention of fires"); Ordinance of Apr. 18, 1881, ch. XV, art. XX, § 1298, in Municipal Code of Chicago 307 (Jamieson ed. 1881) (prohibiting firearms discharge under article governing "Firearms, Fireworks and Cannons").

[15] *See* Ordinance of Mar. 9, 1826, § 6, in Baltimore Gazette and Daily Advertiser, Dec. 17, 1827 ("[I]f any person shall fire or discharge any Gun or Pistol or fire arms within the City, unless it be on some occasion of Military parade and then by order of some officer having the command, every such person, for every such offense, shall forfeit and pay a sum not exceeding five dollars."); Acts of Feb. 17, 1831, § 6, in 29 Acts of a

(continued...)

not stake our interpretation of the Second Amendment upon a single law . . . that contradicts the overwhelming weight of other evidence . . . ."). This falls far short of establishing that target practice is wholly outside the Second Amendment as it was understood when incorporated as a limitation on the States.

We proceed, then, to the second inquiry, which asks whether the City's restriction on range training survives Second Amendment scrutiny. As we have explained, this requires us to select an appropriate standard of review. Although the Supreme Court did not do so in either *Heller* or *McDonald*, the Court *did* make it clear that the deferential rational-basis standard is out, and with it the presumption of constitutionality. *Heller*, 554 U.S. at 628 n.27 (citing *United States v. Carolene Prods.*, 304 U.S. 144, 152 n.4 (1938)). This necessarily means that the City bears the burden of justifying its action under *some* heightened standard of judicial review.

The district court specifically decided against an intermediate standard of scrutiny but did not settle on any other, then sided with the City "even if" intermediate scrutiny applied. A choice must be made. The City urges us to import the "undue burden" test from the Court's abortion cases, *see, e.g., Planned Parenthood of Se. Pa. v. Casey*, 505 U.S.

---

[15] (...continued)
General Nature of the State of Ohio 162 (Olmsted ed. 1831) (subjecting "any person or persons [who] shall shoot or fire a gun at a target within the limits of any recorded town plat" to a fine "not exceeding five dollars, nor less than fifty cents").

833, 876-79 (1992), but we decline the invitation. Both *Heller* and *McDonald* suggest that First Amendment analogues are more appropriate, *see Heller*, 554 U.S. at 582, 595, 635; *McDonald*, 130 S. Ct. at 3045, and on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context, *see Skoien*, 614 F.3d at 641; *id.* at 649 (Sykes, J., dissenting); *Chester*, 628 F.3d at 682; *Marzzarella*, 614 F.3d at 89 n.4; *see also* Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. at 1449, 1452, 1454-55; Lund, *The Second Amendment,* Heller, *and Originalist Jurisprudence*, 56 UCLA L. Rev. at 1376; Winkler, Heller*'s Catch-22*, 56 UCLA L. Rev. at 1572.

In free-speech cases, the applicable standard of judicial review depends on the nature and degree of the governmental burden on the First Amendment right and sometimes also on the specific iteration of the right. For example, "[c]ontent-based regulations are presumptively invalid," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), and thus get strict scrutiny, which means that the law must be narrowly tailored to serve a compelling governmental interest, *id.* at 395; *see also Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, Nos. 10-238, 10-239, 2011 WL 2518813, at *9 (June 27, 2011). Likewise, "[l]aws that burden political speech are subject to strict scrutiny." *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 898 (2010) (internal quotation marks omitted). On the other hand, "time, place, and manner" regulations on speech need only be "reasonable" and "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The Supreme Court also uses a tiered standard

of review in its speech-forum doctrine; regulations in a traditional public or designated public forum get strict scrutiny, while regulations in a nonpublic forum "must not discriminate on the basis of viewpoint and 'must be reasonable in light of the forum's purpose.'" *Choose Life Ill., Inc. v. White*, 547 F.3d 853, 864 (7th Cir. 2008) (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001)).

In election-law cases, regulations affecting the expressive association rights of voters, candidates, and parties are subject to a fluctuating standard of review that varies with the severity of the burden on the right; laws imposing severe burdens get strict scrutiny, while more modest regulatory measures need only be reasonable, politically neutral, and justified by an important governmental interest. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190-91 (2008); *Wash. State Grange*, 552 U.S. at 451-52; *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006). "First Amendment challenges to disclosure requirements in the electoral context"—for example, laws compelling the disclosure of the names of petition signers—are reviewed "under what has been termed 'exacting scrutiny.'" *Doe v. Reed*, 130 S. Ct. 2811, 2818 (2010). This standard of review requires "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," and "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (internal quotation marks omitted).

Similarly, restrictions imposed on adult bookstores are reviewed under an intermediate standard of scrutiny

that requires the municipality to present "evidence that the restrictions actually have public benefits great enough to justify any curtailment of speech." *Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 462 (7th Cir. 2009) (citing *Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), and *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)). And in commercial-speech cases, the Court applies an intermediate standard of review that accounts for the "subordinate position" that commercial speech occupies "in the scale of First Amendment values." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989). In this context intermediate scrutiny requires "a fit between the legislature's ends and the means chosen to accomplish those ends, . . . a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Id.* at 480 (internal quotation marks and citation omitted); *see also Sorrell v. IMS Health Inc.*, No. 10-779, 2011 WL 2472796, at *13 (June 23, 2011) (To justify commercial-speech restrictions, "the State must show at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest.").

Labels aside, we can distill this First Amendment doctrine and extrapolate a few general principles to the Second Amendment context. First, a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more

easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right.

In *Skoien* we required a "form of strong showing"—a/k/a "intermediate scrutiny"—in a Second Amendment challenge to a prosecution under 18 U.S.C. § 922(g)(9), which prohibits the possession of firearms by persons convicted of a domestic-violence misdemeanor. 614 F.3d at 641. We held that "logic and data" established a "substantial relation" between dispossessing domestic-violence misdemeanants and the important governmental goal of "preventing armed mayhem." *Id.* at 642. Intermediate scrutiny was appropriate in *Skoien* because the claim was not made by a "law-abiding, responsible citizen" as in *Heller*, 554 U.S. at 635; nor did the case involve the central self-defense component of the right, *Skoien*, 614 F.3d at 645.

Here, in contrast, the plaintiffs *are* the "law-abiding, responsible citizens" whose Second Amendment rights are entitled to full solicitude under *Heller*, and their claim comes much closer to implicating the core of the Second Amendment right. The City's firing-range ban is not merely regulatory; it *prohibits* the "law-abiding, responsible citizens" of Chicago from engaging in target practice in the controlled environment of a firing range. This is a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense. That the City conditions gun possession on range training is an additional reason to closely scrutinize the range ban. All this suggests that a more rigorous showing than that applied in *Skoien* should be required, if not quite "strict

scrutiny." To be appropriately respectful of the individual
rights at issue in this case, the City bears the burden of
establishing a strong public-interest justification for its ban
on range training: The City must establish a close fit be-
tween the range ban and the actual public interests it serves,
and also that the public's interests are strong enough
to justify so substantial an encumbrance on individual
Second Amendment rights. Stated differently, the City must
demonstrate that civilian target practice at a firing range
creates such genuine and serious risks to public safety that
prohibiting range training throughout the city is justified.

At this stage of the proceedings, the City has not
come close to satisfying this standard. In the district
court, the City presented no data or expert opinion to
support the range ban, so we have no way to evaluate
the seriousness of its claimed public-safety concerns.
Indeed, on this record those concerns are entirely specula-
tive and, in any event, can be addressed through sensible
zoning and other appropriately tailored regulations.
That much is apparent from the testimony of the City's own
witnesses, particularly Sergeant Bartoli, who testified to
several common-sense range safety measures that could be
adopted short of a complete ban.

The City maintains that firing ranges create the risk
of accidental death or injury and attract thieves wanting
to steal firearms. But it produced no evidence to
establish that these are realistic concerns, much less that
they warrant a total prohibition on firing ranges. In the First
Amendment context, the government must supply actual,
reliable evidence to justify restricting protected expression
based on secondary public-safety effects. *See Alameda Books,*

*Inc.*, 535 U.S. at 438 (A municipality defending zoning restrictions on adult bookstores cannot "get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance."); *see also Annex Books, Inc. v. City of Indianapolis*, 624 F.3d 368, 369 (7th Cir. 2010) (affirming preliminary injunction where a city's "empirical support for [an] ordinance [limiting the hours of operation of an adult bookstore] was too weak"); *New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556, 560-61 (7th Cir. 2009) (affirming preliminary injunction where municipality offered only "anecdotal justifications" for adult zoning regulation and emphasizing the necessity of assessing the seriousness of the municipality's concerns about litter and theft).

By analogy here, the City produced no empirical evidence whatsoever and rested its entire defense of the range ban on speculation about accidents and theft. Much of the focus in the district court was on the possible hazards of mobile firing ranges. The City hypothesized that one cause of range-related injury could be stray bullets, but this seems highly implausible insofar as a properly equipped indoor firing range is concerned. The district court credited the plaintiffs' evidence that "mobile ranges are next to Sam's Clubs and residences and shopping malls and in parking lots, and there's not been any difficulties with them in those places." Commissioner Scudiero acknowledged that the law-enforcement and private-security firing ranges in Chicago are located near schools, churches, parks, and stores, and they operate safely in those locations. And Sergeant Bartoli testified about the availability of

straightforward range-design measures that can effectively guard against accidental injury. He mentioned, for example, that ranges should be fenced and should designate appropriate locations for the loading and unloading of firearms. Other precautionary measures might include limiting the concentration of people and firearms in a range's facilities, the times when firearms can be loaded, and the types of ammunition allowed. *See also, e.g.*, NRA RANGE SOURCE BOOK (providing "basic and advanced guidance to assist in the planning, design, construction and maintenance of shooting range facilities"), http://www.nrahq.org/shootingrange/sourcebook.asp (last visited June 2, 2011); FLA. STAT. § 823.16(6) (2011) (referencing the safety standards of the NRA *Range Source Book*); KAN. ADMIN. REGS. § 115-22-1(b) (2011) (same); MINN. STAT. § 87A.02 (2010) (same); NEB. REV. STAT. § 37-1302(4) (2010) (same); OHIO ADMIN. CODE 1501: 31-29-03(D) (2011) (same).

At the preliminary-injunction hearing, the City highlighted an additional public-safety concern also limited to mobile ranges: the risk of contamination from lead residue left on range users' hands after firing a gun. Sergeant Bartoli was asked a series of questions about the importance of hand-washing after shooting; he said that "lucrative amounts of [cold running] water and soap" were required to ensure that lead contaminants were removed. The City argued below that mobile firing ranges might not be sufficiently equipped for this purpose, suggesting that mobile ranges would have inadequate restroom facilities and might have to rely on "port-a-potties." This sparked a discussion about the adequacy of the water supply available at a standard "port-a-potty." The City continued on this

topic until the judge cut it short by acknowledging her own familiarity with "port-a-potties." On appeal the City raised but did not dwell on its concern about lead contamination. For good reason: It cannot be taken seriously as a justification for banishing all firing ranges from the city. To raise it at all suggests pretext.

Perhaps the City can muster sufficient evidence to justify banning firing ranges everywhere in the city, though that seems quite unlikely. As the record comes to us at this stage of the proceedings, the firing-range ban is wholly out of proportion to the public interests the City claims it serves. Accordingly, the plaintiffs' Second Amendment claim has a strong likelihood of success on the merits.

### D.  Balance of Harms

The remaining consideration for preliminary injunctive relief is the balance of harms. It should be clear from the foregoing discussion that the harms invoked by the City are entirely speculative and in any event may be addressed by more closely tailored regulatory measures. Properly regulated firing ranges open to the public should not pose significant threats to public health and safety. On the other side of the scale, the plaintiffs have established a strong likelihood that they are suffering violations of their Second Amendment rights every day the range ban is in effect. The balance of harms favors the plaintiffs.

The plaintiffs asked the district court to enjoin the enforcement of *Chicago Municipal Code* § 8-20-280—the prohibition

on "[s]hooting galleries, firearm ranges, or any other place where firearms are discharged." They are entitled to a preliminary injunction to that effect. To be effective, however, the injunction must also prevent the City from enforcing other provisions of the Ordinance that operate indirectly to prohibit range training. The plaintiffs have identified several provisions of the Ordinance that implicate activities integral to range training: CHI. MUN. CODE §§ 8-20-020 (prohibiting the possession of handguns outside the home), 8-20-030 (prohibiting the possession of long guns outside the home or business), 8-20-080 (prohibiting the possession of ammunition without a corresponding permit and registration certificate), 8-20-100 (prohibiting the transfer of firearms and ammunition except through inheritance), 8-24-010 (prohibiting the discharge of firearms except for self-defense, defense of another, or hunting). To the extent that these provisions prohibit law-abiding, responsible citizens from using a firing range in the city, the preliminary injunction should include them as well. Similarly, the injunction should prohibit the City from using its zoning code to exclude firing ranges from locating anywhere in the city.

Finally, because range training is required for the issuance of a Chicago Firearm Permit, a registration certificate, and ultimately, for lawful possession of any firearm, *see* CHI. MUN. CODE §§ 8-20-110(a), 8-20-140(a)-(b), the firing-range ban implicates not only the right to train at a range but also the core Second Amendment right to possess firearms for self-defense. Accordingly, the preliminary injunction should include sections 8-20-110(a) and 8-20-140(a) to the extent that those provisions operate to prohibit otherwise eligible

No. 10-3525

persons from "carry[ing] or possess[ing] a firearm" at a
range without a Permit or registration certificate while they
are trying to complete the range-training prerequisite for
lawful firearm possession.

Those are the bounds of the proposed preliminary
injunction, which should be entered upon remand. The City
worries that entering an order enjoining the range
ban would allow "anyone [to] park a mobile range any-
where, anytime"; shoddy ranges operated by unlicensed
instructors and lacking adequate hand-washing facilities
could crop up in Chicago's most dangerous neighborhoods.
To the contrary, a preliminary injunction against the range
ban does not open the door to a parade of firing-range
horribles. *Cf. McDonald*, 130 S. Ct. at 3047 ("Despite munici-
pal respondents' doomsday proclamations, incorporation
does not imperil every law regulating firearms."). The City
may promulgate zoning and safety regulations governing
the operation of ranges not inconsistent with the Second
Amendment rights of its citizens; the plaintiffs may chal-
lenge those regulations, but not based on the terms of this
injunction. As for the City's concern about a "regulatory
vacuum" between the issuance of the preliminary injunction
and the promulgation of firing-range zoning and safety reg-
ulations, we note that it faced a similar dilemma after
the Supreme Court decided *McDonald*. The sky did not
fall. The City Council moved with dispatch and
enacted the Ordinance just four days later.

The plaintiffs have established their entitlement to a
preliminary injunction based on their Second Amend-
ment claim, so we need not address the alternative argu-
ment that range training is protected expression under

the First Amendment. Given the strong likelihood of success on the former claim, the latter claim seems like surplusage.

For the foregoing reasons, we REVERSE the district court's order denying the plaintiffs' motion for a preliminary injunction and REMAND with instructions to enter a preliminary injunction consistent with this opinion.

ROVNER, *Circuit Judge*, concurring in the judgment. Stung by the result of *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), the City quickly enacted an ordinance that was too clever by half. Recognizing that a complete gun ban would no longer survive Supreme Court review, the City required all gun owners to obtain training that included one hour of live-range instruction, and then banned all live ranges within City limits.[1] This was not so much a nod to the importance of live-range training as it was a

---

[1] As the majority clarifies, the City grants exceptions for ranges in a few select circumstances such as ranges used by law enforcement personnel. None of these ranges are open to the public in general or to the plaintiffs in particular.

thumbing of the municipal nose at the Supreme Court. The effect of the ordinance is another complete ban on gun ownership within City limits. That residents may travel outside the jurisdiction to fulfill the training requirement is irrelevant to the validity of the ordinance inside the City. In this I agree with the majority: given the framework of *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald*, the City may not condition gun ownership for self-defense in the home on a prerequisite that the City renders impossible to fulfill within the City limits. The plaintiffs have a strong likelihood of success on the merits of that claim and the district court should have granted an injunction against the operation of the ordinance to the extent that it imposed an impossible pre-condition on gun owner- ship for self-defense in the home. There are two obvious ways for the City to remedy this problem: it may either drop the requirement for one hour of live range training or it may permit live-range training within the City limits.

Even if the City were to drop the live-range require- ment, though, the plaintiffs claim an independent Second Amendment right to maintain proficiency in firearm use by practicing live-range shooting. The majority goes much farther than is required or justified, however, in finding that the plaintiffs' claim for live- range training is so closely allied to "core" Second Amendment rights that a standard akin to strict scrutiny should be applied. Granted, the right to use a firearm in the home for self-defense would be seriously impaired if gun owners were prevented from obtaining the training necessary to use their weapons safely for that purpose. We do not yet know how a complete ban on any firearms training would be received by the Supreme

Court, but *Heller* and *McDonald* strongly suggest that a comprehensive training ban would not pass constitutional muster. But the City has not banned all firearms training; it has banned only one type of training. There is no ban on classroom training. There is no ban on training with a simulator and several realistic simulators are commercially available, complete with guns that mimic the recoil of firearms discharging live ammunition. *See e.g.* http://www.virtrasystems.com/law-enforcement-training/virtra-range-le (last visited July 6, 2011); http://www.meggitttrainingsystems.com/main.php?id=25&name=LE_Virtual_Bluefire_Weapons (last visited June 24, 2011); http://www.ontargetfirearmstraining.com/simulator.php (last visited July 6, 2011). It is possible that, with simulated training, technology will obviate the need for live-range training. In any case, the limited record to date suggests that even the City considers live-range training necessary to the safe operation of guns in the home for self-defense. A complete ban on live ranges in the City, therefore, is unlikely to withstand scrutiny under any standard of review. The plaintiffs have a strong likelihood of succeeding on the merits of this claim. Public safety interests apply on both sides of the balance: there are obvious safety risks associated with operating live shooting ranges (more on that later), but there are perhaps equally compelling safety interests in ensuring that gun owners possess the skills necessary to handle their weapons safely. On the record as it currently stands, the district court should have enjoined that part of the ordinance banning all live ranges within City limits. For that reason, I concur in the judgment.

I write separately because the majority adopts a standard of review on the range ban that is more stringent than is justified by the text or the history of the Second Amendment. Although the majority characterizes this aspect of the ordinance as a complete ban on an activity "implicating the core of the Second Amendment right," a more accurate characterization would be a regulation in training, an area ancillary to a core right. *Ante*, at 45. A right to maintain proficiency in firearms handling is not the same as the right to practice at a live gun range. As such, I cannot agree that "a more rigorous showing than that applied in *Skoien*, should be required, if not quite 'strict scrutiny.'" *Ante*, at 46. *Skoien* required the government to demonstrate that the statute at issue served an "important government objective," and that there was a "substantial relationship" between the challenged legislation and that objective. *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 1674 (2011).

The majority's analysis of laws in effect during the time period surrounding the adoption of the Second and Fourteenth Amendments helps to prove the point that no scrutiny beyond that described in *Skoien* is necessary. The majority concedes that the City has presented us with "a number of founding-era, antebellum, and Reconstruction state and local laws that limited the discharge of firearms in urban environments." *Ante*, at 37. Some jurisdictions enacted outright bans on discharging firearms in city limits. Some laws limited the time, place and manner of firearms discharges. Some laws required permission from a government authority before

discharging firearms in urban areas.  The majority finds these laws irrelevant to the Second Amendment analysis here because they are "not specific to controlled target practice and, in any event, contained significant carveouts and exemptions." *Ante*, at 37-38. The majority also distinguishes them as regulatory measures rather than outright bans on firing ranges. Finally, the majority dismisses some of the laws because they were clearly aimed at fire suppression, which the majority believes would not be a concern at a safely sited and properly equipped firing range.

But these observations contravene rather than support the majority's ensuing analysis. First of all, none of the 18th and 19th century jurisdictions cited by the City and dismissed by the majority were apparently concerned that banning or limiting the discharge of firearms within city limits would seriously impinge the rights of gun owners or limit their ability to learn how to safely use their weapons. Citizens living in densely populated areas had few legitimate reasons to discharge their firearms near their homes, and likely used them mostly when out in the country. Opportunities to hunt and practice outside of city limits were likely adequate for training purposes. Given the majority's nod to the relevance of historical regulation, curt dismissal of actual regulations of firearms discharges in urban areas is inappropriate.

Second, as I noted above, many of these jurisdictions regulated the time, place and manner of gun discharges. For example, as the majority itself points out, one statute prohibited the discharge of firearms before sunrise, after sunset, or within one quarter mile of the

nearest building. Others prohibited firearms discharge without specific permissions and only then at specific locations. The "time, place and manner" framework of the First Amendment seems well-suited to the regulation of live-range training within a densely populated urban area. A complete ban on live-range training in Chicago, of course, likely would not survive under the intermediate scrutiny applied to restrictions on time, place and manner, especially because the City itself concedes the importance of this training to the safe operation of firearms for self-defense in the home. Indeed, the City allows ranges to operate in some of the most densely populated parts of the City, albeit strictly for the use of law enforcement and trained security personnel. The majority purports to distinguish time, place and manner restrictions and other regulations on the grounds that the City's ordinance is a complete ban, but the ban on live ranges affects only one aspect of firearms training. The intermediate scrutiny applied to time, place and manner restrictions is both adequate and appropriate in these circumstances.

Finally, that some of those early laws were concerned with fire suppression does not mean that they are irrelevant to our analysis today. On the contrary, these laws inform us that public safety was a paramount value to our ancestors, a value that, in some circumstances, trumped the Second Amendment right to discharge a firearm in a particular place. Analogizing to the First Amendment context, a categorical limit is sometimes appropriate, as in the case of bans on obscenity, defamation, and incitement to crime. *See Skoien*, 614 F.3d at 641. In the same way that a person may not with impunity cry out "Fire!" in a crowded theater, a

person in 18th century New York, and 19th century Chicago and New Orleans could not fire a gun in the tinder boxes that these cities had become. *See* Footnote 14 above. If we are to acknowledge the historical context and the values of the period when the Second and Fourteenth Amendments were adopted, then we must accept and apply the full understanding of the citizenry at that time. In the instance of firearms ordinances which concerned themselves with fire safety, we must acknowledge that public safety was seen to supercede gun rights at times. Although fire is no longer the primary public safety concern when firearms are discharged within City limits, historical context tells us that cities may take public safety into account in setting reasonable time, place and manner restrictions on the discharge of firearms within City limits.

The majority's summary dismissal of the City's concern for public safety related to live gun ranges is to my mind naive. One need only perform a simple internet search on "gun range accidents" to see the myriad ways that gun owners manage to shoot themselves and others while practicing in these supposedly safe environments. From dropping a loaded gun in a parking lot to losing control of a strong weapon on recoil, gun owners have caused considerable damage to themselves and others at live gun ranges. To say that the City's concerns for safety are "entirely speculative" is unfounded. *Ante*, at 46. The plaintiffs themselves "do not doubt that gun ranges may be regulated in the interest of public safety." Reply Brief at 22. *See also* Reply Brief at 26-27 (conceding that the City may except certain parts of the City, set range distances from other uses, require a license or permission for target practice, and

regulate the operation and location of gun ranges). The
plaintiffs' concessions regarding gun range regulations are
by no means a complete list of restrictions the City may
impose on gun ranges. At this stage of the litigation,
the City has not yet had an opportunity to develop a
full record on the safety issues raised by placing live
gun ranges in an urban environment. Common sense
tells us that guns are inherently dangerous; responsible gun
owners treat them with great care. Unfortunately, not all
gun owners are responsible. The City has a right
to impose reasonable time, place and manner restric-
tions on the operation of live ranges in the interest
of public safety and other legitimate governmental concerns.

As for the remaining parts of the ordinance challenged by
the plaintiffs, I agree that, to the extent that these provisions
entirely prohibit gun owners from practicing at live ranges,
they must be enjoined for the time being. As far as I can tell,
though, the plaintiffs have not presented any evidence
demonstrating, for example, that prohibiting gun owners
from possessing guns outside the home will impinge on
their ability to practice at a range. As the plaintiffs' own
witnesses testified, some ranges lend patrons guns with
which to practice. But if the ordinance both prohibits gun
owners from transporting their own weapons and prevents
ranges from lending weapons for practice, then those
aspects of the ordinance must be enjoined.

The ordinance admittedly was designed to make
gun ownership as difficult as possible. The City has legiti-
mate, indeed overwhelming, concerns about the prevalence
of gun violence within City limits. But the Supreme Court
has now spoken in *Heller* and *McDonald* on the Second

No. 10-3525                                                    59

Amendment right to possess a gun in the home for self-
defense and the City must come to terms with that reality.
Any regulation on firearms ownership must respect that
right. For that reason, I respectfully concur in the judgment.

_____