1   C. D. Michel - S.B.N. 144258
    Glenn S. McRoberts - S.B.N. 144852
2   Clinton B. Monfort - S.B.N. 255609
    Anna M. Barvir - S.B.N. 268728
3   MICHEL & ASSOCIATES, P.C.
    180 E. Ocean Boulevard, Suite 200
4   Long Beach, CA 90802
    Telephone: 562-216-4444
5   Facsimile: 562-216-4445
    Email: cmichel@michellawyers.com
6
    Attorneys for Plaintiffs
7

8              IN THE UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                  SAN FRANCISCO DIVISION

11  ESPANOLA JACKSON, PAUL COLVIN,    )  CASE NO. C09-2143-RS
    THOMAS BOYER, LARRY BARSETTI,     )
12  DAVID GOLDEN, NOEMI MARGARET      )  **NOTICE OF MOTION**
    ROBINSON, NATIONAL RIFLE          )  **AND MOTION FOR PARTIAL**
13  ASSOCIATION OF AMERICA, INC., SAN )  **JUDGMENT ON THE PLEADINGS**
    FRANCISCO VETERAN POLICE          )
14  OFFICERS ASSOCIATION,             )  Fed. R. Civ. P. 12(c)
                                      )
15           Plaintiffs               )  Hearing:   July 12, 2012
                                      )  Time:      1:30 p.m.
16           vs.                      )  Place:     Courtroom 3 - 17th Floor
                                      )            450 Golden Gate Ave.
17  CITY AND COUNTY OF SAN            )            San Francisco, CA 94102
    FRANCISCO, THE MAYOR OF           )
18  SAN FRANCISCO, AND THE CHIEF      )
    OF THE SAN FRANCISCO POLICE       )
19  DEPARTMENT, in their official capacities, )
    and DOES 1-10,                    )
20                                    )
             Defendants.              )
21                                    )
    _____     )
22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE(S)**

NOTICE OF MOTION AND MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM OF POINTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.      STANDARD GOVERNING MOTIONS FOR JUDGMENT
        ON THE PLEADINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.     RESTRICTIONS ON THE RIGHT TO KEEP AND BEAR ARMS
        WITHIN THE HOME COMMAND THE HIGHEST LEVELS OF
        SCRUTINY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        A.      *Heller* Advances a Scope-Based Approach to Second
                Amendment Challenges That Applies Here, as Plaintiffs
                Are Law-Abiding Citizens Seeking to Vindicate Their
                Rights to Keep and Bear Arms Within Their Homes. . . . . . . . . . . . . . . . 7

        B.      Alternatively, Restrictions on "Core Conduct" Protected by the Second
                Amendment, Including In-Home Self-Defense, Command Strict Scrutiny. . . 9

                1.      *Heller* and *McDonald* Expressly Reject the Rational-Basis
                        Standard and an "Interest-Balancing" Approach Akin to
                        Intermediate Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                2.      Under the Traditional Standards of Review Model, Laws
                        Regulating "Core Areas" of Fundamental Rights Command
                        Strict Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## TABLE OF CONTENTS (CONT.)

PAGE(S)

III.   SECTION 4512 VIOLATES THE SECOND AMENDMENT . . . . . . . . . . . . . . . .  12

A.   The City's Requirement That Handgun Owners Either Carry
Their Handguns or Keep Them Locked Up at All Times Within
the Sanctity of Their Own Homes Is Invalid Under *Heller's*
Scope-Based Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

1.   The City's Locked-Storage Law Restricts the Right to Keep
and Bear Arms Within the Home for the "Core Lawful Purpose"
of Self-Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

2.   There Is No Historical or Traditional Support for Forcing
Handgun Owners to Carry Their Firearms or Keep Them
Locked Up at All Times Within the Sanctity of Their Own Homes . . .  14

B.   The City's Requirement that Handguns Be Kept Locked Up
When Not Being "Carried" Within the Home Cannot Survive
Strict Scrutiny – or Any Heightened Scrutiny . . . . . . . . . . . . . . . . . . . . . .  16

IV.   SECTION 613.10(g) VIOLATES THE SECOND AMENDMENT . . . . . . . . . . . . .  18

A.   The Second Amendment Secures a Fundamental Right to
Acquire Firearms and Ammunition for Self-Defense . . . . . . . . . . . . . . . . . .  18

B.   The City's Ban on the Commercial Sale of Ammunition in
"Common Use" for Lawful Purposes, Including Self-Defense,
Cannot Survive Judicial Review, Under Any Test . . . . . . . . . . . . . . . . . . . .  19

1.   The City's Ban on the Sale of Expanding and/or Fragmenting
Ammunition is Categorically Invalid Under *Heller's*
Scope-Based Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

2.   The City's Ban on the Sale of Expanding and/or Fragmenting
Ammunition Fails Under Any Level of Heightened Scrutiny . . . . . . .  22

C.   The City's Ban on the Sale of "Ammunition that Does Not Serve a
Sporting Purpose" Cannot Survive Judicial Review, Under Any Test . . . . .  24

ii

**TABLE OF CONTENTS (CONT.)**

**PAGE(S)**

1. **The City's "Sporting Purposes"-Based Ammunition Ban Is Categorically Invalid Under *Heller's* Scope-Based Analysis** . . . . . . . 24

2. **The City's "Sporting Purposes"-Based Ammunition Ban Fails Under Any Level of Heightened Scrutiny** . . . . . . . . . . . . . . . . 24

**V.    CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# **TABLE OF AUTHORITIES**

**PAGE(S)**

## **FEDERAL CASES**

*Bateman v. Perdue*,
No. 5:10-265 (E.D. N.C. Mar. 29, 2012).................................... 11, 19

*Brown v. Entm't Merchs. Ass'n*,
__ U.S. __, 131 S. Ct. 2729 (2011). ........................................ 18

*District of Columbia v. Heller*,
554 U.S. 570 (2008)............................................. *passim*

*Citizens United v. Fed. Election Comm'n*,
__ U.S. __, 130 S. Ct. 876 (2010). ...................................... 8, 11

*Ezell v. Chicago*,
651 F.3d 684 (7th Cir. 2011). ........................... 3, 8, 10, 19

*Fajardo v. County of Los Angeles*,
179 F.3d 698 (9th Cir. 1999). ............................................ 6

*Griswold v. Connecticut*,
381 U.S. 479 (1965)........................................... 18

*J.D.B. v. North Carolina*,
__ U.S. __, 131 S.Ct. 2394 (2011)........................................ 13

*Landmark Commc'ns v. Virginia*,
435 U.S. 829 (1978)........................................... 22

*Los Angeles v. Alameda Books, Inc.*,
535 U.S. 425 (2002)........................................... 22

*McDonald v. City of Chicago*,
561 U.S. 2025, 130 S. Ct. 3020 (2010). ............................ *passim*

*Moore v. Madigan*,
No. 11-03134, 2012 WL 344760 (C.D. Ill. Feb. 3, 2012). ..................... 10

*Nordyke v. King*,
664 F.3d 774 (9th Cir. 2011) . ............................................ 7

*Nordyke v. King*,
No. 07-15763, 2012 WL 1110131 (9th Cir. Apr. 4, 2012). ..................... 7

*Qwest Commc'ns Corp. v. City of Berkley*,
208 F.R.D. 288 (N.D. Cal. 2002)........................................... 6

# TABLE OF AUTHORITIES (CONT.)

PAGE(S)

## FEDERAL CASES CONT.

*Reno v. Flores,*
    507 U.S. 292 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16

*Richmond Newspapers v. Virginia,*
    448 U.S. 555 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
    411 U.S. 1 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

*Sykes v. United States,*
    __ U.S. __, 131 S. Ct. 2267 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Booker,*
    644 F.3d 12 (1st Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Chester,*
    628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Engstrum,*
    609 F. Supp. 2d 1227 (D. Utah 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Masciandaro,*
    638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*United States v. Marzarella,*
    614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Miller,*
    307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Reese,*
    627 F.3d 792 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Weaver,*
    No. 09-00222, 2012 WL 727488 (S.D. W. Va. Mar. 6, 2012). . . . . . . . . . . . . . . . . . 11

*United States v. Williams,*
    616 F.3d 685 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Woollard v. Sheridan,*
    No. 10-2068, 2012 WL 695674 (D. Md. Mar. 2, 2012). . . . . . . . . . . . . . . . . . . . . . . 11

## STATE CASES

*Andrews v. State,*
    50 Tenn. 165 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

1

**TABLE OF AUTHORITIES (CONT.)**

2

**PAGE(S)**

3

<u>STATUTES & RULES</u>

4

18 U.S.C. § 921(a)(17) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

5

18 U.S.C. § 922(a)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

6

Cal. Penal Code § 16460 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

7

Cal. Penal Code § 18710. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

8

Cal. Penal Code § 18735. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

9

Cal. Penal Code § 25100. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

10

Cal. Penal Code § 25105. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

11

Cal. Penal Code § 25200. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

12

Cal. Penal Code § 25205. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

13

Fla. Stat. §790.174. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

14

Haw. Rev. Stat. §134-10.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

15

Haw. Rev. Stat. § 707-714.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

16

720 Ill. Comp. Stat. 5/24-9(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

17

Iowa Code § 724.22(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18

Mass. Gen. Laws ch. 140, § 131L. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

19

Md. Code Ann., Crim. Law § 4-104. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

20

Minn. Stat. § 609.666. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

21

N.H. Rev. Stat. Ann. § 650-C:1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

22

N.J. Stat. Ann. § 2C:39-3(f),(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

23

N.J. Stat. Ann. § 2C:58-15. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

24

N.C. Gen. Stat. § 14-315.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

25

R.I. Gen. Laws § 11-47-60.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

26

Tex. Penal Code § 46.13. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

27

28

MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS C-09-2143-RS

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:** Notice is hereby given that on July 12, 2012, at 1:30 p.m., or as soon thereafter as counsel may be heard by the above-entitled Court, located at 450 Golden Gate Ave., San Francisco, California, in the courtroom of the Honorable Judge Richard Seeborg, Plaintiffs will and hereby do move for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

This motion shall be based on this notice of motion and motion, the memorandum of points and authorities in support, the request for judicial notice and declarations filed concurrently herewith, the papers on file, and upon any further matters the Court deems appropriate.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**STATEMENT OF THE ISSUES PRESENTED**

1. Does San Francisco's locked-storage law, Section 4512,[1] violate Plaintiffs' Second Amendment right to keep their handguns "in the home operable for the purpose of immediate self-defense" – as did the locked-storage ordinance struck down in *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) – where:

    (a) Section 4512 requires that handguns be kept in a locked container or disabled with a trigger-lock at all times within the home, regardless of whether minors, felons, mentally ill individuals, or other persons unauthorized to possess handguns are present; and

    (b) the only exceptions to the locked-storage requirement are when the handgun is "carried on the person" or "under the control of a person who is a peace officer"?

2. Does Section 613.10(g)'s ban on the sale or transfer of *all* ammunition that is "designed to expand" or "fragment" upon impact violate Plaintiffs' Second Amendment right to armed self-defense within the home by prohibiting the sale of a broad class of ammunition commonly used for self-defense purposes – as did the District's ban on a broad class of firearms (i.e., handguns) commonly used for self-defense purposes struck down in *Heller*?

3. Does Section 613.10(g)'s ban on the sale or transfer of *all* ammunition that does not

---

[1] All statutory references are to the San Francisco Police Code, unless otherwise indicated.

serve a "*sporting* purpose" violate Plaintiffs' Second Amendment rights by banning ammunition

used for other lawful, *non-sporting* purposes, including the "core lawful purpose of *self-defense*"

in the home, in direct conflict with *Heller*?

## INTRODUCTION

Sections 4512 and 613.10(g) infringe Plaintiffs' Second Amendment rights to keep and

bear arms by requiring locked storage[2] of handguns in the home *at all times*[3] except when being

"carried on the person" and by banning the sale of a broad class of ammunition in common use

for self-defense and *all* "non-sporting" ammunition. The infringements are self-evident because

the broad regulations, like those found categorically invalid in *Heller*, directly conflict with the

rights of law-abiding adults to keep and bear arms for "the core lawful purpose of self-defense"

*within the home*, "where the need for defense of self, family, and property is most acute." *Heller*,

554 U.S. at 628-30.

This direct conflict renders Defendants' restrictions invalid under *Heller* as a matter of law

and subject to judgment on the pleadings. For while *Heller* did not settle *all* Second Amendment

issues, it emphatically declared that "whatever else it leaves to future evaluation, it surely elevates

above all other interests the right of law-abiding, responsible citizens to use arms in defense of

hearth and home." *Id*. at 635. This point is not a subtle one. It renders the right to arms within the

sanctity of one's home virtually sacrosanct and any restrictions on that right subject to the highest

levels of scrutiny. If the restrictions conflict with the right as they did in *Heller*, they are

categorically invalid. That is the case here.

While the challenged ordinances differ in some ways from those invalidated in *Heller*,

they nonetheless conflict in similar fashion with the Second Amendment. In *Heller*, the District's

locked-storage law made it "legally impossible" to render one's handgun operable for self-defense

---

[2] "Locked storage," as it pertains to Section 4512, means the requirement that handguns kept within the home be stored in a locked container or disabled with a trigger-lock.

[3] "At all times" means "at all times unless the person is carrying the firearm." This is both short-hand and recognition of the obvious – that very few law-abiding adults "carry" handguns around the house during waking hours, nor is it possible to do so while sleeping. That is, the carry exception itself is impractical during waking hours and impossible to exercise while asleep.

1   emergencies. *Id.* at 630. Here, by effectively requiring Plaintiffs' firearms to be stored inoperable

2   when Plaintiffs are at the greatest risk of criminal attack, Defendants' locked-storage law makes it

3   impractical or "virtually impossible" to do so. In *Heller*, the District also banned a broad class of

4   firearms (handguns) in common use for in-home self-defense. *Id.* at 629. Here, Defendants ban

5   the sale of a broad class of ammunition in common use for self-defense – in fact, they ban the sale

6   of *all* ammunition serving no "sporting purpose." In each case, the laws directly conflict with

7   Plaintiffs' rights to keep and bear arms for "the core lawful purpose of self-defense" in the home.

8       Unlike the vast majority of post-*Heller* decisions, this case does *not* raise questions about

9   the rights of felons or violent misdemeanants, nor about firearms that are uncommon or of

10  questionable legality, nor about public carry. Instead, this case concerns competent, law-abiding

11  adults seeking to exercise their Second Amendment rights in defense of hearth and home.

12  Because the conduct that Defendants restrict is protected activity under the Second Amendment,

13  and because there is no historical basis for the restrictions, the challenged laws are categorically

14  invalid under *Heller*. Regardless, as in *Heller*, the challenged ordinances are unconstitutional

15  under any form of heightened scrutiny. And if there were any doubt as to constitutional invalidity,

16  such doubt is removed because the challenged ordinances, like those at issue in *Heller*, directly

17  conflict with protected *self-defense conduct*, the central component of the Second Amendment,

18  and they do so *in the home*, where the need for self-defense is "most acute."[4]

19      Finally, because this motion concerns facial challenges to self-evident restrictions on

20  Plaintiffs' fundamental rights, facts concerning Plaintiffs' personal circumstances are irrelevant.[5]

21  This leaves only legal questions at issue, questions that may be resolved on the pleadings.

22

---

23      [4] Even if the Court employs a means-end test, either alternatively or to buttress a *Heller*-style

24  analysis, it should employ the highest scrutiny given the context of defending hearth and home.
    *See Heller*, 554 U.S. at 635. As shown below, the challenged ordinances fail under any heightened

25  standard of review because they negate rights protected by the Second Amendment.

26      [5] In facial challenges, the constitutional violation inheres in the terms of the statute, not its
    application. The remedy is directed at the statute itself and must be injunctive and declaratory. If

27  unconstitutional, the challenged laws are unconstitutional without regard to their application or in
    all of their applications. *Reno v. Flores*, 507 U.S. 292, 301 (1993); *Ezell v. Chicago*, 651 F.3d

28  684, 698-99 (7th Cir. 2011).

**STATEMENT OF THE CASE**

Plaintiffs filed this suit on May 15, 2009, to challenge the validity of Sections 4512, 1290, and 613.10(g), enacted by the City and County of San Francisco and enforced by its Mayor and Chief of Police (collectively "the City"). Plaintiffs sought declaratory and injunctive relief from violations of their Second Amendment rights to keep and bear arms and their right to due process enshrined in the Fifth and Fourteenth Amendments. (Am. Compl. [Doc. No. 18] 19:21-21:1.)

On July 9, 2009, the City filed its first motion to dismiss. Plaintiffs filed their First Amended Complaint on August 24, 2009. The case was then stayed pending the determination of whether the Second Amendment applies against the states. (Min. Order, Aug. 27, 2009 [Doc. No. 21].) That stay was lifted when the U.S. Supreme Court ruled in *McDonald v. City of Chicago*, 561 U.S. 2025, 130 S. Ct. 3020 (2010), that it does. (Order, Sept. 13, 2010 [Doc. No. 37].)

The City thereafter filed yet another 12(b)(1) motion to dismiss, arguing again that Plaintiffs lacked standing to challenge the ordinances because they had not yet been charged with violating the challenged provisions, and because they allegedly faced no "genuine threat" of enforcement. (Defs.' Mem. Supp. Mot. Dismiss [Doc. No. 61] 12:17-20.) For largely the same reasons, the City argued that Plaintiffs' claims were not ripe for review. (*Id.* at 14:18-16:16.) The Court denied the City's Motion to Dismiss, finding that Plaintiffs have sufficiently alleged standing and their remaining claims are ripe for review. (Order [Doc. No. 89] 2:4.) The Court also granted Plaintiffs leave to amend their challenge to Section 1290, which the City repealed in the wake of this litigation to allow for the discharge of firearms in self-defense and in defense of others, as well as other circumstances permitted under state and federal law. (*Id.* at 2:6.) Plaintiffs later filed notice of intent not to amend. (Notice of Intention to Not Am. Compl. [Doc. No. 90].)

The Court thereafter ordered the City to respond to Plaintiffs' First Amended Complaint by October 17, 2011. (Order, Oct. 6, 2011 [Doc. No. 91].) The City filed its answer wherein it raised six affirmative defenses and continued to dispute Plaintiffs' standing and ripeness. (Defs.' Answer [Doc. No. 92] 9:21-10:22.) In response, Plaintiffs filed a motion to strike the standing and ripeness defenses. (Pls.' Mot. to Strike [Doc. No. 96].) In its order denying that motion, the Court acknowledged that its ruling on standing and ripeness turned on a relatively narrow set of facts,

1    which are unlikely to be in substantial controversy.[6] (Order, Dec. 12, 2012 [Doc. No. 105] 1-2.)

2         Plaintiffs now bring this Motion for Partial Judgment on the Pleadings pursuant to Federal

3    Rule of Civil Procedure 12(c) because the City's Answer provides no viable defense to Plaintiffs'

4    remaining claims and Plaintiffs are entitled to judgment as a matter of law.

5                                   **STATEMENT OF FACTS**

6         **Section 4512 – Locked-Storage Requirement:** In August 2007, the City passed Section

7    4512, requiring handguns kept within the home to be stored in a locked container or disabled with

8    a trigger-lock, unless that firearm "is carried on the person of an individual over the age of 18" or

9    "under the control of a person who is a peace officer." Violation is punishable by a fine not to

10   exceed $1,000 and/or by imprisonment not to exceed six months, under Section 4512(e).

11        In short, Section 4512 requires, under threat of prosecution, that Plaintiffs render and keep

12   their handguns inoperable and practically useless for self-defense emergencies, except when being

13   "carried on the person." And this is true regardless of whether children, felons, or other persons

14   unauthorized to possess handguns are present, or whether Plaintiffs are home alone.

15        **Section 613.10(g) – Ban on Sale of Expanding and/or Fragmenting Ammunition and**

16   **Ammunition that "Serves No Sporting Purpose":** Plaintiffs also challenge Section 613.10(g)'s

17   ban on the sale, lease, or transfer of ammunition that "serves no sporting purpose" or is designed

18   to expand or fragment upon impact. Section 613.10(g) effectively prohibits city residents from

19   purchasing ammunition within San Francisco commonly used and preferred for self-defense

20   purposes. Such ammunition, including hollow point ammunition, provides greater "stopping

21   power" against attackers and reduces risks to innocent bystanders due to ricochet or over-

22   penetration of assailants and building materials.

23        The prohibited ammunition is far from uncommon or unusual. To the contrary, it is

24   _____

25        [6] Should the City continue to dispute Plaintiffs' standing, and should the Court find declarations
     necessary on this point, possibly converting Plaintiffs' Motion for Judgment on the Pleadings to
26   one for summary judgment under Federal Rule of Civil Procedure 12(d), Plaintiffs have
     concurrently filed declarations attesting to the limited circumstances regarding Plaintiffs'
27   standing. (*See* Decls. of Espanola Jackson, Paul Colvin, Larry Barsetti, Thomas Boyer, David
     Golden, and Noemi Margaret Robinson Supp. Mot. J. Pldgs.)
28

1  generally available for consumer purchase throughout the country, it is routinely chosen by

2  civilians for in-home self-defense, and it is the same ammunition used by the City's own law

3  enforcement. *See infra* Part IV.B.1. and notes 21-25.

**ARGUMENT**

4

**I.    STANDARD GOVERNING MOTIONS FOR JUDGMENT ON THE PLEADINGS**

5

6          The standard for assessing a Rule 12(c) motion for judgment on the pleadings is the same

7  as the standard for a Rule 12(b)(6) motion to dismiss: Construing all material allegations in the

8  light most favorable to the party opposing the motion, a court should grant a motion for judgment

9  on the pleadings when the moving party is entitled to judgment as a matter of law. *Fajardo v.*

10 *County of Los Angeles*, 179 F.3d 698, 699 (9th Cir. 1999). When brought by a plaintiff, judgment

11 on the pleadings is appropriate when the defendant's answer fails to assert a viable affirmative

12 defense. *Qwest Commc'ns Corp. v. City of Berkley*, 208 F.R.D. 288, 291 (N.D. Cal. 2002).

13

**II.    RESTRICTIONS ON THE RIGHT TO KEEP AND BEAR ARMS WITHIN THE
      HOME COMMAND THE HIGHEST LEVELS OF SCRUTINY**

14

15         If, as *Heller* expressly found, the need for the Second Amendment right to keep and bear

16 arms in defense of self, family, and property is "most acute" within the sanctity of one's home, *id*.

17 at 628, then so too is this Court's obligation to protect that right. To meet that obligation, the court

18 must apply the highest levels of judicial scrutiny. To that end, the *Heller* Court employed a

19 "scope-based" approach that examines whether a challenged law restricts activity within the

20 Second Amendment's scope and whether the historical record supports such a restriction. The

21 ordinances struck down by *Heller* directly conflicted with rights secured by the Second

22 Amendment without any justification in history or tradition, and the Court found them

23 categorically invalid without resort to any means-end standard of review. Like the laws

24 invalidated in *Heller*, the challenged ordinances restrict protected Second Amendment activity in

25 the home without historical support. Accordingly, this case can be resolved under *Heller's* scope-

26 based analysis without employing any means-end test. Should this Court choose to examine the

27 City's prohibitions under a means-end model, however, established precedent commands strict

28

MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS C-09-2143-RS

scrutiny.[7]

**A.** ***Heller* Advances a Scope-Based Approach to Second Amendment Challenges That Applies Here, as Plaintiffs Are Law-Abiding Citizens Seeking to Vindicate Their Rights to Keep and Bear Arms Within Their Homes**

As in *Heller*, Plaintiffs are law-abiding citizens seeking to exercise their Second Amendment rights within the home. When *Heller* was argued before the Supreme Court, the Solicitor General urged the Court to employ "intermediate scrutiny" in reviewing the District's handgun ban and locked-storage law, believing if that standard were employed, the laws would be upheld. *See* Oral Arg. at 44-45, *Heller*, 554 U.S. 570 (No. 07-290). Chief Justice Roberts rejected this attempt to "articulate an all-encompassing standard" applicable to every Second Amendment case, asking:

> Isn't it enough to determine the scope of the existing right that the amendment refers to, look at the various regulations that were law-available at the time, including you can't take the gun to the marketplace and all that, and determine how . . . this restriction and the scope of this right looks in relation to those?
>
> I'm not sure why we have to articulate some very intricate standard. I mean, these standards that apply in the First Amendment just kind of developed over the years as sort of baggage that the First Amendment picked up. But I don't know why when we are starting afresh, we would try to articulate a whole standard that would apply in every case?

*Id.* at 44.

Chief Justice Roberts was suggesting that courts simply ask whether the law restricts activity falling within the scope of the right as originally understood. *Id.* If it does, the law is *presumed* invalid unless the *government* can show its regulation is so commonplace in our history and traditions that the scope of the fundamental right to keep and bear arms must be understood in light of it.[8] But there would be no "balancing test" or weighing of burdens and benefits. *Id.*

---

[7] A three-judge panel of the Ninth Circuit recently decided *Nordyke v. King*, 664 F.3d 776 (9th Cir. 2011), and applied a "substantial burden" test to a challenge to Alameda County's restriction on gun shows on government property. The case was reheard en banc, and it is no longer citeable authority. *Nordyke v. King*, 664 F.3d 774 (9th Cir. 2011). The en banc panel did not adopt a standard of review and instead ordered mediation, indicating there may be no justiciable controversy. *Nordyke v. King*, No. 07-15763, 2012 WL 1110131 (9th Cir. Apr. 4, 2012).

[8] *Heller* suggests that as to law-abiding citizens in a home setting – where the need for the right to arms is "most acute," 554 U.S. at 628 – the analysis stops there. Other courts, in different

1    While the initial inquiry under *Heller* focuses on whether the law restricts conduct within

2    the Second Amendment's scope, *Heller* does not suggest that the severity of the burden should

3    affect the standard of review that applies. *See infra* notes 9, 16. Rather, when a law restricts an

4    enumerated, fundamental right *at its core*, the highest judicial scrutiny must be applied. *San*

5    *Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973); *Citizens United v. Fed. Election*

6    *Comm'n*, __ U.S. __, 130 S. Ct. 876, 898 (2010). Here, the laws at issue restrict law-abiding

7    individuals' ability to exercise their right to self-defense in the home, conduct at the very core of

8    the Second Amendment.[9] *See infra* Parts III.A.1. and IV.B..

9    When *Heller* was decided, this scope-based approach was, in large part, the approach

10   taken by the majority, after it expressly rejected Justice Breyer's subjective, interest-balancing

11   test. *Heller*, 554 U.S. at 634-35. Notably absent from *Heller's* analysis was any discussion of

12   "compelling interests," "narrowly tailored" laws, or any other standard of review jargon. Nor were

13   there discussions of the District's "legislative findings" purporting to justify the restrictions by

14   linking them to crime prevention or health and safety.

15   Instead, *Heller* focused on whether the challenged laws restricted the right to keep and

16   bear arms as that right was understood by those who drafted and enacted both the Second and

17   Fourteenth Amendments. *Id.* at 626-34. The Court gleaned that understanding from an extensive

18   examination of the text and the "historical narrative" surrounding the pre-existing right to arms, to

19   define, at least in broad terms, the scope of the rights that the Second Amendment guarantees. *Id.*

20   at 605-19. In doing so, the Court emphasized that "[c]onstitutional rights are enshrined with the

21   scope they were understood to have when the people adopted them, whether or not future

22

23   _____

24   circumstances, have added a means-end analysis to *Heller*'s scope-based approach. *See, e.g.*,
     *Ezell*, 651 F.3d at 701-04; *United States v. Marzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *United*

25   *States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010).

26   [9] Should the Court nonetheless apply a means-end test, the severity of the restriction would only
     be relevant to whether the government can meet its obligation to establish that a restriction on in-

27   home self-defense is narrowly tailored and, specifically, that there are no less burdensome
     alternatives. That is, it would only be relevant if applying a means-end test, not to deciding which

28   test applies.

1  legislatures or (yes) even future judges think that scope too broad." *Id.* at 634-35.

2  The *Heller* Court ultimately found that handguns are arms protected by the Second

3  Amendment, *id.* at 629, and that keeping handguns in one's home for self-defense purposes is

4  core conduct protected by the same, *id.* at 635. Because the District's handgun ban and locked-

5  storage law directly conflicted with that protected conduct, and because there was no evidence

6  suggesting that there was a historical record of such restrictions, the laws were unconstitutional –

7  *under any test*. *Id.* at 628-30.[10] As explained below, the same is true here because the City's

8  restrictions *directly conflict with and negate*, rather than regulate, rights secured by the Second

9  Amendment, and there is no historical precedent supporting such restrictions.

10  **B.  Alternatively, Restrictions on "Core Conduct" Protected by the Second
     Amendment, Including In-Home Self-Defense, Command Strict Scrutiny**

11

12  Alternatively, this Court should hold that restrictions on the core right of law-abiding

13  citizens to armed self-defense in the home are subject to strict scrutiny. This follows from

     *McDonald*'s holding that the right to keep and bear arms is incorporated through the Fourteenth

14  Amendment due to its "fundamental" nature, 130 S. Ct. at 3050, and from *Heller*'s rejection of

15  both rational basis scrutiny and Justice Breyer's "interest-balancing" approach, akin to

16  intermediate scrutiny tests that weigh burdens and benefits, 554 U.S. at 628 n.27, 634-35.

17

18  **1.  *Heller* and *McDonald* Expressly Reject the Rational-Basis Standard
     and an "Interest-Balancing" Approach Akin to Intermediate Scrutiny**

19  The Supreme Court has described the right to keep and bear arms as fundamental.

20  *McDonald*, 130 S. Ct. at 3036-42. As with other fundamental rights, the explicit nature of the

21  right of the people to have arms precludes application of rational-basis review.

22      [R]ational-basis scrutiny is a mode of analysis we have used when evaluating laws
        under constitutional commands that are themselves prohibitions on irrational

23      laws. . . . Obviously, the same test could not be used to evaluate the extent to
        which a legislature may regulate a specific, enumerated right, be it the freedom of

24      speech, the guarantee against double jeopardy, the right to counsel, or the right to
        keep and bear arms.

25

26  ────────────────

        [10] *Heller* did not limit "core conduct" protected by the Second Amendment to keeping or

27  bearing arms for self-defense purposes. It did indicate that the need for such a right was "most
    acute" within the home, *Heller*, 554 U.S. at 628, leaving no doubt that restrictions on that

28  particular "core conduct," and in that particular place, are subject to the most exacting review.

9

1    *Heller*, 554 U.S. at 628 n.27 (citations omitted).

2        *Heller* also rejected a "judge-empowering 'interest-balancing inquiry' that 'asks whether

3    the statute burdens a protected interest in a way or to an extent that is out of proportion to the

4    statute's salutary effects upon other important governmental interests.' " *Id.* at 634. In rejecting

5    such an approach, the Court strongly suggested that rights protected by the Second Amendment

6    should not be subject to a judicial balancing of the right's value against the government's interest

7    on a case-by-case basis. As the Court noted:

8            We know of no other enumerated constitutional right whose core protection has
             been subjected to a freestanding "interest-balancing" approach. The very
9            enumeration of the right takes out of the hands of government – even the Third
             Branch of Government – the power to decide on a case-by-case basis whether the
10           right is *really worth* insisting upon. . . . Like the First, [the Second Amendment] is
             the very *product* of an interest-balancing by the people . . . . And whatever else it
11           leaves to future evaluation, it surely elevates above all other interests the right of
             law-abiding, responsible citizens to use arms in defense of hearth and home.

12   *Id.* at 634-35.

13       Although the Court did not expressly rule out intermediate scrutiny in *all* cases, it

14   indicated that, at least in terms of the right to keep and bear arms within the home for self-defense,

15   few restrictions would be tolerated. Those post-*Heller* cases that have analyzed firearms

16   regulations under some lower standard of review invariably did so because of some countervailing

17   factors not present in *Heller*, e.g., firearm possession by felons.[11] Such is not the case here, where

18

19

20   _____

     [11] *See, e.g.*, *Ezell*, 651 F.3d at 708 ("Intermediate scrutiny was appropriate in *Skoien* because the
21   claim was not made by a 'law-abiding, responsible citizen' as in *Heller*; nor did the case involve
     the central self-defense component of the right[.]")(citation omitted). Some post-*Heller* cases
22   involve felons or violent misdemeanants and apply lesser levels of scrutiny. *See, e.g.*, *United
     States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011)(applying substantial relationship test and
23   upholding bar on firearm ownership by persons convicted of misdemeanor domestic violence);
     *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010)(applying intermediate scrutiny and
24   upholding bar on possession by felons); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir.
     2010)(applying intermediate scrutiny and upholding bar on possession by persons restrained by a
25   domestic violence protection order). Some post-*Heller* cases find the right to arms outside the
     home is less protected, claiming it does not involve "core conduct." *See, e.g.*, *United States v.
26   Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011). A few lower courts even suggest that no right to
     arms exists outside the home. *See, e.g.*, *Moore v. Madigan*, No. 11-03134, 2012 WL 344760
27   (C.D. Ill. Feb. 3, 2012). These arguments, even if they had any merit, do not apply here.

28

the challenged laws impact the fundamental rights of law-abiding citizens to keep and bear arms for "the core lawful purpose" of self-defense within the home.

### 2. Under the Traditional Standards of Review Model, Laws Regulating "Core Areas" of Fundamental Rights Command Strict Scrutiny

Generally, when a law "impinges upon a fundamental constitutional right explicitly or implicitly protected by the Constitution," it is subject to "strict judicial scrutiny." *San Antonio Indep. Sch. Dist.*, 411 U.S. at 17. More to the point, strict scrutiny applies to the regulation of conduct occupying "core areas" of enumerated, fundamental rights. *Citizens United*, 130 S. Ct. at 898 (indicating that laws affecting political speech, "core conduct" protected by the First Amendment, are subject to strict scrutiny). Because *McDonald* found that the right to keep and bear arms is "fundamental" and *Heller* found that exercising that right in the home for self-defense purposes is "core conduct," restrictions on that conduct command strict scrutiny.

*McDonald* laid to rest any doubt about the fundamental nature of the right to keep and bear arms, declaring that it "was fundamental to the newly formed system of government." 130 S. Ct. at 3037. The Court affirmed in both *Heller* and *McDonald* that the right to keep and bear arms for self-defense purposes within one's home constitutes central or core conduct protected by the Second Amendment, *Heller*, 554 U.S. at 628, 630; *McDonald*, 130 S. Ct. at 3036, thus warranting strict judicial scrutiny. When the Supreme Court characterizes the right to arms as "the true palladium of liberty," *Heller*, 554 U.S. at 606, and declares that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id.* at 635, arguments for a lesser level of scrutiny fall flat.[12]

---

[12] There is a growing, albeit mostly implied, consensus that absent some countervailing factor – unauthorized user, illegal weapon, etc. – restrictions on the right to keep and bear arms within the home are subject to strict scrutiny or at least something more than intermediate scrutiny. *See supra* note 11 (citing cases applying intermediate scrutiny because of some offsetting factor). *See also Masciandaro*, 638 F.3d at 470 ("As we observe that any law regulating the content of speech is subject to strict scrutiny, we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny."); *Woollard v. Sheridan*, No. 10-2068, 2012 WL 695674, at *4 (D. Md. Mar. 2, 2012); Order at 12, *Bateman v. Perdue*, No. 5:10-265 (E.D.N.C. Mar. 29, 2012)(attached as Ex. A to Req. Jud. Not. Supp. Mot. J. Pldgs. ("Req. Jud. Not.")); *United States v. Weaver*, No. 09-00222, 2012 WL

---

## III.    SECTION 4512 VIOLATES THE SECOND AMENDMENT

The City's requirement that all residents carry their handguns around their homes or keep them locked up, regardless of the circumstances, renders Plaintiffs' guns unavailable and thus inoperable for "immediate self-defense" in emergency situations. *See Heller*, 554 U.S. at 635.[13] A law that renders guns useless for emergency self-defense within the sanctity of one's own home cannot pass constitutional muster under any test.

### A.    The City's Requirement That Handgun Owners Either Carry Their Handguns or Keep Them Locked Up at All Times Within the Sanctity of Their Own Homes Is Invalid Under *Heller's* Scope-Based Approach

Under *Heller's* scope-based approach, the Court must first ask whether the law restricts activity that falls within the scope of the right as it was originally understood. *See supra* Part II.A. As described below, the City's locked-storage law undeniably does. That being the case, it is incumbent upon the City to show its law is like others historically or traditionally accepted by those who drafted and enacted both the Second and Fourteenth Amendments as a proper limit on the right to arms. The City simply cannot meet that burden, for there is no such history or tradition regarding mandatory locked storage.

### 1.    The City's Locked-Storage Law Restricts the Right to Keep and Bear Arms Within the Home for the "Core Lawful Purpose" of Self-Defense

The City's locked-storage law renders Plaintiffs' handguns *not* "operable for the purpose of immediate self-defense" in the home, *see Heller*, 544 U.S. at 635, making them, for all practical purposes, useless for self-defense in emergencies. The restriction on Plaintiffs' Second Amendment rights is obvious and cannot be rationalized away.

Section 4512 provides limited exceptions for law enforcement and for adults when they carry their handguns in the home. Section 4512 essentially acknowledges the right to "bear" arms

---

727488, at *6 (S.D. W. Va. Mar. 6, 2012); *United States v. Engstrum*, 609 F. Supp. 2d 1227, 1231-32 (D. Utah 2009).

[13] The term "inoperable" is used to describe handguns kept in a locked container or disabled with a trigger-lock because that is what they are in a self-defense emergency. One could use them as a projectile or bludgeon, but cannot operate them as intended. (*See infra* page 13:14-21 for colloquy between Chief Justice Roberts and Justice Scalia.)

1   in the home, but ignores the right to "keep" them ready for self-defense "in case of confrontation."

2   *See id.* at 592. And in terms of the restriction on *emergency* use of arms for self-defense, the

3   "carry" exception provides little relief. For example, under the City's locked-storage law, most

4   gun owners are forced to keep their handguns locked throughout the night, while asleep, i.e., when

5   it is *impossible* to "carry" a gun on one's person. But that is when robberies of occupied dwellings

6   are most prevalent and occupants are at greatest risk of attack.[14]

7        It is a matter of common sense that City's locked-storage law imposes a restriction on

8   Second Amendment rights.[15] Chief Justice Roberts and Justice Scalia illuminated this point during

9   oral argument in *Heller* when counsel for the District suggested the locked-storage law had an

10   implied self-defense exception and that, because of that exception, the ordinance did not restrict

11   one's right to armed self-defense. The Chief Justice and Justice Scalia disagreed – finding the

12   contention implausible as they briefly imagined the steps needed to render a locked handgun

13   operable to defend against a sudden late-night attack:

14       JUSTICE SCALIA:    You turn on, you turn on the lamp next to your bed so you can – you

15       can turn the knob at 3-22-95, and so somebody –

16       MR. DELLINGER:    Well –

17       CHIEF JUSTICE ROBERTS: Is it like that? Is it a numerical code?

18       MR. DELLINGER:    Yes, you can have one with a numerical code.

19       CHIEF JUSTICE ROBERTS: So then you turn on the lamp, you pick up your

20       reading glasses –

21       (laughter)

22

23

---

24   [14] At night, the need to have access to an operable firearm is most acute. From 2003 to 2007, an

25   estimated 61.3% of robberies of occupied dwellings occurred between 6 p.m. and 6 a.m. Bureau of Justice Statistics, U.S. Dep't of Justice, National Crime Victimization Survey 6 tbl.9 (2010), *available at* http://www.bjs.gov/content/pub/pdf/vdhb.pdf (attached as Ex. C to Req. Jud. Not.).

26   [15] *See Sykes v. United States*, __ U.S. __, 131 S. Ct. 2267, 2280 (2011)(Thomas, J., concurring)

27   (courts may apply "common sense" in decision making); *J.D.B. v. North Carolina*, __ U.S. __, 131 S.Ct. 2394, 2416 (2011)(same). *See also infra* note 9 (severity of the restriction is not relevant

28   to whether the law restricts conduct within the scope of the Second Amendment).

1   Oral Arg. at 83-84, *Heller*, 554 U.S. 570 (No. 07-290) (attached as Ex. B to Req. Jud. Not.)

2        While the Court found humor in counsel's suggestion that the locked-storage law (even

3   assuming a self-defense exception) would impose only a minimal burden on the right to arms in a

4   self-defense emergency, the point is a serious one that translates well to the present case. The

5   restriction the City imposes on conduct at the core of the Second Amendment is both obvious and

6   significant, making armed self-defense impractical, if not impossible, when the need is most

7   acute. In comparison to the storage law struck down in *Heller*, we have simply gone from a law

8   making it "legally impossible" to engage in emergency self-defense conduct to one that makes it

9   "practically impossible." That is a distinction without a difference when facing a sudden attack.[16]

10       In short, the locked-storage law, even with a self-defense exception – which is essentially

11  what the City's "carry" exception amounts to – renders a firearm inoperable for emergency self-

12  defense and restricts the right to arms. The Supreme Court found arguments to the contrary

13  unpersuasive, even humorous. It is the City's burden to explain otherwise.

### 2.   There Is No Historical or Traditional Support for Forcing Handgun Owners to Carry Their Firearms or Keep Them Locked Up at All Times Within the Sanctity of Their Own Homes

16       Consistent with *Heller's* analysis, after finding that a regulation restricts conduct within

17  the Second Amendment's scope, courts should consider whether the regulation was historically or

18  traditionally understood to be an accepted limitation on the right. *Heller*, 554 U.S. at 626-28. The

19  question here becomes whether laws requiring people to keep their handguns locked up when in

20  their own homes – regardless of the circumstances – were part of the historical narrative

21  surrounding the Second Amendment when it was drafted.

22       *Heller* refers to a single framing-era ordinance, enacted in Boston in 1783, that prohibited

---

24  [16] Moreover, "impossibility" of self-defense *cannot* be the standard for finding firearms
25  restrictions invalid. If it were, *Heller* would not have struck down the District's handgun ban, for
    long guns were readily available for armed self-defense. But the Court found that it is not
26  permissible to ban handgun possession simply because long gun possession is allowed, for the
    availability of shotguns does not save the handgun ban from constitutional infirmity. *Heller*, 554
27  U.S. at 629. Similarly, just because the City's law may leave open some avenue for exercising the
    right to in-home self-defense, e.g., by wearing a handgun around the house during the day, it does
28  not follow that the restriction is valid.

---

1   the taking of loaded firearms into "any Dwelling House, Stable, Barn, Out-house, Ware-house,

2   Store, Shop or other Building" and permitted the seizure of any loaded firearms found therein. *Id.*

3   at 631 (quoting Act of Mar. 1, 1783, ch. 13, 1783 Mass. Acts p. 218). But the Court found this

4   isolated law only marginally relevant to the debate over the government's right to regulate

5   firearms in the home, noting that "a single law, in effect in a single city" is *not* evidence of a

6   regulatory scheme steeped in tradition. *Id.* at 632. And, in any event, Boston's law was clearly

7   intended to "eliminate the danger to firefighters posed by the 'depositing of loaded Arms' in

8   buildings," *id.* at 631, and not to render all household firearms inoperable for fear that an

9   unauthorized individual might misuse them. The only other historic ordinances offered by Justice

10   Breyer, *id.* at 684-86 (Breyer, J., dissenting), and dismissed by the Court, *id.* at 632-33 (majority

11   opinion), addressed the storage of excess gunpowder – again, to protect firefighters in densely

12   populated urban areas; *not* to "protect" law-abiding citizens from themselves.[17]

13       *Heller* cites no examples of laws requiring law-abiding citizens to keep firearms locked at

14   all times in the home when not being carried. If there had been any historical evidence suggesting

15   that people thought the government had such authority, the dissent certainly would have cited it,

16   and the majority would have had to distinguish it from the storage ordinance at issue in that case.

17   But *Heller* never engaged in such an analysis because there simply is no history or tradition

18   supporting the requirement. Even today, such restrictive laws are extremely rare.[18]

19       In sum, *Heller* found that keeping, bearing, and using handguns in defense of hearth and

20   home is core conduct protected by the Second Amendment. *Id.* at 635. Common sense, and the

21   United States Supreme Court, tell us that the City's law restricts that protected conduct. Plaintiffs

22   have thus satisfied the first prong of *Heller's* two-part test. But the City cannot meet its burden to

23

24   [17] It was in this context the Court mentioned in passing that its analysis was not intended to
25   "suggest the invalidity of laws regulating the storage of firearms to prevent accidents." *Heller*, 554
     U.S. at 631-32. The only firearm storage law examined in *Heller* concerned the District's *locked*-
26   storage requirement, and it *was* found invalid. Whether typical *safe*-storage laws, like those
     referenced in Plaintiffs' Request for Judicial Notice, are valid is not at issue here.

27   [18] Massachusetts remains an outlier, with the City, in imposing such an unnecessary and
28   extreme restriction on the right to keep arms in the home. *See* Mass. Gen. Laws ch. 140, § 131L.

1    establish that there is a significant history or tradition supporting laws mandating locked storage

2    of firearms. The City's locked-storage requirement is thus categorically invalid.

3        **B.**    **The City's Requirement that Handguns Be Kept Locked Up When Not Being "Carried" Within the Home Cannot Survive Strict Scrutiny – or Any Heightened Scrutiny**

4

5        Under strict scrutiny, the City must show that its locked-storage law is "narrowly tailored

6    to serve a compelling state interest." *Reno v. Flores*, 507 U.S. at 301-02. Even assuming the

7    government has a "compelling interest" in the manner that law-abiding citizens store their

8    firearms in their homes, the City's broad and burdensome law is simply not "narrowly tailored."

9    Plaintiffs do not generally object to reasonable laws that encourage responsible gun ownership,

10   e.g., laws intended to keep firearms out of the hands of unsupervised children or felons. But

11   Section 4512 keeps operable handguns out of the hands of competent, law-abiding adults when it

12   matters most, rendering them unprepared for self-defense emergencies, and thus preventing the

13   meaningful exercise of their Second Amendment rights. Plaintiffs do object to that.

14       The City cannot defend its infringement of Plaintiffs' constitutional rights by claiming the

15   law is intended to protect children from accidental injury or to keep handguns out of the hands of

16   unauthorized persons, with any attendant restriction on the right being incidental and necessary.

17   There is simply no logical fit between such an interest and a law requiring that *all* residents,

18   including competent, law-abiding adults, keep their handguns locked up at *all times* – regardless

19   of whether minors or felons or anyone else is present or has access to them.

20       Many states have *safe*-storage regulations that address the concerns above, but in a far less

21   burdensome manner, with safe storage being a factor that absolves the gun owner of criminal

22   liability if an unauthorized person gains access to and misuses the firearm, thus providing

23   significant incentive for safe storage.[19] Such laws allow law-abiding adults to "keep" their arms

24   operable and ready for use in case of confrontation under most circumstances. The City's

25

26       [19] *See* Cal. Penal Code §§ 25100, 25105, 25200, 25205; Fla. Stat. § 790.174; Haw. Rev. Stat.

27   §§134-10.5, 707-714.5; 720 Ill. Comp. Stat. 5/24-9(a); Iowa Code § 724.22(7); Md. Code Ann., Crim. Law § 4-104; Minn. Stat. § 609.666; N.H. Rev. Stat. Ann. § 650-C:1; N.J. Stat. Ann. §

28   2C:58-15; N.C. Gen. Stat. § 14-315.1; R.I. Gen. Laws § 11-47-60.1; Tex. Penal Code § 46.13.

restrictions come at the problem from the opposite perspective, with law-abiding adults only able to "keep" their handguns operable when being carried. In essence, this conflates the right to keep and bear arms with the related but distinct right of self-defense, suggesting one's right to keep operable firearms available remains inchoate until one is under attack.

The only remaining justification for forcing law-abiding adults to keep their handguns locked at all times is that guns are dangerous. Authorized users might pick up an unlocked handgun and accidentally shoot themselves – or do it on purpose. But the ordinance itself allows authorized users to carry operable handguns in the home, making the argument that the locked-storage requirement will reduce accidents and suicides among authorized users tenuous at best.

Moreover, the oft-cited suicide-reduction argument is directly at odds with the right to use arms in self-defense. That argument rests on the belief that the additional time it takes to unlock a handgun will afford the suicidal adult time to reconsider the act – the more time, the better. The opposite is of course true in self-defense emergencies where any delay in accessing an operable handgun necessarily reduces the ability to use it to ward off an attack. Thus, in the interest of a questionable theory on suicide prevention, the City's locked-storage requirement, by design, infringes the fundamental right to armed self-defense in the home.

Any debate regarding whether it is a good idea to allow law-abiding adults to possess and use firearms is over. The Framers surely understood that guns are dangerous and that their misuse can result in accidental death or suicide, just as they understood that *most* rights involve risks, including injury and death. For instance, the *McDonald* Court noted how the constitutionally protected rights of criminal defendants allow some criminal offenders back on the streets to repeat their crimes. 130 U.S. at 3045. But that does not give state and local officials license to curtail those constitutional rights. The same is true of the Second Amendment. The right to keep arms in an operable (i.e., useful) condition cannot be prohibited by laws that seek justification in well-known risks associated with that very right, risks equally well-known to those who enshrined the right in our Second Amendment. As *Heller* observed, the inclusion of the right to arms in the Bill of Rights "necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636.

## IV.     SECTION 613.10(g) VIOLATES THE SECOND AMENDMENT

The threshold question, here, is whether the Second Amendment protects the sale and purchase of ammunition. Assuming it does, the City's ban on the sale of expanding and/or fragmenting ammunition, a broad class of ammunition in common use for self-defense, is categorically invalid under *Heller's* scope-based approach because it restricts protected conduct without any historical justification. Alternatively, the City's ban on the commercial sale of such ammunition fails under any heightened means-end test. The City's total ban on the sale of *any* ammunition that does not "*serve a sporting purpose*" is similarly invalid. That particular provision requires only brief examination because its *sporting-purpose* limitation cannot be reconciled with the "central component" of the Second Amendment right: *self-defense*.

### A.     The Second Amendment Secures a Fundamental Right to Acquire Firearms and Ammunition for Self-Defense

The Supreme Court recently confirmed that the Second Amendment secures a fundamental right to possess functional firearms for self-defense. *Heller*, 554 U.S. at 635; *McDonald*, 130 S. Ct. at 3042. That right necessarily includes the right to acquire firearms *and* ammunition. "[C]ertain unarticulated rights are implicit in enumerated guarantees. . . . [F]undamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80 (1980). "The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and *to purchase and provide ammunition suitable for such arms. . . .*" *Andrews v. State*, 50 Tenn. 165, 178 (1871)(emphasis added).

Further, banning commerce in arms violates the Second Amendment right at its core. *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010). The government can no more ban the sale of protected ammunition than it can ban the sale of protected books, contraceptives, or even violent video games. *See Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965); *Brown v. Entm't Merchs. Ass'n*, __ U.S. __, 131 S. Ct. 2729, 2738 (2011). A right to keep and bear arms, without the attendant right to acquire them, would be meaningless. And so, laws that prohibit law-abiding citizens from purchasing and transporting protected arms to their homes are at odds with

the Second Amendment, regardless of whether they directly restrict the possession of such arms. *See* Order at 10, *Bateman v. Perdue*, No. 5:10-265 (E.D. N.C. Mar. 29, 2012).

Finally, bans on the commercial sale of ammunition cannot be saved by the premise that individuals might purchase the prohibited ammunition in other jurisdictions or from private parties. *See Ezell*, 651 F.3d at 697-700 (availability of shooting ranges outside city limits did not save otherwise invalid ban on ranges within the city). Just as a local government may not ban speech by prohibiting the sale of protected books within its jurisdiction, requiring residents to go elsewhere, it is likewise precluded from banning the sale of protected firearms and ammunition.

**B.** **The City's Ban on the Commercial Sale of Ammunition in "Common Use" for Lawful Purposes, Including Self-Defense, Cannot Survive Judicial Review, Under Any Test**

Arms "typically possessed by law-abiding citizens for lawful purposes" or those "in common use" are protected by the Second Amendment. *Heller*, 554 U.S. at 624-25 (citation and internal quotation marks omitted). And, as described above, the Second Amendment protects equally the purchase and possession of ammunition necessary to meaningfully exercise the right to keep and bear arms. *Andrews v. State*, 50 Tenn. at 178; *see also Richmond Newspapers*, 448 U.S. at 579. It follows that ammunition in "common use" for "lawful purposes" is protected by the Second Amendment, and any restriction on its sale is presumed invalid.

The City's ban on the sale of expanding and/or fragmenting ammunition broadly restricts the sale of ammunition commonly used by law-abiding residents for self-defense. The City can provide neither historical basis nor legitimate justification for the restriction, rendering the law invalid under both *Heller's* scope-based analysis and any means-end test consistent with *Heller*.

**1.** **The City's Ban on the Sale of Expanding and/or Fragmenting Ammunition Is Categorically Invalid Under *Heller's* Scope-Based Analysis**

In *Heller*, the Court found a ban on handguns, a class of weapons in "common use" for self-defense in the home, categorically invalid despite the availability of long guns. *Heller*, 554 U.S. at 629. The Court held that "[i]t is enough to note . . . that the American people have considered the handgun to be the quintessential self-defense weapon" and "a complete prohibition on [its] use is invalid." *Id.* Finding handguns to be commonly used for a lawful purpose (i.e., self-

defense) and banned by the challenged ordinance, the Court did not have to go any further. *Id.*[20]

Here, Section 613.10(g)(2)-(3) bans the sale of any ammunition "designed to expand . . . [or] fragment upon impact." Like the class of arms at issue in *Heller*, i.e. handguns, this class of ammunition is in "common use" for lawful purposes including self-defense, Request for Judicial Notice and Exhibits K-T attached thereto, and the City cannot completely ban its sale and purchase. With its reduced risk of over-penetration and ricochet, and its ability to bring down a violent aggressor with fewer shots fired, the prohibited ammunition is especially preferred over fully-jacketed ammunition in densely-populated areas.[21] Such ammunition is common throughout the nation and it is widely available in every state, there being no statewide ban on its sale or possession in California or elsewhere.[22] And it is no secret that civilians who own firearms for self-defense regularly purchase the ammunition at issue for use in self-defense emergencies, but purchase and fire less expensive (and less effective) fully-jacketed ammunition for target shooting. It is indeed the "quintessential" self-defense ammunition.

The City cannot credibly claim that ammunition sold on a widespread basis and widely possessed by civilians for self-defense in the home is not in "common use." Even the City's own law enforcement personnel acknowledge the superior effectiveness of the banned ammunition in

---

[20] *Heller* finds support for its "common use" test in *United States v. Miller*, 307 U.S. 174, 179 (1939), and in the historical tradition of prohibiting the carrying of arms that are both "dangerous and unusual." *Heller*, 554 U.S. at 627. The City characterizes the ammunition at issue here as "unusually dangerous" or "particularly dangerous," Defs.' Mot. to Dismiss Am. Compl. 1:17, 5:2, 14:13, but that's not the test. It is whether the arms at issue are in "common use" for lawful purposes. This ammunition certainly is. And, in any event, it is not both "dangerous and unusual."

[21] Experts cite many advantages of expanding bullets over fully-jacked ammunition: (1) reduced ricochet, (2) reduced over-penetration of target and building materials, and (3) ability to take down subject in fewer shots. *See e.g.*, Clifford Krauss, *Experts Support Hollow Point Bullets*, N.Y. Times, Mar. 6, 1997 (attached as Ex. E to Req. Jud. Not.)("[the hollow point bullet] rarely ricochets or penetrates an object, thereby lessening the possibility of hitting anyone other than the target"); Stephen J. Lynton & Alfred E. Lewis, *More Powerful Ammo Studied By D.C. Police*, Wash. Post, Nov. 5, 1976 at A1, A4 (attached as Ex. M to Req. Jud. Not.)("you can neutralize the individual with a minimum number of shots").

[22] New Jersey remains an outlier by regulating the carry of hollow nose bullets. N.J. Stat. Ann. § 2C:39-3(f),(g). But that statute does *not* ban the sale or private possession of such ammunition.

1    self-defense, and they carry such ammunition for that very reason. Transcript, S.F. Bd. of Supers.,

2    Pub. Safety Comm. Hr'g at 12 (Sept. 15, 2011)(attached as Ex. H to Req. Jud. Not.).[23]

3         In contrast, while the City and others might argue that ammunition with some history of

4    prohibition under state and federal law (e.g., incendiary ammunition, armor-piercing ammunition,

5    or ammunition greater than .60 caliber)[24] is not in "common use," the same simply is not true of

6    the ammunition the City prohibits. Section 613.10 goes far beyond those restrictions and bans the

7    sale of a broad class of ammunition in "common use" by law-abiding citizens for self-defense in

8    the home. And it does so based on the rationale that the ammunition has greater stopping power

9    and can cause greater bodily harm – that is to say, the risks *and* benefits associated with self-

10   defense ammunition. Using the City's rationale, the less bodily harm and stopping power, the

11   better. But for someone engaging in self-defense to stop a violent attack, the opposite is true.

12   While there are limits as to what firearms and ammunition are protected, *Heller* instructs us as to

13   what that limit is – ammunition that is *not* in "common use" for lawful purposes. *Id*. at 627.

14        In response, the City is sure to invoke its recently-passed legislative findings of "fact,"

15   wherein it purports to find that the banned ammunition is not in "general use." S.F., Cal., Police

16   Code § 613.9.5(4) (2011). But the City accepted these findings without evaluating them against

17   the wealth of countervailing evidence presented to it – evidence which unequivocally shows that

18   the banned ammunition is not only in "common use" for lawful purposes, but also among the

19   types of ammunition best suited for self-defense.[25] Not surprisingly, the City's findings do not

---

21   [23] The self-defense interests of police in using this ammunition are no different than those of
     civilians. If anything, a civilian's needs for effective self-defense ammunition are *more* acute.
22   Hollow point ammunition allows the defensive shooter to bring down a target with fewer shots
     fired. Lynton & Lewis, *supra* note 21. This is crucial for civilians who may be less likely than a
23   trained officer to make a perfectly placed shot capable of taking down a home intruder.

24   [24] *See, e.g.*, Cal. Penal Code §§ 16460, 18710, 18735, 30315; 18 U.S.C. §§ 921(a)(17),
     922(a)(8).
25

26   [25] *See* Letter from California Rifle & Pistol Association, to S.F. Bd. of Supers. apps. B-C (Sept.
     26, 2011)(attached as Ex. D to Req. Jud. Not.)(*citing, e.g.*, Krauss, *supra* note 21; Statement of
27   Martin Fackler, M.D. (Sept. 23, 2011)(attached as Ex. F to Req. Jud. Not.); Statement of Stephen
     Helsley (Sept. 23, 2012)(attached as Ex. G to Req. Jud. Not.); Req. Jud. Not. Ex. H; Transcript,
28   S.F. Bd. of Supers. Hr'g (Sept. 27, 2011)(attached as Ex. I to Req. Jud. Not.); Transcript, S.F. Bd.

1  include any support for its "conclusion" that the prohibited ammunition is not in general use. And

2  the findings include *no* acknowledgment of the well-known benefits of the banned ammunition,

3  including its ability to most effectively ward off aggressors with the least potential for harm to

4  bystanders. *See id.* at § 613.9.5. These are crucial omissions, making the City's findings as

5  misleading as arguing for reducing accidents by banning the sale of cars without acknowledging

6  their widespread use or the benefits they provide. As such, any findings of "fact" the City uses to

7  legitimize its unconstitutional conduct are unhelpful to the Court, at best.[26]

8       In sum, Section 613.10(g) flatly prohibits the sale of ammunition in "common use" for

9  self-defense. While the City may be able to regulate ammunition sales to a degree, this far-

10  reaching ban on the sale of common self-defense ammunition to law-abiding residents goes too

11  far, directly conflicting with conduct protected by the right to engage in self-defense, " 'the

12  *central component*' of the Second Amendment . . . ." *McDonald*, 130 S. Ct. at 3036, 3048.

13       Under *Heller's* analysis, the City must establish that our nation's history and traditions

14  support its flat ban on the sale of arms commonly used for self-defense. Plaintiffs submit that the

15  City cannot meet its burden, rendering the City's ban categorically invalid.

16            **2.    The City's Ban on the Sale of Expanding and/or Fragmenting**
                    **Ammunition Fails Under Any Level of Heightened Scrutiny**

17       Even if the Court applies a means-end analysis, Section 613.10(g) still fails because there

18  is no logical fit between the City's ban and any interest the City may claim. And in no way is the

19  City's law "narrowly tailored" to those ends. Under the guise of an interest in "public safety," the

20  City bans the sale of expanding and/or fragmenting ammunition. In doing so, it promotes the sale

21  and possession of ammunition that is *more* dangerous to the public and eliminates access to

22  ammunition that is most effective and commonly used for self-defense – outcomes that run

23  _____

24  of Supers. Hr'g  (Oct. 4, 2011)(attached as Ex. J to Req. Jud. Not.).

25  [26] Even "true" legislative fact-finding cannot undermine fundamental rights. *See Landmark*

26  *Commc'ns v. Virginia*, 435 U.S. 829, 843 (1978)("[d]eference to a legislative finding cannot limit
   judicial inquiry when First Amendment rights are at stake"). Even in the context of less protected

27  speech where such findings matter, as with the location of an adult bookstore, a municipality
   cannot "get away with shoddy data or reasoning." *Los Angeles v. Alameda Books, Inc.*, 535 U.S.

28  425, 438-39 (2002). Here too, the Court should not rely on "facts" concocted by the City in
   response to a challenge to its laws and without any consideration of contradicting evidence.

directly counter to any interest the City might have in promoting public safety.

Notably, by barring access to expanding and/or fragmenting ammunition, the ordinance promotes the use of fully-jacketed ammunition, ammunition that is *more* dangerous to bystanders and neighbors in urban settings. And it bans ammunition designed to prevent ricochet and the over-penetration of targets or building materials – notorious characteristics of the fully-jacketed round. Krauss, *supra* note 21 (quoting New York Medical Examiner, Dr. Charles Hirsch, "[Hollow points] are much less likely to pierce through a person, a wall, a car or other object than are fully-jacketed bullets. I think they are safer"). The use of fully-jacketed ammunition thus *increases* the likelihood that shots will pass through a target or objects behind him. Expanding and/or fragmenting ammunition reduces that risk, making the public more safe, not less.

Additionally, expanding and/or fragmenting ammunition is not more dangerous than other types of readily available ammunition. For example, 12 gauge shotgun shells are extremely lethal when compared to small caliber expanding and fragmenting handgun ammunition, but shotgun shells are available throughout the nation, and they remain lawful in San Francisco.

Further, the ordinance strips the only viable option for effective armed self-defense from those incapable of handling larger caliber firearms with greater "stopping power." These residents are left with no other option but fully-jacketed ammunition – ammunition that is known to over-penetrate its target and, unless a perfectly placed shot is made, fail to incapacitate an aggressor before the defensive shooter is harmed. According to famed wound ballistics expert, Martin Fackler, M.D., "even if shot through the heart by a non-expanding bullet, an attacker still can retain 30 to 40 seconds of activity. That is enough time for the attacker to empty a gun into a victim or stab the victim multiple times." (Req. Jud. Not., Ex. F).

What interest could the City have in so limiting the self-defense rights of its residents – especially considering that the law *encourages* the use of ammunition that poses a greater risk to bystanders? The answer is simply that there is not one. The City's law not only fails to further any purported interest in public safety, it runs directly counter to it. This makes the City's expanding/ fragmenting ammunition sales ban unconstitutional under any level of heightened scrutiny. But this means-end analysis is unnecessary because the City's ban directly conflicts with the right to

purchase ammunition in common use for self-defense without any support in history or tradition.

### C.  The City's Ban on the Sale of "Ammunition that Does Not Serve a Sporting Purpose" Cannot Survive Judicial Review, Under Any Test

It is unclear what ammunition Section 613.10(g)'s "sporting purposes" clause actually prohibits.[27] What is clear is that the City's ammunition ban is wholly inconsistent with the mandates of the Second Amendment and its "central component": individual self-defense. *McDonald*, 130 S. Ct. at 3036. Moreover, as explained above, the Second Amendment protects the right to acquire firearms and ammunition "in common use" –  period. The City cannot impose additional "constitutional" conditions by requiring that commonly used ammunition also be used for some City-recognized "sporting purpose" before Plaintiffs have the right to acquire it.

#### 1.  The City's "Sporting Purposes"-Based Ammunition Ban Is Categorically Invalid Under *Heller's* Scope-Based Analysis

There is simply no squaring the right to acquire firearms and ammunition for self-defense purposes with Section 613.10(g)'s ban on the sale (and purchase) of ammunition that "does not serve a sporting purpose." While the City's ordinance fails to define "sporting purpose," it is clear that whatever recreational or competitive activities are covered by the City's "sporting purpose" qualification, defending oneself from violent crime in the home is not among them. Self-defense is not a sport. Neither is militia duty, for that matter. Unless the City can show that all commonly used "self-defense ammunition" also serves a "sporting purpose," the provision necessarily restricts conduct protected by the Second Amendment. Thus, the first prong of *Heller's* scope-based analysis is satisfied. That being the case, it is the City's responsibility to show some textual, historical, or traditional support for banning the sale of "ammunition that does not serve a sporting purpose" to law-abiding citizens. None appears in *Heller* or *McDonald*. Plaintiffs submit there is none and that the "sporting purpose" provision is categorically invalid.

#### 2.  The City's "Sporting Purposes"-Based Ammunition Ban Fails Under Any Level of Heightened Scrutiny

Even if the Court applies a means-ends test to City's "sporting purposes"-based ban, the

---

[27] The City's "sporting purposes"-based ban is fatally vague on its face. In the interests of judicial economy, and because the City's ban directly violates the Second Amendment, Plaintiffs are not pursuing their vagueness claim in this motion. Plaintiffs do not waive this cause of action.

1   analysis ends quickly under any standard of review as there is no legitimate interest in restricting

2   firearms use to "sporting purposes." The City's interest cannot be public safety. There is no

3   logical reason to think the public would be safer if gun owners use only "sporting" ammunition.

4          The nonsensical nature of the ban is revealed when considering the ammunition it allows

5   and that which it ostensibly prohibits. Under the City's law, ammunition commonly used to hunt

6   elk and bears is legal. Yet the City prohibits sales of the smallest caliber ammunition if it is not

7   sufficiently used for "sporting purposes." The City cannot credibly argue that its interest in public

8   safety is served by an ordinance that permits residents to purchase ammunition so powerful it is

9   used to kill wild animals weighing more than 1000 pounds, but not ammunition of the smallest

10  caliber – just because it isn't sufficiently used in "sporting" activities.

11         In short, this provision cannot survive any level of scrutiny. It serves no compelling

12  interest, nor a substantial one – and it is not tailored to serve any such interests. In fact, to the

13  extent the law is intelligible, it is irrational because it bans the sale of ammunition commonly used

14  for s*elf-defense* if it does not also satisfy the City's "*sporting purposes*" condition.

15         But, as with the City's expanding and fragmenting ammunition sales ban, such means-end

16  analysis is unnecessary because the City's "sporting purpose" provision so clearly conflicts with

17  the core constitutional guarantee of armed self-defense in the home – without any historical

18  support.

19  **V.    CONCLUSION**

20         The City's laws are invalid because they restrict the right to keep and bear arms in one's

21  home for the core lawful purpose of self-defense and do so in ways foreign to those who enacted

22  the Second and Fourteenth Amendments. In any event, the laws lack the fit with a government

23  interest required of laws that infringe fundamental rights. Accordingly, Plaintiffs request the Court

24  grant their Motion for Partial Judgment on the Pleadings and enter judgment in their favor.

25   Date: May 17, 2012                    MICHEL & ASSOCIATES, P.C.

26

27                                          s/ C. D. Michel
                                            C. D. Michel
28                                          Attorney for Plaintiffs

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ESPANOLA JACKSON, PAUL COLVIN, THOMAS BOYER, LARRY BARSETTI, DAVID GOLDEN, NOEMI MARGARET ROBINSON, NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., SAN FRANCISCO VETERAN POLICE OFFICERS ASSOCIATION, <br><br> Plaintiffs <br><br> vs. <br><br> CITY AND COUNTY OF SAN FRANCISCO, THE MAYOR OF SAN FRANCISCO, AND THE CHIEF OF THE SAN FRANCISCO POLICE DEPARTMENT, in their official capacities, and DOES 1-10, <br><br> Defendants. | ) **CASE NO.: CV-09-2143-RS** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) **CERTIFICATE OF SERVICE** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 E. Ocean Blvd., Suite 200, Long Beach, California, 90802.

I am not a party to the above-entitled action. I have caused service of

**NOTICE OF MOTION AND MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Wayne Snodgrass, Deputy City Attorney
Christine Van Aken, Deputy City Attorney
Office of the City Attorney
1 Drive Carlton B.  Goodlett Place
City Hall, Room 234
San Francisco, CA 94102

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 17, 2012.

s/ C. D. Michel
C. D. Michel
Attorney for Plaintiffs

26

MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS C-09-2143-RS