# EXHIBIT "H"



# City and County
# of San Francisco

THURSDAY, SEPTEMBER 15, 2011

**supervisor mirkarimi:** good morning.

Welcome to the public safety meeting.

We understand supervisor campos will be joining us certainly.

madame clerk, could you please

read items #one, to, three, and for? >> item 1, a resolution authorizing the fire department to spend a grant in the amount

of $230,000 from the federal emergency management agency for

fiscal year 2007, a supplemental port security grant program for assets to enhance the fire department' s water-based response capabilities and

increase its protection of the port of san francisco and the san francisco bay.

Item #2, authorizing the fire department to spend a grant in

the amount of $7,870,484 from the federal emergency management

ag and seat for the fiscal year 2008 port security grant program to enhance the fire department' s water-base response capabilities and increase its protection of

the port of san francisco and san francisco bay.

Item 3, authorizing the fire

department to accept an expanded

grant of 645120 -- $645,000 for

the security bent -- for $645,125 to increase its protection of the port of san francisco and san francisco bay.

item #4, authorizing the fire

department to accept and expand

a grant in the amount of 107,000

to enter $96 from the federal emergency management agency for the purchase and installation of seven commercial washer

extractors to clean personal protective a quick assessment.

-- personal protective equipment.

Supervisor

**mirkarimi:** thank you. >> I' m here on behalf of the

fire department to present the first four items on the agenda.

The first three are resolutions requesting approval by the board of supervisors to authorize the

department to except and expend

approximately 8.7 $5 million related to water and pour-based projects.

-- approximately $ 8.75 million

related to water-based projects.

The department applied for the

program coordinated by with assistance from the united states coastguard.

In January of this year, the far apart was notified we were

awarded eight projects totaling

$8.75 million.

This is one of the grant programs under the federal department of homeland' s security.

the purpose is to increase management at the nation' s ports and protect the nation support infrastructure.

These projects are water-based and designed to enhance the port and a response capabilities. The san francisco bay qualifies as a highest risk status as a port.

the three different fiscal year

grants for a total of $237,000,

the 2008 grant is for $7.9

million, and the 2010 grant is approximately $650,000.

It is good news in the current economic climate. There are no matching funds required by the department for any of these projects.

The largest project is in the

2008 fiscal year both in scope and financial size, a new type to fireboat. Currently, there are two

fireboats and they' re both over 15 years old. This would allow the department to purchase a new fire boat.

The department is not actually

receiving the money from.

A fiduciary agent has been set up and we will be working with them for reimbursement. The department is very excited

about these upcoming projects,

more so in light of america' s cup coming to san francisco.

We request you move these to the full board for approval. on the fourth item, an

additional grant from , a resolution to have the department approved a grant for the purchase of installation of

several wash extractors for the department.

In August of last year, the board of supervisors passed a

resolution at -- recommending a gift of five washer extractors to be used to clean personal

protective equipment of members.

These were donated by the san francisco fire fighters cancer prevention center. At the time, we were working

with the cancer foundation and

applying through for a grant of

the dish -- of an additional seven washer extractors for a total of 12. The department was awarded the grand earlier this year.

The total cost is 140 -- $134,000. A match is required which comes

to a cost inc. To department' s budget.

The total amount of federal

funds is $107,296, that is the 80% federal contribution.

These machines are heavy-duty

machines used to clean personal

protective a quip and white coats and pants over the course

of responding to incidents, they

could be sought with toxins

etc., so the goal is to increase not all health and safety

department members but reduce wear and tear of personal

protective gear and help them out by washington. I' m happy to answer any questions.

Supervisor mirkarimi: this is all pretty straightforward.

Is there any change in staffing?

>> no.

supervisor mirkarimi: colleagues, any question?

Is there any public comment? Public, disclosed. We take this with recommendation. So moved.

Madame Clerk, item no. 5.

>> a resolution authorizing the district attorney to renew its current agreement with the

california victims' compensation and government claims board, an agency of the state of california, for a revolving fund

and the amount of $75,000 to be

used to pay for verified funeral

and burial expenses for eligible homicide victims and emergency relocation for victims of domestic violence and sexual

assault from the July 1, 2011

through June 30th, 2014.

Supervisor

**mirkarimi**:   good morning. Welcome. >> I' m from the district attorney' s office. We have a contract with the

state victim' s compensation program. The revolving fund is full of money that allows us to make

payments faster to providers, victims, and their families.

If there is a homicide, we are able to pull the money out for

the funeral burial expenses within a couple of days, otherwise we would have to wait for a longer process.

This pool of money allows us to do that.

Homicide cases, domestic violence, and sexual assault cases.

**Supervisor mirkarimi**:   sometimes my office and I know others have had to intervene to get

assistance for victims families

who do not have the wherewithal

to pay for funeral expenses and

other accessory costs.

does it get to a point where we exceed the capacity of money made available to the city in

being able to assist that

population, especially if the population is increase relative to the homicide rate?

>> know, we have not run out of

funds to assist homicide victims and their families. I would imagine it' s a rare case when there is outside involvement needed to get these expenses paid.

For example, when a homicide happens, the crisis response team responds immediately, they go up to the scene of every homicide. We have a close working

relationship with the crt professionals and they will walk family members to our office.

If that does not happen, our

advocates reject immediately, but the contact information from the medical examiner, and start making contact as soon as a homicide has occurred.

This is something we work on quickly.

The homicides, we do not wait. The only wrinkle is the state

has tightened up their interpretation of their guidelines for eligibility. So whereas a case in the past

where there is a homicide and

the victim May be was engaged in a drug deal, that would still go through. Today, that would be tougher to push through because the state is looking at whether the victim contributed or was involved in the crime.

>> all the dollars associated our state driven, is there any match local dollars at all? >> there is no local match.

>> is there a need for added

assistance of local dollars or

what is provided for by the state is sufficient?

>> in terms of their appalling fund, that has been working well.

When we get to item number six, the general victim compensation

staffing, the dollars, we have

taken a cut to that grand, so we have had to pick up one of the positions on the general fund, so there is additional need their.

>>

supervisor

campos:   I' m wondering if you can give us information

as far as how many families have

benefited from this service?

>> our data is not real good.

The state keeps the data.

What I can tell you is for

fiscal year 2009-2010, we paid out over $3 million in benefits

to victims, their families and providers.

That was for a total of 1120

cases filed in san francisco. That' s not the number of victims

we see, that is closer to 4000, but the number of applications

was 1720. --

supervisor campos: what is the rate at which applications are approved or denied?

What is the percentage in terms of applications that are approved? >> I don' t know the answer to that and it depends on the benefit.

In this last fiscal year, the

numbers are lower for approval because of state guidelines.

**Supervisor campos:**   what I am

trying to get to is to have an understanding of how what we are doing relates to the need that

is out there and I think that

requires having a better sense

of how many people are applying, how many people are seeking

help, who actually ends up

getting the help, and to the extent applications are denied,

what the basis for that and I'

ll is -- the bases for that and I' ll are.

-- for that denial are. >> I don' t know if I will have

the breakdown, but I think we do

have the percentage of approvals and denials.

**Supervisor campos:**   I think it is something we as a city should be

aware of and have that information.

to the extent this is a state-

run program, where there May be

a need where a gap needs to be

filled, we need to be mindful or aware of that. I don' t know where the money for something like that would come from, but it' s something we

should consider and certainly look into.

To do that, to have a sense of whether or not there' s a need for the city to step in and supplement what the city is

doing, we need to find out what the need is and we need to get a

better sense of the way of the land. Thank you very much.

Supervisor cohen: following along the lines of the

supervisor campos, a want to

know which department manages this data.

>> it is the california victim compensation claims board.

**Supervisor cohen**:  is this a politically appointed board? >> is appointed by the governor.

**supervisor cohen**:  all seats? >> yes.

**Supervisor cohen**:  do you have the information on what the average payment to each family is? >> I do not. I don' t know if they would have it.

**Supervisor cohen**:  so say my son

is killed and I live in public housing. I make an application, where do

i find that application? >> in the D.A.' s office.

**Supervisor cohen**:  then who reviews it? >> the claims staff employed by the D.A.' s office.

**Supervisor cohen**:  then what happens?

>> it will determine eligibility and send it to the state.

**Supervisor cohen**:  does the state have final say?

do they have the ability to overturn the decision made at a local level? >> they do.

**Supervisor cohen**:  I suspect you probably don' t know what that ratio is. >> I do not.

**Supervisor mirkarimi**:  just picking up on the threat of this discussion, who advocates for the victims' families to the state? is that you? >> yes.

That is the advocates in the victims' services division. Because of the problems we' re having now with the state' s tightening up their guidelines, advocates have become experts on the appeal process. They' re ready to assist throughout the process.

>> I would think part of --

**supervisor mirkarimi**:  I would think part of that advocacy

would be to be well equipped

with statistics as to who is getting the kind of funding

necessary and is getting rejected. I think that would empower san francisco to be more vocal

either to the state or signal to

the city government that state is not helping to the degree they should so maybe we need to step in.

I have to tell you, less than one month ago, I had to spend a very sad morning with the mother

whose son was murdered in hayes valley.

She was very distressed and it

was hard to have a measure discussion, but she was not getting assistance.

Her office did have to call on

the expenses that she felt

completely overwhelmed, and very distressed about.

Not that I expect your office to be the ones that fix it all, but

it bubbles up quite a bit that we have had to intervene from

our office over the years to try

to usher people through the process.

I do not believe this is as smooth as it sounds like, and I

have a feeling there' s a larger population out there getting rejected then we are aware of. it would be nice to know that for sure because it is anecdotal. >> I think it would be nice to have the data.

The process is rarely smooth because you' re dealing with families that have suffered a devastating loss.

The first time they come to our

office, sometimes they don' t even remember they have been there. It' s not uncommon for them to go

to another office and say no is

helping me when they have been held to the rest of our ability.

But we cannot help everything and we cannot make the pain go away. We' re always open to calls from other agencies for assistance,

but those advocates, especially

on homicide, I am positive they reached out to that mother before they called you.

**supervisor mirkarimi:**   I think it

helps to tie the loop up so the D.A.' s office and the victim' s witness assistant does not feel

alone in this process, that there would be a more collaborative effort so we are at least half of the game,

especially if the state is going through the kind of fiscal crisis is going through.

That least prepares us so that

in the budget committee, which I

sit on, we are able to then

anticipate potential need.

It seems to be relative to the

violence rate and homicide rate we have been experiencing, and it has been seesawing quite a bit.

>> we were collectively, so we will accept any help that is available.

.

**Supervisor mirkarimi:**   we May

want to have a different relationship so that binds the

officers and potentially criminal justice agencies, so that they' re a little more

alert to the fact that this is a need that needs to be addressed.

Thank you. We appreciate everything.

I do not believe we have anymore questions. Any public comment on this item?

I did not call the next one, so

-- I am ok for now. Any public comment?

Public comment is closed. Can we take this without objection? So moved.

Madame Clerk, which call in #6?

>> item 6, resolution

authorizing the office of the district attorney retroactively

accepting to expand this $714,138 allocated from the california victim compensation and government claims board for a project entitled the joint

powers agreement for July 1st, 2011 through June 30th, 2012.

>> this is the grant that funds of the staff in the D.A.' s

office to handle the applications and all of the bills and outreach that goes on with providers. As I said earlier, the amount of

the grant was cut by 5% and we

are currently -- which currently holds seven staff members whereas before it was able to pay for eight. We still have eight working on the program because that is what is needed to make it work.

Supervisor campos: why is the grant retroactive?

>> I think that was a timing issue.

it has taken that long to get here.

We have been doing the load all along and there has not been a gap in service.

Supervisor cohen: how many

people on staff will this grant cover? >> 7.

Supervisor cohen: and you are not looking to expand or contract staff? >> we have had eight for a

number of years, but only seven

are covered by the grand -- to the grant.

Supervisor cohen: how is the eighth covered? >> to the federal fund.

Supervisor mirkarimi: the you have a volunteer program? sometimes I hear about people who are motivated by what happens in their neighborhood and want to help.

Maybe through internship there a

particular criteria that is trained, maybe you could update us about that.

>> we have a very robust intern and volunteer program. We currently have six or seven volunteers working on this

program, which, without them, I don' t know what we would do in terms of phone calls and data entry.

We do use that and it supports a lot of our operations.

Supervisor mirkarimi: thank you. Keep up the good work. Any other public comment?

Public comment is closed.

colleagues, can we take this without objection? So moved.

Madame Clerk, item number seven. >> item #7 is an ordinance amending the san francisco police code by adding sections

4511 dissections

613.9.5 to add

findings to ordnances requiring a handgun to be kept in a locked container or disabled with a

trigger lock and prohibiting the sale of enhanced lethality ammunition.

Supervisor mirkarimi: the purpose is to add a findings backed by research of two separate, existing laws.

One requires handguns to be kept

in locked containers or disabled with a trigger lock.

The other, which prohibits the

sale of the hands of lethality ammunition, the most common of which are hollow point bullets.

In 2008, the supreme court decision change the interpretation of the second amendment to mean that it protected an individual' s rights to possess a gun for self- defense.

Since then, gun advocates have been challenging local gun laws

across the nation, including san

francisco, which is why I teamed up with the city attorney' s

office so we can fortify our defense of reasonable gun safety laws.

This ordinance is needed to

clarify the board of supervisors on going intend to reflect updated research to ensure

existing gun laws in the police code are for look -- are fully enforceable. There is ample evidence these laws are needed now more than ever and they will save countless lives every year.

In addition to several shootings in August, a man was shot a

forty-niners game we heard about when the police chief was on

which made national news about insufficient staffing at a tailgate party that erupted.

In July, at least eight innocent

bystanders were hit by stray bullets, two of them were children, one was in my district, which are is absolutely livid about and visited in san francisco general hospital. Fortunately, she survived.

A north beach woman was hit by a bullet that passed through her body.

It fortunately did not cause life-threatening injuries, but

the police department confirmed they were hollow point bullets that hit her.

They are illegal in my mind and would not have passed through

her body because it would have expanded and a much greater

damage and would have then possibly life-threatening.

Each year, there are hundreds of gun-related injuries in san

francisco and we can only guess how many would be fatalities if it were easier for people to buy hollow point bullets.

With regard to the locked container and trigger locks, dozens of studies show keeping a loaded door unlocked done in the home is associated with an

increased risk of a gun-related injuries or death.

Less than one year ago, and 8- year-old boy found a gun in his

house, took it outside in a play yard and shot himself in the stomach.

another

personally visited who luckily survived, that was a tragedy.

The sad truth is that guns left at home are often used in

suicides or against friends and family and it is these incidences we are trying to prevent. We have a number of speakers

today that include the following

-- the deputy city attorney, the city attorney' s office, which we appreciate for their hard work in arriving at this particular reintroduction of our laws.

The san francisco police

department officer, san francisco general surgeon

resident and trauma researcher,

and we are familiar that there are a number of other people here to speak --

I would like to go ahead and invite you to help introduce this and we can go from there.

>> thank you, supervisor.

I am currently employed as a san francisco police officer.

i started my law enforcement

career back in November of 1970 with the oakland police department.

I worked in special

investigations and crime reduction in that city and

retired in 1991 and went to work for the california department of justice.

While with the california

department justice, I worked in

gangs and organized-crime until 2000 when I was promoted to a

position of special agent supervisor. I assisted in founding in putting together the firearms division in sacramento.

During that time, I testified on

numerous occasions before the

legislature and its superior and federal court on firearms

issues, prohibited possessions,

ballistics, and assault weapons

identification and operations.

Over those times, I from a 2000

to 2008, I sat on the committees that approved storage locks and

safes for the sales in california and requirements they have to pass to be certified for sale in this state.

During that time, we were given

the information on all accidental shootings that

occurred within the state.

What was predominately clear to us is that a number of those

shootings were the fact that

those guns were accessed by

persons who were unaware of the aspects and operations of the firearm and the fact they could not tell if the firearm was loaded or not.

During that time, laws were

passed for delivery of the

firearms through the firearms safety certificate.

Not only did they have to take a

test to acquire a firearm safety

certificate to purchase the gun,

prior to delivery of the gun, that person has to go through a

hands-on, objective test with dummy ammunition to show they

know how to load, unload, and secure the firearm in their home.

During the passage of those laws, a section was added that,

during the sale of the gun, the firearm has to be supplied with

a certified lock, certified by

the state of california, or the

person can bring a lock in that shows a certified number on it, certified by the state of

california, or they can sign an

affidavit with the model and co.

Of the gun say they have at home that would allow them to take the gun home without having to

have those requirements of a lock on site at the delivery time.

One of the easiest access to a firearm in the home through a

safe is through an electronic keypad lock for a firearm safe,

which is a small safe that allows a person to keep a

firearm in the safe, relatively accessible with a digital combination only known to

persons who are the owner or someone else who is allowed to know the combination for that safe.

There are saves which are relatively accessible to the person who knows the combination

but keeps other people who are unaware of the operations or loaded capabilities of the gun away from a firearm.

In addressing the hollow point

issue, hollow point ammunition,

over the last 41 years in law enforcement, I have been

involved in numerous armed

confrontations, shootings, so on

and so forth and experience them myself and investigated them.

One thing we have found is

hollow point ammunition expands

as it hits whatever medium it strikes, whether it is closing,

flash, and it expands.

Normally in 38-caliber, it will

try to expand in diameter so

that it causes a larger

temporary wound cavity in the object it hits.

That temporary wound cavity

causes incapacitation in the

target and thus allows the

cessation or incapacitation to

start and the altercation to cease. That'

s the efficiency of the whole point and mission, that it

expands, what ever it hits opens

up, and it is more efficient on

the target.

We have had numerous shootings

where I investigated, while I was on gang task force, currently I' m with the new

violence reduction team, and four persons were shot by one assailant.

The person was using full metal jacket ammunition. Everyone that was not hit in a

vital organ was treated and

walked away from sfgh .

The person who was injured the most was shot right in the aorta.

The surgeons at sfgh , saved the

man, patched the young man up,

and if it had been hollow point ammunition, opening it up and

making a larger temporary wound cavity, they probably would not have been able to save this young man.

I think there is a legitimate reason for law enforcement, because we are held to an

extremely high regulation about

the use of deadly force that, if we see a threat to our life or someone else' s life and we have

to seize that threat, hollow point ammunition, which we carry, it does act more

efficiently, for less rounds expanded to seas confrontation. We do not want a large amount of rounds launched in that direction because it would cause

ancillary damages that would not be accepted by our department.

So we want something that is efficient to put the threat

down, and one of the other

issues, are there legitimate issues for having hollow point ammunition within the city and county of san francisco?

there is relatively no particular use for target shooting.

Hollow point ammunition costs twice as much as full metal jacket ammunition.

The shooting ranges we have in

san francisco does not allow you to bring your own ammunition in

because of the lead in the indoor range.

Have to purchase the alleged free ammunition from the range.

-- the lead-free ammunition from the range.

Is full metal jacket ammunition as efficient?

For the purposes of self-defense

and home defense, I would not

want to be shot with either full metal jacket or hollow point ammunition. That is why we were ballistic vest.

--

why we where ballistic vests.

I believe the ancillary damage

to what average hits as well as a way by the fact that full

metal jacket can and does the

same job, as shot placement is done by the person trying to

defend their lives, and familiarization with the

firearm, practice with it, that

will help that person in using the right kind of ammunition to acquire the same desire effect.

-- the same desired effect.

Do you have any questions?

**Supervisor mirkarimi:**  I am sure we have a few.

The ballistic vest, are they fortified enough to withstand the impact of a hollow point bullet? >> yes.

on the level that we carry, that

we wear and the normal types of ammunition we are running into,

yes, they will stand up to hall. Ammunition.

On tests I conducted what I was

certifying whether we can allow

the 57 around to be sold in

california, that very fella --

very fast round coming out of a

small pistol was stopped as it

expanded on the seventh layer of the 21 layers of the front panel.

So, yes, as it grabs the kevlar material, it does slow the ball down and stop.

**Supervisor mirkarimi:** you make a

good case in explaining the

technical reasons why and public safety reasons why we would want

to resist this allowing of hollow point bullets in san francisco. But can you speak to the general

trend as to why people feel the

need who are gun advocates, who believe in the right to

possession, which is of course there second amendment right,

why do you think they have to

have something that is that much

more lethal that is made

available or can be accessed?

>> I think it is the same reason they feel they need assault weapons. They need what ever is accessible to them without encumbering their second of amorites.

We are stepping into an area of that is limiting them from free access to whatever they want.

Granted, we' re limiting the

sales here in the city and county of san francisco, but hollow point ammunition is

accessible south of the border

on a bimonthly or try monthly basis at the san francisco gun show in daly city.

I believe they want the same

lethality we desire as a police department to seize the confrontation. That' s another issue I believe gun advocates would want.

Supervisor

**mirkarimi:** I am traversing between both themes

and here that are fortifying our gun safety laws.

With respect to gun locks,

which -- when a gun is not kept

safe and locked, such as the

incident of the 8-year-old who

found a gun and shot himself,

what then do we do with the

parents or guardians where the

gun was made available or not kept safe?

i never hear that side of the story too much about either arrest or prosecution.

>> from my experience over these

years in law enforcement and

dealing with the shootings and the response of the state -- of

the safe storage laws in california, which has been on the books for almost 15 years --

if -- there is a variance in

punishment, and it is all to the discretion of the district attorney' s office.

Of all the shootings I have investigated and responded to,

only one has been prosecuted for the un safe storage act.

It was a grandfather who left a 25 auto on the coffee table and the grandson picked the gun up and shot himself with it. That's the only time I've ever

seen the un safe storage laws prosecuted.

>> that is of recent memory in

san francisco --

**supervisor mirkarimi:** it is not consistent with news reports you

read in the "chronicle" or hear

about how a child in particular will find a gun, shoots

themselves, or shoot somebody

else and that gun was supposed

to be kept safe based on laws

currently obligatory.

What is missing in this picture?

>> I truly believe it is very difficult to mandate laws that look into the homes and dictate what a person does inside the house.

There is another case where a young kid shot himself with a

gun the mother said the boyfriend just pulled out of the

safe that afternoon and loaded and left it in a closet.

Happened in contra costa county.

They are prosecuting the boyfriend.

But how do we legislate, when we

pass all of the laws, about save storage in the books and now we'

re going to put one on the

san francisco ordinance to restrict the storage of a firearm in the home, how do we look into the house?

Most of the safe storage gun

laws are kind of after the fact, after the gun is used illegally or someone is hurt.

**Supervisor mirkarimi:** but the

process is when somebody is rushed to san francisco general and aid to the brilliant job of saving somebody's life, any time

a weapon is used, there's a normal reporting process.

That reporting process that I

assume triggers the intervention of the police department to

investigate if it was

deliberately used or if it was an accident and how access to

the weapon occurred, especially

for a child, I would assume is

that next step that an

investigation or prosecution --

I recall in my district of

hearing of children who get guns, shoot themselves or shoots

somebody else, and I never hear

of anybody being arrested for an investigation resulting in

prosecution of those parents at

all for the guardians.

>> I understand your results.

it is the same one I have.

The route the bay area and california, it is at the

discretion of the district attorney' s office after they review the investigation whether

or not to prosecute the person, number one who had the obligation to store the weapons faithfully, and, number two, whether that person reneged on that by bringing the gun out and leaving it loaded in an unsafe area.

**Supervisor mirkarimi:**  thank you.

Colleagues, any questions?

**Supervisor campos:**  thank you.

First of all, I want to thank

supervisor mirkarimi for bringing this legislation

forward and thank you, officer, for your presentation.

I think this legislation makes a great deal of sense and I don' t

see that it is in any way

infringing upon anyone' s constitutional rights.

I think it is a very well

thought out public policy

approach that ultimately tries

to prevent a number of things,

including accidental deaths that happen.

In terms of what can be expected that in terms of this moving forward, is there a legal

challenge?

Is that a possibility? is that a concern as we are moving forward?

I know that supervisor

mirkarimi has drafted this very

carefully in coordination with the city attorney' s office.

Have we heard anything? ˙

**Supervisor mirkarimi:**  them -- this is a good time to insert the city attorney. >> I am the deputy city attorney and I can answer that question.

There are a lot of laws under

challenge all across the nation

in the wake of the decision and a subsequent decision which

applied heller to state and

localities, announcing the

individual right to a firearm in a home for purposes of self- defense.

Any laws that appear to burden

their right in any way, such as

even a requirement to have your

loaded weapon in a gun save that

you can open in a few seconds are under challenge.

or laws that would reduce the

sale of incredibly lethal

ammunition or reduced the use to law-enforcement.

These sorts of things which seem

very common sense to a lot of people are under legal challenge. That's true in this city and it's one of the reasons you are being presented with this legislation. The national rifle association is actually suing the city and

county of san francisco over these two ordnances.

When the city originally adopted them, it was not the case under that law that there was a second

amendment right that might be infringed.

We did not prepare as would

normally be the case, with legislation with a constitutional dimension.

We did not prepare findings at that point because we did not know these laws would be so

closely scrutinized by the judiciary. now that we know that, it's important to come back to these laws and explain what the foundation is for them exactly

and so, the fact these laws are

under challenge right now in

this city is one of the primary reasons why it is important for

the board of supervisors to

express what its rationale was for these laws.

**Supervisor campos:**   thank you, and I reiterate the point that it is important to clarify the

policy reasoning behind these

laws and I think the discussion here today and the findings that will come out of it are clearly

outlined, why from a public policy standpoint this makes sense.

I do think ultimately, the connection with any

constitutional violation is

remote, if at all, and hopefully that will prevail in the courts.

Thank you supervisor mirkarimi , and officers for work.

**Supervisor mirkarimi:**   I would

like to call up san francisco

general surgeon, randy smith.

>> I am a surgery resident in my fourth year of training,

currently working at the san francisco injury center on a violent intervention program.

I have a particular interest in trauma surgery after witnessing day after day young people

coming in with gunshots, stab wounds, and assaults.

as you alluded to earlier, this is a big public health problem nationally and locally. Homicide's represent the second

leading cause of death for age

15 to 44 years old and, on a

local level, firearms represent

the third leading cause of all entries at san francisco general hospital. I want to speak to you about my

clinical experience with hollow point bullets and the injuries they cause as a result of their severe destruction. Destruction.

I have operated on a lot of

people that have suffered from

gunshot wounds and I will tell

you is very typical, as a trauma

surgeon, to deal with these injuries.

Most recently, I operated on

someone who was shot in both kidneys.

If you can imagine, as a trauma

surgeon in the moment, you want to do as much as you can to

repair whatever injuries are possible to save someone' s life so that they can go on and

become a productive member of society.

Hollow point bullets caused

massive destruction that is terrible. I liken it to hamburger meat.

Everything has exploded in front

of you, the kidney is

irreparable, you have to remove it. So you have gone from a bullet that can cause a laceration in the kidney that can be repaired, to something that has to be removed.

Imagine two kidneys gone.

Someone who is now on dialysis

dependent, 20 years of age, that

is a considerable cost for the

city and county, especially the disability associated with the patient. i have several stories like

that, but it stems from what we

have already heard from the

ballistics expert, that the bill expands.

And that is its job, to expand and causing massive destruction and have a larger area of impact

inside the body.

I also want to say, from a violent intervention standpoint, I have had the opportunity to continue to work with people

outside of the operating room

ever ready of projects, and mortality is definitely there, but disability is worse.

We see people that are quadraplegic, paraplegic, have colostomy bags that they have to

deal with, dialysis dependents.

-- dependence.

I think that this issue is very important locally.

The medical implications are

grand, and I believe that you

can go from having a patient

that can be -- that can recuperate fillet to someone that can die from all of the

destruction, or have significant disability as a result of a hollow point bullets. Happy to answer any questions you might have p .

**supervisor mirkarimi:**   thank you for your testimony.

On behalf of many of us here who have heard from repetitive from san francisco general hospital, in the trauma

department, just so impressed

with what you do saving people' s lives. Brilliant.

i know that the mortality rate

would be a hell of a lot higher

if it was not for what sfgh has

been able to do in pulling out those miracles.

But there is no question that

there is a growing population of

people in wheelchairs, people

who are completely disabled,

whose lives have been completely crippled because of the gunshots.

I see it in so many of the same communities that have been

routinely distressed economically as well as public safety, where the violence has been the most pronounced.

And that population is really growing. I do not think people think to

themselves and cause and effect as to why this particular pokes are disabled, as if they had been all their lives.

I see this now surging. I do not think san francisco is any different than any other

city, but it is very conspicuous.

stats are always a hard thing

that we try to ascertain when we get to this committee process.

Do you have any idea on the use

of hollow point bullets, maybe

and vocally, -- anecdotally,

what sfgh has had to deal with?

>> usually, if we recover any bullets or bullet fragments, we

send it to the police department for further examination.

We cannot get the results of those examinations.

But anecdotally, there is a difference in the destruction that we see visibly with the organ.

in recent operations I have had to partake in, the

it seems like

there are more cases of destruction, hamburger meat.

It seemed to be becoming more prevalent these days.

I also do clinical work at highland hospital.

the same is true across the bay.

This problem is growing locally .

That is a front line hospital also. The same thing happens there as well. I think this problem is growing

locally, and I think there is an industry that is trying to have

more destruction with this bullet. So we are seeing it more in the operating room.

**Supervisor mirkarimi:**  you mention it, quite right, the

costs are internalized to the city. These people who are being affected who were already

reliant on that level of assistance.

When they become incapacitated

or disabled, that produces a surge in the cost of the responsibility of the city.

How to keep up with that, we have not had that conversation yet in city hall.

>> sanfrancisco general hospital is unique in that it is the only trauma center in the county. We treat 90% of all penetrating industries.

Around 80% of our population is

either uninsured or underinsured.

if you take the hospital costs

associated with penetrating injuries and the disabilities

that results after, more severe

with hollow point bullets, you need rehabilitation, ancillary

services to maintain the patient' s medical needs.

It actually becomes quite costly for the city and county.

**Supervisor mirkarimi:**   the other thing we are focusing on, and

guns not kept safe, getting into the wrong hands.

Anything that you would like to reflect on that?

>> we see self-inflicted gunshot wounds all the time. Usually, we will get some

information.

By and large, there was a gun that was left unlocked.

We do not have any hard-core

statistics for that, it is all anecdotal, but that is what we usually hear from the people bringing in the patient at the time.

**supervisor mirkarimi:**   supervisor campos?

**Supervisor campos:**   I think, in

terms of making the policy case, explaining why something like

this is needed, I think the

testimony and comments from our

public health staff, personnel, is compelling.

It is not just a public safety issue, it is a public health issue. Not only is it about saving

lives, but making sure you also

improve the quality of the lives

that you do save, and that you

also minimize the impact that

additional expenditures that

come with these kinds of

incidents have on the rest of the system.

For money that you spend on one critically injured patients

, that is money that you are not going to have for other needs within the system.

I think it is very compelling, and I hope that there is more of

an effort, not only within san

francisco, but nationwide, to see this as a public health issue. That is really what it is.

if the testimony from our doctors who are doing this work

and saving lives on a daily

basis is not compelling, I do not know what is.

I do want to be on the record,

thinking -- thanking sf general hospital, the doctors,

personnel, for daily polling of so many miracles.

I do not think people understand

how that has changed the

mortality rate around it while

in crime in san francisco, -- violent crimes in san francisco.

Our homicides would be much higher without the tremendous

work that is done at sf general.

We are very lucky that we live

in this city because we do have,

I think, one of the top hospitals in the world.

i certainly saw that with the

police commission, a big reason why the homicide rate was going

down, because of the great work

that goes on at general. You continue that and I do not think you can say enough about that. So I just want to say thank you for doing that.

**supervisor mirkarimi:**    well said, supervisor. Thank you very much.

Is there anybody else -- we can go to public comment if that is ok.

>> I think that the rest of the

people who are here to speak are members of the public.

Those were the two city

employees, other than myself, to talk about the legislation.

**Supervisor mirkarimi:**    ok, I know that there are some people who

are eager to get into our dcyf item.

let' s go ahead and open this up to public comment.

I mentioned a few names, but if

there is anyone else, please

feel free to come up and joined.

>> good morning, I am a staff

attorney at legal communities against violence.

We are a separate disk-based national law center that works

with state and local governments working on gun prevention issues.

We have worked with the city of san francisco on a number of projects over the years.

We are founded out of the 1993

assault weapons massacre that is cited in the founding.

We strongly support these

ordinances, strong support the proposed findings.

These findings speak both to the nation' s gun violence epidemic and to the epidemic' s impact on our communities in san francisco.

the findings demonstrate clearly why the ordinances are needed to help protect public safety. For me, personally, I did not need the findings to be convinced of the need for these

ordnances, but the findings go a long way through the inclusion of important research and

evidence to support the importance of these ordinances.

Legal community against violence has worked with local governments across california since our conception.

We recognize the value and importance of local leadership on this issue.

Federal firearms laws are weak. They are far too weak. State laws in california are better, but they are not complete.

Local governments in california have both the capacity, and I

think, the obligation to enact

in ordnances that are reactive to the needs of their communities. Different communities will have different needs with respect to the guns and gun violence.

Different crime problems in different communities, different law strategies employed.

the use of firearms for sport are hunting might be different between communities.

So it is important to enable

communities to enact local ordinances that are responsive.

I commend the city of

sanfrancisco for adopting these

ordnances, and work as well.

At the same time, local government can show leadership in sacramento.

We have seen a trickle up affect

where local ordinances -- jurors diction will adopt ordnances and are later adopted by the state legislature.

In summary, I find these ordinances important and entirely consistent with the second amendment right that the

supreme court recognized. Thank you for your time.

**Supervisor mirkarimi:**   thank you for your work as well. Thank you. Next speaker please.

>> I am the founder of youth

alive, a youth violence prevention organization statewide.

I started it because at the end of the 1980's, guns were the leading killer of kids in california.

They continue to be a leading killer, a seemingly quick way of

solving an argument, fight,

responding to a moment of anger. Trauma doctors that I have

worked with often said if the a youth uses a gun and an

attempted suicide, they never wake up in the operating room. They end up in the mortgage.

These two sections provide

evidence to support two critical ordinances that add critical steps to slow down what are

often impulsive decisions that

are often life-ending, making it

difficult to grab a gun, more

difficult to buy a hollow point expandable ammunition will save lives.

In closing, I want to thank san francisco for being in the

forefront of being in the four

-- of protecting its citizens from gun violence.

i learned from the department of justice in sacramento, at a time when annual gun sales in california are at 600,000 per

year, this is double what sales were eight years ago.

With the nra shooting to

fighting to shoot

holes in every ordinance, this is critical. In terms of what we were talking

about before, how do you enforce a law that is in the home?

This is the same issue in the 1970' s, the domestic violence movement phase.

How do you break the concept that a man' s home is his castle?

how do you enforce those laws?

It has been through education

and also through reinforcement

that has been made public that

lets people know, reminds them of what they should be doing.

So it can be done.

**Supervisor mirkarimi:** and cultural shaming, like with domestic violence.

I appreciate your public comment. I just wanted to say an anecdote related to what you opened up with.

We are noticing a trend of more

young people who are quick to use guns because the way they

settle conflicts. i remember having a conversation

not long ago with a group of

fairly young adults, teenagers.

I said, why, explain to me why you see others using guns?

The response was that it was

completely uncool to get into a fight.

to use your fists, to get into a physical altercation, it is just sort of passe.

I am paraphrasing.

It is just much more what they would think is the modern

response, to jump to using a weapon. >> it is true.

So making guns less a accessible

makes a difference, so that it does not feed this new wave of culture.

**Supervisor mirkarimi:** thank you.

Next speaker please.

>> my name is griffin dix.

I used to be a professor of cultural anthropology at santa clara.

I was in research at san francisco chronicle and examiner

and research director at mac week.

in 1994, a 15-year-old son was killed in an unintentional shooting visiting a friend house.

My son' s death is really an

example of a finding that need

to be added, that you have written here.

my son was not playing with a gun. He was just visiting the home of a gun owner.

You can look at my son' s death from four points of view. Let me first explain what happened.

Without telling my son, this boy decided he was going to get

the gun that his father kept loaded and unlocked in his bedroom for protection.

The boy got the gun, took out

the ammunition clip, he put in an empty one, and took a back

upstairs, pulled the trigger of the gun -- of course, a horrible mistake on his part -- .

of course, the gun was the only product in that home is exempt from consumer product regulation. There was still a blip in the chamber of the gun and the boy

did not know that.

You can look at what happened from four different points of view. I will be brief.

this father had been convinced that the way to protect his

family was to keep his gun

loaded and unlocked, because he felt he needed it to be instantly available.

Second, from the point of view from the gun industry.

hunting is in decline, the sale

of shotguns and rifles have been in decline for decades.

The gun industry has been trying

to sell people on the idea of buying handguns for protection.

They have had been saying, those guns need to be immediately

available .

The nra home safety manual said

that guns in the home are

always in use and can be kept unlocked.

if the nra is now changing that, I am glad to know it.

Certainly, now , there are ways

that a gun can be stored safely and still quickly accessed.

Third, from the point of view

from the public, safe storage laws work.

There is research that shows they reduce gun suicide among

teenagers. They make it harder for criminals --

**supervisor mirkarimi:**   we are going to do just a formality here. Tell me why it makes it harder for criminals.

please continue.

>> it is harder for criminals to

steal guns and use them if they are locked up.

Apparently, more people to lock them up.

If these laws are in place.

but over a half million guns are stolen and immediately in criminal hands every year.

Also, most guns in school

shootings come from the home. Fourth, from the point of view

of government costs, in

california, the cost to california government of gun

violence treatment his $470

million annually in $2,005, and that only includes the cost of

medical care, mental-health, emerged to transport police, and criminal justice.

It does not include the loss of

lost taxes from people killed.

Does not include all of the

other costs to businesses , to california citizens, and so forth.

So I am convinced that safe

storage laws reduced gun suicides, unintentional injuries, and gun crimes with stolen guns.

I appreciate these findings.

you do not want to get a phone

call that says your son has been killed.

He was not playing with a gun, he was visiting the home of someone else and he has been killed. Thank you.

**Supervisor mirkarimi:** thank you for sharing that very powerful and tragic story. thank you for everything that you are doing to really help stem the tide. Thank you.

Next speaker please.

>> good morning, supervisors of public safety.

is there any member of the public that would like to comment? Seeing none, public comment is closed.

>> think it over, think it over because I want it safe in the city today

and police take away all the hate.

come on, public safety

committee, come see about that

**supervisor mirkarimi:** thank you.

Any other public comment?

This is the time to time in. Seeing none, public comment is closed.

-- chine in.

Colleagues, Madam City attorney, if there is anything that you would like to add?

>> nothing more from the other

than, as a citizen of san francisco, appreciative that we are a leader on these policy issues.

**Supervisor mirkarimi:** despite

the adversity nationally, locally from special interest groups. I think the fighting speak for themselves.

I believe we can always add more

to those, shared by the

anecdotes in the stories and to committed here today, make it

that much more powerful.

I am proud to be convincing this

so that it reinforces san francisco' s commitment to what I

believe are sensible gun measure

safety laws to keep our citizenry, children protected.

i would very much like to see this advance.

**Supervisor campos:** motion to

move for the recommendation. I would like to be added as a co-sponsor.

I also want to thank the gentleman that spoke about his

experience with the death of his son.

i want to thank him and all the

parents and family members who

have taken such a tragedy and

made something positive, in the sense that they are fighting to save lives.

That is very courageous and we are truly indebted to you.

**Supervisor mirkarimi:** agree.

As a father, it is almost unspeakable. thank you.

May we take this without objection? Excellent.

Thank you, city attorney' s office, everybody you had a hand in crafting this.

Madam Clerk. Item 8.

>> item 8. Hearing on the "youth violence

**prevention initiative:** local action plan" report by the department of children, youth, and their families.

**Supervisor mirkarimi:** a very good. Thank you for your patience.

I think it has been a very good

substantive opportunity to hear what the city is contending with on public safety from a range of points.

Today, we have ever -- presentation from the department

of children, youth, and families

on their recent youth violence report. The violence is becoming a significant problem in san francisco.

We are track -- constantly

trying to check in with. agencies to find solutions so

that we can intervene and reduce

as quickly as we possibly can. The following statistics make the need that much more clearer. Homicide is the leading cause of

death among youth in san francisco between the ages of 15

and 24, nearly twice the state rate.

Into the 9, san francisco family

and support services addressed

over 1000 cases of child abuse and neglect.

Certainly, also not just from a public safety perspective, but from a budget committee perspective, we are beginning to

see the cost and the man on city

services translate into a very impact all way that also raises additional alarms for its collateral consequences of ongoing and unchecked violence.

I would like to welcome the dcyf

director maria sue.

i understand there are other department have that will be speaking. Family gerber, public health department.

Director, great to see you.

>> thank you, karen mirkarimi, members of the committee.

Before I begin my presentation, I want to say thank you so much for passing the ordinance for

safe storage of firearms and also for addressing the issues

of lethal ammunition. So proud to be a sanfrancisco

residents.

We are leaders in safety and prevention. Thank you so much for your leadership.

Once again, good morning, I' m the director for the department of children, youth, and their families.

I am here the joined with be colleagues from the provision apartment and Dr. Gerber from the department of public health.

We are here to secure support of

a joint report that we released through the juvenile justice

coordinating council called the

violence protection initiative local action plan.

This local action plan report establishes the city' s strategies and recommendations for community violence prevention interventions

services targeting at risk youth

and young adults in our city.

we are a state mandated body that is comprised of

approximately 20 members, representing public safety

entities including sfpd, the D.A.' s office, public defenders, sheriff, adult, and juvenile

probation department, as well as social service agencies, including the human services agencies, the part of public

health, sampras is a unified school districts, and of course, dcyf.

We also included other entities

such as the youth commissions and the board of supervisors.

we want to make sure that this

body that is going to direct the policy work for children within

the city, has to be representative of the need and include all of our voices. Just a little background.

In 2008, the three departments represented here made a strategic decision with the

support of our major to align our funding and policies and program development. This partnership led to many

best practices that I can list and go on and on, but I' m going

to call on best practices already recognize statewide.

First of note, in 2009, we

created a joint rfp, which is a joint solicitation process in

which we blended the different

funding streams that fund the violence prevention services,

both federal, state, and local funding streams.

So that we can create an easily

extensible and streamlined system, so that when we say every door is the right door for our young people, we truly mean it.

you do not need to be in a de-

compensated state to receive our of violence prevention services. We want to read our young people

from entering surgery.

-- prevent our young people from entered surgery.

we were also able to leverage

their expertise and resources of

public health, particularly, leveraging the state funding stream that pays for mental health services.

This is considered a best practice because we were able to

take very limited and precious and general fund and were able

to grow it to the magnitude of almost 50%.

We invested 50 cents for services. The state was able to pay for the other 50 cents of services.

Both of these are considered

cutting edge, believe it or not,

in the state, so much so, next

monday, for several days, and

the california cities gang

prevention network will host their conference here in the city so they can highlight this type of partnership, so we can take this partnership and talk about this type of work to other cities throughout the state.

finally, I want to acknowledge

and recognize my staff and the

violence prevention team for spending to help us hours, meeting with community members,

members of your staff, key stakeholders throughout the

city, and truly listening to

them and their needs, and taking

up all of that, along with the

data from sfpd, and creating a report that is truly representative of the needs of the city. Now I'

m going to hand the podium to allison mickey from the juvenile probation department.

I will be here for any other questions for the committee.

**supervisor mirkarimi:**  thank you

for all the great work by dcyf staff and all the partners then

we will hear from, both in the initial presentation and in public comment. Break the appreciate it.

-- greatly appreciate it.

>> good morning, supervisors. Allison mcgee.

i wanted to expand on a couple of maria' s comments. We are in the third year of our

partnership of

which was meant to minimize budget cuts would for

coming down for our community partners. That partnership has grown into a true collaborative.

by allowing

jpd to shift its

focus from -- to my term contracts, we are better able to

focus on supporting our staff in

terms of their developing their partnerships and relationships with their community partners, and with you themselves.

we have been able to dedicate a police officer to serve as a

liaison between our police officers to insure fewer gaps in services and better service across the board. This partnership has also

expanded out words in terms of our other internal stakeholders.

For referred to the juvenile justice court council.

this body is mandated by the state to allow the county to

receive certain funds, but it

had really devolved into a rubber-stamp process were every year it wasn' t approving the

same plan, and through the partners, we have expanded the

role that jjc takes in over

seeing, coordinating fought the french and citywide.

In doing so, we have insured better consistency or continuity in the programs and policies and the members themselves. The police department,

adult

probation, we all agree on the city' s strategy. They can then incorporate that strategy in their own policies. We are proud of the work we have done. We are eager to continue.

I will not introduce Dr. Emily

gerber who will speak on behalf

of dcyf.

-- dph.

>> I am the manager of the intensive supervision and clinical services program, which

has benefited from the local

action plan partnership.

It is a great example of what

our cross agency partnerships look like on the ground.

In 2010-2011, intense community-

based services were provided by five agencies and a program

psychiatrist, funded by a blend of violence prevention

initiative dollars and state metical dollars.

Services were provided city

wide to over 250 juvenile

justice involved youth with

serious behavioral problems and high risk.

As you know, nationwide, over

70% of youth involved in the juvenile justice system have mental health needs.

another of 25% have serious mental health needs.

lscs is designed to serve those youth.

The majority of the youth in our

program have been exposed to repeated community but

violence. At least have have symptoms of

ptsd, which can contribute to the kinds of behaviors that get

them into trouble and involved in the system.

lfcs is more effective than just supervision alone.

combines monitoring of the structure of intensive supervision with an array of clinical services, including

evidence-based practices like cognitive therapy and seeking safety. Some of that information I believe have been provided to you.

Our overall goal is to address

the critical needs of youth,

reduced recidivism, and increase their well-being and functioning. Key to the success of this

program is the close probation and a rural health collaboration

that takes place on the ground

to implement an individualized plan for youth based on

standardized assessment of their needs and strengths.

And having this assessment and a plan based on what is actually

going on with youth allows

probation and behavioral health to work together with progress

benchmarks that youth and family can see and everyone else involved can see.

We have done some preliminary

evaluations of the program and

the evaluation has shown an

increase in the appropriateness

of the services that youth are

being provided.

Has shown increased behavioral health and behavioral collaboration.

Youth are actually engaging in these services. A fuller about tuition is

currently being conducted of our first two years a program outcomes.

we hope to follow up with you on

those outcomes charlie -- shortly. Thank you.

I will not pass the podium on to

deanna who will tell you more about the program.

>> good morning, public safety supervisors. it is a pleasure to speak today

about the work and what we are

looking forward to with this new local action plan. I have a couple of slides that I would like to show you.

I am not sure if it will appear. I did bring hard copies.

but that I will start

I will start off by letting you know the local action plan is part of an effort that we

were assigned at dcyf to conduct

a while back pay and we had envisioned planning for couple of years to produce this document. We did in the past was look at all different plans that our

department was assigned and create an umbrella document and revision to the bond prevention plan. If you look at the second slide

in your packet, what you see is a diagram that speaks to the revision process.

the local action plan specifically is the second phase of our over all by and prevention plan revision.

**Supervisor mirkarimi:** did you want to use the overhead?

>> great.

As you can see, we are on the second phase.

The first phase was the straight violence reduction initiative. Currently, it is in its implementation process.

We are working closely with the agencies that work with us on

the street level to reduce

violence, not only would gang-

related violence, under current

terms, issues that exist on the street level.

We drafted a plan that was a requirement from some of our national and state partners, and now we are and point of making it happen, working closely with

those agencies to make sure we were could easily not only at

the city level, but also at the community level to reduce street violence in general and to keep our homicides reduced over all.

the second phase of the violence prevention program is the local action plan.

Today, I am presenting to you around this product of what it

looks like, in terms of what our

joint partners envisioned when preventing violence.

Some of the major issues that we

see to date that really should influence the way we dictate our

funding, that we actually produced in general. The third phase is still in progress.

That is the city-wide ballot project -- prevention program. We are waiting for the transition of the new mayor to

come on board to then further define how we want to move

forward with the bond prevention plan.

the existing plan expires in 2013, so we hope to use this

upcoming year to finalize the updated version and and move on

to our next five years strategic plan. Moving into the violence prevention plan in general, lap,

we created an extensive community input process that included community meetings, focus groups, interviews, and we

also had a series of key stakeholder meetings that a lot of you where a part of. A lot of your aides for dissipated and gave us extensive feedback.

From that you see a total of

about 400 estimated data points that we collected.

from this point, we also looked

at the literature

that told the story of what needed to be prioritized in terms of violence prevention in the city.

The combination of community input and literature review shaped the way that we finalized our local action plan.

so what is the local action plan?

The local action plan purpose

was established by the jjc partners.

It is to establish the funding strategies and recommendation for community violence prevention and intervention efforts targeting young adults between the ages of 10 and 25.

all this funding is supposed to steer towards that direction. We want to make sure that it is

clear, that it is dictated in a

concise way so that it is clear what the funding is for. Then we can better shape some of the outcomes we would like to see.

The framework we used for our local action plan this time

around, because we do produce had a local action plan every year.

This reiteration of it, we used

a theory of change for our bond prevention and intervention efforts.

We are working with the mission analytics group, an independent

evaluation firm, to create an overall framework that connects

all of our violence prevention and intervention in a portfolio. We are also looking at including an hour from mark a circle of care model which have traditionally put been part of the local action plan.

That looks at providing service

to youth and prevent them from three incarcerating, refunding,

and moving them into a more productive framework. Finally, something that is fairly new in this year' s

framework of the lap is a restorative justice principle.

We want to follow the principles of restorative justice.

It was also a recommendation that was strongly recommended by

not only the jjcc, but by our community partners. Most of the principles follow

the rules of the san and cisco unified school district.

We tried to align ourselves with

the vision of san francisco of restorative justice.

In this sense, restorative

justice is at the forefront of the remark. Following that is community input and the evidence of best practices that dictate the way

that our lap is shaped.

Our target population is 10 to

25 years of age.

We are predominately focusing on three major target populations.

One being at risk, two being

highly at risk, and 3 being in risk.

The definitions which are more details are in the action plan. We are more than happy to go through any other question that

he might have about the target population.

**Supervisor cohen:** I wanted to go

back over the definition. At risk, in risk, and highly at risk?

you said it is in the packet, but in terms of those who are

listening and watching, for those who do not have the information in front of them, could you go over the distinction of each definition? >> absolutely.

At risk are you involved in some sort of violence but are not necessarily involved with the system necessarily.

That is kind of the broad definition that you can think about.

Highly at risk refers to more youth that are exhibiting more delinquent behavior that have

had some sort of contact with the police or law enforcement entities but have not been incarcerated.

In risk means you are in

custody, actually inside an

adult or juvenile prison setting, on probation, parole. That is the difference between the three categories.

And again, more extensive detail is included in the plan.

In layman' s terms, that is the general definition.

some of the major findings that

we had, what we did an extensive literature review and we found some really concerning challenges that relate to the juvenile and adult population.

One of the thing that I want to

highlight was coming in 2010, we

found most of the referrals -- juvenile referrals were between

the ages of 15 and 18 years of age. Most of the individuals referred

to us are disproportionately represented.

40% are african-american, 17% are latino males.

And when we also found, and our

findings, most of the bookings,

most of the offenders, yes, there is an increase in the amount of bookings, but there is

an increase -- decrease in the amount of bookings, but there is a incr

n increase in the seriousness. Also wanted to highlight the criminal justice challenges that we found. When we spoke to our colleagues

in adult probation, we found for

this population, there was an

80% percentage of and need to address education.

75% were dealing with issues of unemployment.

20% dealing with issues of mental health inez' s.

80% dealing with substance abuse issues.

70% with criminal associations. These major findings are alongside many other findings to we have included in the plan.

It wanted to highlight the major findings because it was really important for us to look at what

are some of the current trends of the population we are speaking to.

Following that, on the flip

side, we also wanted to present the major achievements at our portfolio has funded in the past.

That is also included in the

lap, like what has happened with the local action plan, and the

funding, a question that most supervisors and individuals in the community have. Some of the achievements are highlighted here.

In 2009 through 2010, we found around 511 youth were diverted

from detention and enrolled in

the community as a set -- assessment and referral center, a major initiative funded to

work out of huckleberry programs, working in

collaboration with juvenile department.

In terms of specific programs,

we wanted to highlight a around 374 women received a gender-

specific services.

Out of the 395 youth served in

total, 374 were part of jpd'

s database.

That meant that this amount of

women were given a comprehensive program and were also enrolled in jpd'

s database.

These agencies work closely with the youth at the juvenile level.

Following that, our case management strategy, we wanted

to highlight the jjccp funding

of this goes tomb a lot of amazing programs.

Eight served 823 youth, 85% of

which demonstrated a positive outcome.

That could of been the obtaining

an education, completing school,

going to some type of girl that is necessary, whether it is employment, life skills. These are some of the major outcome that we wanted to highlight in terms of the funding and what has been produced.

Following that, to the side, you see the strategies and services

we funded over all in fy10- fy11. These are the strategies that we

produced out of our lap, and

from that, 5044 youth in total served by this portfolio.

This year, when we wanted to do, after all the input, we realize it was important for us to

define similar but refine and define strategies. We have similar strategies, but they' re only six this upcoming round.

The strategies are presented on top.

They are secondary prevention, diversion, detention

alternatives, the tension-based

services, after care reentry, and after care services. The difference between the color

coding is the agreement focuses

on mostly at risk and fiat -- highly at risk youths.

The red focuses on in risk, custody young adults.

What you see on the far right is all the activities that we fund.

once again, what we did was collect all the information

from the community, look at the

need, the data, and look at what we were already funding and what

we had stated in previous lap' s,

and moved into this new refined products that you see today. This is a product of the extensive work that has been done. From this point on, this strategy really informs our

current rfp which we announced in the last couple of weeks.

We want to also highlights some

of the major changes that were

included from the previous lap and current lap.

What we found in our research, you are being impacted by

violence at a number of -- you are being impacted by violence

at a younger age -- youth are

being impacted by violence at a younger age.

A couple of things that I mentioned before, really defining some of our strategies.

In that work, what hope to dubai of the dividing our strategy is

is to look at defining our activities that we are funding and looking at outcomes that support our overall work.

Figuring out, telling the story

of what do we get for the money -- what do we produce for the

money that we allocate for services?

In that effort, we have redefined some of the strategy is like case management as an actual activity versus a

strategy, so that it is clear in terms of what products we would like to see.

finally, we have included gender

responsive services throughout the spectrum.

We see gender responsive services as an important

component in all areas. It is a service that should target the entire population.

Not only a specific cohort.

in past years, we passed gender specific services on the juvenile population.

This time, we will focus on the three target populations.

In a nutshell, these are the three major changes that you will see in the upcoming lap.

From that point on, as I

mentioned, we have strategies

that are connected to a target

population and that really allow us to look at an allocation distribution.

This is the allocation -- proposed allocation for our 18-

month cycle for the upcoming

year of fy10 -- a 2012 through 2013.

What I want to highlight is the

allocation is about $15.5 million.

We hope to fund 80 programs in

total that do violence prevention and intervention work through all the strategies that are listed.

As I mentioned, the rfp was released August 30. This local action plan dictated

the way that rfp was articulate, the way it was presented.

We had a proposal conference on September 8 that was attended by

many agencies, a total of 62 agencies that attended the bidders conference.

Proposals will be due on monday october 3. We hope to then go through a

thorough process where recruiters can review and then we will be looking at trying to

have reviewers that our experts in the field of violence prevention locally and outside of counties. Finally, we hope to announce the

awards in December, negotiate

around the same time period, any

type of contracts to finalize by December and begin to grant

in January, and then the term of funding January 30, 2013.

I know that was a lot of information.

And I do apologize, I went through it fast. i wanted to get to the major content.

And I also wanted to hear any question that you might have.

I know we put an e-mail out to see if your interested in asking questions beforehand. It appears that most of you were

familiar with the plan.

Again, I am here, along with the rest of the department directors, if you have any questions.

**Supervisor mirkarimi:** on the 5044 youth served, is there a

breakdown of neighborhoods, and

demographics of where those 5044 come from?

>> there is and I can share that with you individually.

i can definitely share that. There is a breakdown included.

I do not have it right now, but I can definitely share that with you.

**Supervisor mirkarimi:** it would be useful to see what is working

and what is not, where trends are in the various neighborhoods. That would be helpful.

Anecdotally, just by experience, I think we can guess which neighborhoods are in the pecking order, where you might be coming from, but is important is that accurate.

-- we stay accurate.

maybe you or juvenile probation

can speak to this, but it does

not mention any stats on repeat offenders, recidivism.

I am very interested in this issue.

Considering the fact that the

precursor to our adult issues

exactly is this orbit right here, where is that information?

>> supervisor, we talked about this earlier. We expected this to come up.

certainly, something the

jjcc needs to do.

I would also encourage your participation. We need to come up with a common definition of recidivism.

Some folks May think multiple

bookings would qualify as recidivism, where others would say, not until the adjudication

process is complete and the

child is -- a disposition has been made. So we are trying to come up with

some common definitions of what do we mean when we say recidivism?

When somebody is booked, and does not necessarily mean that

they are going to go through the adjudication process and a

disposition will be found. It is an important distinction and we need to get to a port and

we talked about recidivism, we talk about the same thing.

Supervisor cohen: just for clarification, what definition are you working from?

>> we are not really working with a common definition either.

we know in 2010, there are about 608 bookings in juvenile hall.

Unduplicated.

About 18% of those came in

multiple times, had one or more bookings.

18% of the 600-plus booked cayman multiple times. But that is only 2010.

So we would have to run a full

analysis year after year to follow those individuals through

time to see today come back into the juvenile system, do they come back into the adult system?

We certainly want to do that, are willing to do that, and I

think it would help everybody,

in terms of clarifying what recidivism actually means for us in san francisco.

**Supervisor mirkarimi:** the reentry council has been grappling with this and they have zeroed in on this question.

one that we have to for our own

local needs, but that is being accelerated to answer this

larger question because of present realignment, which commences in two weeks.

That needs that needs to be lined up with the juvenile side of it.

Based on the adults definition of recidivism, we' re losing that

age gap between 18, 19 to 27, because we' re noticing that the repeat offender rate is substantial in san francisco,

but if there is not that linkage to the juvenile sort of analysis

consistently, or as consistent as the juvenile system can allow

for this, then that is not going to help us try to figure this out. >> absolutely.

And one of the real downside to having a separate juvenile probation department and an adult probation department is we' re not able to really follow

those individuals as one department would in other jurisdictions because of confidentiality and everything

else we really struggle with that.

We have been working with adult probation.

I hate to bring this up, but one

way is to re-elect at justice and juvenile' s interaction with

the justice process -- we relook at justice.

It would help us in running some of those analyses. We' re trying to better partner

with adult probation in terms of

case planning and looking at new systems to see how we can better

link our information to adjust to what you' re talking about. We are very aware of it.

**Supervisor mirkarimi:**  this is a very lively topic.

**supervisor cohen:**  vienna,

supervisor mirkarimi was talking

about trends as it relates to

the framework of the model you and your department have decided to work there.

Is this a cookie cutter approach? or models that have been

successful in district 5,

district 9, 11, or wherever

across the city -- are they able

to be duplicated across the city

or is it sounded that needs to be individualized to understand

better the complexity of the individual districts, all the

way down to the neighborhoods, to the unique nuances?

It is a very convoluted question.

>> in terms of the rfp, what we have decided to do is really enforce that would like

evidence-based practices and best practices to be proposed.

so that is as far as we have gotten at this point because we' re in the rfp phase. In a local action plan, we have

included some of the highlight

initiatives, recommendations in terms of best practices.

Given our current models that we

have, which is a reentry team that looks at a comprehensive way of looking at when you come out and how you actually engage

with the juvenile hall at the community-based level and providing initial services. We have best practices that have been recognized nationally,

we have also highlighted other best practices throughout the nation. And we have been looking at some

of the outcomes in evaluating

our current set of programs.

You know, some of the details

are guidelines in the upcoming rfp is that we are going to be

looking at past history of a community-based agency performance.

That is part of the criteria

that we have included, or some

of the areas that will be scored that have been defined in the rfp.

In terms of looking produce strict, what we' re going to do -- currently, we' re doing

analysis of what the current

street violence pulse is a beach district. We look at the population

changes, and then trying to see if we can look as some of the current juvenile probation at that and the current provision data, so we can make better- informed decisions.

That is as far as we have gotten so far.

Again, we do encourage ongoing communication to sharpen the

work, to accommodate the cultural and diversity needs of every district.

Our program officers were really closely with the agency to make sure that is going on.

We do have that commitment once

the words are awarded, and we go through contract negotiations. We will be emphasizing that.

>> does your analysis or the action plan take into

consideration those people that

are part of san francisco' s

community but are immigrants and

taking into consideration their status?

How do you begin to even address that?

>> I think the reality is that

it is a high percentage are in san francisco.

in terms of the portfolio that

we have, what we have done technically is to really look at

what funding streams require

maybe an ssi number and which ones do not and looking a comprehensive or creative ways to blend the funding to make

sure we fill the needs of our

federal reporting, but also to fulfil the needs of our locality.

That is something we have been tried to work with agencies. And we promote all agencies to

make sure they serve all residents of san francisco.

That is an obvious need in san francisco, and we really support that. >>

**supervisor cohen:**   how long have you been working to move in that direction?

>> I know that mary I can probably speak to the department' s commitment, but I

have only been in a position for two years.

Supervisor cohen: --

>> one of the reasons and benefits of lending our resources to this department is

so that we can then in fuse very discretionary funds throughout the service area.

I made a comment about every door being the right door. We will not turn away young

people who need the services,

including young people that have different statuses.

So we strategically use of general funds to make sure that

recover any gaps that restricted funds will not be able to cover.

**Supervisor cohen:** ok, thank you, maria.

One last question. This goes to the major changes per up -- from the previous local action plan. The second bullet, you said you' re broadening the age range of the turkish population that

you serve -- of the target

population that you serve to

incorporate a 10-year-old to 25- year-old.

In the past it was 13 to 24.

I want to know, May be statistically as well as

anecdotally, what did you see the focus group? What did you hear that actually led to this change?

10-year old -- that is a fourth grader. >> part of the reason why is

because what we saw first that the juvenile probation data is

that the youngest booking is at 11 years of age.

so that was one of the hard data points a week elected, one of the points that influenced our

decision to go down to 11.

In terms of 10-year-old, what we found in a lot of the focus

groups with community-based providers, they kept telling us that middle school age is very

important to focus on, because that is when we can prevent young people from further incarcerating are being detained

or engaging in violent behavior. Given our work with the agencies that work with the younger population, you know, the focus on the first upcoming high

school age, we wanted to not only listen to them, but we thought, let' s take it out to the community to see how far we should take our target population when it comes to

dealing with violence prevention issues. Time and time again, we heard the same thing.

We need to focus on a middle school age. We got the most appropriate age we could probably go down to is tan.

In terms of the 24 and 25

change in years of age, our decision is that we found there

was a lot of 25-year olds that

reading service and that cannot transition out of our portfolio.

There were a lot of committee-

based partners that said someone

is 25 -- there usually 25 when they leave our case management,

our work in general, our ged program, so I think you should consider that when you do the new round of rfp funding.

Given all those factors, we thought the most appropriate way

to move forward was to reduce

the age from 13 to 10 and to increase to at least 25. When we look at overall statistics in terms of how

individuals be fine it,

transitional age huge -- youth is usually between 18 to 25. So for other city what initiatives the support that age specifically, we thought it would be best to be able to expand our scope in general.

**Supervisor cohen:** there was an article not too long ago where

there were talking about how the

definition of an adult has actually expanded.

Several years ago, maybe when our parents were coming through,

at 25, most people were married.

They were purchasing their home and were starting their family.

Now what you find, people are at the very least 30 years old

before they are finishing their advanced degree or any kind of an education or training program, getting married, settling down, just later in

life. Through healthy living in good

practices, we extend our life.

As a it is interesting -- to the other side.

That is maybe a more positive

spin on things, that we have to

expand our reach on folks that

we need to continue to support. i am speaking anecdotally, but I

think that this expansion is timely, and I would not be

surprised if in years to come -- granted the economy does not

turn around, that we will probably continue to see service providers saying that you might need to expand to 30. It is an interesting trend. Thank you.

**supervisor mirkarimi:** thank you.

**Supervisor campos:** thank you. I want to thank everyone for the excellent presentation. It looks like white was the color of choice today.

I am sorry I am not wearing it. Maybe you will be bringing h beats.

-- maybe you' ll be bringing back

hats, and I think that is a good trend. But thank you for the presentation. A couple questions. One of the things that we saw with the consolidation of the

funding iran public safety -- around public safety was that

there was a reduction in the

overall amount that was being spent by the city.

i am wondering if you can maybe say -- I do not know if it is

the director, but if someone could talk a little bit about where we are in terms of where we were three, four, five years

ago, because even though there are a lot of great changes

happening, at the end of the day, how many resources do we

have, and how much money we' re spending is also important.

>> I 100% agree. Thank you for the question.

The main reason that prompted the conversations among the

three departments back in 2008 was the budget reduction in the city.

Through reductions on our state

funding level and local

reductions, I think it' s that time each department was looking

at summer between $4 million to $6 million reductions across the

city for prevention services. and of course, each department

went about a process to figure

out how to make this reduction within our respective departments.

And then we decided and realized, wait a minute, we' re

actually -- there are multiple departments that fund the same

agencies, so it made sense for us to get together and say,

well, this is how dcyf will approach the reduction, so how are we doing that?

And the mayor' s office of criminal justice was also doing that. What we realized is what the proposals that we were

considering, we would actually

essentially take down or dismantle a lot of crucial and

needed services in the city.

So at that point, we said, well, let' s really think about this. We realized that we were

actually finding a lot of the same agencies.

And in some situations, we were actually increasing their capacity.

in some situations, we were actually funding duplicative work. So we decided at that point to

go through an rfp process to do two things. One was because we had to make

that very painful reduction in the service area.

And two, to make sure that we

were allies and the core services that the three departments felt were needed at that time.

At the end of the day, we made

approximately $4 million in

reductions, because the board of supervisors graciously reallocated some funds back to our department to make sure that we cover some of the crucial services.

i am sad to say that over the years since then, for the past

three years, we have continually receive reductions from the

state.

Whether it was reductions primarily through vehicle license fees, because that is the primary source of our funding for a violence

prevention work in the city, or because we were not allowed to apply for state grants for whatever reason. However, I am produce a that the

three departments, including the

department of public health, has made the policy decision to keep

our funding for the service area as protected as possible.

so the three departments have actually not made reductions to be funding service area.

So, in a way, because the three of us walked into the budget office and say, look, we have to do this together, and we' re

going to do this together to protect its service area to protect the budget.

In terms of the state level, i cannot speak to that.

We, unfortunately, are somewhat at the mercy of the state, as you all are very aware of.

And unfortunately, you know, if

I am reading things correctly, we will see even more painful reductions, even after the

realignment of the public safety entities on the state level.

it feels as if the state is advocating their responsibility

and sending some of their responsibilities in taking care

of our citizens back to the local government, which will

stretch our services even thinner.

if you notice in this local

action plan, we called out a new

service category called reentry

and after care, because we want to make sure that we truly acknowledged that is a need. When our young people, whether

they are in juvenile hall or in mandated out of home placement, and when they go back into our communities, we want to make sure that we help them make that transition as well.

**Supervisor campos:**  well, thank you for that. I agree with everything you said. I wanted to put that out there, because even though I think a lot of great things are

happening, we also want to be

very clear about the fact that even though we' re doing these things, we' re talking about, in

the last few years, the city

reducing its expenditures on a violence prevention.

As you noted, the rfp that went out with these three departments

had a combined $4 million less than it did before. and I think that we need to remember that as we are moving

forward with the budget process

for this coming fiscal year.

I personally think that these departments and this kind of funding should be among the very

last things that we touch, if we touched at all. And hopefully as the economy

improves that we do not lose

sight of this reduction and we come back to the issue that we' re always talking about, the

issue of what the proper level of funding is.

I just want to make sure that we are aware of that, and I do not think that enough people know that we are, in fact, talking

about millions of dollars in last funding in just a matter of two, three years.

This second point that I wanted

to make is the point, something

that I am dealing with as a supervisor for district 9 and

something that has to be our top

priority, and that is the safety

of our neighborhoods and our districts.

As you know, there has been an increase in violence in the

mission, and if it is something

we have to take very seriously.

My office, we have been working

very closely with our partners

in not only your department, but

also the police department and violence prevention workers to make sure that they have the

resources they need to not only

deal with what has happened but

also to prevent more crime, and I do feel that we' re doing everything we can with the resources we have.

but one of the things that I worry about as you' re going through these processes and getting the rfp and everything

else that is happening is making

sure that we are also keeping a focus on what is happening on the ground.

And so, I am wondering if you

can say a little bit about that?

i think it is important for us to have systems in place, to

maintain accountability, to have transparency, but I do think

that at the end of the day, the

priority has to be, you know, what is happening on the ground, especially with these young people. I am wondering if you can talk a little bit about how you

balance this process with that,

and also, more specifically on

what is happening within the

mission to address some of the

incidents that have taken place?

>> I am going to attempt to answer your question, supervisor.

Before that, I wanted to make a comment about -- one of the

reasons why we' re being very

strategic in crafting up the particular populations of at-

risk, highly at-risk, and in- risk is because with knowledge

that the level of funding in the

types of services that are

required to truly meet a

particular outcome that we are

going to lay out for our cbo'

s are actually differ for each one of these populations. Actually, maybe not, but we do not know because we do not have that level of data. What we have now someone saying that we serve young people in

the bay view or the mission, but

we do not know what some of the risk factors are that these

young people have.

Or, where are they on this continuum of need?

Now that we have broken apart this way -- and I realize that means a little bit more work for our community partners, but it will definitely help us in terms

of gathering that type of data.

So that we can say, in order to

serve as a young person here as

in-custody contact, it actually

costs us this must -- this much money. For us to truly serve the population, we need to truly invest in this population.

and invest in the types of services that will produce that type of outcome. So we hope to get there through this rfp and through this process.

In terms of meeting the needs of

on the ground, street level, and ensuring processes have been,

one of the reasons why -- there was a comment that this is funding for 18 months.

This is an 18-month rfp. A couple of reasons.

One is that through our committee process, we have

realized that making the shift,

making a funding shift or a contractual shift during the

summer months is really

detrimental for a violence prevention providers.

Even if it is the same agency.

Even if it was the same agency. There are resources that the agency needs to dedicate to work with our office, but the contract together, to negotiate

with us, to redo all of their hiring things, and all of these things. and you have that happen during the summer months where there is limited summer school, young

people are out on the streets

and have more time, so it just does not make sense.

Which is why we requested and were approved to extend the current contracts that all of

our contractors are on by six months, which will then take

their current contract to end in December of 2011. So that we can then have that

transition happened during the winter months of December to January. Here

supervisor campos: I want to thank you for that, because that was going to be my follow-up.

i am all for having systems and making sure that we have

accountability measures and that

we try to make the most of every dollar.

But I do worry that, you know, when that happens, because I

know that, for instance, in commission, for December, the summer, for whatever reason, has

been that very difficult time

when is violence politian -- prevention workers are the police department, their job is even tougher. So I want to thank you for that

flexibility, because I do think

that it goes a long way, and I think it shows the level of responsiveness on the part of the department. so thank you for that.

>> and then the other comment of us making sure that we continue to check in with our cbo'

s and on the ground folks to make sure our policies and strategies makes sense. Makes sense for the case

managers, the social support providers. I believe, and I would like to believe, that we do that on a regular basis and that we connect with our providers on a

regular basis but I definitely acknowledge that my level of communication and frequency of communication might be different from others, but I do want to put out there that our doors are

always open for more feedback.

And in terms of specific efforts out in the mission, I would

defer that to dee anna.

>> I think that there is a

series of purposeful meetings that we have orchestrated in this last year to be up to make

sure that there is ongoing communication on the ground

level, so we have tried to go to the peace collaborative. We have tried to talk to agencies. We have also really look at our team' s specifically, trying to make sure that we communicate with the school district and treader have the ongoing communication with the actual

community residents. I think those are efforts that our team has done.

In terms of specific meetings, we attended the peace collaborative. In terms of visitation valley,

we created its service provider coalition, and we facilitated it for quite some time and passed

it over to mercy housing, and other community partners where

it was more than a community entity would lead a community meeting. We provide a capacity-building on that.

We try to eat -- a jindal events and community gatherings. We are invested in making sure that we' re there the ground level.

We also communicate with our police partners.

The police department, ongoing. most of the time when there is a critical incident like a

homicide, which recently occurred in the mission, a

couple of homicide, we' re often communicating with our crn' s and

case managers.

We talk to the police.

We try to provide any kind of linkage is necessary in order to

be responsive to the homicide.

Those are a couple of areas on what we do ongoing.

>> there is a great model for this work.

Dph, jcpp, and jpf me monthly with all of our providers. It allows us to see whether the

expectations, requirements, and policies are actually aligned

with what our front line workers are doing. There' s a continuous feedback loop, which is very helpful.

Supervisor campos: if I May say -- and we have a lot of other things to cover, but I simply

want to say that I look forward to continuing to work with all

departments. I think it is one of the things

that we should do, and we' re trying to set up a community

meeting in the next few days,

and we want to make sure that others in the community know what we' re doing.

What I have heard from many folks in my neighborhood is we

hear what is happening from

reading the chronicle or the

examiner, and it is always on something that happens, but there' s not enough information about all the positive things and pro-active things that are being done.

I think we can all play a role in making that happen. Thank you again, and I look forward to continuing to work with you.

**supervisor mirkarimi:**   if it is ok, why don' t we go to public comment? Another has been a lot of partners here who would like to chime in. One after the other, and we look forward to hearing from you.

>> good afternoon, supervisors.

My name is Dr. Terry delane.

i run life learning academy. I am here in support of the local action plan to the life

learning academy is a model school. We have been there for 13 years. We' re on treasure island.

We deal with the answer all of the populations that have been described. All three at-risk groups.

we have never had a fight in our

school, and the kids that we deal with come from all neighborhoods which we pick them up from. We pick them up.

We have a van service, which makes a huge difference.

The kids that are from rival

areas, not only just coexist --

we have a delancy street model school where we teach kids not to just coexist, but we create a community of non-violence. Our hope is that they take it back into their communities once they graduate from our school.

So I just wanted to say we are

in support of this initiative, and that is it.

**supervisor mirkarimi:**   thank you. Next speaker, please.

>> good afternoon, supervisors.

My name is liz jackson since then, executive director of the

youth guidance center improvement community, which is a nonprofit corporation that lives on campus said the juvenile probation department and has been around about 30 years. We provide alternative

education, employment services, and that version services to

young people who are engaged in the juvenile justice system.

We have been intimately involved

in the entire local action planning process, pretty much since its inception. I just want to commend the departments for coming together and thinking about how to strategically plan and realign

the resources to help support

this very in-risk population.

We, too, focus on young people

who have been engaged in the juvenile justice system.

and this comprehensive process has enabled us to be able to get

input not only from key

stakeholders in the department or even community-based organizations, but the young people and their families themselves.

So I applaud dcyf for their efforts in ensuring that.

It has been a tremendous -- it

takes really all the collection

of resources and a comprehensive service strategy to support our young people.

They get to us when the normal system'

s did not work or going to a comprehensive high school did not work. They need comprehensive solutions to make it. we are intimately involved in the entrance to reduction initiative, so many of the young people to go to our school have

been truant for a long time and are not providing was some of

the basic orders of probation to

go to school, and we support the

model in helping young people to get engaged and connected to employment.

so we applaud and want to support this strategy and this

plan, because it takes the mental health services -- I cannot encourage the people to go to school or get a job when

their basic needs are not being met. When the have mental health challenges our substance-abuse challenges.

we have referrals to some of the other service strategies in order to support our students

and our young job-seeker speed up again, we' re glad that this effort is complete, and we

support and applaud you in approving this plan. Thank you.

**Supervisor mirkarimi:** thank you very much.

And good to see you toygc

at ycg.

It was good. >> thank you.

**Supervisor mirkarimi:** any other public comment?

Seeing none, public comment is closed.

Director sue -- I know this is just a hearing, but why don' t we

sum it up -- it is really critical information you are sharing with us in terms of what the action plan is. The cautionary tales about

budgeting, as supervisor campos was discussing, are very important. So that the city does everything

it can to obligate itself to the

triad here of organizations that

are working together.

And I really want to put an

emphasis on it the new category

that you have now decided on,

and that is on reentry and after care.

As much as I am optimistic, yes or extraordinarily nervous about what is coming down the pike for san francisco.

And all systems have to be in

place on the adult side, but

again, looking at the recidivism figures, the repeat offender figures for young

adults, the carry over is undeniable in terms of the recidivism on the juvenile site.

so I do not know how that gets

modified, whether in the reentry consoles or a subset, but I

personally will push very hard

for there to be almost kind of a slightly different approach in

making sure adult and juvenile

probation and juveniles elevated in the discussion on the adult

side, because it is all adults,

with a sprinkling of juveniles, but not in the formalized way that I think it needs to happen.

And I know that the chiefs talk all the time and are connected at the hip on this. But the systems and support systems do not recognize that.

on down to almost on a nonprofit level and the service delivery level, even if staff knows that. That is what I am worried about,

and that systems delivery

infrastructure, they have not quite seen that transitional age

question in repeat offenders

from used into adult.

that is noticeable in the

statistics that we have been thoroughly reviewing.

We are at 75% on a repeat offender level at the juvenile

level from what we have been

able to tell, depending on your definition of recidivism could a

that is the wavering definition. So I get that.

and it could be a lot lower.

But that, of course is a strong flag, something that has been flagged that we' re going to have to really look over.

Supervisor cohen: I agree.

It is no mistake twice dcyf was appointed to the reentry council. it was your leadership in making that happen.

It was very essential for dcyf to be appointed so we could be the body that can link the two. There has been a lot of

conversations between our staff and the juvenile justice coordinating council staff and the reentry council staff to make sure that when we' re talking about support services, we' re talking about the continuum of services.

because, once again, there' s no

magical kind of shift of mind

frame from 17 to 18 or from 24 to 25 or 25 to 26.

And then with ab109 coming down, we need to make sure that we

have all of our reentries

services and after care services all aligned, and I look forward to your leadership on that.

**Supervisor mirkarimi:**  would delimited dollars we have, public safety means are now being driven not by first-time

offenders, but it is all being

driven by the repeat offenders,

a very clearly on the adult side, so the police department

is the most well-resourced in taking care of repeat offenders

on a level of almost about 65% to 70%, but they' re not the ones responsible for rehabilitation or after care or reentry.

it is the department' s you all are associated with on the juvenile side, or it is adult probation.

But the funding for those

departments is a fraction. So, in many ways, this

conversation is a precursor of looking at the logic of the current practice and how counterintuitive the logic is, why we keep the front loading so

much to see this repetitive habit picking up the same

people, and there' s no break in their behavior, criminal behavior.

It is also, as it was described

earlier, a bureaucratic snafu of

juvenile that obeys information not allowed to be shared on the adult level. This handicaps us considerably.

We understand all the reasons

why, but somehow, someway, there has got to be a bridging of that

divide, because it really ill- equips us in dealing with the

young offender and the recidivism issue. I do not know how that is going to happen, but I know this has been percolating discussion in the reentry council.

Well, thank you very much. I know this is a hearing. I want to thank everybody who is here in participation.

I appreciate all your work.

i do not believe any action is required here.

This is a hearing informing us

of the rfp and of the

communication that is going out .

Good work, and we look forward

to being part of this process. Thank you.

We' re going to set with a perfectly into the final piece

of the matter today, and that is adult probation.

So please read item number 9.

>> item 9, or in its amending the administrative code by

adding section 2a.300 and

2a.301 to designate the adult probation department as the county agency responsible for

providing post release community supervision to eligible inmates released from the state prison,

as required under california

penal code section 3451, and operate the adult probation department to develop a home detention and electronic monitoring program that can be

used as the supervision tool and a sanction for persons to violate conditions of their post release community supervision program.

**Supervisor mirkarimi:** I am going to introduce this. I' d just want to say that in the

series of legislation, this is

literally the final piece of our preparation for a prisoner realignment, prompted by assembly bill 109. This ordinance accomplishes two things.

It designates san francisco

adult probation department as a county agency responsible for providing post release supervision to inmates as part

of the realignment process under

ab109, and it authorizes the adult probation department to develop a home detention and electronic monitoring program to

be used as the supervision tool and sanctions for persons who

violate conditions of their post release supervision.

That is now well known. Governor brown signed legislation last April that

directs a low percentage -- directs a percentage of low level adult offenders convicted

of non-serious, non-violent, and not-sexual offenses to california counties. San francisco is gadahn to

receive approximately 650 of these offenders in a little over two weeks.

The population that we' re about ready to receive is substantially lower than many counties throughout the state, so that might be some welcome news as well, too. San francisco is well ahead of most counties in the state

because it started early thanks

to the creation of the reentry council and its ability to prepare for what nobody would have expected years ago, the

advent of ab109 and since has worked diligently to create a realignment plan that will rely heavily of post release programs

in areas of housing, jobs, and treatment. The sheriff' s department is

prepared for any new influx of prisoners, since we' re one of

the few counties in the state that is experiencing under

crowding, not overcrowding. Adulteration is taking the lead in coordinating the many law enforcement agencies involved in

this effort . Under this ordinance, adult probation will be about to

implement adult electronic monitoring program. In the past, that has been under the purview of the sheriff' s department. Now this will be a shared

responsibility in the discretion that is now forwarded through

ab109, both to adult probation.

David cook, adult probation, welcome. >> thank you, a chair, and members of the committee could

you have so elegantly explained what is happening with the

ordinance and with the plan . I would just acknowledge, the board approval of the public safety realignment plan earlier

in the week, I appreciate the board' s support for that. Truly, that was a collaborative

effort, putting the plan together. Indeed, it will require a

collaborative effort to be successful in implementing it.

i have every confidence that we will be successful in implementing this.

You have already pointed out what the ordinance does, and I will not reiterate that.

I just encourage your support and appreciate your support for

the plan and the department' s activities related there, too.

>> and double-

**supervisor mirkarimi:** just to be

noted, I talk to chief still all

the time, the board of supervisors just passed his

first reading, the most increase of personnel for adult probation cents adult probation

was established in san

francisco in anticipation of

ab109.

So your department has now exponentially grown.

It is an interesting new reality that is taking hold of some of

the other, what people have not

seen as visibly, the criminal justice and public safety stakeholders in this city are

now taking a more front line of view, like adult probation. >> absolutely.

Given the presentation prior to

this, I am very excited about

linking efforts of a juvenile probation and adult probation, especially in regards to

transition-age youth population.

there are things that we can

obviously do better and work together more effectively in addressing the needs of that very unique population. And as you point out, that is a group that is much more prone to

reoffend, and if there is a way to stem the tide of those used migrating into the adult system, that is where efforts should be maintained.

**Supervisor mirkarimi:**  well said, thank you. That is exactly what we really

have to 0-in on very prominently

-- zero-in on in a way that has not been before.

**Supervisor cohen:**   I have a couple questions.

i was actually hopeful -- [No

audio]

-- use a compass as a

technology tools to help with

the success rate of the inmates that are going to be coming.

>> certainly adult probation has.

We are in the instance stages, if you will.

We have implemented the compass-

based pre sentence report.

That started in June, so the courts are now receiving pre sentence recommendations that

are based on best practices and the assessment contained in the compass. The conversations with the sheriff' s department, I know they are interested in examining

that for their in-custody work ,

and the california department of corrections and rehabilitation has used a

compass, so some of that information is available to us

on inmates who are being

released to post-release community supervision. The other thing is that our discussion with a number of

partners, whether it be department of public health, human services agency, the various community providers and

service providers, we are

sharing that assessment information and identification

of criminogenic needs.

**Supervisor cohen:** criminogenic? is that a real word?

>> it comes up under a spell

check under the -- all the time is underling, so I am not sure that it is. It is well established in our

profession, and it identifies those risk factors that are actually changeable.

For example, substance abuse

behavior, familial relationships, anti-social values and attitudes.

Interventions can be applied, working with offenders so they can change their attitudes,

change the way they think, change their attitude toward

substance embryos, improved family relationships, and therefore not reoffend.

There is a concerted effort to work with our service providers

and partners in doing more

collaborative and court in any case management, focusing on those needs and risk factors that are identified through

compass -- coordinating with case management.

**Supervisor cohen:** thank you.

in the review this supposed ordinance, and was wondering if the department of public health was also invited to participate

or did they not show up?

**Supervisor mirkarimi:** no, they have been part of the whole creation of this.

But since the consoles, as it had been convened by both myself

and the mayor and the key partners involved in getting

ready for assembly bill 109

realignment has been sure of,

adult probation. district attorney, public defender, and the department of public health has been involved, too.

This is to finally designate, as

is required by state law, a department, or co-departments, but in this case, it has been

decided that adult probation as

the best equipped to deal with

the welcoming, receiving of the

650 approximately inmates to come in. But the department of public

health has a very integral role in all this, no question about it.

And there exactly in tandem with the sheriff' s department,

who is also in tandem with adult probation.

Those are very key departments

that are going to be asked to really step up.

I will give an example, jail

psychiatric services.

a psychiatric services in the sheriff' s department, that comes from the department of public health, not the sheriff' s department. I would not be a surprise that a number of the inmates under

coming back, despite the low level criteria of what the

felons are, that they will have mental health needs. That will continue to stress or

destress existing services

provided by psych services.

Dph plays a strong role in helping build adult probation

and helping the sheriff's department. Yes, absolutely.

**supervisor cohen:** thank you.

Supervisor mirkarimi:sorry, I did not mean to give you to match information. >> yes, the department of health has been actively involved. A portion of the state funding

is going to dph to provide very important services for these offenders coming up.

just to put a point on that, the

pre-release packets that were

now receiving -- we have about

30 people, 30 packets, 30 individuals we know are coming

out in the next month. Five of those have been

identified as having severe mental health issues. And we're already working very

closely with crag murdoch and

his staff, so there is a cooperative effort to do an

assessment of those individuals

before they come out and to

identify the type of services and prepare for placement of

those individuals before they

are released to community supervision.

**Supervisor mirkarimi:** thank you. I greatly appreciate.

Hello to the chief, yes. Any public comment?

Ok. We have fans.

Public comment is closed .

colleagues, can we take this without -- ok, excellent.

Madam Clerk, move this with a recommendation

Thank you.

Adult probation and others who have been here.

Is there any other business?

>> no, Mr. Chairman.

>> ok, just in time for the rules committee to come on in. We got a lot covered in public safety.

Thank you, supervisors. Everybody have a good day.

And thank you, sfgtv, for your ongoing excellence. Meeting adjourned.