DENNIS J. HERRERA, State Bar #139669
City Attorney
WAYNE SNODGRASS, State Bar #148137
CHRISTINE VAN AKEN, State Bar #241755
Deputy City Attorneys
1 Dr. Carlton B. Goodlett Place
City Hall, Room 234
San Francisco, California 94102-4682
Telephone:      (415) 554-4633
Facsimile:       (415) 554-4699
E-Mail:          christine.van.aken@sfgov.org

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO,
THE MAYOR OF SAN FRANCISCO and
THE CHIEF OF THE SAN FRANCISCO POLICE DEPARTMENT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESPANOLA JACKSON, PAUL COLVIN, THOMAS BOYER, LARRY BARSETTI, DAVID GOLDEN, NOEMI MARGARET ROBINSON, NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., and SAN FRANCISCO VETERAN POLICE OFFICERS ASSOCIATION,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, THE MAYOR OF SAN FRANCISCO, and THE CHIEF OF THE SAN FRANCISCO POLICE DEPARTMENT, in their official capacities,<br><br>Defendants. | Case No. C09-2143 RS<br><br>**CITY AND COUNTY OF SAN FRANCISCO'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**<br><br>Hearing Date:   July 12, 2012<br>Time:              1:30 p.m.<br>Place:            450 Golden Gate Ave.<br>                     Courtroom 3 - 17th Floor<br>                     San Francisco, CA 94102 |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION .....................................................................................................................1

STATEMENT OF FACTS .......................................................................................................2

    I.    SAN FRANCISCO'S SAFE-STORAGE ORDINANCE .......................................2

    II.    SAN FRANCISCO'S ENHANCED-LETHALITY AMMUNITION
        ORDINANCE ........................................................................................................3

ARGUMENT ...........................................................................................................................4

    I.    PLAINTIFFS CANNOT PREVAIL ON THEIR PLEADINGS ALONE. .............4

    II.    SAN FRANCISCO'S SAFE-STORAGE ORDINANCE IS
        CONSTITUTIONAL. ...........................................................................................6

        A.    Standard of Review .................................................................................6

        B.    The Safe Storage Ordinance Does Not Restrict Plaintiffs' Second
            Amendment Rights At All. .....................................................................9

        C.    Alternatively, The Safe-Storage Ordinance Only Minimally Burdens
            Plaintiffs' Second Amendment Rights And Should Be Subject To
            Correspondingly Minimal Scrutiny. .....................................................12

        D.    The Safe-Storage Ordinance Easily Passes Muster Under Heightened
            Scrutiny. .................................................................................................15

    III.    SAN FRANCISCO'S PROHIBITION ON THE SALE OF ENHANCED-
         LETHALITY AMMUNITION IS CONSTITUTIONAL. ...................................16

        A.    The Prohibition On The Sale Of Enhanced-Lethality Ammunition Does
            Not Burden The Second Amendment Right. ..........................................18

        B.    Alternatively, If The Sale Prohibition Burdens The Second Amendment
            Right, The Prohibition Readily Survives Heightened Scrutiny Review....20

CONCLUSION ........................................................................................................................23

# **TABLE OF AUTHORITIES**

**Federal Cases**

*Bd. of Trustees of the State Univ. of N.Y. v. Fox*
   492 U.S. 469 (1989)................................................................15

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*
   447 U.S. 557 (1980)..................................................................8

*Clingman v. Beaver*
   544 U.S. 581 (2005)..................................................................8

*Dandridge v. Williams*
   397 U.S. 471 (1970)................................................................19

*District of Columbia v. Heller*
    554 U.S. 570 (2008)........................................................ *passim*

*Enos v. Holder*
   2:10-CV-2911 JAM-EFB, 2012 WL 662454 (E.D. Cal. Feb. 28, 2012)..................14

*Ezell v. City of Chicago*
   651 F.3d 684 (7th Cir. 2011) ...........................................8, 13, 15

*Fla. Bar v. Went For It, Inc.*
   515 U.S. 618 (1995)..................................................................5

*Gen. Conference Corp. of Seventh-Day Adventists*
    *v. Seventh-Day Adventist Congregational Church*
   887 F.2d 228 (9th Cir. 1989). .......................................................5

*Gun S., Inc. v. Brady*
   877 F.2d 858 (11th Cir. 1989) ......................................................21

*Hall v. Garcia*
   No. C 10-03799 RS, 2011 WL 995933 (N.D. Cal. Mar. 17, 2011)................9, 12

*Heller v. Dist. of Columbia*
   670 F.3d 1244 (D.C. Cir. 2011) ....................................................13

*Kennedy v. Louisiana*
   554 U.S. 407 (2008)................................................................16

*Kwong v. Bloomberg*
   11 CIV. 2356 JGK, 2012 WL 995290 (S.D.N.Y. Mar. 26, 2012)...................14

*Madsen v. Women's Health Ctr., Inc*.
   512 U.S. 753 (1994)................................................................16

*McDonald v. City of Chicago*
   561 U.S. --, 130 S. Ct 3020 (2010)..........................................7, 12, 20

*Muscarello v. United States*
    524 U.S. 125 (1998)..................................................................................................10

*Nat'l Treasury Employees Union v. Von Raab*
    489 U.S. 656 (1989)..................................................................................................15

*Nordyke v. King*
    644 F.3d 776 (9th Cir. 2011) .....................................................................................8

*Nordyke v. King*
    No. 07-15763, 2012 WL 1959239 (9th Cir. June 1, 2012)........................................8

*Reed v. Town of Gilbert*
    587 F.3d 966 (9th Cir. 2009) ...................................................................................16

*Tillison v. Gregoire*
    424 F.3d 1093 (9th Cir. 2005) .................................................................................22

*United States v. Am. Library Ass'n, Inc.*
    539 U.S. 194 (2003)...................................................................................................9

*United States v. Bena*
    664 F.3d 1180 (8th Cir. 2011) .................................................................................14

*United States v. Booker*
    644 F.3d 12 (1st Cir. 2011)
    *cert. denied,* 132 S. Ct. 1538 (2012).................................................................6, 13

*United States v. Carter*
    669 F.3d 411 (4th Cir. 2012) ...............................................................................5, 16

*United States v. Chester*
    628 F.3d 673 (4th Cir. 2010) ...............................................................8, 13, 14, 15

*United States v. Engstrum*
    60 F. Supp. 2d 1227 (D. Utah 2009)...................................................................14, 16

*United States v. Greeno*
    No. 10-6279, 2012 WL 1813672 (6th Cir. May 21, 2012)...................................8, 11

*United States v. Marzzarella*
    614 F.3d 85 (3d Cir. 2010)
    *cert. denied,* 131 S. Ct. 958 (U.S. 2011)........................................8, 13, 15, 16, 20

*United States v. Masciandaro*
    638 F.3d 458 (4th Cir. 2011)
    *cert. denied,* 132 S. Ct. 756 (2011)..................................................6, 8, 13, 14, 15

*United States v. McCarty*
   421 F. Supp. 2d 220 (D. Me. 2006)
   *aff'd*, 475 F.3d 39 (1st Cir. 2007)............................................................................21

*United States v. Salerno*
   481 U.S. 739 (1987).................................................................................................6

*United States v. Skoien*
   614 F.3d 638 (7th Cir. 2010)
   *cert. denied,* 131 S. Ct. 1674 (U.S. 2011)...................................................... *passim*

*United States v. Vongxay*
   594 F.3d 1111 (9th Cir. 2010)
   *cert. denied*, 131 S. Ct. 294 (U.S. 2010)..............................................................12

*United States v. Weaver*
   Criminal No. 2:09–cr–00222, 2012 WL 727488 (S.D. W. Va. Mar. 6, 2012)..........................14

*Wash. State Grange v. Wash. State Repub. Party*
   552 U.S. 442 (2008).................................................................................................6

*Woollard v. Bateman*
   Civil Case No. L–10–2068, 2012 WL 695674 (D. Md. Mar. 2, 2012) .....................................14

**Federal Rules, Statutes & Regulations**

18 U.S.C. § 921............................................................................................................21

18 U.S.C. § 922.......................................................................................................14, 21

18 U.S.C. § 924............................................................................................................10

26 U.S.C. § 5845..........................................................................................................21

Fed. R. Civ. P. 12(c). ....................................................................................................4

Fed. R. Evid. 201(b) .....................................................................................................5

Fed. R. Evid. 801(c) .....................................................................................................5

**Constitutional Provisions**

U.S. Const. amend. II.......................................................................................... *passim*

U.S. Const. amend. XIV .................................................................................................7

**State Statutes**

Act of April 13, 1782, ch. DCCCCLVIII, sec. XLII, Pennsylvania Statute..................................11

Act of April 13, 1784, ch. 28, New York Statute ..................................................................11

Act of December 25, 1837, Georgia Statute .........................................................................18

Act of February 20, 1901, South Carolina Statute ...........................................................18

Act of March 1, 1783, ch. 24, Massachusetts Statute ....................................................11

Act of March 14, 1879, ch. XCVI, § 1, Tennesee Statute ............................................18

**San Francisco Ordinances & Codes**
S.F. Police Code § 613.10................................................................................4, 18, 21, 22

S.F. Police Code § 613.9.5...................................................................................1, 4, 18

S.F. Police Code § 4506.................................................................................................10

S.F. Police Code § 4511................................................................................2, 3, 9, 10, 16

S.F. Police Code § 4512....................................................................................2, 9, 10

**Other References**
Adam Winkler, GUN FIGHT: THE BATTLE OVER THE RIGHT TO
     BEAR ARMS IN AMERICA 12, 163-70, 196-204 (2011)........................................9, 12

Law Enforcement Officers Protection Act of 1985, Hearing Before the Subcomm.
     on Crime of the H. Comm. on the Judiciary, 99th Cong. 1 .................................21, 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# INTRODUCTION

San Francisco imposes the modest requirement on gun owners that, when not carrying their handguns on their persons in the home, they must secure their guns by locking them either with a trigger lock or in a locked storage box.  This requirement has no impact at all on the ability of handgun owners to use their firearms in case of a self-defense emergency.  Modern lockboxes can be accessed in just seconds, and portable lockboxes can store loaded weapons so that they are always in reach on counters or bedside tables.  But this simple protective measure of locking a gun when it is not in use can save lives.  Studies have shown that guns kept in the home are far more likely to be used in suicides and against family and friends than for self-defense.  San Francisco's ordinance addresses this problem by reducing the chances that irresponsible people, including teenagers and children, can obtain handguns.  Indeed, safe-storage laws have been shown to reduce gun accidents and suicides involving children.  They may also reduce gun thefts, one of the biggest sources of guns used in crime, and adult suicides as well.

San Francisco also prohibits ammunition dealers within city limits from selling ammunition that is "designed to tear larger wounds in the body by flattening and increasing in diameter on impact and/or exploding and dispersing shrapnel throughout the body."  S.F. Police Code § 613.9.5 (App. A-1).[1]  The prohibited ammunition, when it is used, is more likely to result in injury or death to the victim of a gunshot wound.  San Francisco's measure helps ensure that when guns are discharged in San Francisco, they are less likely to cause grave or lethal injuries.

Neither of these measures has any impact on the Second Amendment rights of San Franciscans, who are free to possess and use handguns in their homes for self-defense, to load their guns with conventional ammunition that suffices for self-defense, and even to travel to other jurisdictions to obtain enhanced-lethality ammunition.  Because San Francisco's ordinances do not prevent or impede the exercise of the core right to self-defense in the home, they are not subject to any scrutiny at all under the Second Amendment.  But even if this Court were to evaluate the ordinances under some higher level of scrutiny, it should deny Plaintiffs' motion for partial judgment on the

---

[1] All San Francisco ordinances cited in this brief, along with cited Framing-era and other historic statutes, may be found in the accompanying appendix.

pleadings. Every appellate court to have articulated a standard of review for Second Amendment claims has applied something short of strict scrutiny to measures other than flat bans on the use or possession of handguns, and nearly all appellate courts have applied intermediate scrutiny to such claims. If this Court rejects rational basis review, it should apply no more searching test than intermediate scrutiny. San Francisco's measures easily pass this threshold. They are unquestionably intended to advance the important government interest in public safety, and San Francisco's legislative findings of fact demonstrate that its ordinances are reasonably tailored to advance that object. On a motion directed only at the face of the pleadings, Plaintiffs cannot simply have this Court disregard San Francisco's findings of fact. Yet that is what the Court would have to do to find that San Francisco's ordinances do not survive scrutiny. The Court should reject the invitation and deny Plaintiffs' motion.

## STATEMENT OF FACTS

### I.    SAN FRANCISCO'S SAFE-STORAGE ORDINANCE

In 2007, San Francisco enacted Police Code § 4512 (App. A-12), requiring any handgun maintained in the home to be "stored in a locked container or disabled with a trigger lock" unless it is "carried on the person of an individual over the age of 18" or "under the control of" a peace officer. This safe-storage requirement does not require that stored guns be kept unloaded, nor does it apply to long guns.

In late 2011, San Francisco made legislative findings in support of its 2007 safe-storage ordinance. S.F. Police Code § 4511 (App. A-8). These findings demonstrate the immense destructive effects of misused guns. Among the findings are that gun injuries are the second most common cause of injury deaths in this country, and the third most common cause of injury death in San Francisco. Police Code § 4511(1)(a), (1)(e). In 2009, more than 18,000 people in the United States were treated for unintentional gunshot wounds. *Id.* § 4511(1)(c). Children are particularly vulnerable when they gain access to guns that are unsecured. In addition to their risk of accidents, children and teens who gain access to guns are vulnerable to suicide. *Id.* § 4511(3)(b). Suicide among young people is often driven by an immediate crisis, and the presence of an unsecured gun in the home can make an impulsive suicide decision fatal. *Id.* § 4511(3)(c). A 2005 study found that an estimated 1.69 million

American children ages 18 and under live in households with loaded and unlocked firearms.  *Id.* § 4511(3)(a).

San Francisco's findings also describe why requiring locked storage can save lives.  Safe-storage requirements have a demonstrated protective effect in homes with children and teenagers.  Police Code § 4511(5).  For that reason, using locking devices to prevent access to guns by unauthorized people has been recommended not only by the International Association of Chiefs of Police and the American Academy of Pediatrics but also by the National Rifle Association.  *Id.* § 4511(6).  Even in homes where children are not present, there is benefit to requiring guns to be locked.  It can help stem the flow of illegal guns into the community: more than half a million guns are stolen in the United States each year.  *Id.* § 4511(2)(d).  And studies have shown that even the risk of adult suicide is elevated in homes where guns are kept loaded or unlocked.  *Id.* § 4511(2)(b).

San Francisco's factfinding also considered whether requiring locked storage would burden the residents' ability to use handguns for self-defense in the home.  It found that the requirement did not "substantially burden the right or ability to use firearms for self-defense in the home" for three reasons.  Police Code § 4511(7).  First, the locking requirements only apply to handguns that are not being carried, giving gun owners the choice to keep their loaded and unlocked handguns with them at any time.  *Id.* § 4511(7)(a).  Second, "[g]un security does not preclude quick access" with modern lockboxes:

> "For example, affordable lockboxes using Simplex-type locks, which pop open immediately when several keys or pushbuttons are touched in a preset sequence, are widely available.  Users report that they can retrieve a loaded weapon in just two to three seconds, and that the locks are also easy to open in the dark. The NRA describes this type lockbox as providing 'a good combination of security and quick access.'  Some lockboxes also feature biometric locks, which provide immediate access when they scan the owner's fingerprint." *Id.* § 4511(7)(b).

Third, portable lockboxes can store loaded handguns so that they are within easy reach on nightstands or counters.  "Such safely stored weapons are more quickly and easily retrieved for use in self-defense than unlocked guns that have been hidden away in seldom-used locations." *Id.* § 4511(7)(c).

## II.    SAN FRANCISCO'S ENHANCED-LETHALITY AMMUNITION ORDINANCE

San Francisco first prohibited licensed ammunition dealers from selling some types of enhanced-lethality ammunition in 1994, and that ordinance has continued in effect through today, with

slight modifications.  Presently, the ordinance states that a licensee "shall not sell, lease or otherwise transfer to any person any ammunition that:

> "(1) Serves no sporting purpose;
>
> "(2) Is designed to expand upon impact and utilize the jacket, shot or materials embedded within the jacket or shot to project or disperse barbs or other objects that are intended to increase the damage to a human body or other target (including, but not limited to, Winchester Black Talon, Speer Gold Dot, Federal Hydra-Shok, Hornady XTP, Eldorado Starfire, Hollow Point Ammunition and Remington Golden Sabre ammunition; or
>
> "(3) Is designed to fragment upon impact (including, but not limited to, Black Rhino bullets and Glaser Safety Slugs)."  S.F. Police Code § 613.10(g) (App. A-2).

In 2011, San Francisco conducted hearings, accepted public comments and submissions into the legislative record (including submissions from the California Rifle and Pistol Association identical to those items attached as Exhibits D-G and M-O to Plaintiffs Request for Judicial Notice ["RJN"]), and made findings of fact concerning its prohibition on enhanced-lethality ammunition.  S.F. Police Code § 613.9.5 (App. A-1).  San Francisco found that "enhanced-lethality ammunition is more likely to cause severe injury and death than is conventional ammunition that does not flatten or fragment upon impact."  *Id.* § 613.9.5(2).  It found that prohibiting enhanced-lethality ammunition does not substantially burden the right of self-defense because the right can be fully exercised using conventional, non-collapsing ammunition.  *Id.* § 613.9.5(4).  San Francisco's findings concluded that the city "has a legitimate, important and compelling governmental interest in reducing the likelihood that shooting victims in San Francisco will die of their injuries by reducing the lethality of the ammunition sold and used" in San Francisco.  *Id.* § 613.9.5(6).  San Francisco did not, however, prohibit the possession of enhanced-lethality ammunition by its residents.  Nor could San Francisco's ordinance affect what ammunition is sold by firearms dealers outside city limits; the ordinance applies only to the single ammunition dealer licensee within San Francisco.  *Id.* § 613.10.

## ARGUMENT

## I.   PLAINTIFFS CANNOT PREVAIL ON THEIR PLEADINGS ALONE.

Judgment on the pleadings is proper only when there are no issues of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 12(c).  "All allegations of fact by the party opposing the motion are accepted as true, and are construed in the light most favorable to

that party. … [I]f the defendant raises an affirmative defense in his answer it will usually bar judgment on the pleadings." *Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989).

For purposes of this motion, however, Plaintiffs have essentially asked the Court to assume not only that it is Plaintiffs', not San Francisco's, factual allegations that are true, but also that the legislative findings that San Francisco made in support of its ordinances are false.  To grant Plaintiffs' motion, the Court would have to assume that locked guns are inoperable or nearly impossible to use in a self-defense emergency, that gun storage lockboxes cannot be opened in just a few seconds in a self-defense emergency, that enhanced-lethality ammunition is the most commonly used ammunition among law-abiding citizens, and that conventional ammunition is inadequate for self-defense purposes.  Indeed, for some of their arguments Plaintiffs rely on facts reported in newspaper articles and other secondary sources, which they ask this Court to judicially notice[2]—and, presumably, to accept as true instead of viewing the facts in the light most favorable to San Francisco.  This not only turns on its head the factual burden in a motion for judgment on the pleadings, but it also errs by paying no deference at all to San Francisco's legislative judgments.  "Even when applying strict scrutiny—requiring a more taxing proof threshold than the one we apply here [in a Second Amendment case challenging conviction of a marijuana user in possession of a firearm]—the government may, in appropriate circumstances, carry its burden by relying 'solely on history, consensus, and simple common sense.'"  *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012) (quoting *Fla. Bar v. Went For It, Inc.,* 515 U.S. 618, 628 (1995); additional quotation marks omitted)).

---

[2] The Court should deny much of Plaintiffs' request for judicial notice.  Exhibits C through G and K through O are not judicially noticeable because Plaintiffs rely on them to show facts that are subject to dispute and because the facts they purport to show cannot "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Nor are they evidence on which Plaintiffs could rely in a summary judgment motion; they are out of court statements offered for their truth.  Fed. R. Evid. 801(c).  (Plaintiffs apparently contend that the Court can judicially notice their newspaper articles because they are offered not for their truth but to show "information in the public realm."  But the question of what information was publicly available about ammunition at the time those newspaper articles were published is not relevant; Plaintiffs plainly want the Court to consider the articles as true.)

San Francisco does not, however, object to Plaintiffs' request that the Court judicially notice court documents and transcripts (RJN Exhs. A and B), legislative history for the ordinances at issue (RJN Exhs. I and J), or state statutes and administrative enactments (RJN Exhs. Q through T).

As the Court will find when it hears summary judgment motions in this case, San Francisco has relied not only on common sense but also on social science and medical literature to reach reasonable findings.  Plaintiffs cannot simply wave San Francisco's factfinding away, and their motion should be denied on this basis alone.

The motion for judgment on the pleadings is also without merit because, to bring a facial challenge to San Francisco's ordinances, Plaintiffs must show as a factual matter that the ordinances burden them.  "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  "While some Members of the [Supreme] Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a plainly legitimate sweep."  *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 449, (2008) (internal quotation marks omitted).  Courts considering facial Second Amendment challenges have held plaintiffs to this standard.  *See United States v. Booker*, 644 F.3d 12, 22 (1st Cir. 2011) *cert. denied*, 132 S. Ct. 1538 (2012).  They have also required plaintiffs to show that a challenged law is unconstitutional *as applied to them* before permitting them to bring facial challenges.  *United States v. Masciandaro*, 638 F.3d 458, 474 (4th Cir. 2011) *cert. denied,* 132 S. Ct. 756 (2011) ("In view of our determination that 36 C.F.R. § 2.4(b) is constitutional under the Second Amendment as applied to Masciandaro, *a priori* we reject his facial overbreath [*sic*] challenge to § 2.4(b)."); *United States v. Skoien*, 614 F.3d 638, 645 (7th Cir. 2010) (*en banc*) *cert. denied,* 131 S. Ct. 1674 (U.S. 2011) ("A person to whom a statute properly applies can't obtain relief based on arguments that a differently situated person might present.").  Since Plaintiffs have not shown that San Francisco's ordinances burden their Second Amendment rights as a factual matter, they cannot obtain they relief they seek.

## II.   SAN FRANCISCO'S SAFE-STORAGE ORDINANCE IS CONSTITUTIONAL.

### A.   Standard of Review.

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation."  554 U.S. 570, 592 (2008).  At the "core" of the individual right is "the inherent right of self-defense" which is

"most acute" in the home.  *Id.* at 628.  Accordingly, when confronted with a District of Columbia ordinance that "totally bans handgun possession in the home" and requires "that firearms in the home be rendered and kept inoperable at all times," with no exception for self-defense emergencies, the Court held that this flat ban on exercising the right to use firearms in self-defense was barred by the Second Amendment.  *Id.* at 628-30.  The Court did not prescribe a level of scrutiny or method for analyzing gun control laws, but it noted that D.C.'s ban would fail "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights."  *Id.* at 628, 634.  *Heller* also affirmed that "the right secured by the Second Amendment is not unlimited."  *Id.* at 625.  Indeed, *Heller* lists a host of regulations that withstand Second Amendment scrutiny, including "prohibitions on carrying concealed weapons" and "longstanding prohibitions on the possession of firearms by felons or the mentally ill, or laws forbidding the carrying of firearms in sensitive places …, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 626-27.  *Heller* also expressly cautioned against applying its reasoning to invalidate firearm storage laws.  *Id.* at 632.

In *McDonald v. City of Chicago*, 561 U.S. --, 130 S. Ct 3020 (2010), the Court held that the Second Amendment is incorporated against the States and local governments through the Fourteenth Amendment, *id.* at 3050 (plurality opinion), or the Privileges and Immunities Clause, *id.* at 3059 (Thomas, J., concurring).  Notably, *McDonald* did not clarify what standard of review applies to Second Amendment challenges, other than to hold that the Second Amendment limits the regulatory powers of the States and of localities to the same extent it limits the federal government. *Id.* at 3044-45 (plurality).  Just as notably, *McDonald* reaffirmed that the Second Amendment right is a limited one. *Id.* at 3047 (plurality) ("It is important to keep in mind that *Heller*, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.' . . .  We repeat those assurances here.") (quoting *Heller*, 554 U.S. at 626); *id.* at 3046 (plurality) (the Second Amendment right allows "state and local experimentation with reasonable firearms regulation [to] continue").

In the wake of *Heller* and *McDonald*, the Ninth Circuit has not yet decided what form of scrutiny courts should apply to gun control laws.  *See Nordyke v. King*, No. 07-15763, 2012 WL

1959239 (9th Cir. June 1, 2012) (*en banc*).  Most circuits have adopted a two-step approach.  "Under

the first prong, the court asks whether the challenged law burdens conduct that falls within the scope

of the Second Amendment right, as historically understood."  *United States v. Greeno*, No. 10-6279,

2012 WL 1813672, at *7 (6th Cir. May 21, 2012) (Alarcón, J.).  Under the second prong, if the

challenged law indeed burdens protected conduct, then the court applies "some form of means-end

scrutiny" to determine whether it is constitutional, with greater burdens on the core right being subject

to greater scrutiny.  *United States v. Marzzarella*, 614 F.3d 85, 89, 96 (3d Cir. 2010) *cert. denied,* 131

S. Ct. 958 (U.S. 2011); *see also Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011) ("the rigor

of this judicial review will depend on how close the law comes to the core of the Second Amendment

right and the severity of the law's burden on the right"); *Masciandaro*, 638 F.3d at 471 (applying

intermediate scrutiny to prohibition on loaded firearms in national parks); *United States v. Chester*,

628 F.3d 673, 680, 682-83 (4th Cir. 2010) (applying intermediate scrutiny to criminal law prohibiting

domestic violence misdemeanants from possessing firearms); *Skoien*, 614 F.3d at 641 (same).[3]

This two-step test appropriately recognizes that not all gun control laws implicate Second

Amendment rights, since the historical right was always bounded, and since even where the right is

burdened, a lesser level of scrutiny may be appropriate depending on the extent of the burden.  It is not

the case, as Plaintiffs argue at page 11 of their brief, that all laws regulating the core of fundamental

rights are subject to strict scrutiny.  *See, e.g., Clingman v. Beaver*, 544 U.S. 581, 592 (2005) (in voting

rights challenge, holding that "strict scrutiny is appropriate only if the burden is severe"); *Central

Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561-65 (1980) (articulating

intermediate scrutiny test under First Amendment for regulation of commercial speech).  Indeed, there

is good reason to think that intermediate scrutiny should be the default standard for regulations that

infringe Second Amendment rights.  Guns are inherently dangerous and threaten public safety when

---

[3] In *Nordyke v. King*, 644 F.3d 776 (9th Cir. 2011), the Ninth Circuit applied what was arguably an even less exacting standard than the two-step test, applying only rational basis scrutiny unless gun regulations "substantially burden" the right to keep and bear arms.  *Id.* at 783.  Under this test, a regulation that intruded upon but did not substantially burden the right would receive rational basis review.  The 2011 panel decision, however, was vacated when the Ninth Circuit ordered rehearing *en banc.*  664 F.3d 774.  The *en banc* opinion did not determine the standard of review.  2012 WL 1959239.

they are misused, as they frequently are, and regulation of guns has been pervasive in American history.  *See* Adam Winkler, GUN FIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA 12, 163-70, 196-204 (2011) (describing extensive frontier-era and New Deal-era gun regulations).  It would cripple the ability of States and localities to address real threats to public order and safety if they had to surmount the strict scrutiny test to regulate guns.  *Cf. United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 217 (2003) (Breyer, J., concurring in the judgment) ("'strict scrutiny' implies too limiting and rigid a test for me to believe that the First Amendment requires it in this context," *i.e.* a federal law requiring libraries to use internet filters).  This Court should therefore adopt the predominant two-step test for its analysis, rather than mechanically applying strict scrutiny as Plaintiffs argue.  *See Hall v. Garcia*, No. C 10-03799 RS, 2011 WL 995933, at *2-*3 (N.D. Cal. Mar. 17, 2011) (noting that many common firearms restrictions listed in *Heller* as presumptively lawful or similar to those listed in *Heller* have summarily been affirmed, that *Heller* did not adopt the strict-scrutiny test, and that courts have tested some restrictions under intermediate rather than strict scrutiny).

### B.   The Safe Storage Ordinance Does Not Restrict Plaintiffs' Second Amendment Rights At All.

Plaintiffs try to wedge San Francisco's safe storage ordinance into the same mold as the D.C. ordinance that *Heller* invalidated.  It is a poor fit.  The D.C. ordinance "totally ban[ned] handgun possession in the home. It also require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock *at all times*, rendering it inoperable."  *Heller*, 554 U.S. at 628 (emphasis added).  *Heller* expressly noted that there was no self-defense exception to the D.C. ordinance: it was unlawful to unlock or assemble a firearm even in the face of mortal danger.  *Id.* at 630.  The trigger-lock requirement literally made it "*impossible* for citizens to use [firearms] for the core lawful purpose of self-defense."  *Id.* (emphasis added).  D.C.'s ordinance masqueraded as a storage regulation but actually imposed a flat ban on the use of firearms for any purpose.

San Francisco's ordinance, by contrast, does not ban any class of weapons.  It does not prohibit residents from carrying or using their firearms.  S.F. Police Code § 4511(7)(a).  It permits residents to leave long guns unlocked and loaded in their homes.  *Id.* § 4512(b)(3).  It allows residents to maintain

their handguns loaded and unlocked and ready for immediate self-defense so long as the handguns are carried by an adult.  *Id.* § 4512(c)(1).  The ordinance requires only that, when a handgun is not "carried on the person" of an adult, it be secured with a lock.  *Id.* § 4511(a).  It does not, contrary to Plaintiff's contention, require them to lock their guns while they sleep.  The ordinary meaning of the phrase "carried on the person" includes carrying a handgun in a pocket or holster.[4]  If Plaintiffs fear nighttime burglary and wish to sleep with their guns holstered to their bodies, they are free to do so under the plain terms of the ordinance.  Nor does the ordinance make it difficult or impossible for any Plaintiff to use a stored gun in the case of a self-defense emergency.  As San Francisco's legislative findings make clear, there are affordable lockboxes with numeric keypads that provide ready access to a stored gun "in just two to three seconds" and are "easy to open in the dark."  *Id.* § 4511(7)(b).  There are also biometric lockboxes that "provide immediate access" when they scan the authorized user's fingerprint.  *Id.*[5]  And San Francisco expressly permits its residents to discharge their handguns in the home "in necessary and lawful defense of self or others."  *Id.* § 4506(a)(2) (App. A-7).  In short, San Francisco's ordinance is truly a *storage* ordinance, not a prohibition in disguise.

The Second Amendment is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Heller*, 554 U.S. at 626.  Because the Second Amendment does not include the right to store a handgun in any manner whatsoever, the Court need go no further than the first step of the two-step analysis to find that their claims are not within the historic scope of the Second Amendment.  This is clear from history and from *Heller*.

At least three jurisdictions in the Framing era regulated storage of firearms or ammunition for safety reasons.  In Boston in 1783, it was unlawful to take a loaded firearm into any building,

---

[4] This is demonstrated by *Muscarello v. United States*, 524 U.S. 125 (1998), where the dispute between the majority and dissent was whether the phrase "carries a firearm," in the criminal statute prohibiting the use or carriage of a firearm while committing a drug trafficking crime, 18 U.S.C. § 924(c)(1), encompassed a gun locked in the glove compartment of the truck used by the trafficker, 524 U.S. at 128, or merely included any gun kept in a pocket or holster, *id.* at 145 n.7.  No one contended that "carried" meant "held in the hands" or that carrying something in a holster did not qualify as carrying.

[5] A colloquy between Chief Justice Roberts, Justice Scalia and the District of Columbia's attorney at oral argument in *Heller* does not establish binding authority that a lockbox is difficult or time-consuming to open.  See Pltfs. Br. at 13.  Other than this colloquy, Plaintiffs offer nothing but their own *ipse dixit* that "locked" is tantamount to "inoperable."  But San Francisco expressly found otherwise, and on a motion for judgment on the pleadings, the Court must accept these facts as true.

including a dwelling.  An Act In Addition to the Several Acts Already Made for the Prudent Storage of Gun-Powder within the Town of Boston, Mar. 1, 1783, in The Charter of the City Council of Boston etc. with Such Acts of the Legislature of Massachusetts as Relate to the Government of Said City 18 (1827) (App. A-15).  In New York City in 1784, it was unlawful for "any … person … to have or keep any quantity of gun powder exceeding twenty-eight pounds weight, in any one place, less than one mile to the northward of the city hall … and the said quantity of twenty-eight pounds weight … shall be separated into four stone jugs or tin cannisters, which shall not contain more than seven pounds each."  An Act to Prevent the Danger Arising From the Pernicious Practice of Lodging Gunpowder in Dwelling Houses, Stores, or Other Places Within Certain Parts of the City of New York, or on Board of Vessels Within the Harbour Thereof, Apr. 13, 1784, ch. 28, 1784 Laws of the State of N.Y. 627-28 (App. A-18).  New York's statute contained no express exception for gunpowder kept in a loaded gun rather than a stone jug or tin canister.  Pennsylvania in 1782 prohibited the storage of more than 25 pounds of gun powder in any shop or dwelling.  An Act for Erecting the Town of Carlisle, in the County of Cumberland, into a borough; for Regulating the Buildings, Preventing Nuisances and Encroachments on the Commons, Squares, Streets, Lanes and Alleys of the Same, and for Other Purposes Therein Mentioned, 1782, ch. DCCCCLVIII, sec. XLII, 1803 Laws of the Commonwealth of Penn. 349-50 (App. A-23).  New York State's and Pennsylvania's statutes "did not clearly prohibit loaded weapons," *Heller*, 554 U.S. at 632, but it is at least arguable that they did, and Massachusetts's surely did.  The presence of these laws in three of the Framing-era states demonstrates that the historical understanding of the right to bear arms has never included immunity from reasonable storage regulations to prevent accidents.

Plaintiffs may claim that these Founding-era statutes should be disregarded because *Heller* noted that they were intended to prevent fires instead of the misuse of guns.  554 U.S. at 632.  Courts have rejected such a narrow view of historic antecedents in Second Amendment cases.  *See Greeno*, 2012 WL 1813672, at *8 (rejecting narrow historic argument that recent vintage of drug laws meant that use of guns in drug trafficking was historically protected and asking "broader question" whether Second Amendment protected use of guns by criminals); *Skoien*, 614 F.3d at 641 ("we do take from *Heller* the message that exclusions [from the scope of the Second Amendment right] need not mirror

1    limits that were on the books in 1791.").  History demonstrates beyond doubt that guns may be

2    regulated to serve public safety ends.  *See* Winkler, *supra*, GUN FIGHT at 12 (noting that regardless of

3    Second Amendment interpretation, gun rights are established in nearly every state constitution, but

4    that "[a]t the same time, we've also always had gun control.  The founding fathers instituted gun

5    control laws so intrusive that no self-respecting member of today's NRA board of directors would

6    support them.").  Public safety regulation, not a ban, is what San Francisco's ordinance does, and it fits

7    easily within this tradition of regulation.

8        *Heller* itself further confirms that safe-storage ordinances are categorically valid.  In discussing

9    the Framing-era storage laws, *Heller* states:  "Nothing about those fire-safety laws undermines our

10   analysis; they do not remotely burden the right of self-defense as much as an absolute ban on

11   handguns.  *Nor, correspondingly, does our analysis suggest the invalidity of laws regulating the*

12   *storage of firearms to prevent accidents.*"  554 U.S. at 632 (emphasis added).  Because storage laws

13   are among those gun control laws identified by *Heller* as untouched by its holding, and because San

14   Francisco's ordinance is a storage law and not a ban in disguise, it warrants no heightened Second

15   Amendment analysis by this Court.  *See Hall*, 2011 WL 995933, at *2 ("Where a challenged statute

16   apparently falls into one of the categories signaled by the Supreme Court as constitutional, courts have

17   relied on the 'presumptively lawful' language to uphold laws in relatively summary fashion.").

18       The right to be free of storage regulations is simply not a right that is encompassed by the

19   Second Amendment.  The Court need go no further than this to deny Plaintiffs' motion.  By regulating

20   the storage of firearms when they are not carried to prevent thefts, accidents, and suicides, San

21   Francisco's law clearly bears a rational relationship to legitimate government interests.

**C.    Alternatively, The Safe-Storage Ordinance Only Minimally Burdens Plaintiffs' Second Amendment Rights And Should Be Subject To Correspondingly Minimal Scrutiny.**

24       The Ninth Circuit has said that "*Heller* did not establish that Second Amendment restrictions

25   must be reviewed under strict scrutiny."  *United States v. Vongxay*, 594 F.3d 1111, 1118 n.5 (9th Cir.

26   2010) *cert. denied*, 131 S. Ct. 294 (U.S. 2010).  In accord with the Ninth Circuit's statement, not a

27   single appellate court since *Heller* and *McDonald* has held that strict scrutiny is the standard of review

28   applicable to any of the diverse gun control measures it has considered.  *See Heller v. Dist. of*

*Columbia*, 670 F.3d 1244, 1252-53, 1255, 1257-58 (D.C. Cir. 2011) ("*Heller II*") (applying

intermediate scrutiny to novel and onerous handgun and long gun registration requirements); *Ezell*,

651 F.3d at 704-05, 708 (applying "not quite strict scrutiny" where the City of Chicago burdened the

Second Amendment right by requiring live-fire training for its residents to obtain firearm licenses but

prohibited public live-fire training ranges within city limits); *Booker*, 644 F.3d at 25 (rejecting strict

scrutiny and instead requiring a "a substantial relationship between the restriction [on firearms

possession for domestic violence misdemeanants] and an important governmental objective");

*Masciandaro*, 638 F.3d at 471 (applying intermediate scrutiny to prohibition on loaded firearms in

national parks); *Chester*, 628 F.3d at 680, 682-83 (applying intermediate scrutiny to criminal law

prohibiting domestic violence misdemeanants from possessing firearms); *Skoien*, 614 F.3d at 641

(same); *Marzzarella*, 614 F.3d at 97 (applying intermediate scrutiny to criminal prohibition on

firearms with obliterated serial numbers).  The fact that appellate courts have repeatedly declined to

apply strict scrutiny to regulations far broader and more pervasive than San Francisco's—such as the

ban on domestic violence misdemeanants' ever possessing a gun for any purpose—demonstrates that

strict scrutiny is inappropriate here.

  Not only is there a consensus that strict scrutiny is inappropriate for all but the most severe of

Second Amendment deprivations, but the weight of authority indicates that even in the *home*, where

the need for self-defense is the "most acute," *Heller*, 554 U.S. at 628, gun regulations that stop short of

a ban on possession or use are subject only to intermediate scrutiny.  For instance, the D.C. Circuit

held that registration and training requirements that "*make it considerably more difficult* for a person

lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the

home—the core lawful purpose protected by the Second Amendment"—are nonetheless subject only

to intermediate scrutiny.  *Heller II*, 670 F.3d at 1255, 1257-58 (emphasis added).  Similarly, in *United

States v. Marzzarella*, the Third Circuit acknowledged that a prohibition on possession of a handgun

without a serial number "implicates [the possessor's] interest in the defense of hearth and home" but

nonetheless applied intermediate scrutiny to the law.  614 F.3d at 94, 97.  In *Kwong v. Bloomberg*, the

Southern District of New York applied intermediate scrutiny and rejected a Second Amendment

challenge to New York City's $340 fee for residential handgun licenses notwithstanding plaintiffs'

1    argument that the fee burdened the right to self-defense in the home.  11 CIV. 2356 JGK, 2012 WL

2    995290, at *11 (S.D.N.Y. Mar. 26, 2012).

3         Plaintiffs claim that there is "a growing, albeit mostly implied, consensus" that restrictions on

4    the right to bear arms in the home are subject to strict scrutiny "absent some countervailing factor."

5    Pltfs. Br. at 11 n.12.  But the cases they cite stand for nothing of the sort.  Most of their cited cases

6    addressed restrictions on gun possession outside the home, and had no occasion to decide whether

7    every gun regulation applicable within the home is subject to strict scrutiny.  *See Masciandaro*, 638

8    F.3d 458 (rejecting Second Amendment challenge to a regulation prohibiting loaded guns in national

9    parks); *United States v. Weaver*, Criminal No. 2:09–cr–00222, 2012 WL 727488 (S.D. W. Va. Mar. 6,

10   2012) (rejecting facial and as-applied challenges to 18 U.S.C. § 922(h) (prohibiting possession of

11   firearms while in the employ of a felon)); *Woollard v. Bateman*, Civil Case No. L–10–2068, 2012 WL

12   695674, *4 (D. Md. Mar. 2, 2012) (holding that the Second Amendment is violated by a discretionary

13   system of licenses to carry a firearm in public).  Only *United States v. Engstrum* considered a law that

14   impacts possession in the home.  60 F. Supp. 2d 1227, 1231-32 (D. Utah 2009).  *Engstrum* found that

15   strict scrutiny applies to a restriction on possession by a domestic violence misdemeanant—but

16   nonetheless found that the prohibition was narrowly tailored to achieve the compelling state interest of

17   mitigating future violence by previous violent offenders.  *Id.* at 1234-35.  In applying strict scrutiny,

18   *Engstrum* is an outlier, and other courts have not applied strict scrutiny to laws prohibiting gun

19   possession by domestic violence misdemeanants.  *See, e.g.*, *United States v. Bena*, 664 F.3d 1180,

20   1185 (8th Cir. 2011); *Chester*, 628 F.3d 673; *Skoien*, 614 F.3d 638; *Enos v. Holder*, 2:10-CV-2911

21   JAM-EFB, 2012 WL 662454, at *10 (E.D. Cal. Feb. 28, 2012) ("because this Court finds that §

22   922(g)(9) warrants inclusion on *Heller*'s list of presumptively lawful longstanding prohibitions on the

23   right to bear arms, no further constitutional scrutiny is required").

24        Instead of determining the level of scrutiny by looking to whether a firearm regulation operates

25   in the home, as Plaintiffs would have it, courts have looked to the severity of the burden imposed on

26   the Second Amendment right.  *Chester*, 628 F.3d at 682; *Heller II*, 670 F.3d at 1257.  Where a law

27   "was neither designed to nor has the effect of prohibiting the possession of any class of firearms, it is

28   more accurately characterized as a regulation of the manner in which persons may lawfully exercise

1    their Second Amendment rights" and subject only to intermediate scrutiny.  *Marzzarella*, 614 F.3d

2    at 97.

3            Applying this test, the Court should conclude that if San Francisco's safe storage ordinance is

4    subject to any heightened scrutiny at all it should receive intermediate scrutiny.  *Heller* itself stated

5    that storage laws "do not remotely burden the right of self-defense as much as an absolute ban on

6    handguns."  554 U.S. at 632.  In *Masciandaro*, the Fourth Circuit noted that a ban on loaded weapons

7    in national parks, which would require an individual seeking to use a gun for self-defense to load the

8    weapon during a self-defense emergency, "leaves largely intact the right to possess and carry weapons

9    in case of confrontation."  638 F.3d at 474.  San Francisco's safe-storage ordinance is less restrictive

10   than the regulation at issue in *Masciandaro*.  It does not prohibit the possession of any firearm and

11   regulates only the manner of residents' storage of firearms.  It imposes only a minimal burden, in light

12   of San Francisco's findings about the speed and ease with which a locked gun can be accessed.  In

13   light of these minimal regulatory burdens, if it is subject to any scrutiny at all under the Second

14   Amendment, it should be subject only to intermediate scrutiny, and then only the mildest form.  *Cf.*

15   *Ezell*, 651 F.3d at 708 (applying "not quite strict scrutiny" to a law that banned public live-fire training

16   ranges within a city that required residents to obtain live-fire training to qualify to possess firearms).

17        **D.    The Safe-Storage Ordinance Easily Passes Muster Under Heightened Scrutiny.**

18           Under an intermediate scrutiny standard, "the government must demonstrate … that there is a

19   'reasonable fit' between the challenged regulation and a 'substantial' government objective"  *Chester*,

20   628 F.3d at 683 (quoting *Bd. of Trustees of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)).

21   "[I]ntermediate scrutiny does not require that a regulation be the least intrusive means of achieving the

22   relevant government objective, or that there be no burden whatsoever on the individual right in

23   question."  *Masciandaro*, 638 F.3d at 474.

24           Plaintiffs half-heartedly argue that San Francisco's safe-storage ordinance fails intermediate

25   scrutiny.  Pltfs. Br. at 16-17.  The argument is wrong.  San Francisco's government interest in public

26   safety, in preventing gun thefts, and in preventing accidents and suicides, especially involving

27   children, is unquestionably substantial.  *See, e.g.*, *Nat'l Treasury Employees Union v. Von Raab*, 489

28   U.S. 656, 672 (1989) (government interest in safety is compelling); *Madsen v. Women's Health Ctr.,*

*Inc.*, 512 U.S. 753, 768 (1994) (government "has a strong interest in ensuring the public safety and order"); *Reed v. Town of Gilbert*, 587 F.3d 966, 979 (9th Cir. 2009) (safety is "readily recognized as [a] significant governmental interest[]").  Simple common sense demonstrates that locking something dangerous or frequently stolen can prevent these harms.  *See Carter*, 669 F.3d at 418 (discussing government's minimal burden to produce evidence even in strict scrutiny case); *Skoien*, 614 F.3d at 641 ("*Heller* did not suggest that [regulations] would be effective only if the statute's benefits are first established by admissible evidence," and there is not requirement of "proof, satisfactory to a court" that an Ordinance be "vital to the public safety.")  But San Francisco relies on more than simple common sense; its legislative findings are drawn from reliable social science and medical literature.  Plaintiffs cannot gainsay these findings on a motion on the pleadings.  Indeed, San Francisco's factual findings that locking guns prevents accidents, thefts, and suicides are sufficient at the pleadings stage to satisfy the exacting strict scrutiny test.  *Cf. Marzzarella*, 614 F.3d at 99 (holding that although intermediate scrutiny applied to law prohibiting possession of firearm with obliterated serial number, challenged law also satisfied strict scrutiny); *Engstrum*, 60 F. Supp. 2d at 1234-35 (holding that prohibition on firearm possession by domestic violence misdemeanants satisfied strict scrutiny).  The Court should therefore deny Plaintiffs' motion.

## III.  SAN FRANCISCO'S PROHIBITION ON THE SALE OF ENHANCED-LETHALITY AMMUNITION IS CONSTITUTIONAL.

The fundamental logic behind the City's prohibition on enhanced-lethality ammunition is that shootings should not necessarily be lethal or cause irreparable injury.  This logic is compelling in light of the vast numbers of accidental and intentional shootings that occur in this country every day; any reduction in the harm that results from shootings serves the public interest.  *See, e.g.,* S.F. Police Code § 4511(1)(a) ("In 2007, 31,224 Americans died in firearm-related homicides, suicides, and unintentional shootings – the equivalent of 85 deaths each day and more than three deaths each hour.").  And the logic is also compelling even in the case of self-defense emergencies.  Armed robbery and attempted homicide are not lawfully punishable by death, *see Kennedy v. Louisiana*, 554 U.S. 407 (2008), and even a home intruder who provokes an armed response should not be killed

unless there is no other way for the resident to defend himself.  It is a fact that enhanced-lethality ammunition causes greater injuries and more deaths, and this is the reason it is regulable.

Plaintiffs apparently do not dispute this fact but instead claim it for a virtue, euphemistically lauding the "stopping power" of hollow-point ammunition.  Indeed, they cite to state laws requiring hunters and animal-slaughter workers to use hollow-point ammunition on game and livestock.  *See* RJN Exhs. P through T.  But the purpose of these laws is precisely the opposite of San Francisco's purpose.  These states require hunters and slaughterers to use hollow point ammunition *in order to kill the animals they shoot* instead of merely wounding them.  *See, e.g.*, RJN Exh. S at 3 (in Ohio livestock euthanasia regulation, providing that "gunshot must utilize bullets … that expand on impact.  The projectile must enter the brain causing instant loss of consciousness and humane death."); RJN Exh. T at 1 (Washington statute provides that firearms used for slaughtering livestock must contain "[h]ollow pointed bullets" or frangible ammunition and that firearms are to produce unconsciousness in livestock "immediately by a combination of physical brain destruction and changes in intercranial pressure").  San Francisco, by contrast, believes that in nearly all circumstances it is better if guns do not kill.

Since Plaintiffs and San Francisco apparently agree that enhanced-lethality ammunition causes greater injury and death than conventional ammunition, the question for this Court is whether the City may lawfully prohibit gun dealers within its borders from selling this ammunition in light of the ammunition's exceptionally lethal properties.  The Court should again apply the two-step analysis adopted by the majority of circuits.  It should hold that this prohibition does not burden the Second Amendment right at all because of the history of prohibitions on the sale of certain weapons and because San Francisco's residents can fully exercise their right to self-defense without resort to the kind of ammunition that some states require to result in the immediate death of livestock.  In the alternative, if the Court finds any burden on residents' Second Amendment rights, it should apply only intermediate scrutiny because of the minimal burden the ordinance exacts and because it serves the City's important interest in saving lives.

### A. The Prohibition On The Sale Of Enhanced-Lethality Ammunition Does Not Burden The Second Amendment Right.

Police Code § 613.10(g) does not burden Plaintiffs' Second Amendment rights to possess and carry guns for self-defense, for two reasons.

First, the historic scope of the Second Amendment right has never required local jurisdictions to permit every kind of weapon to be sold within their borders. *Heller* itself states that "nothing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-67. This is borne out by history, which shows that bans on the sale of particular arms, even those that are popular or common, have existed throughout much of this nation's history. *See, e.g.*, An Act to Guard and Protect the Citizens of this State, against the Unwarrantable and Too Prevalent Use of Deadly Weapons, Dec. 25, 1837, ¶ 367, § 1, 1851 Statute Laws of the State of Ga. 848 (App. A-33) (making it illegal "for any merchant . . . or any other person . . . to sell, or offer to sell . . . pistols"); An Act to Prevent the Sale of Pistols, Mar. 14, 1879, ch. XCVI, § 1, 1879 Act of the State of Tenn. 135-36 (App. A-48) (banning the sale or disposal of "belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol[s]"); An Act to Regulate the Carrying, Manufacture, and Sale of Pistols, and to Make a Violation of the Same a Misdemeanor, Feb. 20, 1901, No. 435, § 1, 1902 Code of the Laws of S.C. 478-49 (App. A-46) (banning the sale of pistols less than 20 inches in length and 3 pounds in weight). There is no reason to distinguish between laws banning the sale of certain weapons and San Francisco's ordinance banning the sale of a kind of ammunition. The historic scope of the right tolerates prohibitions like San Francisco's.

Second, as the City's factual findings show, the prohibition on the sale of enhanced-lethality ammunition within the City does not prevent individuals from defending themselves. Standard ammunition has more than sufficient self-defense capacity. S.F. Police Code § 613.9.5(4). Plaintiffs concede as much when they argue that some kinds of conventional ammunition are sufficient to bring down a 1000-pound wild animal. Pltfs. Br. at 25. The Second Amendment protects not a right to own a particular firearm or particular ammunition but instead to keep and bear guns in the home that are useful for self-defense. *Cf. Heller*, 554 U.S. at 626 ("the right was not a right to keep and carry any weapon whatsoever"). If conventional ammunition is sufficient to vindicate the right to self-defense,

then it does not burden the right to self-defense to prohibit other, more lethal kinds of ammunition. This is true even if, as Plaintiffs argue and San Francisco does not dispute, most police forces use hollow-point ammunition for their officers, including the San Francisco Police Department.  The kinds of activities police engage in, such as proactively engaging criminals and attempting to stop crimes, are different from the self-defense needs of residents in their homes.  *Heller* acknowledged that the Second Amendment, notwithstanding its prefatory "militia" language, does not necessarily protect the kinds of weapons that are the most useful in military service.  554 U.S. at 627.  Since police forces also use sophisticated weapons and gear that are not available to the public at large, *Heller*'s logic should apply equally to ammunition selected by the police for needs particular to the police.  And if Plaintiffs truly believe that enhanced-lethality ammunition is the only kind of ammunition that will serve their self-defense needs, they are free to go to nearby gun shops in Daly City or South San Francisco to obtain it, since the City's ordinance prohibits only the sale and not the possession of this ammunition.

Because the prohibition on sales of enhanced-lethality ammunition does not burden Plaintiffs' Second Amendment rights, it need only be rationally related to a legitimate government interest, and it easily passes constitutional muster.  Aiming to reduce the likelihood of serious injury or death caused by an accidental or illegal shooting is certainly a legitimate interest for the City, and making bullets that cause grave injury or death less prevalent throughout the City through a sale prohibition is a rational way to decrease these dangers.  The fact that the Ordinance is only a sale prohibition and not a ban on use does not undermine the rational connection to the City's goals.  Only those who affirmatively wish to obtain enhanced-lethality ammunition will go outside the City to get it, while those who have no strong preference but may have purchased the ammunition were it available in their local gun store will not, thus reducing the overall amount of enhanced-lethality ammunition through out the City.  The City need not "choose between attacking every aspect of a problem or not attacking the problem at all," *Dandridge v. Williams*, 397 U.S. 471, 486-87 (1970); rather, the City may take incremental steps to address the problem it has identified.

### B. Alternatively, If The Sale Prohibition Burdens The Second Amendment Right, The Prohibition Readily Survives Heightened Scrutiny Review.

Even if this Court were to determine that the prohibition on the sale of enhanced-lethality ammunition within the City falls within the Second Amendment right as historically understood, the Ordinance easily satisfies the "means-end scrutiny," used to determine whether it is constitutional, with greater burdens on the core right being subject to greater scrutiny.  *Marzzarella*, 614 F.3d at 89. As the prohibition on the sale on enhanced-lethality bullets within the City is at most a minimal burden on the right, the Court should apply minimal scrutiny.  The core of the right is "the inherent right of self-defense," *Heller*, 554 U.S. at 628, which is at most, only slightly burdened by a regulation that removes but one of many ammunition options from Plaintiffs.  Indeed, the extent of this burden cannot be known at the pleadings stage.  The City's sale prohibition has no bearing on whether an individual within the City can lawfully possess or use enhanced-lethality ammunition.  It may be the case that Plaintiffs can easily purchase whatever ammunition they like from the gun dealers operating just outside the City's borders.  If so, the City's prohibition burdens them hardly at all, and they may not bring a facial challenge to legislation that does not violate their rights.  *See Skoien*, 614 F.3d at 645 ("A person to whom a statute properly applies can't obtain relief based on arguments that a differently situated person might present.").

In light of these minimal burdens, San Francisco's prohibition on the sale of enhanced-lethality ammunition passes intermediate scrutiny because it is substantially related to San Francisco's interest in preserving public safety and reducing the number of fatalities arising from accidental discharges and intentional shootings.  The Second Amendment "leaves [cities] a variety of tools for combating" the danger of gun violence, *Heller*, 554 U.S. at 636, and allows for "state and local experimentation with reasonable firearms regulation [to] continue," *McDonald*, 130 S. Ct. at 3046 (plurality).  The prohibition on the sale of enhanced-lethality ammunition is likely to decrease the amount of enhanced-lethality ammunition within the City.  Those who still wish to purchase such ammunition may go outside the City limits to do so, but those with no particular preference, but who may have purchased such ammunition were it available at their local gun shop, will not, and thus the overall amount of such ammunition in the City will decrease.  This decrease in use is substantially related to the goal of

1    reducing the number of fatalities resulting from accidental and illegal shootings.  Furthermore,

2    decreasing the lethality of the ammunition used against police officers is another important aspect of

3    preserving public safety.  "Responding to a domestic disturbance call is among an officer's most risky

4    duties."  *Skoien*, 614 F.3d at 644.  And where such guns are brandished against police officers, having

5    a reduced amount of enhanced-lethality ammunition in these guns is an important public safety

6    measure.  In addition to domestic disturbances, it is also in the City's interest that criminals not be

7    equipped with enhanced-lethality ammunition.

8         Plaintiffs also complain about the ordinance's language prohibiting the sale of ammunition that

9    "serves no sporting purpose."  S.F. Police Code § 613.10(g)(1).  This language is only obscure to those

10   who are unfamiliar with firearms regulation; it has regularly been employed by Congress as a term of

11   art to indicate weapons and ammunition that are considered suitable only for military use or that are

12   typically used by criminals rather than law-abiding members of the public.  *See*, *e.g.*, 18 U.S.C.

13   § 921(4)(B) (defining "destructive device" as "any type of weapon (other than a shotgun or a shotgun

14   shell which the Attorney General finds is generally recognized as particularly suitable for sporting

15   purposes) . . . which will . . . expel a projectile by the action of an explosive or other propellant, and

16   which has any barrel with a bore of more than one-half inch in diameter"); *id.* § 922(r) ("It shall be

17   unlawful for any person to assemble from imported parts any semiautomatic rifle or any shotgun

18   which is identical to any rifle or shotgun prohibited from importation under . . . this chapter as not

19   being particularly suitable for or readily adaptable to sporting purposes"); *Gun S., Inc. v. Brady*, 877

20   F.2d 858, 862 (11th Cir. 1989) (in discussing 18 U.S.C. § 922(l) concerning importation of firearms,

21   stating "the sponsor of the legislation, Senator Dodd, stated: . . . 'The entire intent of the importation

22   section is to get those kinds of weapons that are used by criminals and that have no sporting

23   purpose.'") (citation to Congressional Record omitted); *United States v. McCarty*, 421 F. Supp. 2d 220,

24   225 (D. Me. 2006) *aff'd*, 475 F.3d 39 (1st Cir. 2007) ("Based on the legislative history of the Gun

25   Control Act and subsequent circuit court precedent, this Court concludes that unregistered sawed-off

26   shotguns serve no sporting purpose and fall within [26 U.S.C.] § 5845(f)(2)'s definition of a

27   destructive device."); Law Enforcement Officers Protection Act of 1985, Hearing Before the

28   Subcomm. on Crime of the H. Comm. on the Judiciary, 99th Cong. 1 (1985) (statement of Chairman

1   Hughes) ("Armor-piercing ammunition has no sporting purpose whatsoever. It is not used by hunters

2   or sportsmen or target shooters. This ammunition has principally a military or offensive purpose to

3   penetrate armor. This ammunition should not be sold without reasonable controls to assure that it is

4   not used in the commission of crime."); *id.* at 91 (statement of David Baker, of the International Union

5   of Police Associations) ("[T]here is no legitimate sporting use for this ammunition. Congress has seen

6   fit to restrict the private ownership of machine guns and other military weapons, in part because of an

7   absence of legitimate sporting purposes. These bullets should not be an exception to that logic.").

8         Thus, when San Francisco's prohibition on ammunition that "serves no sporting purpose" is

9   treated as a definition and read together with other definitional elements of the ordinance (ammunition

10  that "[i]s designed to expand upon impact and utilize the jacket, shot or materials embedded within the

11  jacket or shot to project or disperse barbs or other objects that are intended to increase the damage to a

12  human body or other target," S.F. Police Code § 613.10(g)(2), or that "[i]s designed to fragment upon

13  impact," *id.* § 613.10(g)(3)), the purpose of the language is clear.  Read together, the ordinance

14  prohibits the sale of ammunition that either has no legitimate purposes or that is intended to cause

15  enhanced harm to the human body.  Because this prohibition has a rational basis and a reasonable

16  relationship to an important government interest, it is constitutional.

17        Finally, the rest of the arguments proffered by the Plaintiffs about the desirability of hollow-

18  point ammunition amount to nothing more than their policy preferences.  It is not the place of the

19  Court to select one policy over another.  Rather, it is for the legislative branch to weigh competing

20  concerns and select its policy preference.  "[B]road discretion is vested in the legislature to determine

21  what the public demands and what measures are necessary to protect the public interest." *Tillison v.*

22  *Gregoire*, 424 F.3d 1093, 1105 (9th Cir. 2005).  Here, Plaintiffs offer no reason to disturb San

23  Francisco's judgment that would not require the Court to disregard San Francisco's legislative findings

24  at the pleadings stage.  The Court should reject their challenge to San Francisco's ammunition

25  ordinance.

26      / / /

27      / / /

28

1

**CONCLUSION**

2      For the reasons offered above, this Court should deny Plaintiffs' Motion for Partial Judgment

3   on the Pleadings.

4

    Dated:  June 7, 2012                      DENNIS J. HERRERA

5                                             City Attorney
                                              WAYNE SNODGRASS
6                                             CHRISTINE VAN AKEN
                                              Deputy City Attorneys
7

8                                       By:   s/*Christine Van Aken*
                                              CHRISTINE VAN AKEN
9
                                              Attorneys for Defendants CITY AND COUNTY OF
10                                            SAN FRANCISCO, THE MAYOR OF SAN
                                              FRANCISCO and THE CHIEF OF THE SAN
11                                            FRANCISCO POLICE DEPARTMENT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28