1    C. D. Michel - S.B.N. 144258
     Glenn S. McRoberts - S.B.N. 144852
2    Clinton B. Monfort - S.B.N. 255609
     Anna M. Barvir - S.B.N. 268728
3    MICHEL & ASSOCIATES, P.C.
     180 E. Ocean Boulevard, Suite 200
4    Long Beach, CA 90802
     Telephone: 562-216-4444
5    Facsimile: 562-216-4445
     Email: cmichel@michellawyers.com
6
     Attorneys for Plaintiffs
7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                   SAN FRANCISCO DIVISION

11   ESPANOLA JACKSON, PAUL COLVIN,    )  **CASE NO. C09-2143-RS**
     THOMAS BOYER, LARRY BARSETTI,     )
12   DAVID GOLDEN, NOEMI MARGARET      )  **PLAINTIFFS' REPLY TO DEFENDANTS'**
     ROBINSON, NATIONAL RIFLE          )  **OPPOSITION TO MOTION FOR PARTIAL**
13   ASSOCIATION OF AMERICA, INC., SAN )  **JUDGMENT ON THE PLEADINGS;**
     FRANCISCO VETERAN POLICE          )  **EXHIBITS "A - I"**
14   OFFICERS ASSOCIATION,             )
                                       )  Fed. R. Civ. P. 12(c)
15            Plaintiffs               )
                                       )  Hearing:  July 12, 2012
16        vs.                          )  Time:     1:30 p.m.
                                       )  Place:    Courtroom 3 - 17th Floor
17   CITY AND COUNTY OF SAN            )            450 Golden Gate Ave.
     FRANCISCO, THE MAYOR OF           )            San Francisco, CA 94102
18   SAN FRANCISCO, AND THE CHIEF      )
     OF THE SAN FRANCISCO POLICE       )
19   DEPARTMENT, in their official capacities, )
     and DOES 1-10,                    )
20                                     )
              Defendants.              )
21                                     )
     _____ )
22

23

24

25

26

27

28

# TABLE OF CONTENTS

PAGE(S)

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    JUDGMENT ON THE PLEADINGS IS APPROPRIATE BECAUSE
       THERE IS NO ISSUE OF MATERIAL FACT AND THE CITY
       ASSERTS NO VIABLE DEFENSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.    *Heller* Endorses a Scope-Based Analysis, Not a Means-End
             Approach That Necessarily Entails a Balancing of Interests. . . . . . . . . . . . . 4

       B.    If the Court, However, Chooses to Adopt a Means-End Test for
             Second Amendment Challenges, Strict Scrutiny Must Apply. . . . . . . . . . . . . 5

IV.    SECTION 4512 VIOLATES THE SECOND AMENDMENT. . . . . . . . . . . . . . . 7

       A.    The City's Requirement That Handguns Be Kept Locked Up
             When Not Being "Carried" Restricts the Right to Keep and Bear
             Arms for the "Core Lawful Purpose" of Self-Defense in the Home. . . . . . . . . 7

       B.    The City's Locked-Storage Requirement Cannot Survive *Heller's*
             Scope-Based Approach; Neither the City's Answer Nor Its
             Opposition Refute This. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       C.    The City's Locked-Storage Law Cannot Survive Any Heightened
             Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.     SECTION 613.10(g) VIOLATES THE SECOND AMENDMENT. . . . . . . . . . . 10

       A.    The City's Ammunition Sales Ban Restricts Second Amendment
             Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       B.    Bans on the Sale of Arms in "Common Use" Are Unconstitutional in
             the Wake of *Heller* and *McDonald* – Under Any Standard of Review. . . . . . . 12

             1.    There Is No Historical Record Supporting Bans on the Sale of
                   Expanding Ammunition or Other Protected Arms. . . . . . . . . . . . . . . . . . 12

             2.    The City's Ban on the Sale of Expanding and/or Fragmenting
                   Ammunition Fails Under Any Level of Heightened Scrutiny. . . . . . . . . . 13

       C.    The City's Ban on the Sale of "Ammunition That Does Not Serve a
             Sporting Purpose" Cannot Survive Judicial Review, Under Any Test. . . . . . . 14

VI.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**TABLE OF AUTHORITIES**

**PAGE(S)**

**STATE CASES**

*Fiscal v. City and County of San Francisco,*
        158 Cal. App. 4th 895 (Cal. App. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**FEDERAL CASES**

*Bd. of Trustees of State Univ. of N.Y. v. Fox,*
        492 U.S. 469 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Boy Scouts of America v. Dale,*
        530 U.S. 640 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Brown v. Entm't Merchs. Ass'n,* __ U.S. __,
        131 S. Ct. 2729 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
        447 U.S. 557 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Citizens United v. Fed. Election Comm'n,* __ U.S. __,
        130 S. Ct. 876 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Clingman v. Beaver,*
        544 U.S. 581 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Clark v. Jeter,*
        486 U.S. 456 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Dearth v. Holder,*
        641 F.3d 499 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ezell v. City of Chicago,*
        651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Gowder v. City of Chicago,*
        No. 11-1304, 15 (N.D. Ill. June 19, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Griswold v. Connecticut,*
        381 U.S. 479 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Heller v. District of Columbia,*
        554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Heller v. District of Columbia* (*Heller II*),
        670 F.3d 1244 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Kelo v. City of New London, Conn.,*
        545 U.S. 469 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

1

## **TABLE OF AUTHORITIES**

2

PAGE(S)

3

### **FEDERAL CASES (CONT.)**

4

*Kwong v. Bloomberg,*
    No. 11-2356, 2012 WL 995290, at *11 (S.D. N.Y. Mar. 26, 2012).. . . . . . . . . . . . . . . 7

5

*McDonald v. City of Chicago,*
    _U.S._, 130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

6

7

*Nordyke v. King,*
    664 F.3d 774 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

8

*Payton v. New York,*
    445 US. 573 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

9

10

*Parker v. District of Columbia,*
    478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

11

*Qwest Commc'ns Corp. v. City of Berkeley,*
    208 F.R.D. 288 (N.D. Cal. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

12

13

*Reno v. Flores,*
    507 U.S. 292 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

14

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15

16

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
    411 U.S. 1 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

17

*Tashjian v. Republican Party of Conn.,*
    479 U.S. 208 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18

19

*Timmons v. Twin Cities Area New Party,*
    520 U.S. 351 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

20

*United States v. Booker,*
    644 F.3d 12 (1st Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21

22

*United States v. Chester,*
    628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

23

*United States v. Masciandaro,*
    638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

24

25

*United States v. Marzarella,*
    614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

26

*United States v. Playboy Entm't Group, Inc.,*
    529 U.S. 803 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

27

28

# **TABLE OF AUTHORITIES**

**PAGE(S)**

## **FEDERAL CASES (CONT.)**

*United States v. Salerno,*
  481 U.S. 739 (1987)................................................... 3

*United States v. Skoien,*
  614 F.3d 638 (7th Cir. 2010)....................................... 7

*United States v. Williams,*
  616 F.3d 685 (7th Cir. 2010)....................................... 7

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989)................................................. 10

## I.   INTRODUCTION

The City characterizes its locked-storage requirement as "modest" and having "no impact at all on the ability of handgun owners to use their firearms in case of a self-defense emergency." (Defs.' Opp'n 1:1-4.) As noted in Plaintiffs' motion, however, the City's "modest requirements" are among the most severe in the nation, forcing residents to keep their handguns locked up unless "carried on the person" – under *all* circumstances. Further, the "impact" on one's ability to use firearms in a self-defense emergency is obvious, especially in the case of a late-night attack – as shown at oral argument in *Heller*, where the Supreme Court found the "no impact" argument humorous. (Pls.' Mot. 13:11-21, 14:1-13.) Yet the City repeats that claim here. The City's response to this obvious problem is that: "If Plaintiffs fear nighttime burglary and wish to sleep with their guns holstered to their bodies, they are free to do so under the plain terms of the ordinance." (Defs.' Opp'n 10:5-7.) While the Court found the "no impact" claim humorous, it no doubt would find the "sleeping with loaded guns" argument absurd.

In similar fashion, the City defends its ammunition ban by claiming Plaintiffs cannot prove that the ammunition in question is "the most commonly used" for self-defense. But Plaintiffs never made that assertion, nor is that the test. The question is whether the ammunition is in "common use." And it is. That is a fact that the City cannot, and does not, dispute. The City thus flatly bans the sale of protected ammunition – a prohibition that cannot withstand *any* sort of judicial scrutiny in light of *Heller*. Here too, the City's "modest" restrictions are extreme.

There are only two material facts at issue in this case: (1) whether a gun in a locked box is "inoperable" and (2) whether the ammunition law bans sales of ammunition in "common use" for lawful purposes. Both are indisputably true. Because the City cannot explain how to operate a gun in a locked box, or deny that the ammunition banned is in common use, it raises irrelevant facts – some disputed, some not – and demands that this Court balance them. The Supreme Court did not engage in such balancing of facts or "findings" in *Heller* or *McDonald*, nor should this Court do so, here. The City's laws infringe upon the exercise of a fundamental, enumerated right by law-abiding adults for a lawful purpose – the right's *core* purpose – within the sanctity of their own homes. Such laws cannot survive any judicial review.

1

**II.    JUDGMENT ON THE PLEADINGS IS APPROPRIATE BECAUSE THERE IS NO ISSUE OF MATERIAL FACT AND THE CITY ASSERTS NO VIABLE DEFENSE**

When brought by a plaintiff, judgment on the pleadings is appropriate when the answer fails to assert a *viable* affirmative defense. *Qwest Commc'ns Corp. v. City of Berkeley*, 208 F.R.D. 288, 291 (N.D. Cal. 2002). But, as the City would have it, it should prevail if it asserts *any* affirmative defense, regardless of whether it is supported by the law or by *material* facts. (Defs.' Opp'n 5:1-2.) The City's defenses are supported by neither.

Instead, the City has continued its attempt to turn this case into a debate over irrelevant factual issues. The City's efforts thus far include inquiries into whether the challenged ordinances have been enforced against Plaintiffs, the details of every firearm Plaintiffs have possessed since 2007, including the serial numbers of those guns, and requests for gun manufacturers' liability disclaimers regarding the storage of firearms. (*See* Defs.'s Interrogs. to Pls. Jackson, Colvin, Boyer, Barsetti, and Golden, attached as Exs. A through E; Defs.' Subpoenas to Produc. Docs. to Winchester Repeating Arms, Smith & Wesson Corp., and Beretta USA Corp., attached as Exs. F through H.) The City now raises the accessibility of gun lockboxes, the sufficiency of fully-jacketed ammunition, and the availability of ammunition in other jurisdictions. And it introduces studies and legislative findings of "fact" to justify its restrictions on core protected conduct.

Plaintiffs are not asking the Court to reject factual contentions made by the City. Rather, Plaintiffs note that such facts are not relevant to a determination of whether the government can demand that, if law-abiding adults desire to keep an unlocked firearm in their homes at night, they must sleep with it in a holster attached to their bodies. The City's factual claims are also irrelevant to a determination of whether the government may flatly ban the sale of protected ammunition.

It is wholly irrelevant whether Plaintiffs are capable of opening a gun lockbox quickly, of purchasing other ammunition "sufficient" for self-defense purposes, or of traveling outside the city to acquire the banned ammunition. It is further unnecessary for Plaintiffs to show that the banned ammunition is the "*most* commonly used" ammunition; the test is "common use." The validity of the City's laws does not require resolution of any of these factual debates. *See infra* Part III (discussing analysis of Second Amendment challenges); Pls.' Mot. Parts II.A-B (same).

REPLY TO OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS C-09-2143-RS

1    The only "factual" issues relevant to whether the City's gun laws violate the Second

2    Amendment, i.e., that a locked firearm is inoperable and that the banned ammunition is in

3    "common use" for lawful purposes, are not in controversy. It is beyond dispute that a locked

4    firearm is not "operable" (i.e., it is not capable of being fired), and the City does not counter this

5    seemingly obvious point. It is also beyond dispute that the banned ammunition is in "common

6    use" for lawful purposes. Plaintiffs submitted ample judicially noticeable information on this

7    point – and the City itself does not dispute that the ammunition is in "common use."

8    Looking again to the City's "findings," the City cannot legislatively conclude that their

9    justifications are sufficient as a matter of law. Any attempt by the City to rely on those findings

10   that state that the challenged ordinances pose no substantial burden on the right to self-defense in

11   the home, or that the City has a "legitimate, important, and compelling" interest in the regulation,

12   is inappropriate even upon a motion for judgment on the pleadings. Such findings are purely

13   conclusions of law. The Court should not permit the legislature to usurp its authority to resolve

14   the legal questions presented. *See Kelo v. City of New London, Conn.*, 545 U.S. 469, 517-18

15   (2005) (Thomas, J., dissenting) (citing *Payton v. New York*, 445 US. 573, 589-90 (1980)).

16   Finally, the standard for facial challenges set out in *United States v. Salerno*, 481 U.S. 739

17   (1987) does not preclude Plaintiffs' facial claim. The challenged ordinances are not merely invalid

18   under *some* circumstances or as applied to *some* individuals. They proscribe protected activities

19   *regardless of the circumstances.* The government simply cannot require residents to keep their

20   firearms inoperable in their homes or ban the sale of protected ammunition.

21   **III.   STANDARD OF REVIEW**

22   *Heller* and *McDonald*, while not settling on a framework for all Second Amendment

23   challenges, leave little doubt that courts are to assess gun laws based on history and tradition, and

24   not by resorting to interest-balancing tests. To be sure, *Heller* rejects the tiers-of-scrutiny approach

25   the City advocates. *Heller*, 554 U.S. at 628 n.27, 634-35; *see also Heller v. District of Columbia*

26   (*Heller II*), 670 F.3d 1244, 1271-74 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). But if this court

27   adopts a means-end approach, strict scrutiny must apply. There are no factors militating in favor

28   of a lesser standard, so the general rule demanding strict scrutiny of laws that "impinge upon"

3

1  fundamental rights controls. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16-17 (1973).

2      **A.**   ***Heller* Endorses a Scope-Based Analysis, Not a Means-End Approach That Necessarily Entails a Balancing of Interests**

3

4      *Heller* advances a scope-based analytical approach that determines first whether the law

5  restricts activity within the scope of the right as originally understood, and second whether the

6  regulation is so commonplace in our history and traditions that the scope of the fundamental right

7  to keep and bear arms must be understood in light of it. *See Heller v. District of Columbia*, 554

8  U.S. 570, 634-35 (2008); Oral Arg. at 44, *Heller*, 554 U.S. 570 (No. 07-290).

9      The Court's later decision in *McDonald* further underscores the notion that history and

10  tradition, rather than burdens and benefits, should guide analyses of Second Amendment

11  challenges. Like *Heller*, *McDonald* did not use balancing tests and expressly rejected judicial

12  assessment of "the costs and benefits of firearms restrictions," stating that courts should not make

13  "difficult empirical judgments" about the efficacy of particular gun regulations. *McDonald v.*

14  *City of Chicago*, 130 S. Ct. 3020, 3050 (2010). This language is compelling. Means-end tests, like

15  strict or intermediate scrutiny, necessarily require the assessment of the "costs and benefits" of

16  government regulations, as well as "difficult empirical judgments" about their effectiveness.[1] The

17  Court's clear rejection of such inquiries is incompatible with the means-end approach that the City

18  advances.  The City's opposition wholly ignores this framework and Plaintiffs' application of it.

19      Instead, the City advances a two-step approach that "asks whether the challenged law

20  burdens conduct that falls within the scope of the Second Amendment right, as historically

21  understood" and, if it does, applies a means-end test chosen based on the severity of the burden on

22  the right to keep and bear arms. (Defs.' Opp'n. 8:1-7.) Under the City's framework, history and

23  tradition serve only as a threshold to determine whether the challenged law implicates the

24  individual right. (*Id.*) But, as explained in Plaintiffs' moving papers, *Heller* and *McDonald* set

25

26     [1]  The City's reliance on "studies" to justify the challenged ordinances' restriction on core

27  conduct "creates exactly the type of problem identified by Justice Scalia in *Heller I*, since when reviewing the constitutionality of an ordinance under a balancing test, as opposed to under a text,

28  history, and tradition approach, for every study, there can be a credible or convincing rebuttal study." *See Gowder v. City of Chicago*, No. 11-1304, slip op. at 15 (N.D. Ill. June 19, 2012).

forth a test based wholly on text, history, and tradition. (Pls.' Mot. 7:17-21, 9:19-25.)

The City's reliance on election law cases, like *Clingman v. Beaver*, 544 U.S. 581 (2005), to bolster its two-step approach is misplaced. The United States Constitution explicitly grants states the broad authority to prescribe reasonable regulations to govern the electoral process. *See Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986). As such, "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). While the City is correct to cite *Clingman* for the general proposition that *all* laws regulating core fundamental rights need not survive the most exacting scrutiny, it overlooks the constitutionally granted authority that justifies the sliding-scale approach to determining the standard of review applied in each election law case. In the Second Amendment context, however, there is no explicit countervailing constitutional interest that necessitates a lesser standard.

This is not to say that a number of circuit courts have not adopted an approach that requires means-end analysis, the vigor of which depends on the severity of the burden. (Defs.' Opp'n 8:1-13.) But they have done so in error. Neither *Heller* nor *McDonald* support adoption of such an approach. And doing so requires those courts to ignore or discount the many passages from *Heller* and *McDonald* that rely on history and tradition and largely condemn the use of interest-balancing tests, and in no event advocate for the adoption of a particular means-end approach. The Ninth Circuit seems to understand the folly of adopting this analysis, having vacated the opinion of a three-judge appellate panel engaging in a similar discussion. *Nordyke v. King*, 664 F.3d 774 (9th Cir. 2011). With no controlling framework in the Ninth Circuit, this Court has the chance to straighten course and choose an analysis more faithful to the guidance of *Heller* and *McDonald.*

**B.   If the Court, However, Chooses to Adopt a Means-End Test for Second Amendment Challenges, Strict Scrutiny Must Apply**

Should the Court hold that restrictions on the core right of law-abiding citizens to self-defense in the home are subject to means-end analysis, strict scrutiny must be the test. The City claims that intermediate scrutiny (or less ) is appropriate "for all but the most severe of Second

5

1    Amendment deprivations." (Defs.' Opp'n 13:16-19.)[2] But this argument conflicts with the

2    protection courts afford to core areas of other fundamental, enumerated rights. And it rests on

3    cases involving some countervailing factor not present in *Heller* (e.g., prohibited person, sensitive

4    place, unprotected firearm). Here, no such factors are in play.

5        Just as "any law regulating the content of speech is subject to strict scrutiny, . . . any law

6    that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding

7    citizen would be subject to strict scrutiny." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th

8    Cir. 2011). Courts uniformly apply strict scrutiny when restrictions on *core* First Amendment

9    conduct is concerned, including regulations on the content of speech, *United States v. Playboy*

10   *Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000),[3] political expenditures, *Citizens United v.*

11   *Fed. Election Comm'n*, __ U.S. __, 130 S. Ct. 876, 898 (2010), and expressive association,

12   *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). In these contexts, courts consider the severity

13   of the burden a regulation places on core protected conduct *only* in weighing whether the

14   regulation survives strict scrutiny – *not* in determining the applicable standard of review. *See*

15   *Citizens United*, 130 S. Ct. at 898-99; *Playboy Entm't Grp., Inc.*, 529 U.S. at 812-13; *Boy Scouts*

16   *of America v. Dale*, 530 U.S. 640, 658-59 (2000); *Roberts*, 468 U.S. at 658-59. Here too, where

17   the laws restrict the *core* Second Amendment right to self-defense in the home by law-abiding

18   adults, strict scrutiny must apply regardless of the severity of the burden imposed. In short, "strict

19   scrutiny [is] important to protect the core right of self-defense of a law-abiding citizen in his

20   home[.]" *Masciandaro*, 638 F.3d at 471.

21       The City argues that Plaintiffs' challenge is at most entitled to intermediate scrutiny because

22   the degree of burden on Plaintiffs' rights is minimal. (Defs.' Opp'n 15:3-16, 20:1-16.) But this

23   argument rests on the incorrect premise that the severity of a burden on Plaintiffs' core protected

24

25       [2] Laws restricting Second Amendment conduct demand more than rational basis review.
     Whatever else *Heller* left for future courts to decide, it is clear on this point. 554 U.S. at 628 n.27.

26

27       [3] The City points to a single speech case in which the court applied intermediate scrutiny.
     (Defs.' Opp'n 8:19-21 (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447
28   U.S. 557, 561-65 (1980).) That case, however, is inapposite in that it dealt with the regulation of
     commercial speech – activity not at the core of the First Amendment.

1    conduct is relevant to the level of scrutiny that should be applied. As described above, this

2    approach derives no support from *Heller* or *McDonald*, and it stands in direct opposition to the

3    protection courts afford to core areas of enumerated, fundamental rights. In any event, the City's

4    restrictions place a heavy burden on Plaintiffs' Second Amendment rights because they restrict

5    conduct at the very core of the right, triggering the most exacting standard of review.

6         Further, those courts that have applied intermediate scrutiny have done so in cases

7    presenting vastly different questions than those presented here – where conduct undoubtedly at the

8    very core of the Second Amendment is directly implicated. Almost without exception, these cases

9    do not involve the right to armed self-defense by law-abiding citizens within the home.[4] In fact,

10   most involve conduct decidedly *outside* the core Second Amendment right, including possession

11   by violent criminals, *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011), *United States v.*

12   *Chester*, 628 F.3d 673, 680, 682-83 (4th Cir. 2010), *United States v. Williams*, 616 F.3d 685, 692

13   (7th Cir. 2010), *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010), possession in places

14   the court determined to be "sensitive," *Masciandaro*, 638 F.3d at 471, and possession of arms the

15   court determined are not in "common use" for lawful purposes, *United States v. Marzarella*, 614

16   F.3d 85 (3d Cir. 2010). The clear implication is that laws that do restrict the core right to armed

17   self-defense in the home by law-abiding citizens with protected arms, like the laws at issue here,

18   require *more* exacting scrutiny. Strict scrutiny is that test.

19   **IV.    SECTION 4512 VIOLATES THE SECOND AMENDMENT**

20       **A.    The City's Requirement That Handguns Be Kept Locked Up When Not Being**
21          **"Carried" Restricts the Right to Keep and Bear Arms for the "Core Lawful Purpose" of Self-Defense in the Home**

22        The City's locked-storage law plainly restricts the right to keep and bear operable arms

23   within the home for the "core lawful purpose" of self-defense. The restriction is obvious and

24   significant. The City fails to address any *material* fact in its answer or opposition that establishes

25

26       [4] The only cases involving firearm possession in the home at all dealt with challenges to mere permitting or registration laws. Those laws do not directly conflict with core conduct in the

27   manner of City's laws, which ban the sale of protected arms and prohibit residents from keeping operable firearms in their homes for self-defense. *Heller II*, 670 F.3d at 1254; *Ezell v. City of*

28   *Chicago*, 651 F.3d 684 (7th Cir. 2011); *Kwong v. Bloomberg*, No. 11-2356, 2012 WL 995290, at *11 (S.D. N.Y. Mar. 26, 2012).

1  otherwise. And no amount of legislative "fact" finding can rationalize away the restriction that the

2  City imposes on conduct at the core of the Second Amendment.

3      It is in the dead of night, when robberies of occupied dwellings are most prevalent, that the

4  City's locked-storage requirement presents the most obvious restriction. (Pls.' Mot. 13:2-21

5  (citing Oral Arg. at 83-84, *Heller*, 554 U.S. 570 (No. 07-290).) The law requires Plaintiffs, under

6  threat of criminal penalty, to choose between locking up their handguns through the night when

7  they are at highest risk for attack, or sleep with their loaded guns strapped to their bodies. (Defs.'

8  Opp'n 10:2-7.) The "choice" is as false as it is absurd.

9      It is irrelevant that the City has determined that "there are affordable lockboxes with

10  numeric keypads that provide ready access to a stored gun 'in just two to three seconds' and are

11  'easy to open in the dark.'" (Defs.' Opp'n 10:8-10.) How quickly one's firearm might be

12  *rendered* operable (with the right technology) simply has no bearing on whether the City's

13  requirement infringes Plaintiffs' core right to keep their arms operable for immediate self-defense

14  in the home. To be sure, physical impossibility to exercise the right to self-defense is not the test

15  for determining whether a firearm restriction is valid. (*See* Pls.' Mot. 14 n.16.) If it were, *Heller*

16  would have upheld the District's handgun ban, for long guns remained readily available for armed

17  self-defense. But, as *Heller* found, the District could not save its law just because exercise of the

18  right remained "possible." 554 U.S. at 629. Similarly, the City's locked-storage law is not valid

19  because it might be possible to render a firearm operable in time to save one's life.

20      Further, *Heller* does *not* suggest that locked-storage laws like the City's are "categorically

21  valid" or even within any of the "categories signaled by the Supreme Court as constitutional."

22  (Defs.' Opp'n 12:8-17.) The Court's statement that its "analysis does [not] suggest the invalidity

23  of laws regulating the storage of firearms to prevent accidents[,]" *Heller*, 554 U.S. at 632, merely

24  reassures state and local governments that storage ordinances are not *necessarily* invalidated by its

25  holding. Such language certainly does not insulate from meaningful judicial review one of the

26  most extreme storage laws remaining in the country – especially considering that *Heller* itself

27  invalidated the only locked-storage law it had the opportunity to consider.

28  / / /

**B.    The City's Locked-Storage Requirement Cannot Survive *Heller's* Scope-Based Approach; Neither the City's Answer Nor Its Opposition Refute This**

The City has not met its burden to establish that laws requiring people to keep their handguns locked up when in their own homes regardless of the circumstances were part of the historical narrative surrounding the Second Amendment when it was drafted. And Plaintiffs submit that it cannot, for there is no such history or tradition regarding mandatory locked storage.

In reviewing potentially relevant history and tradition, both Plaintiffs and the City have referenced the same three Framing-era regulations. (Pls.' Mot. 14:22-15:12; Defs.' Opp'n 10:20-11:21.) Not one of those laws, however, establishes a history and tradition of laws that, like the City's, mandate locked storage of firearms in the home regardless of the circumstances. Two of the ordinances regulated only the storage of large quantities of gunpowder, and were motivated by an expressed desire to prevent widespread fires. *Heller*, 554 U.S. at 631. And the only ordinance that did prohibit the taking of loaded firearms into buildings was similarly aimed at reducing the risk of fire. *Id.* Unlike the City's generalized interest in preventing accidents, those ordinances do not claim some amorphous regulatory interest in public safety, nor do they reference the harm posed by unsecured firearms. Rather, they are targeted at a specific harm – entirely unrelated to the storage and possession of firearms for self-defense. *See id.* at 632. Plaintiffs assert that there is no history and tradition justifying ordinances like the City's that mandate the locked storage of firearms in the home regardless of the circumstances, and the City cites to none.

In any event, the City cannot justify its extreme locked-storage requirement on so few marginally relevant Framing-era ordinances. *See Heller*, 554 U.S. at 632. This is especially clear considering that the gun storage provisions of nearly every other jurisdiction come no where close to the restriction the City imposes in requiring locked storage at all times. They instead permit gun owners to keep their firearms operable for self-defense as they see fit, but absolve them of liability if an unauthorized person gains access to and misuses their firearms. (Pls.' Mot. 16:20-24, n.19.) The storage law most similar to the City's was struck down in *Heller*. 554 U.S. at 635.

**C.    The City's Locked-Storage Law Cannot Survive Any Heightened Scrutiny**

To pass muster under even intermediate scrutiny, which is not appropriate in this case, the

9

REPLY TO OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS C-09-2143-RS

1    City must show that its locked-storage law is "*substantially* related to an important governmental

2    objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (emphasis added). That is, the City must

3    establish a tight "fit" between the locked-storage requirement and a substantial governmental

4    interest, a fit "that employs not necessarily the least restrictive means but . . . a means *narrowly*

5    *tailored* to achieve the desired objective." *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S.

6    469, 480 (1989) (emphasis added). "The requirement of narrow tailoring is satisfied so long as the

7    regulation promotes a substantial governmental interest that would be achieved less effectively

8    absent the regulation, and the means chosen are not substantially broader than necessary to

9    achieve that interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 799-800 (1989).

10    Here, examples abound of narrowly tailored laws that promote the same governmental

11    interest, but do so in a way that at least attempts to respect the rights of law-abiding citizens to

12    keep their firearms operable for immediate self-defense. (Pls.' Mot. 16 n.19.) The City's law is

13    not so tailored. It instead broadly sweeps up all gun owners and requires they keep their handguns

14    inoperable regardless of the circumstances. And nothing in the City's answer, opposition, or

15    "fact" finding legislation indicates that those more narrowly tailored laws are less effective means

16    for achieving the City's governmental interest. Indeed, by absolving gun owners of criminal

17    and/or civil liability in the case one's firearms are misused by an unauthorized person, such laws

18    provide *substantial* incentive to keep guns locked when they are not under the owners' control.

19    Because the City's locked-storage requirement cannot survive even intermediate scrutiny,

20    and because the City makes no serious attempt to justify its regulation under strict scrutiny,[5] it is

21    unnecessary to revisit the many reasons it must likewise fail under that test. (Pls.' Mot. 16-17.)

22    **V.    SECTION 613.10(g) VIOLATES THE SECOND AMENDMENT**

23    **A.    The City's Ammunition Sales Ban Restricts Second Amendment Conduct**

24    Section 613.10(g) plainly restricts Plaintiffs' rights by banning the sale of ammunition in

25

26    _____

     [5] The City half-heartedly argues that its "findings that locking guns prevents accidents, thefts,

27    and suicides" saves its locked-storage regulation even under the exacting strict scrutiny test.
     (Defs.' Opp'n 16:10-12.) The argument is wrong. Nowhere does the City even attempt to establish

28    that its regulation is narrowly tailored to its interests in accident, theft, and suicide prevention, as
     it must under strict scrutiny.

REPLY TO OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS C-09-2143-RS

1   "common use" for self-defense and by banning civilian purchases of ammunition that does not

2   "serve a sporting purpose." The City does so despite *Heller*'s express instruction that the Second

3   Amendment protects "arms that are in common use" for the "core lawful purpose of self-defense."

4   (Pls.' Mot. 18:12-24.) Regardless, the City claims its ban does not restrict Second Amendment

5   conduct because the "historic scope of the right tolerates [such] prohibitions" and due to the

6   availability of fully-jacketed and "sporting purpose" ammunition. (Defs.' Opp'n 18:19-22.) The

7   City's arguments miss the mark on both counts.

8       The existence of any historical, commonplace restrictions is relevant to a determination of

9   whether a challenged law is a permissible restriction under *Heller*'s scope-based approach, *see*

10  *supra* Part III.A, not whether the restricted conduct is outside the scope of the right altogether.

11      As for the City's contention that other types of ammunition are available, this is equally

12  irrelevant to a determination of whether the restricted conduct falls within the scope of the Second

13  Amendment. In any event, impossibility is *not* the test. *Heller* is clear that just because some other

14  arm may "suffice" for self-defense – that does not save a ban on arms in "common use." "It is no

15  answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as

16  the possession of other firearms (i.e., long guns) is allowed." *Heller*, 554 U.S. at 629. The court of

17  appeal in *Heller* made a nearly identical ruling:

18          The District contends that since it only bans one type of firearm, "residents still
            have access to hundreds more," and thus its prohibition does not implicate the
19          Second Amendment because it does not threaten total disarmament. *We think that
            argument frivolous.* It could be similarly contended that all firearms may be banned
20          so long as sabers were permitted.

21  *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) (emphasis added).

22      The initial inquiry under *Helle*r properly looks to whether conduct falls within the scope of

23  the Second Amendment as originally understood. The Supreme Court went on to clarify that the

24  Second Amendment protects arms "typically possessed by law-abiding citizens for lawful

25  purposes" or those in "common use." *Heller*, 554 U.S. at 624-25."[6] Plaintiffs' moving papers

26  note, and the City does not dispute, that the Second Amendment thus necessarily protects the

27  _____

28      [6] The City incorrectly argues that the banned ammunition must be the "*most* commonly" used
        ammunition.

REPLY TO OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS C-09-2143-RS

1   acquisition of ammunition in "common use" for "lawful purposes." (Pls.' Mot. 18:12-20.) As it is

2   beyond dispute that the prohibited ammunition is in "common use" – and because the City itself

3   does not dispute this – the City's ammunition ban restricts conduct within the scope of the Second

4   Amendment. (Pls.' Mot. 21:14-19; Req. Jud. Notice, Exs. K-T; *see* Defs.' Opp'n 16:17-21:7.)

      **B.**     **Bans on the Sale of Arms in "Common Use" Are Unconstitutional in the
Wake of *Heller* and *McDonald* – Under Any Standard of Review**

7   Contrary to the City's assertions, Section 613.10(g) does not merely regulate the manner in

which arms may be sold. The City's ban flatly prohibits the sale of protected ammunition. It

cannot be argued that, after *Heller*, a ban on the sale of protected arms would survive judicial

10  review. For the right to keep and bear arms would be meaningless if the government could ban the

sale of the very arms that the Second Amendment protects. (Pls.' Mot. 18:25-27.)

      **1.**     **There Is No Historical Record Supporting Bans on the Sale of
Expanding Ammunition or Other Protected Arms**

13      Generally, laws that prohibit access to fundamental rights are unconstitutional. *See Brown*

14  *v. Entm't Merchs. Ass'n*, ___ U.S. ___, 131 S. Ct. 2729, 2736 (2011) (access to violent video games

15  protected by the First Amendment); *Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965)

16  (access to contraceptives). In *Heller*, the Supreme Court made clear that bans on protected arms

17  cannot stand – without resorting to means end scrutiny. *Heller*, 554 U.S. at 636. Nothing in our

18  nation's history suggests tolerance for laws that flatly ban the sale of arms that are in common use.

19      The City nonetheless attempts to justify its ammunition ban by pointing to three state

20  statutes, claiming that prior bans on the sale of common arms have existed throughout American

21  history, thus warranting its ban on the sale of ammunition that is in "common use." (Defs.' Opp'n

22  18:9-17.) But three statutes enacted well after the adoption of the Second Amendment are

23  insufficient to establish that the enumerated right should be understood in light of those

24  restrictions. *See Heller*, 554 U.S. at 632.

25      Further, it strains all sense of reason to suggest, as the City does, that these statutes could

26  survive a constitutional challenge in light of *Heller*. To be sure, each of the statutes relied on by

27  the City proscribed the sale of handguns – the very type of firearm *Heller* expressly held to be in

28  "common use" for lawful purposes and protected by the Second Amendment. 554 U.S. at 628. It

1    is untenable to conclude that, after *Heller*, bans on the sale of protected arms that are in "common

2    use" would survive a constitutional challenge. The City offers no authority suggesting otherwise.

3              **2.      The City's Ban on the Sale of Expanding and/or Fragmenting
                        Ammunition Fails Under Any Level of Heightened Scrutiny**

4

5              The City advances no legitimate reason (or even a rational explanation) why the

6    government may ban the sale of protected arms despite being precluded from banning the

7    possession of those same protected arms. And the City's blanket sales prohibition is in no way

8    sufficiently tailored to its stated public safety objectives. *See Reno v. Flores*, 507 U.S. 292, 301-02

9    (2008); *Bd. of Trustees of State Univ. of N.Y.*, 492 U.S. at 480. Ultimately, the City's ammunition

10   ban represents a policy choice as to the types of protected arms it desires its residents to use. But,

11   as *Heller* made clear, such policy choices are off the table when considering commonly used,

12   constitutionally protected, firearms and ammunition. *See* 554 U.S. at 636.

13             Moreover, governmental interests in banning handguns are virtually identical to the City's

14   purported interests in banning hollow-point ammunition – to decrease violent injuries caused by

15   handguns, whether through criminal misuse, accidents, or suicides through decreased availability

16   of such arms.[7] Despite these interests, the Supreme Court found the Districts' handgun ban

17   unconstitutional in *Heller* – making clear that even if the Court *had* adopted a means-end standard

18   of review, that the City's handgun ban would be unconstitutional under any test. 554 U.S. at 628-

19   29. The City's ammunition ban is similarly invalid.

20             The City cannot credibly claim that it may ban the sale of protected arms (whether a class

21   of firearms or ammunition), so long as it does not ban their possession. Because the government

22   cannot ban the sale of protected ammunition in "common use" for lawful purposes, the City has

23   not raised a viable defense.

24   / / /

25   _____

26        [7] The District of Columbia advanced these interests in support of its handgun ban in *Heller*, 554
     U.S. at 634, and the City itself advanced similar interests when it instituted its own handgun ban.
27   Proposition H, as approved by voters, Gen. Elec. (November 8, 2005) §§ 1-3, invalidated by
     *Fiscal v. City and County of San Francisco*, 158 Cal. App. 4th 895 (Cal. App. 2008) (attempting
28   to justify ban because "handgun violence is a serious problem" and because handguns contributed
     to 67% of firearms-related injuries and deaths).

REPLY TO OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS C-09-2143-RS

1    **C.    The City's Ban on the Sale of "Ammunition That Does Not Serve a Sporting Purpose" Cannot Survive Judicial Review, Under Any Test**

2

3        The City's "sporting purposes"-based ammunition ban is unconstitutional under any

4    standard of review because it directly contravenes the central component of the Second

5    Amendment – individual self-defense. *McDonald*, 130 S. Ct. at 3036.

6        The City's opposition ignores the Supreme Court's instruction that individuals have a

7    fundamental right to arms for the core purpose of *self-defense*, regardless of whether such arms

8    are used for *sporting purposes*. Instead, the City spends much of its argument attempting to give

9    its ordinance meaning by looking to federal statutes prohibiting importation of non-sporting arms.

10   But even if these federal statutes were appropriately examined to determine the meaning of

11   Section 613.10(g), neither the existence of these statutes, nor their meaning, save the City's ban

12   from constitutional infirmity. These statutes, enacted in the latter part of the twentieth century, do

13   not provide the required commonplace historical basis for limiting importation of arms to those

14   that serve a "sporting purpose" – let alone a historical basis for restrictions such as the City's.

15   Moreover, the drafters of those statutes did not have the benefit of the Supreme Court's guidance

16   in *Heller* and *McDonald* when crafting them. Finally, these statutes, unlike City's ammunition

17   ban, do not flatly ban the sale of all non-sporting arms.[8]

18       The City also attempts to characterize its law as a ban on arms that serve no "legitimate

19   purpose" other than criminal activities (Defs.' Opp'n 21:8-12, 22:13-15); but that is not what its

20   ordinance prohibits. Rather, the City's ordinance plainly bans the sale of ammunition that "does

21   not serve a *sporting* purpose," regardless of its suitability for self-defense. If the City wishes to

22   craft an ordinance to prohibit ammunition it maintains is used in crime that serves no legitimate

23   purpose, whether that purpose be self-defense, hunting, or sporting events – that is what it should

24   do. But the government simply cannot, in the wake of *Heller* and *McDonald*, ban the sale of

25

---

26       [8] Though not referenced by the City, 18 U.S.C. § 922(a)(9) *does* prohibit the mere acquisition

27   of non-sporting firearms – by non-resident aliens. (It is unlawful "for any person . . .  who does
     not reside in any State to receive any firearms unless such receipt is for lawful sporting purposes.)

28   This provision was also enacted in a pre-*Heller* environment, and it has since been challenged.
     *Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011), *remanded to* No. 09-00587 (D.D.C. 2009).

14

1   ammunition on the premise that it does not serve a "sporting purpose."

2        The City's ban is unconstitutional under any standard of review due to its direct conflict

3   with the core right to arms for self-defense. The City has failed to explain why its ordinance is

4   constitutional under *Heller*, as there is no commonplace historical tradition of banning self-

5   defense firearms and ammunition, instead only allowing citizens access to "sporting" arms.

6        Even if this Court were to employ a means-end model of review, the City offers no

7   explanation as to how a law that bans self-defense ammunition but allows "sporting" ammunition

8   would further its interests in public safety. It is illogical to suggest that criminals who might

9   purchase ammunition in San Francisco (or steal it from residents) would use self-defense

10  ammunition in the commission of crimes, but would not commit those crimes using "sporting"

11  ammunition.  And the City offers no explanation as to how the public is safer as a result of a law

12  that bans the smallest caliber of ammunition that does not "serve a sporting purpose," but allows

13  for the sale of much larger rounds so long as they have been used in a sporting event. Moreover,

14  the City's prohibition on the sale of non-sporting ammunition to all law-abiding citizens lacks the

15  required fit with its purported interests. And in no circumstance is the restriction narrowly

16  tailored, as it must be, to further those interests; this is a point even the City does not dispute.

17       In any event, this analysis is unnecessary because the City's ban clearly conflicts with the

18  core constitutional guarantee of armed self-defense in the home – without any historical support.

19  **VI.    CONCLUSION**

20       This case is important, but not difficult. The City's restrictions exist at the extreme end of

21  the gun-regulation continuum, they impinge upon core Second Amendment rights in the home,

22  and the material facts are indisputable. Plaintiffs thus ask this Court to declare the restrictions

23  unconstitutional, and grant Plaintiffs' motion for partial judgment on the pleadings.

24   Date: June 21, 2012                    MICHEL & ASSOCIATES, P.C.

25

26                                          s/ C. D. Michel
                                           _____
27                                         C. D. Michel
                                           Attorney for Plaintiffs

28

REPLY TO OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS C-09-2143-RS

1

**UNITED STATES DISTRICT COURT**

2

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

3

**SAN FRANCISCO DIVISION**

4

ESPANOLA JACKSON, PAUL COLVIN,   ) **CASE NO.: CV-09-2143-RS**
THOMAS BOYER, LARRY BARSETTI,    )

5

DAVID GOLDEN, NOEMI MARGARET     )
ROBINSON, NATIONAL RIFLE         ) **CERTIFICATE OF SERVICE**

6

ASSOCIATION OF AMERICA, INC., SAN )
FRANCISCO VETERAN POLICE         )

7

OFFICERS ASSOCIATION,            )
                                 )

8

    Plaintiffs                   )
                                 )

9

        vs.                      )
                                 )

10

CITY AND COUNTY OF SAN           )
FRANCISCO, THE MAYOR OF          )

11

SAN FRANCISCO, AND THE CHIEF     )
OF THE SAN FRANCISCO POLICE      )

12

DEPARTMENT, in their official capacities, )
and DOES 1-10,                   )

13

                                 )
    Defendants.                  )

14

                                 )
_____  )

15

IT IS HEREBY CERTIFIED THAT:

16

17

    I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 E. Ocean Blvd., Suite 200, Long Beach, California, 90802.

18

    I am not a party to the above-entitled action. I have caused service of

19

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS; EXHIBITS "A - I"**

20

on the following party by electronically filing the foregoing with the Clerk of the District Court

21

using its ECF System, which electronically notifies them.

22

Wayne Snodgrass, Deputy City Attorney

23

Christine Van Aken, Deputy City Attorney
Office of the City Attorney

24

1 Drive Carlton B. Goodlett Place
City Hall, Room 234

25

San Francisco, CA 94102

    I declare under penalty of perjury that the foregoing is true and correct. Executed on June

26

21, 2012.

                                        s/ C. D. Michel

27

                                        C. D. Michel
                                        Attorney for Plaintiffs

28