1  C. D. Michel - S.B.N. 144258
   Glenn S. McRoberts - S.B.N. 144853
2  Clinton B. Monfort - S.B.N. 255609
   Anna M. Barvir - S.B.N. 268728
3  **MICHEL & ASSOCIATES, P.C.**
   180 East Ocean Blvd., Suite 200
4  Long Beach, CA 90802
   Telephone: (562) 216-4444
5  Fax: (562) 216-4445
   cmichel@michellawyers.com
6
   Attorneys for Plaintiffs
7

8          **IN THE UNITED STATES DISTRICT COURT**

9        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10               **SAN FRANCISCO DIVISION**

11  ESPANOLA JACKSON, PAUL COLVIN,     ) **CASE NO. CV-09-2143-RS**
    THOMAS BOYER, LARRY BARSETTI,      )
12  DAVID GOLDEN, NOEMI MARGARET       ) **NOTICE OF MOTION AND MOTION FOR**
    ROBINSON, NATIONAL RIFLE           ) **PRELIMINARY INJUNCTION;**
13  ASSOCIATION OF AMERICA, INC., SAN  ) **MEMORANDUM OF POINTS AND**
    FRANCISCO VETERAN POLICE           ) **AUTHORITIES IN SUPPORT**
14  OFFICERS ASSOCIATION               )
                                       ) Fed. R. Civ. P. 65(a)
15        Plaintiffs,                  )
                                       ) Date:  October 4, 2012
16        vs.                          ) Time:  1:30 p.m.
                                       ) Place: Courtroom 3 - 17th Floor
17                                     )        450 Golden Gate Ave.
    CITY AND COUNTY OF SAN             )        San Francisco, CA 94102
18  FRANCISCO, THE MAYOR OF            )
    SAN FRANCISCO, AND THE CHIEF       )
19  OF THE SAN FRANCISCO POLICE        )
    DEPARTMENT, in their official capacities, )
20  and DOES 1-10,                     )
                                       )
21        Defendants.                  )
    _____)
22

23

24

25

26

27

28

# TABLE OF CONTENTS

PAGE(S)

NOTICE OF MOTION AND MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM OF POINTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE
        THE CHALLENGED PROVISIONS VIOLATE PLAINTIFFS'
        FUNDAMENTAL SECOND AMENDMENT RIGHT TO SELF-DEFENSE. . . . . . 6

        A.      Standard of Review Governing Second Amendment Challenges. . . . . . . . . . . 6

                1.      *Heller* and *McDonald* Endorse a Scope-Based Analysis, Not
                        a Means-End Approach that Necessarily Entails a Balancing
                        of Interests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                2.      Alternatively, Should the Court Adopt a Means-End Test
                        for Second Amendment Challenges, Strict Scrutiny Must
                        Apply. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.      Section 4512 Violates the Second Amendment. . . . . . . . . . . . . . . . . . . . . . . . 11

                1.      The City's Requirement that Handgun Owners Either Carry
                        Their Handguns or Keep Them Locked Up at All Times in
                        Their Homes Is Invalid Under *Heller's* Scope-Based Approach. . . . . . 11

                        a.      The City's Locked-Storage Law Restricts the Right to
                                Keep and Bear Arms for the "Core Lawful Purpose"
                                of Self-Defense in the Home. . . . . . . . . . . . . . . . . . . . . . . . . 11

# TABLE OF CONTENTS

PAGE(S)

        **b.**     **There Is No Historical or Traditional Support for Forcing Handgun Owners to Carry Their Firearms or Keep Them Locked Up at All Times in the Sanctity of Their Own Homes.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

    **2.**     **The City's Requirement that Handguns Be Kept Locked Up When Not Being "Carried" Within the Home Cannot Survive Strict Scrutiny – or Any Heightened Scrutiny.** . . . . . . . . . . . **14**

**C.**     **Section 613.10(g) Violates the Second Amendment.** . . . . . . . . . . . . . . . . . . . . **16**

    **1.**     **The Second Amendment Secures a Fundamental Right to Acquire Firearms and Ammunition for Self-Defense and the City's Ammunition Sales Ban Restricts that Right.** . . . . . . . . . . . **16**

        **a.**     **The City's Ban on the Commercial Sale of Ammunition in "Common Use" for Lawful Purposes Cannot Survive Judicial Review Under Any Test.** . . . . . . . . . . . . . . . . . . . . . . . **17**

            **i.**     **The City's Ban on the Sale of Expanding and/or Fragmenting Ammunition Is Categorically Invalid Under *Heller's* Scope-Based Analysis.** . . . . . . . . . . . . . **17**

            **ii.**     **The City's Ban on the Sale of Expanding and/or Fragmenting Ammunition Fails Under Any Level of Heightened Scrutiny.** . . . . . . . . . . . . . . . . . . . . . . . . **19**

**C.**     **The City's Ban on the Sale of "Ammunition that Does Not Serve a Sporting Purpose" Cannot Survive Judicial Review, Under Any Test.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

    **1.**     **The City's "Sporting Purposes"-Based Ammunition Ban Is Categorically Invalid Under *Heller's* Scope-Based Analysis.** . . . . . . . . **20**

    **2.**     **The City's "Sporting Purposes"-Based Ammunition Ban Fails Under Any Level of Heightened Scrutiny.** . . . . . . . . . . . . . . . . . . . . . . . **21**

**D.**     **Section 613.10(g) Is Void for Vagueness.** . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

1

## TABLE OF CONTENTS

2

PAGE(S)

3

4

5

II.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF PRELIMINARY
        INJUNCTION IS NOT ISSUED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

6

7       III.    THE BALANCE OF THE EQUITIES TIPS SHARPLY IN PLAINTIFFS'
        FAVOR  AND PRELIMINARY INJUNCTION IS IN THE PUBLIC

8       INTEREST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

9       CONCLUSION.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**PAGE(S)**

3

## <u>FEDERAL CASES</u>

4

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

5

*Associated Gen. Contractors  v. Coal. For Econ. Equity*,
    950 F.2d, 1401 (9th Cir.1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

6

*Bagget v. Bullitt*,
    377 U.S. 360 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

7

8

*Bateman v. Perdue*,
    No. 5:10-265, 2012 WL 3068580 (E.D. N.C. Mar. 29, 2012). . . . . . . . . . . . . . . . . . . 17

9

*Bd. of Trustees of State Univ. of N.Y. v. Fox*,
    492 U.S. 469 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19

10

*Boy Scouts of America v. Dale*,
    530 U.S. 640 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

11

*Brown v. Entm't Merchs. Ass'n*, __ U.S. __,
    131 S. Ct. 2729 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

12

*Citizens United v. Fed. Election Comm'n*, __ U.S. __,
    130 S. Ct. 876 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

13

*Clark v. Jeter*,
    486 U.S. 456 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

14

*Colautti v. Franklin*,
    439 U.S. 379 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

15

*District of Columbia v. Heller*,
    554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

16

*Elrod v. Burns*,
    427 U.S. 347 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

17

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

18

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

19

*Griswold v. Connecticut*,
    381 U.S. 479 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

20

*Haynes v. Office of the Attorney General Phill Kline*,
    298 F. Supp. 2d 1154 (D. Kan. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

PAGE(S)

3

**FEDERAL CASES (CONT.)**

4 | *Heller v. District of Columbia* (*Heller II*),
 | 670 F.3d 1244 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5

6 | *Hotel & Motel Ass'n of Oakland v. City of Oakland*
 | 344 F.3d 959 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

7 | *Klein v. City of San Clemente*,
 | 584 F.3d 1196 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

8

9 | *McDonald v. City of Chicago*,
 | 561 U.S. 2025(2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

10 | *Miles Christi Religious Order v. Twp. of Northville*,
 | 629 F.3d 533 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

11

12 | *Monterey Mechanical Co. v. Wilson*,
 | 125 F.3d 702 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

13 | *Preminger v. Principi*,
 | 422 F.3d 815 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

14

15 | *Reno v. Flores*,
 | 507 U.S. 292 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19

16 | *Richmond Newspapers v. Virginia*,
 | 448 U.S. 555 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

17

18 | *Roberts v. U.S. Jaycees*,
 | 468 U.S. 609 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

19 | *United States v. Booker*,
 | 644 F.3d 12 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

20

21 | *United States v. Chester*,
 | 628 F.3d 673 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

22 | *United States v. Decastro*,
 | 682 F.3d 160 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

23

24 | *United States v. Masciandaro*,
 | 638 F.3d 458 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

25 | *United States v. Marzzarella*,
 | 614 F.3d 85 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17

26

27 | *United States v. Playboy Entertainment Group, Inc.*,
 | 529 U.S. 803 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

28

1

<b><u>TABLE OF AUTHORITIES</u></b>

2

<b>PAGE(S)</b>

3

**FEDERAL CASES (CONT.)**

4

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

5

*United States v. Weaver*,
   No. 09-00222, 2012 WL 727488 (S.D. W. Va. Mar. 6, 2012). . . . . . . . . . . . . . . . .  10

6

7

*United States v. Williams*,
   616 F.3d 685 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

8

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

9

10

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

11

*Zepeda v. U.S. Immig. & Naturaliz. Serv.*,
   753 F.2d 719 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

12

13

**STATE CASES**

14

*Andrews v. State*,
   50 Tenn. 165, 178 (1871).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

15

16

*Fiscal v. City and County of San Francisco*,
   158 Cal. App. 4th 895 (Cal. App. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

17

18

**STATUTES, RULES & REGULATIONS**

19

Cal. Penal Code § 25100. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

20

Cal. Penal Code § 25105. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

21

Cal. Penal Code § 25200. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

22

Cal. Penal Code § 25205. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

23

Fla. Stat. § 790.174. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

24

Haw. Rev. Stat. § 134-10.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

25

Haw. Rev. Stat. § 707-714.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

26

720 Ill. Comp. Stat. 5/24-9(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

27

Iowa Code § 724.22(7).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

28

Mass. Gen. Laws ch. 140, § 131L. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

1

**TABLE OF AUTHORITIES**

2

**PAGE(S)**

3

**STATUTES, RULES & REGULATIONS (CONT.)**

4

Md. Code Ann., Crim. Law § 4-104. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Minn. Stat. § 609.666.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

N.H. Rev. Stat. Ann. § 650-C:1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

N.J. Stat. Ann. § 2C:58-15.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

N.J. Stat. Ann. § 2C:39-3(f),(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

N.C. Gen. Stat. § 14-315.1.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

R.I. Gen. Laws § 11-47-60.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Tex. Penal Code § 46.13. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

11A Charles Alan Wright et al.,
    Federal Practice and Procedure § 2948.1 (2d ed.1995). . . . . . . . . . . . . . . . . . . . . . . . . 23

14

**BOOKS & ARTICLES**

Clifford Krauss,
    *Experts Support Hollow Point Bullets*, N.Y. Times, Mar. 6, 1997. . . . . . . . . . . . . . . . . . 18

Stephen J. Lynton & Alfred E. Lewis,
    *More Powerful Ammo Studied By D.C. Police*, Wash. Post, Nov. 5, 1976 . . . . . . . . . . . 18

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**: Notice is hereby given that on October 4, 2012, at 1:30 p.m., or as soon thereafter as counsel may be heard by the above-entitled Court, located at 450 Golden Gate Ave., San Francisco, California, in the courtroom of the Honorable Judge Richard Seeborg, Plaintiffs will and hereby do move for preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure.

Plaintiffs will seek an order enjoining Defendants City and County of San Francisco, the Mayor of San Francisco, and the Chief of the San Francisco Police Department (collectively, "the City") from enforcing San Francisco Police Code section 4512 and 613.10(g). These code sections violate Plaintiffs' right to keep and bear arms under the Second Amendment and, in particular, their right to defend themselves and others by exercising that right within their own homes. Section 613.10(g)(1) further violates Plaintiffs' right to due process under the Fourteenth Amendment as it is unconstitutionally vague.

This motion shall be based on this notice of motion and motion, the memorandum of points and authorities in support, the declarations and evidence filed concurrently herewith, the papers on file, and upon any further matters the Court deems appropriate.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**STATEMENT OF THE ISSUES PRESENTED**

1.    Whether the Court should enjoin the City's enforcement of San Francisco Police Code section 4512,[1] the City's locked-firearm-storage requirement, because Plaintiffs are likely to succeed on the merits as the law violates their fundamental right to keep an operable handgun for immediate self-defense in the home, the infringement of which causes Plaintiffs irreparable harm.

2.    Whether the Court should enjoin the City's enforcement of section 613.10(g), the City's ban on the sale of expanding and/or fragmenting ammunition and all ammunition that "serves no sporting purpose," because Plaintiffs are likely to succeed on the merits as the law violates their fundamental right to acquire ammunition in common use for self-defense in the

---

[1]    All statutory references are to the San Francisco Police Code, unless otherwise indicated.

1    home, the infringement of which causes Plaintiffs irreparable harm.

2         3.    Whether the Court should enjoin the City's enforcement of section 613.10(g)(1), the

3    City's ban on the sale of all ammunition that "serves no sporting purpose," because Plaintiffs are

4    likely to succeed on the merits because the law is vague in all applications and Plaintiffs suffer

5    irreparable harm from the law's enforcement.

6                                    **INTRODUCTION**

7         Sections 4512 and 613.10(g) infringe Plaintiffs' Second Amendment rights to keep and bear

8    arms by requiring locked storage[2] of handguns in the home *at all times* except when being "carried

9    on the person" and by banning the sale of a broad class of ammunition in common use for self-

10   defense and all "non-sporting" ammunition. The infringements are self-evident because the broad

11   regulations, like those found categorically invalid in *Heller*, directly conflict with the rights of law-

12   abiding adults to keep and bear arms for "the core lawful purpose of self-defense" *within the home*,

13   "where the need for defense of self, family, and property is most acute." *District of Columbia v.*

14   *Heller*, 554 U.S. 570, 628-30.

15        This direct conflict renders Defendants' restrictions invalid under *Heller* as a matter of law.

16   For while *Heller* did not settle *all* Second Amendment issues, it emphatically declared that

17   "whatever else it leaves to future evaluation, it surely elevates above all other interests the right of

18   law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. at 635. This point

19   is not a subtle one. It renders the right to arms within the sanctity of one's home virtually

20   sacrosanct and restrictions on that right subject to the highest levels of scrutiny.

21        While the challenged ordinances differ in some ways from those invalidated in *Heller*, they

22   nonetheless conflict in similar fashion with the Second Amendment. In *Heller*, the District's

23   locked-storage law made it "legally impossible" to render one's handgun operable for self-defense

24   emergencies. *Id.* at 630. Here, by requiring Plaintiffs' firearms to be stored inoperable when

25   Plaintiffs are at the greatest risk of criminal attack, the City's locked-storage law makes it

26   "practically impossible" to keep one's handgun operable for self-defense emergencies. In *Heller*,

27   

28        [2] "Locked storage," as it pertains to section 4512, means the requirement that handguns kept
     within the home be stored in a locked container or disabled with a trigger-lock.

---

MOTION FOR PRELIMINARY INJUNCTION    CV-09-2143-RS

2

1  the District also banned a broad class of firearms (handguns) in common use for in-home self-

2  defense. *Id.* at 629. Here, the City bans the sale of a broad class of ammunition in common use for

3  self-defense. In each case, the laws directly conflict with the right to keep and bear arms for "the

4  core lawful purpose of self-defense" in the home.

5        There is no historical precedent supporting, nor any legitimate governmental interest that is

6  furthered by, the City's laws which broadly infringe upon the core, fundamental right of law-

7  abiding citizens to armed self-defense in the home. Accordingly, the City's laws are

8  unconstitutional on their face and, by operation of law, cause Plaintiffs irreparable harm. Enjoining

9  the enforcement of sections 4512 and 613.10(g) will restore Plaintiffs' constitutional rights and, at

10  the same time, restore those rights to all San Francisco residents in furtherance of the public

11  interest. As such, temporary injunctive relief preventing the City from enforcing its

12  unconstitutional laws is warranted while this case proceeds through discovery and toward

13  resolution on the merits.

14                     **STATEMENT OF THE CASE**

15        Plaintiffs filed this suit on May 15, 2009, to challenge the validity of sections 4512, 1290,

16  and 613.10(g), enacted by the City and County of San Francisco and enforced by its Mayor and

17  Chief of Police (collectively "the City"). Plaintiffs sought declaratory and injunctive relief from

18  violations of their Second Amendment right to keep and bear arms and their right to due process

19  enshrined in the Fifth and Fourteenth Amendments. (Am. Compl. [Doc. No. 18] 19:21-21:1.)

20        On July 9, 2009, the City filed its first motion to dismiss. Plaintiffs filed their First

21  Amended Complaint on August 24, 2009. The case was then stayed pending the determination of

22  whether the Second Amendment applies against the states. (Min. Order, Aug. 27, 2009 [Doc. No.

23  21].) That stay was lifted when the U.S. Supreme Court ruled in *McDonald v. City of Chicago*, 561

24  U.S. 2025, 130 S. Ct. 3020 (2010), that it does. (Order, Sept. 13, 2010 [Doc. No. 37].)

25        The City thereafter filed yet another 12(b)(1) motion to dismiss, arguing again that

26  Plaintiffs lacked standing to challenge the ordinances because they had not yet been charged with

27  violating the challenged provisions, and because they allegedly faced no "genuine threat" of

28  enforcement. (Defs.' Mem. Supp. Mot. Dismiss [Doc. No. 61] 12:17-20.) For largely the same

1  reasons, the City argued that Plaintiffs' claims were not ripe for review. (*Id.* at 14:18-16:16.) The

2  Court denied the City's Motion to Dismiss, finding that Plaintiffs have sufficiently alleged

3  standing and their remaining claims are ripe for review. (Order [Doc. No. 89] 2:4.) The Court also

4  granted Plaintiffs leave to amend their challenge to Section 1290, which the City repealed in the

5  wake of this litigation to allow for the discharge of firearms in self-defense and in defense of

6  others, as well as other circumstances permitted under state and federal law. (*Id.* at 2:6.) Plaintiffs

7  later filed a notice of intent not to amend. (Notice of Intention to Not Am. Compl. [Doc. No. 90].)

8        The Court thereafter ordered the City to respond to Plaintiffs' First Amended Complaint by

9  October 17, 2011. (Order, Oct. 6, 2011 [Doc. No. 91].) The City filed its answer wherein it raised

10  six affirmative defense, including (improperly) standing and ripeness. (Defs.' Answer [Doc. No.

11  92] 9:21-10:22.) In response, Plaintiffs filed a motion to strike the standing and ripeness

12  "affirmative defenses." (Pls.' Mot. to Strike [Doc. No. 96].) In denying that motion, the Court

13  acknowledged that its ruling on standing and ripeness turned on a relatively narrow set of facts,

14  which are unlikely to be in substantial controversy. (Order, Dec. 12, 2012 [Doc. No. 105] 1-2.)[3]

15        On May 17, 2012, Plaintiffs filed a motion for partial judgment on the pleadings. (Pls.'

16  Mot. J. Pldgs. [Doc. No. 109.) That motion was denied on August 17, 2012. (Order Den. Pls. Mot.

17  J. Pldgs. [Doc. No. 134].)

18        Plaintiffs now bring this motion for preliminary injunction, asking the Court to enjoin the

19  enforcement of sections 4512 and 613.10(g) while this case proceeds to resolution on the merits.

20                            **STATEMENT OF FACTS**

21        **Section 4512 – Locked-Storage Requirement:** In August 2007, the City passed section

22  4512, requiring handguns kept within the home to be stored in a locked container or disabled with

23  a trigger-lock, unless that firearm "is carried on the person of an individual over the age of 18" or

24  "under the control of a person who is a peace officer." Under section 4512(e), violation is

25  _____

26        [3] In support of this motion, and should the City continue to dispute Plaintiffs' standing,
Plaintiffs have concurrently filed declarations attesting to the limited circumstances regarding

27  each plaintiffs' standing. (*See* Decls. of Espanola Jackson, Paul Colvin, Larry Barsetti, Thomas
Boyer, David Golden, and Noemi Margaret Robinson Supp. Mot. Prelim. J. filed concurrently

28  herewith.)

1   punishable by a fine not to exceed $1,000 and/or by imprisonment not to exceed six months.

2           In short, section 4512 requires, under threat of prosecution, that Plaintiffs keep their

3   handguns under lock and key and *not* immediately accessible under *any* circumstances for

4   self-defense emergencies – except when being "carried on the person." Notably, the "under the

5   control" exception *applies only to peace officers*. Plaintiffs highlight this fact as the Court

6   mistakenly stated in its recitation of relevant facts in its Order Denying Plaintiffs' Motion for

7   Judgment on the Pleadings that the "under control" exception applies to Plaintiffs. (Order Den.

8   Pls.' Mot. J. Pleadings [Doc No. 134]  2:1-3.) It does not. The only time non-peace officer

9   residents may unlock their handguns or remove them from their safes is when they "carry" them

10  "on the person." And this is true regardless of whether children, felons, or other persons who

11  *should* be denied access to handguns are present. It is true even when residents are home alone, in

12  a locked house, in a locked room. It is true whether residents live in large, secure homes in safe

13  neighborhoods or in small homes or apartments in dangerous neighborhoods.

14          In sum, it is a matter of fact that neither the degree of control one has over his or her

15  handgun nor the potential need for such control, e.g., to keep the weapon out of the hands of

16  unauthorized users who might be present, is relevant under the City's locked-storage ordinance.

17  *The weapon must be locked up at all times, under all circumstances  – unless it is "carried on the*

18  *person."* Thus, it is a fact that under the City's locked-storage law, a competent, law-abiding

19  resident who lives alone in a studio apartment in a dangerous neighborhood cannot keep an

20  unlocked, operable handgun on his or her bedside table while sleeping at night under *any*

21  circumstances. It is also a matter of fact that, regardless of the circumstances under any scenario

22  one might conjure up – circumstances *not* the result of government action –  it will take longer to

23  access a handgun that is locked in a safe or disabled by a trigger lock than one that is not. And the

24  City's forced locked-storage restriction, of course, *is* the result of government action.

25          **Section 613.10(g) – Ban on Sale of Expanding and/or Fragmenting Ammunition and**

26  **Ammunition that "Serves No Sporting Purpose":** Plaintiffs also challenge section 613.10(g)'s

27  ban on the sale, lease, or transfer of ammunition that "serves no sporting purpose" or is designed

28  to expand or fragment upon impact. Section 613.10(g) effectively prohibits city residents from

1    purchasing ammunition within San Francisco commonly used and preferred for self-defense

2    purposes. Such ammunition, including hollow point ammunition, provides greater "stopping

3    power" against attackers and reduces risks to innocent bystanders resulting from ricochet or over-

4    penetration of assailants and building materials.

5                                          **ARGUMENT**

6            A plaintiff seeking a preliminary injunction must establish: (1) that he or she is likely to

7    succeed on the merits; (2) that he or she is likely to suffer irreparable harm in the absence of

8    preliminary relief; (3) that the balance of equities tips in his or her favor; and (4) that an injunction

9    is in the public interest. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052

10   (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)).

11           Plaintiffs have suffered, and if this motion is not granted will continue to suffer, the

12   deprivation of their fundamental Second Amendment rights. They are likely to succeed on the

13   merits of their constitutional claim, and the harm invited upon them is irreparable. Further,

14   granting this motion will not only restore Plaintiffs' rights, it will restore and protect the

15   constitutional rights of all San Francisco residents, thus serving the public interest. Accordingly,

16   and as described more fully below, Plaintiffs satisfy each of the factors required for temporary

17   injunctive relief pending resolution of the matter on the merits.

18   **I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE THE
            CHALLENGED PROVISIONS VIOLATE PLAINTIFFS' FUNDAMENTAL
19          SECOND AMENDMENT RIGHT TO SELF-DEFENSE**

20           The City's requirement that all residents carry their handguns around their homes or keep

21   them locked up, regardless of the circumstances, renders Plaintiffs' guns unavailable and thus

22   inoperable for "immediate self-defense" in emergency situations. *See Heller*, 554 U.S. at 635. A

23   law that renders guns useless for emergency self-defense within the sanctity of one's own home

24   cannot pass constitutional muster under any test. As such, Plaintiffs are exceedingly likely to

25   succeed on the merits.

26           **A.    Standard of Review Governing Second Amendment Challenges**
            The Supreme Court, while not settling on a framework for all Second Amendment
27   challenges, has left little doubt that courts are to assess gun laws based on history and tradition,

28

1   and not by resorting to interest-balancing tests. The *Heller* majority rejects the "tiers-of-scrutiny"

2   framework advanced by the City and acknowledged by this Court in its Order Denying Plaintiffs'

3   Motion for Judgment on the Pleadings. *Heller*, 554 U.S. at 628 n.27, 634-35; *see also Heller v.*

4   *District of Columbia* (*Heller II*), 670 F.3d 1244, 1271-74 (D.C. Cir. 2011) (Kavanaugh, J.,

5   dissenting). Alternatively, strict scrutiny must apply.

6           **1.**    ***Heller* and *McDonald* Endorse a Scope-Based Analysis, Not a Means-End Approach that Necessarily Entails a Balancing of Interests**

7        *Heller* advances an analytical approach that first focuses on "examination of a variety of

8   legal and other sources to determine *the public understanding* of [the] legal text," 554 U.S. at 605,

9   with particular focus on "the founding period," *id*. at 604, to determine whether the restricted

10  activity falls within the scope of the Second Amendment. If it does, the court again turns to "text

11  and history" to determine whether the particular restriction is nevertheless permissible because it

12  is analogous to restrictions historically understood as  permissible limits on the right to bear arms,

13  i.e., whether there is some "historical justification for those regulations." *Id*. at 635. In short,

14  where sufficient historical justifications exist for a restriction on activity falling within the scope

15  of the right, the restriction is valid; if not, it is invalid. *See id.* at 634-35. The presumption, of

16  course, is that activity falling within the scope of the right to arms "shall not be infringed," with

17  the burden on the government to justify the challenged restriction, based on text, history, and

18  tradition. *See id.* at 634-36.

19       When *Heller* was argued before the Supreme Court, the Solicitor General urged the Court

20  to employ "intermediate scrutiny" in reviewing the District's handgun ban and locked-storage law,

21  believing if that standard were employed, the laws would be upheld. *See* Oral Arg. at 44-45,

22  *Heller*, 554 U.S. 570 (No. 07-290) (attached as "Ex. A" to the Declaration of Anna M. Barvir

23  ("Barvir Decl.") filed concurrently herewith). Chief Justice Roberts rejected this attempt to

24  "articulate an all-encompassing standard" applicable to every Second Amendment case, asking:

25       Isn't it enough to determine the scope of the existing right that the amendment refers to, look at the various regulations that were available at the time, including

26       you can't take the gun to the marketplace and all that, and determine how . . . this restriction and the scope of this right looks in relation to those?

27

28       I'm not sure why we have to articulate some very intricate standard. I mean, these standards that apply in the First Amendment just kind of developed over the

1  years as sort of baggage that the First Amendment picked up. But I don't know why
2  when we are starting afresh, we would try to articulate a whole standard that would
   apply in every case? *Id.*

3  Chief Justice Roberts was suggesting that courts simply ask whether the law restricts
4  activity falling within the scope of the right as originally understood. If it does, the law is
5  *presumed* invalid unless the *government* can show its regulation is so commonplace in our history
6  and traditions that the scope of the fundamental right to keep and bear arms must be understood in
7  light of it. But there would be no "balancing test" or weighing of burdens and benefits. *Id.*

8  When *Heller* was decided, this scope-based approach was, in large part, the approach taken
9  by the majority, after it expressly rejected Justice Breyer's subjective, interest-balancing test. 554
10 U.S. at 634-35. Notably absent from *Heller's* analysis was any discussion of "compelling
11 interests," "narrowly tailored" laws, or any other standard of review jargon. Nor were there
12 discussions of the District's "legislative findings" purporting to justify the restrictions.

13 Instead, *Heller* focused on whether the challenged laws restricted the right to keep and bear
14 arms as that right was understood by those who drafted and enacted both the Second and
15 Fourteenth Amendments. *Id.* at 626-34. The Court gleaned that understanding from an extensive
16 examination of the textual and historical narrative surrounding the pre-existing right to arms, to
17 define, at least in broad terms, the scope of the rights that the Second Amendment guarantees. *Id.*
18 at 605-19. In doing so, the Court emphasized that "[c]onstitutional rights are enshrined with the
19 scope they were understood to have when the people adopted them, whether or not future
20 legislatures or (yes) even future judges think that scope too broad." *Id.* at 634-35.

21 The *Heller* Court ultimately found that handguns are arms protected by the Second
22 Amendment, *id.* at 629, and that keeping handguns in one's home for self-defense purposes is core
23 conduct protected by the same, *id.* at 635. Because the District's handgun ban and locked-storage
24 requirement directly conflicted with protected conduct, and because there was no historical record
25 of such restrictions, the laws were unconstitutional. *Id.* at 628-30.

26 The Court's later decision in *McDonald* further underscored the notion that history and
27 tradition, rather than burdens and benefits, should guide analyses of Second Amendment
28 challenges. Like *Heller*, *McDonald* did not use balancing tests, and it expressly rejected judicial

1    assessment of "the costs and benefits of firearms restrictions," stating that courts should not make

2    "difficult empirical judgments" about the efficacy of particular gun regulations. *McDonald v. City*

3    *of Chicago*, 130 S. Ct. 3020, 3050 (2010). This language is compelling. Means-end tests, like

4    strict or intermediate scrutiny, necessarily require the assessment of the "costs and benefits" of

5    government regulations, as well as "difficult empirical judgments" about their effectiveness. The

6    Court's clear rejection of such inquiries is incompatible with a means-end approach to Second

7    Amendment challenges.

8              **2.     Alternatively, Should the Court Adopt a Means-End Test for Second
                       Amendment Challenges, Strict Scrutiny Must Apply**

9              Should the Court hold that restrictions on the core right of law-abiding citizens to self-

10   defense are subject to means-end review, strict scrutiny must be the test. The City has claimed that

11   intermediate scrutiny (or less) is appropriate for all but the most severe of Second Amendment

12   deprivations.[4] But this argument conflicts with protections that courts afford to core areas of other

13   fundamental, enumerated rights. And it rests on cases involving factors not present in *Heller* (e.g.,

14   prohibited person, sensitive place, unprotected arms). Here too, no such factors are in play.

15             Just as "any law regulating the content of speech is subject to strict scrutiny, . . . any law

16   that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding

17   citizen would be subject to strict scrutiny." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th

18   Cir. 2011). Courts routinely apply strict scrutiny when restrictions on *core* First Amendment

19   conduct is concerned, including regulations on the content of speech, *United States v. Playboy*

20   *Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000), political expenditures, *Citizens United v.*

21   *Fed. Election Comm'n*, __ U.S. __, 130 S. Ct. 876, 898 (2010), and expressive association,

22   *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). In these contexts, courts consider the severity

23   of the burden that a regulation places on core protected conduct only in weighing whether the

24   regulation survives strict scrutiny – *not in determining the applicable standard of review. See*

25   *Citizens United*, 130 S. Ct. at 898-99; *Playboy Entm't Grp., Inc.*, 529 U.S. at 812-13; *Boy Scouts*

26   *of America v. Dale*, 530 U.S. 640, 658-59 (2000); *Roberts*, 468 U.S. at 658-59. Here too, where

27   ─────────────────────

28        [4] Laws restricting Second Amendment conduct demand more than rational basis review.
         Whatever else *Heller* left for future courts to decide, it is clear on this point. 554 U.S. at 628 n.27.

1   the laws restrict the *core* Second Amendment right to self-defense in the home by law-abiding

2   adults, strict scrutiny must apply regardless of the severity of the burden imposed.

3          The City has maintained that Plaintiffs' challenge is at most entitled to intermediate

4   scrutiny because the degree of burden on Plaintiffs' rights is minimal.  Even assuming the burden

5   here is minimal (which plaintiffs do not concede), this approach derives no support from *Heller* or

6   *McDonald*, and it stands in direct opposition to the protection afforded to core areas of

7   enumerated, fundamental rights. While a minority of courts have relied on the severity of the

8   burden in determining whether strict or intermediate scrutiny applies, this is *not* the approach

9   generally taken. *See, e.g.*, *United States v. Decastro*, 682 F.3d 160, 164-65 (2012), *Heller II*, 670

10  F.3d at 1257. Instead, most circuits have determined the applicable standard of review based on

11  whether or not the challenged law regulates conduct at the "core" of the Second Amendment. *See,*

12  *e.g.*, *Masciandaro*, 638 F.3d at 470; *United States v. Weaver*, No. 09-00222, 2012 WL 727488, at

13  *6 (S.D. W. Va. Mar. 6, 2012) (citing *Masciandaro* with approval); *United States v. Chester*, 628

14  F.3d 673, 680, 682-83 (4th Cir. 2010) (applying intermediate rather than strict scrutiny because

15  firearm possession by domestic violence misdemeanant is not within the core right of the law-

16  abiding citizen to possess a firearm for self-defense).

17         Those courts that have applied intermediate scrutiny have done so in cases presenting

18  vastly different questions than those presented here. Almost without exception, these cases do not

19  involve the right to armed self-defense by law-abiding citizens within the home.[5] In fact, most

20  involve conduct decidedly *outside* the core Second Amendment right, including possession by

21  violent criminals, *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011), *Chester*, 628 F.3d at

22  680, 682-83; *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010), *United States v. Skoien*,

23  614 F.3d 638, 641 (7th Cir. 2010), possession in places the court determined to be "sensitive,"

24  *Masciandaro*, 638 F. 3d at 471, and possession of arms the court determined are not in "common

25  use" for lawful purposes, *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010).

26

27         [5] The only cases relating to possession in the home dealt with challenges to simple permitting
    or registration laws. Those laws do not directly conflict with core conduct in the manner that the
28  City's laws do. *Heller II*, 670 F.3d at 1254; *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011).

1  Accordingly, should the Court determine that the *Heller* scope-based analysis described

2  above does not apply, precedent demands the application of strict scrutiny.

3  **B.    Section 4512 Violates the Second Amendment**

4  The City's requirement that all residents carry their handguns around their homes or keep

5  them locked up, regardless of the circumstances, renders Plaintiffs' guns unavailable and thus

6  inoperable for "immediate self-defense" in emergency situations. *See Heller*, 554 U.S. at 635.[6] A

7  law that renders guns useless for emergency self-defense within the sanctity of one's own home

8  cannot pass constitutional muster – under any test.

9  **1.    The City's Requirement that Handgun Owners Either Carry Their**
   **Handguns or Keep Them Locked Up at All Times in Their Homes Is**
10  **Invalid Under *Heller's* Scope-Based Approach**

11  The City's locked-storage law plainly restricts the right to keep and bear operable arms

12  within the home for the "core lawful purpose" of self-defense. The restriction is obvious and

13  significant. As such, it is incumbent upon the City to show its law is like others historically or

14  traditionally accepted by those who drafted and enacted both the Second and Fourteenth

15  Amendments as a proper limit on the right to arms. The City cannot meet that burden, for there is

16  no such history or tradition regarding mandatory locked storage.

17  **a.    The City's Locked-Storage Law Restricts the Right to Keep and**
   **Bear Arms for the "Core Lawful Purpose" of Self-Defense in the**
18  **Home**

19  The City's locked-storage law renders Plaintiffs' handguns *not* "operable for the purpose

20  of immediate self-defense" in the home, *see Heller*, 544 U.S. at 635, making them, for all practical

   purposes, useless for self-defense in emergencies. The restriction on Plaintiffs' Second
21
   Amendment rights is obvious and cannot be rationalized away by positing hypothetical scenarios
22
   that *might* allow an individual time to unlock and use a handgun when under attack.
23
24  It is a matter of common sense that City's locked-storage requirement imposes a restriction

25  on Second Amendment rights. Chief Justice Roberts and Justice Scalia illuminated this point

26  ─────────────────

27  [6] The term "inoperable" is used to describe handguns kept in a locked container or disabled
   with a trigger-lock because that is what they are in a self-defense emergency. One could use them
28  as a projectile or bludgeon, but cannot operate them as intended. (*See infra* p. 12:7-11 for colloquy
   between Chief Justice Roberts and Justice Scalia.)

1   during oral argument in *Heller* when counsel for the District suggested the locked-storage law at

2   issue there had an implied self-defense exception and that, because of that exception, the

3   ordinance did not restrict one's right to armed self-defense. The Chief Justice and Justice Scalia

4   disagreed, finding the contention implausible as they briefly imagined the steps needed to render a

5   locked handgun operable to defend against a sudden late-night attack:

6           JUSTICE SCALIA:    You turn on, you turn on the lamp next to your bed so you can – you
            can turn the knob at 3-22-95, and so somebody –
7           MR. DELLINGER:    Well –
            CHIEF JUSTICE ROBERTS: Is it like that? Is it a numerical code?
8           MR. DELLINGER:    Yes, you can have one with a numerical code.
            CHIEF JUSTICE ROBERTS: So then you turn on the lamp, you pick up your
9           reading glasses –
            (laughter)
10  Oral Arg. at 83-84, *Heller*, 554 U.S. 570 (No. 07-290) (attached as "Ex. A" to Barvir Decl. filed

11  concurrently herewith.)

12          While the Court found humor in counsel's suggestion that the locked-storage law (even

13  assuming a self-defense exception) would impose only a minimal burden on the right to arms in a

14  self-defense emergency, the point is a serious one that translates well to the present case. The

15  restriction the City imposes on conduct at the core of the Second Amendment is both obvious and

16  significant, making armed self-defense impractical, if not impossible, when the need is most acute.

17  In comparison to the storage law struck down in *Heller*, we have simply gone from a law making

18  it "legally impossible" to keep a handgun ready for emergency self-defense to one that makes it

19  "practically" impossible to do so. That is a distinction without a difference when facing a sudden

20  attack.[7]

21          In short, the locked-storage law, even with a self-defense exception – which is essentially

22  what the City's "carry" exception amounts to – renders a firearm inoperable for immediate self-

23

24          [7] Moreover, "impossibility" of self-defense *cannot* be the standard for finding firearms
    restrictions invalid. If it were, *Heller* would not have struck down the District's handgun ban, for
25  long guns were readily available for armed self-defense. But the Court found that it is not
    permissible to ban handgun possession simply because long gun possession is allowed, for the
26  availability of shotguns does not save the handgun ban from constitutional infirmity. *Heller*, 554
    U.S. at 629. Similarly, just because the City's law may leave open some avenue for exercising the
27  right to in-home self-defense, e.g., by wearing a handgun around the house during the day, it does
    not follow that the restriction is valid.
28

1    defense in the home and restricts the right to arms.

2    **b.    There Is No Historical or Traditional Support for Forcing
                    Handgun Owners to Carry Their Firearms or Keep Them
3                   Locked Up at All Times in the Sanctity of Their Own Homes**

4        Consistent with *Heller's* analysis, after finding that a regulation restricts conduct within

5    the Second Amendment's scope, courts should consider whether the regulation was historically or

6    traditionally understood to be an accepted limitation on the right. *Heller*, 554 U.S. at 626-28. The

7    question here becomes whether laws requiring people to keep their handguns locked up when in

8    their own homes – regardless of the circumstances – were part of the historical narrative

9    surrounding the Second Amendment when it was drafted.

10       *Heller* refers to a single framing-era ordinance, enacted in Boston in 1783, that prohibited

11   the taking of loaded firearms into "any Dwelling House, Stable, Barn, Out-house, Ware-house,

12   Store, Shop or other Building" and permitted the seizure of any loaded firearms found therein. *Id.*

13   at 631 (quoting Act of Mar. 1, 1783, ch. 13, 1783 Mass. Acts p. 218). But the Court found this

14   isolated law only marginally relevant to the debate over the government's right to regulate

15   firearms in the home, noting that "a single law, in effect in a single city" is *not* evidence of a

16   regulatory scheme steeped in tradition. *Id.* at 632.[8]

17       *Heller* cites no examples of laws requiring law-abiding citizens to keep firearms locked at

18   all times in the home when not being carried. If there had been any historical evidence suggesting

19   that people thought the government had such authority, the dissent certainly would have cited it,

20   and the majority would have had to distinguish it from the storage ordinance at issue in that case.

21   But *Heller* never engaged in such an analysis because there simply is no history or tradition

22   supporting the requirement. Even today, such restrictive laws are extremely rare.[9]

23       In sum, *Heller* found that keeping, bearing, and using handguns in defense of hearth and

---

25   [8] The only other historic ordinances offered by Justice Breyer, *id.* at 684-86 (Breyer, J.,
     dissenting), and dismissed by the Court, *id.* at 632-33 (majority opinion), addressed the storage of
26   excess gunpowder – again, to protect firefighters in densely populated urban areas; *not* to
     "protect" law-abiding citizens from themselves.

27

28   [9] Massachusetts remains an outlier, with the City, in imposing such an unnecessary and
     extreme restriction on the right to keep arms in the home. *See* Mass. Gen. Laws ch. 140, § 131L.

1   home is core conduct protected by the Second Amendment. *Id*. at 635. Common sense, and the

2   United States Supreme Court, tell us that the City's law restricts that protected conduct. Plaintiffs

3   have thus satisfied the first prong of *Heller's* two-part test. But the City cannot meet its burden to

4   establish that there is a significant history or tradition supporting laws mandating locked storage of

5   firearms. The City's locked-storage requirement is thus categorically invalid, and Plaintiffs are

6   likely to succeed on the merits of their Second Amendment challenge to section 4512.

7
8
     **2.      The City's Requirement that Handguns Be Kept Locked Up When Not
              Being "Carried" Within the Home Cannot Survive Strict Scrutiny – or
              Any Heightened Scrutiny**

9        Under strict scrutiny, the City must show that its locked-storage law is "narrowly tailored

10  to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301-02 (2008)*.* And to pass

11  muster under even intermediate scrutiny, a standard that is not appropriate in this case, the City

12  must establish that its locked-storage law is "*substantially* related to an important governmental

13  objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (emphasis added). That is, the City must

14  establish a tight "fit" between the locked-storage requirement and a substantial governmental

15  interest, a fit "that employs not necessarily the least restrictive means but . . . a means *narrowly*

16  *tailored* to achieve the desired objective." *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S.

17  469, 480 (1989) (emphasis added). "The requirement of narrow tailoring is satisfied so long as the

18  regulation promotes a substantial governmental interest that would be achieved less effectively

19  absent the regulation, and the means chosen are not substantially broader than necessary to achieve

20  that interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 799-800 (1989). Even assuming the

21  government has sufficient interest in the manner that law-abiding citizens store their firearms in

22  their homes, the City's broad and burdensome law is simply not "narrowly tailored."

23       The City cannot defend its infringement of Plaintiffs' constitutional rights by claiming the

24  law is intended to protect children from accidental injury or to keep handguns out of the hands of

25  unauthorized persons, with any attendant restriction on the right being incidental and necessary.

26  There is simply no logical fit between such an interest and a law requiring that *all* residents,

27  including competent, law-abiding adults, keep their handguns locked up at *all times* – regardless

28  of whether a minor or a felon or anyone else is present or has access to them.

1    Many states have *safe*-storage regulations that address the concerns above, but in a far less

2    burdensome manner, with safe storage being a factor that absolves the gun owner of criminal

3    liability if an unauthorized person gains access to and misuses the firearm, thus providing

4    significant incentive for safe storage.[10] These laws promote the same governmental interest, but do

5    so in a way that at least attempts to respect the rights of law-abiding citizens to keep their firearms

6    operable for immediate self-defense. The City's law is not so tailored. It instead broadly sweeps up

7    all gun owners and requires they keep their handguns inoperable regardless of the circumstances.

8    The only remaining justification for forcing law-abiding adults to keep their handguns

9    locked at all times is that guns are dangerous. Authorized users might pick up an unlocked

10   handgun and accidentally shoot themselves – or do it on purpose. But the ordinance itself allows

11   authorized users to carry operable handguns in the home, making the argument that the locked-

12   storage requirement will reduce accidents and suicides among authorized users tenuous at best.

13   Moreover, the oft-cited suicide-reduction argument is directly at odds with the right to use

14   arms in self-defense. That argument rests on the belief that the additional time it takes to unlock a

15   handgun will afford the suicidal person time to reconsider the act – the more time, the better. The

16   opposite is of course true in self-defense emergencies where any delay in accessing an operable

17   handgun necessarily reduces the ability to use it to ward off an attack. Thus, in the interest of a

18   questionable theory on suicide prevention, the City's locked-storage requirement, by design,

19   infringes the fundamental right to armed self-defense in the home.

20   Any debate regarding whether it is a good idea to allow law-abiding adults to possess and

21   use firearms is over. The Framers surely understood that guns are dangerous and that their misuse

22   can result in accidental death or suicide, just as they understood that *most* rights involve risks,

23   including injury and death. For instance, the *McDonald* Court noted how the constitutionally

24   protected rights of criminal defendants allow some criminal offenders back on the streets to repeat

25

26

27   [10] *See* Cal. Penal Code §§ 25100, 25105, 25200, 25205; Fla. Stat. § 790.174; Haw. Rev. Stat.
     §§134-10.5, 707-714.5; 720 Ill. Comp. Stat. 5/24-9(a); Iowa Code § 724.22(7); Md. Code Ann.,
     Crim. Law § 4-104; Minn. Stat. § 609.666; N.H. Rev. Stat. Ann. § 650-C:1; N.J. Stat. Ann. §
28   2C:58-15; N.C. Gen. Stat. § 14-315.1; R.I. Gen. Laws § 11-47-60.1; Tex. Penal Code § 46.13.

1   their crimes. 130 U.S. at 3045. But that does not give state and local officials license to curtail

2   those constitutional rights. The same is true of the Second Amendment. The right to keep arms in

3   an operable (i.e., useful) condition cannot be prohibited by laws that seek justification in well-

4   known risks associated with that very right, risks equally well-known to those who enshrined the

5   right in our Second Amendment. As *Heller* observed, the inclusion of the right to arms in the Bill

6   of Rights "necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636.

7        Because the City's requirement that handguns be kept locked up when not being "carried"

8   within the home cannot survive any level of heightened scrutiny, Plaintiffs are likely to succeed on

9   the merits.

10       **C.    Section 613.10(g) Violates the Second Amendment**

11       The threshold question here is whether the Second Amendment protects the sale and

12   purchase of ammunition. Assuming it does, the City's ban on the sale of expanding and/or

13   fragmenting ammunition is categorically invalid under *Heller's* scope-based approach because it

14   restricts protected conduct without any historical justification. Alternatively, the ban fails any

15   heightened means-end test. The City's total ban on the sale of *any* ammunition that does not

16   "*serve a sporting purpose*" is similarly invalid. That provision requires only brief examination

17   because its sporting-purpose limitation cannot be reconciled with the "central component" of the

18   Second Amendment right: self-defense.

19                **1.    The Second Amendment Secures a Fundamental Right to Acquire
                          Firearms and Ammunition for Self-Defense and the City's Ammunition

20                        Sales Ban Restricts that Right**

21       Arms "typically possessed by law-abiding citizens for lawful purposes" or those "in

22   common use" are protected by the Second Amendment. *Heller*, 554 U.S. at 624-25 (citation and

23   internal quotation marks omitted). And the Second Amendment protects equally the purchase and

24   possession of ammunition necessary to meaningfully exercise the right to keep and bear arms. *See*

25   *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80 (1980) ("[F]undamental rights, even

26   though not expressly guaranteed, have been recognized by the Court as indispensable to the

27   enjoyment of rights explicitly defined."); *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right

28   to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency

1  for use, and to purchase and provide ammunition suitable for such arms. . . ."). It follows that

2  ammunition in "common use" for "lawful purposes" is protected by the Second Amendment, and

3  any restriction on its sale is presumed invalid.

4        Further, banning commerce in arms violates the Second Amendment right at its core.

5  *Marzzarella*, 614 F.3d at 92 n.8. The government can no more ban the sale of protected

6  ammunition than it can ban the sale of protected books, contraceptives, or even violent video

7  games. *See, e.g., Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965); *Brown v. Entm't Merchs.*

8  *Ass'n*, __ U.S. __, 131 S. Ct. 2729, 2738 (2011). A right to keep and bear arms, without the

9  attendant right to acquire them, would be meaningless. Laws, like section 613.10(g), that prohibit

10  law-abiding citizens from purchasing protected arms are at odds with the Second Amendment,

11  regardless of whether they directly restrict the possession of those arms. *See Bateman v. Perdue*,

12  No. 5:10-265, 2012 WL 3068580, at *4 (E.D. N.C. Mar. 29, 2012)

13        Section 613.10(g) plainly restricts Plaintiffs' fundamental rights by banning the sale of

14  ammunition in "common use" for self-defense and by banning civilian purchases of ammunition

15  that does not "serve a sporting purpose," regardless of its use for self-defense.

16      **a.**    **The City's Ban on the Commercial Sale of Ammunition in**

17                       **"Common Use" for Lawful Purposes Cannot Survive Judicial**
                     **Review Under Any Test**

18        The City's ban on the sale of expanding and/or fragmenting ammunition broadly restricts

19  the sale of ammunition commonly used by law-abiding residents for self-defense. The City can

20  provide neither historical basis nor legitimate justification for the restriction, rendering the law

21  invalid under both *Heller's* scope-based analysis and any means-end test consistent with *Heller*.

22      **i.**    **The City's Ban on the Sale of Expanding and/or**

23                       **Fragmenting Ammunition Is Categorically Invalid**
                     **Under *Heller's* Scope-Based Analysis**

24        In *Heller*, the Court found a ban on handguns, a class of weapons in "common use" for

25  self-defense in the home, categorically invalid despite the availability of long guns. *Heller*, 554

26  U.S. at 629. The Court held that "[i]t is enough to note . . . that the American people have

27  considered the handgun to be the quintessential self-defense weapon" and "a complete prohibition

28  on [its] use is invalid." *Id.* Finding handguns to be commonly used for a lawful purpose (i.e., self-

1    defense) and banned by the challenged ordinance, the Court did not have to go any further. *Id.*

2    Here, section 613.10(g)(2)-(3) bans the sale of any ammunition "designed to expand . . .

3    [or] fragment upon impact." Like the class of arms at issue in *Heller*, i.e. handguns, this class of

4    ammunition is in "common use" for lawful purposes including self-defense, *see* "Exs. B-X"

5    attached to Barvir Decl. filed concurrently herewith. As such, the City cannot completely ban its

6    sale and purchase. With its reduced risk of over-penetration and ricochet, and its ability to bring

7    down a violent aggressor with fewer shots fired, the prohibited ammunition is especially preferred

8    over fully-jacketed ammunition in densely-populated areas.[11] Such ammunition is common

9    throughout the nation and it is widely available in every state, there being no statewide ban on its

10   sale or possession in California or elsewhere.[12] And it is no secret that civilians who own firearms

11   for self-defense regularly purchase the ammunition at issue for use in self-defense emergencies.

12   Indeed, such ammunition is regularly marketed for just that purpose. (*See* "Exs. T-X" attached to

13   Barvir Decl. filed concurrently herewith.) It is indeed the "quintessential" self-defense

14   ammunition. The City cannot credibly claim that ammunition both sold and possessed on a

15   widespread basis by civilians for self-defense is not in "common use" for lawful purposes.[13]

16   In short, section 613.10(g) flatly prohibits the sale of ammunition in "common use" for

17

---

18   [11] Experts cite many advantages of expanding bullets over fully-jacked ammunition: (1) reduced

19   ricochet, (2) reduced over-penetration of target and building materials, and (3) ability to take
     down subject in fewer shots. *See e.g.*, Clifford Krauss, *Experts Support Hollow Point Bullets*,

20   N.Y. Times, Mar. 6, 1997 (attached as "Ex. C" to Barvir Decl. filed concurrently herewith) ("[the
     hollow point bullet] rarely ricochets or penetrates an object, thereby lessening the possibility of

21   hitting anyone other than the target"); Stephen J. Lynton & Alfred E. Lewis, *More Powerful

22   Ammo Studied By D.C. Police*, Wash. Post, Nov. 5, 1976 at A1, A4 (attached as "Ex. K" to Barvir
     Decl. filed concurrently herewith) ("you can neutralize the individual with a minimum number of

23   shots").

24   [12] New Jersey remains an outlier, regulating the carry of hollow nose bullets. N.J. Stat. Ann. §

25   2C:39-3(f),(g). But even that statute does not ban the sale or possession of such ammunition.

26   [13] The self-defense interests of police in using this ammunition are no different than those of

27   civilians. If anything, a civilian's needs for effective self-defense ammunition are *more* acute.
     Hollow point ammunition allows the defensive shooter to bring down a target with fewer shots
     fired. Lynton & Lewis, *supra* note 11. This is crucial for civilians who are less likely than an

28   officer to have backup support for taking down an agressor.

1    self-defense. While the City may be able to regulate ammunition sales to a degree, this far-

2    reaching ban on the sale of common self-defense ammunition to law-abiding residents goes too

3    far, directly conflicting with conduct protected by the right to engage in self-defense, " 'the *central*

4    *component*' of the Second Amendment . . . ." *McDonald*, 130 S. Ct. at 3036, 3048.

5         Under *Heller's* analysis, the City must establish that our nation's history and traditions

6    support its flat ban on the sale of arms commonly used for self-defense. Plaintiffs submit that the

7    City cannot meet its burden, rendering the City's ban categorically invalid. And Plaintiffs are

8    likely to succeed on the merits.

9                    **ii.    The City's Ban on the Sale of Expanding and/or
                            Fragmenting Ammunition Fails Under Any Level of**

10                           **Heightened Scrutiny**

11        Even if the Court applies a means-end analysis, section 613.10(g) still fails because there is

12   no logical fit between the City's ban and any interest the City may claim. And in no way is the

13   City's law "narrowly tailored" to those ends. Under the guise of an interest in "public safety," the

14   City bans the sale of expanding and/or fragmenting ammunition. By barring access to expanding

15   and/or fragmenting ammunition, the law promotes the use of fully-jacketed ammunition –

16   ammunition that is *more* dangerous to bystanders and neighbors in urban settings. And it

17   eliminates access to ammunition designed to prevent ricochet and the over-penetration of targets

18   or building materials, notorious characteristics of the fully-jacketed round. Krauss, *supra* note 11

19   (quoting New York Medical Examiner, Dr. Charles Hirsch, "[Hollow points] are much less likely

20   to pierce through a person, a wall, a car or other object than are fully-jacketed bullets. I think they

21   are safer"). The use of fully-jacketed ammunition thus *increases* the likelihood that shots will pass

22   through a target or objects behind the target. Expanding and/or fragmenting ammunition reduces

23   that risk, making the public more safe, not less.

24        Further, the City can advance no legitimate reason (or even a rational explanation) why the

25   government may ban the sale of protected arms despite being precluded from banning the

26   possession of those same protected arms. And the City's blanket sales prohibition is in no way

27   sufficiently tailored to its stated public safety objectives. *See Reno*, 507 U.S. at 301-02; *Bd. of*

28   *Trustees of State Univ. of N.Y.*, 492 U.S. at 480. Ultimately, the City's ammunition ban represents

1    a policy choice as to the types of protected arms it desires its residents to use. But, as *Heller* made

2    clear, such policy choices are off the table when considering commonly used, constitutionally

3    protected, firearms and ammunition. *See* 554 U.S. at 636.

4         Moreover, governmental interests in banning handguns are virtually identical to the City's

5    purported interests in banning hollow-point ammunition – to decrease violent injuries caused by

6    handguns, whether through criminal misuse, accidents, or suicides through decreased availability

7    of such arms.[14] Despite these interests, the Supreme Court in *Heller* found the Districts' handgun

8    ban unconstitutional – making clear that even if the Court *had* adopted a means-end standard of

9    review, that the City's handgun ban would be unconstitutional under any test. *Id.* at 628-29. The

10   City's ammunition ban is similarly invalid.

11        **C.    The City's Ban on the Sale of "Ammunition that Does Not Serve a Sporting Purpose" Cannot Survive Judicial Review, Under Any Test**

12        The City's ammunition ban is wholly inconsistent with the mandates of the Second

13   Amendment and its "central component": individual self-defense. *McDonald*, 130 S. Ct. at 3036.

14   Moreover, as explained above, the Second Amendment protects the right to acquire firearms and

15   ammunition "in common use" for lawful purposes –  period. The City cannot impose additional

16   "constitutional" conditions by requiring that commonly used ammunition *also* be used for some

17   City-recognized "sporting purpose" before Plaintiffs have the right to acquire it.

18        **1.    The City's "Sporting Purposes"-Based Ammunition Ban Is Categorically Invalid Under *Heller's* Scope-Based Analysis**

19        There is simply no squaring the right to acquire firearms and ammunition for self-defense

20   purposes with section 613.10(g)'s ban on the sale (and purchase) of ammunition that "does not

21   serve a sporting purpose." While the City's ordinance fails to define "sporting purpose," it is clear

22   that whatever recreational or competitive activities are covered by the City's "sporting purpose"

23   qualification, defending oneself from violent crime in the home is not among them. Self-defense is

24

25        [14] The District of Columbia advanced these interests in support of its handgun ban in *Heller*,
26   554 U.S. at 634, and the City itself advanced similar interests when it instituted its own handgun
     ban. Proposition H, as approved by voters, Gen. Elec. (November 8, 2005) §§ 1-3, invalidated by
27   *Fiscal v. City and County of San Francisco*, 158 Cal. App. 4th 895 (Cal. App. 2008) (attempting
     to justify ban because "handgun violence is a serious problem" and because handguns contributed
28   to 67% of firearms-related injuries and deaths).

1    not a sport. Neither is militia duty, for that matter. Unless the City can show that all commonly

2    used "self-defense ammunition" also serves a "sporting purpose," the provision necessarily

3    restricts conduct protected by the Second Amendment. Thus, the first prong of *Heller's*

4    scope-based analysis is satisfied. That being the case, it is the City's responsibility to show some

5    textual, historical, or traditional support for banning the sale of "ammunition that does not serve a

6    sporting purpose" to law-abiding citizens. None appears in *Heller* or *McDonald*. Plaintiffs submit

7    there is none and that the "sporting purpose" provision is categorically invalid. Plaintiffs are thus

8    likely to succeed on the merits.

9             **2.    The City's "Sporting Purposes"-Based Ammunition Ban Fails Under
                      Any Level of Heightened Scrutiny**

10   Even if the Court applies a means-ends test to City's "sporting purposes"-based ban, the

11   analysis ends quickly under any standard of review as there is no legitimate interest in restricting

12   firearms use to "sporting purposes." The City's interest cannot be public safety. There is no logical

13   reason to think the public would be safer if gun owners use only "sporting" ammunition.

14            The nonsensical nature of the ban is revealed when considering the ammunition it allows

15   and that which it ostensibly prohibits. Under the City's law, ammunition commonly used to hunt

16   elk and bears is legal. Yet the City prohibits sales of the smallest caliber ammunition if it is not

17   sufficiently used for "sporting purposes." The City cannot credibly argue that its interest in public

18   safety is served by an ordinance that permits residents to purchase ammunition so powerful it is

19   used to kill wild animals weighing more than 1000 pounds, but not ammunition of the smallest

20   caliber – just because it isn't sufficiently used in "sporting" activities.

21            In short, section 613.10(g)(1) cannot survive any level of scrutiny and Plaintiffs are likely

22   to succeed on the merits of their Second Amendment challenge to the provision. It serves no

23   compelling interest, nor a substantial one – and it is not tailored to serve any such interests. In fact,

24   to the extent the law is intelligible, it is irrational because it bans the sale of ammunition

25   commonly used for s*elf-defense* if it does not also satisfy the City's "*sporting purposes*" condition.

26            But, as with the City's expanding and fragmenting ammunition sales ban, such means-end

27   analysis is unnecessary because the City's "sporting purpose" provision so clearly conflicts with

28   the core constitutional guarantee of armed self-defense in the home – without any historical

1    support.

2    **D.    Section 613.10(g) Is Void for Vagueness**

3          The due process clause guarantees individuals the right to "fair notice" of whether their

4    conduct is prohibited by law. *Colautti v. Franklin*, 439 U.S. 379, 390-91 (1979). A law must fail

5    for vagueness unless it first "give[s] the person of ordinary intelligence a reasonable opportunity to

6    know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S.

7    104, 108 (1972). Second, the law must provide "explicit standards" for the application of the law

8    to prevent "arbitrary and discriminatory enforcement." *Id*. Further, laws that abut upon

9    constitutionally protected freedoms demand the greatest clarity. *Bagget v. Bullitt*, 377 U.S. 360,

10   372 (1964) ("[T]he vice of unconstitutional vagueness is further aggravated where . . . the statute

11   in question *operates to inhibit the exercise of individual freedoms affirmatively protected by the*

12   *Constitution*."). Although past Ninth Circuit jurisprudence suggests that the most exacting

13   vagueness review for laws implicating constitutional conduct should be limited to the free speech

14   context, *Hotel & Motel Ass'n of Oakland v. City of Oakland* 344 F.3d 959 (9th Cir. 2003), the

15   Second Amendment has only recently been confirmed as protecting individual rights – freedoms

16   that are indeed "fundamental to our system of ordered liberty", and deserving of protections

17   similar to the First Amendment, *Heller*, 554 U.S. at 595, 634-35; *McDonald*, 130 S. Ct. at 3042.

18   To date, the courts have not yet had occasion to apply a more exacting review to a Second

19   Amendment challenge. This case presents that opportunity.

20         Here, the City's ban plainly abuts upon constitutionally protected conduct, i.e., the

21   commercial purchase of ammunition, thus warranting heightened vagueness review. Regardless,

22   the City's approach to banning ammunition is unconstitutional under any standard, as it is vague

23   in all of its applications. Without further clarification or guidelines, it is impossible for anyone

24   (retailers, law enforcement, or otherwise) to know what ammunition is prohibited.

25         The question of what activities the City intended to qualify as a sporting purpose, and what

26   frequency or recency of use in these activities is required for the ammunition to "serve" such

27   purposes is unknown, and is not clarified by the Police Code or court decisions to Plaintiffs'

28   knowledge. And even if retailers and law enforcement were to guess at these answers, they would

1    then have to undertake the painstaking task of researching the ammunition in question to

2    determine whether any given ammunition (of which there are literally thousands of varieties)

3    would  actually satisfy the criteria of the "serves no sporting purpose" language.

4         Accordingly, the "sporting purposes" ban fails to provide notice of the ammunition that it

5    bars, and Plaintiffs are likely to succeed on the merits of their facial vagueness claim.

6    **II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF A PRELIMINARY
          INJUNCTION IS NOT ISSUED**

7         Generally, once a plaintiff has shown a likelihood of success on the merits of a

8    constitutional claim, irreparable harm is presumed. 11A Charles Alan Wright et al., Federal

9    Practice and Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional

10   right is involved, most courts hold that no further showing of irreparable injury is necessary.")

11   This is particularly true in the First Amendment context. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347,

12   373 (1976). The violation of the First Amendment right is frequently presumed to cause

13   irreparable harm because of "the intangible nature of the benefits flowing from the exercise of

14   those rights; and the fear that, if those rights are not jealously safeguarded, persons will be

15   deterred, even if imperceptibly, from exercising those rights in the future." *Miles Christi Religious*

16   *Order v. Twp. of Northville*, 629 F.3d 533, 548 (6th Cir. 2010).  Importing this

17   "irreparable-if-only-for-a-minute" concept to cases involving other constitutional rights, federal

18   courts have routinely held that a deprivation of constitutional rights is irreparable harm per se.

19   *Monterey Mechanical Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (citing *Associated Gen.*

20   *Contractors  v. Coal. For Econ. Equity*, 950 F.2d, 1401, 1412 (9th Cir.1991)). And the Supreme

21   Court has made clear the Second Amendment should be afforded the same respect granted the

22   First. *See McDonald*, 130 S. Ct. at 3043-44.

23        Accordingly, the Court of Appeals for the Seventh Circuit has recognized that because

24   "[t]he Second Amendment protects . . . intangible and unquantifiable interests" similar to those

25   protected by the First Amendment, "[i]nfringements of this right cannot be compensated by money

26   damages." *Ezell v. Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). And so, in the Second

27   Amendment context, "the plaintiffs' harm is properly regarded as irreparable and having no

28   adequate remedy at law." *Id.* at 700.

1    With the respect due to the Second Amendment and because of the ongoing deprivation of

2   Plaintiffs' fundamental rights, irreparable harm should be presumed. Because Plaintiffs have

3   established they are likely to succeed on the merits of their constitutional challenges, they have

4   presumptively demonstrated irreparable harm and preliminary injunction is appropriate.

5   **III.    THE BALANCE OF THE EQUITIES TIPS SHARPLY IN PLAINTIFFS' FAVOR
            AND PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST**

6    The Ninth Circuit has held that when plaintiffs challenge government action that affects

7   the general public seeking to exercise constitutional rights, as Plaintiffs do here, "the balance of

8   equities and the public interest thus tip sharply in favor of enjoining the ordinance." *Klein v. City*

9   *of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). And the City "cannot reasonably assert that

10  [it] is harmed in any legally cognizable sense by being enjoined from constitutional violations."

11  *Haynes v. Office of the Attorney General Phill Kline*, 298 F. Supp. 2d 1154, 1160 (D. Kan. 2004)

12  (citing *Zepeda v. U.S. Immig. & Naturaliz. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983)).

13   Here, Plaintiffs seek to vindicate the fundamental, constitutional rights of all San Francisco

14  residents. And, as the Ninth Circuit has made clear, "*all* citizens have a stake in upholding the

15  Constitution" and have "concerns [that] are implicated when a constitutional right has been

16  violated." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) (emphasis added). Not only

17  are Plaintiffs' rights at stake in this action, but so are the rights of anyone wishing to engage in

18  conduct that is protected by the Second Amendment but prohibited by the City's laws.

19   Even absent the constitutional dimension of this lawsuit, the balance of harms tips sharply

20  in Plaintiffs' favor. As explained above, the City can establish no harm to its interests as neither

21  law actually serves the public interest or increases public safety. To the contrary, government

22  action impeding law-abiding citizens' ability to keep an operable firearm for immediate self-

23  defense and limiting access to common self-defense ammunition makes the public *less* secure.

24   As explained above, and described in Plaintiffs' declarations, section 4512 necessarily

25  impedes access to operable handguns, putting residents at *greater* risk when faced with a self-

26  defense emergency, the consequences of which can be deadly. (*See* Decls. of Espanola Jackson,

27  Paul Colvin, Larry Barsetti, Thomas Boyer, David Golden, and Noemi Margaret Robinson Supp.

28  Mot. Prelim. J.) And section 613.10(g) limits access to commonly used and effective self-defense

1    ammunition, while promoting the purchase and use of fully jacketed ammunition known to over-

2    penetrate targets and ricochet, placing bystanders and neighbors at *greater* risk of harm than that

3    posed by the banned ammunition.

4         Further, the City has suggested that there is no threat of harm from prosecution and thus no

5    controversy warranting injunctive relief from sections 4512 and 613.10(g) because the City has

6    never prosecuted any person under those laws. (*See* Mot. Dismiss [Doc. 9] 9:13-15, July 9, 2009;

7    Decl. Maria Protti Supp. Mot. Dismiss [Doc. 11] ¶¶ 6-8.) While there is a presumption that the

8    City enforces its laws, if the City's position is that it does not, then the requested injunction will

9    cause it no harm. It will merely maintain what the City claims is the status quo.

10        On the other hand, granting a preliminary injunction here will end the ongoing violation of

11   Plaintiffs' Second Amendment rights to defend themselves in the sanctity of their homes, allowing

12   them the freedom to exercise their rights without fear of prosecution. Plaintiffs will no longer be

13   forced to choose between exercising those rights and obeying the City's laws.

14        As such, the balance of the equities tips sharply in Plaintiffs' favor  and preliminary

15   injunction is in the public interest.

16                                   **CONCLUSION**

17        Based on the foregoing, Plaintiffs ask that their motion for a preliminary injunction be

18   granted and an order issued enjoining the City and its agents, employees, officers, and

19   representatives, including defendants the Mayor of San Francisco and the Chief of Police of the

20   San Francisco Police Department, from enforcing San Francisco Police Code sections 4512 and

21   613.10(g).

22    Dated: August 30, 2012                 MICHEL & ASSOCIATES, P.C.

23

24                                 /s/ C.D. Michel

25                                C. D. Michel
                                  Attorneys for Plaintiffs

26

27

28

1

UNITED STATES DISTRICT COURT

2

FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

SAN FRANCISCO DIVISION

4
ESPANOLA JACKSON, PAUL COLVIN,   ) CASE NO.: CV-09-2143-RS
THOMAS BOYER, LARRY BARSETTI,    )
5
DAVID GOLDEN, NOEMI MARGARET     )
ROBINSON, NATIONAL RIFLE         ) CERTIFICATE OF SERVICE
6
ASSOCIATION OF AMERICA, INC., SAN)
FRANCISCO VETERAN POLICE         )
7
OFFICERS ASSOCIATION,            )
                                 )
8
              Plaintiffs          )
                                 )
9
          vs.                    )
                                 )
10
CITY AND COUNTY OF SAN           )
FRANCISCO, THE MAYOR OF SAN      )
11
FRANCISCO, AND THE CHIEF         )
OF THE SAN FRANCISCO POLICE      )
12
DEPARTMENT, in their official capacities, )
and DOES 1-10,                   )
13
                                 )
              Defendants.         )
14
                                 )
_____)

15

16

IT IS HEREBY CERTIFIED THAT:

17

        I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 E. Ocean Blvd., Suite 200, Long Beach, California, 90802.

18

I am not a party to the above-entitled action. I have caused service of

19

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

20

21

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

22

23

Wayne Snodgrass, Deputy City Attorney
Christine Van Aken, Deputy City Attorney
Office of the City Attorney
1 Drive Carlton B. Goodlett Place
City Hall, Room 234
San Francisco, CA 94102

24

25

        I declare under penalty of perjury that the foregoing is true and correct. Executed on August 30, 2012.

26

27

                                        /s/ C.D. Michel
                                        _____
                                        C. D. Michel
                                        Attorneys for Plaintiffs

28

MOTION FOR PRELIMINARY INJUNCTION     CV-09-2143-RS